## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

### Alexandria Division

|  |  |  |
|---|---|---|
| **BLUE FLAME MEDICAL LLC,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | Civil Action No. __20 Civ 658__ |
| | ) | **JURY TRIAL DEMANDED** |
| **CHAIN BRIDGE BANK, N.A.,** | ) | |
| **JOHN J. BROUGH, and** | ) | |
| **DAVID M. EVINGER,** | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |

### COMPLAINT

Plaintiff Blue Flame Medical LLC ("Blue Flame"), by and through undersigned counsel, for its Complaint against Defendants Chain Bridge Bank, N.A. ("Chain Bridge Bank" or the "Bank"), John J. Brough, and David M. Evinger (together, "Defendants"), hereby alleges on the basis of knowledge with respect to itself and its own actions and on the basis of information and belief as to all other matters, as follows:

### INTRODUCTION

1.      Blue Flame brings this action to redress the massive harm caused to its business and to the reputations of Blue Flame and its principals, Michael Gula and John Thomas, by Defendants.

2.      Defendants' unilateral and wrongful actions caused the State of California ("California") to abruptly breach a large supply contract with Blue Flame that would have put at least 100 million pieces of scarce and vital personal protective equipment in the hands of first responders, doctors, nurses, and other healthcare workers combating the COVID-19 pandemic.

3.      Despite providing numerous explicit assurances to Blue Flame in the days leading up to the transaction that the Bank could and would process the anticipated very large payment (in excess of $450 million) by wire transfer from California for such equipment, as well as confirming to Blue Flame that it had in fact received such funds and that they were available in Blue Flame's account, Defendants abruptly and without basis contacted California government officials after receiving the funds for the transaction and wrongfully suggested to them that Blue Flame was a fraud.  As a result of Defendants' intentional, reckless, and negligent conduct, California panicked, the payment was reversed or otherwise returned to California, and Blue Flame's transaction with California was torpedoed.

4.      Defendants' actions violated, among other laws, Federal Reserve Board regulations that strictly control whether, when, and under what circumstances a bank may agree to return or cancel a wire transfer it receives for a beneficiary account holder.  Defendants also violated Virginia law by removing the funds wired by California from Blue Flame's account after the wire transfer was completed.  In addition, Defendants violated the terms of the Bank's Account Agreement with Blue Flame, which the Bank unilaterally "voided" shortly after its wrongful accusations of fraud against Blue Flame to California officials.

5.      In addition to causing California to breach its contract and cease doing business with Blue Flame, Defendants' wrongful actions have led to a torrent of negative press reports falsely suggesting that Blue Flame's business is a fraud, causing other Blue Flame customers to walk away from transactions and resulting in great harm to Blue Flame's business and the personal and professional reputations of Blue Flame and its principals.

6.      In interfering with Blue Flame's business, Defendants betrayed Blue Flame's and its principals' trust, which had been built through a 13-year professional relationship between the

Bank and Blue Flame's Chief Executive Officer, Mr. Gula.  Upon information and belief,

Defendants' actions had nothing to do with Blue Flame's or the transaction's legitimacy; indeed,

the Bank continues to do business with Mr. Gula.  Instead, Defendants chose to interfere with

Blue Flame's transaction for purely self-serving reasons.  Among other things, Defendants

evidently decided at the last minute that it would not be in the Bank's economic interest to

handle such a large deposit—a decision directly at odds with specific assurances made by Mr.

Brough and Mr. Evinger to Blue Flame that the Bank could and would process the transaction,

upon which Blue Flame relied to its detriment.

7.     The ramifications of Defendants' misconduct cannot be overstated.  Not only has

Defendants' selfish conduct significantly harmed Blue Flame's business and the reputations of

Blue Flame and its principals, but their wrongful actions also have deprived the residents of

California and other states and municipalities rapid access to reliable and badly needed medical

supplies at fair market prices in the midst of an unprecedented public health crisis.

## PARTIES

8.     Blue Flame is a Delaware limited liability corporation with a principal place of

business located at 150 South Los Robles Avenue, Suite 675, Pasadena, California, 91101.

9.     Chain Bridge Bank is a nationally chartered banking association organized and

existing under federal law with a principal place of business located at 1445A Laughlin Avenue,

McLean, Virginia, 22011.  It is the sole subsidiary of Chain Bridge Bancorp, Inc., a bank holding

corporation incorporated under the laws of the Commonwealth of Virginia with the same

principal place of business as Chain Bridge Bank.

10. John J. Brough is the founding Chief Executive Officer of the Bank and a member of the Bank's Board of Directors. Upon information and belief, Mr. Brough resides in Fairfax County, Virginia, at 4103 North River Street, Apartment T, McLean, Virginia 22101.

11. David M. Evinger is the President, Chief Credit Officer, and Secretary of the Bank, as well as a member of the Bank's Board of Directors. Upon information and belief, Mr. Evinger resides in Fairfax County, Virginia, at 2898 Franklin Oaks Drive, Herndon, Virginia 20171.

## JURISDICTION AND VENUE

12. The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it presents a federal question concerning the Bank's violation of applicable Federal Reserve Board regulations, including Federal Reserve Board Regulation J.

13. The Court has personal jurisdiction over Defendants because the Bank's principal place of business, as well as Mr. Brough and Mr. Evinger's principal place of employment, is located in Fairfax County, Virginia.

14. Venue is proper in this Court pursuant to 28 U.S.C. § 1931(b)(2) because Defendants' acts giving rise to this action occurred in Fairfax County, Virginia.

## FACTS

15. Blue Flame is a medical supply company that was founded to deliver urgently-needed medical supplies and personal protective equipment at fair prices to state and local governments, law enforcement agencies, hospitals, and other healthcare providers to combat the COVID-19 pandemic.

16.     Blue Flame's ability to source these medical supplies during this period of unprecedented worldwide demand is based on its strong relationships with manufacturers and large volume purchasing power.

17.     In order to secure inventory for its customers during the pandemic, Blue Flame must pay a high percentage of the manufacturer's prices up front; in March 2020, Blue Flame's manufacturing partners required 100 percent up-front payment.  Accordingly, Blue Flame necessarily requires its customers to pay substantial up-front deposits at the time of their orders. Upon information and belief, Blue Flame's up-front deposit requirements are consistent with standard industry practice.

18.     Because of the intense competition to secure these medical supplies and the emergency nature of the pandemic, time is of the essence for all aspects of Blue Flame's business; the quicker it can secure a purchase and payment from its customer, the quicker it can secure inventory from manufacturers to ensure that its customers receive their orders as soon as possible.

19.     On March 20, 2020, Blue Flame's principals began negotiating a large and urgent agreement with California officials to supply personal protective equipment, including hundreds of millions of desperately needed N95 face masks, at fair market prices.

20.     At the time those negotiations began, Blue Flame's principals had entered agreements to connect distributors of personal protective equipment with states and municipalities through a different company they managed, known as Blue Flame Strategies.

21.     The potential transaction with California presented a new opportunity for Blue Flame's principals to create a venture that could serve as a distributor of personal protective equipment and provide the lowest prices possible.

22.     Blue Flame's principals recently began their careers in the medical supply industry, but they each have had distinguished, award-winning careers in the political consulting industry and helmed numerous successful business ventures.  Mr. Gula has founded or co-founded numerous political consulting firms over his career, including Mike Gula & Associates in 2005, the Gula Graham Group in 2006, and Prime Advocacy in 2010.  The Gula Graham Group grew to become one of the country's largest political fundraising firms, raising hundreds of millions of dollars for candidates for the United States Presidency, Senate, and House of Representatives.  Following the death of his business partner, Jonathan Graham, in 2018, Mr. Gula was eager to transition to a less public and more fulfilling career outside of politics.  Mr. Thomas founded the political consulting and communications firm Thomas Partners Strategies in 2008 and the opinion research firm Thomas Partners Research in 2018.  In addition, he has prior experience with the healthcare sector, in which his firm Thomas Partners Properties has helped develop real estate solutions for commercial healthcare providers designed to lower healthcare costs.  Mr. Thomas joined Blue Flame because he shared Mr. Gula's goal of trying to get life-saving personal protective equipment into the hands of American first responders and healthcare professionals as quickly and cost-effectively as possible.  Blue Flame Strategies and Blue Flame were both founded for that purpose.

23.     On March 23, Blue Flame's principals incorporated Blue Flame in the State of Delaware to enter the potential transaction with California, and they planned for Blue Flame to enter additional follow-on transactions with California as well as deals with other state and local governments.

24.     Since its formation, Blue Flame has successfully filled orders for personal protective equipment for government entities, including its recent delivery of 100,000 N95

masks to the City of Chicago for use by its first responders, for which the buyer provided a 100 percent up-front payment to Blue Flame.

25.     As of March 24, Blue Flame and California officials were deep in negotiations for a purchase of 100 million N95 masks by California for a total of $609,161,000, for which Blue Flame required a 75 percent up-front deposit of approximately $456 million.  Upon information and belief, the price per N95 mask offered by Blue Flame was less than half of what California had agreed to pay other suppliers.

26.     In anticipation of reaching an agreement with California, Blue Flame contacted the Bank to open a new business checking account for the entity that could receive up-front payments in excess of hundreds of millions of dollars, in order to secure orders for California and other customers.

27.     Mr. Gula chose Chain Bridge Bank for Blue Flame's corporate account because of his longstanding relationship with the Bank dating back to at least 2007.  Over the course of 13 years, Mr. Gula had used the Bank for his personal and professional banking needs, and used the Bank for several business ventures related to his career in political consulting, as well as Blue Flame Strategies.

28.     Chain Bridge Bank is well known in the political consulting and campaign finance worlds for its ability to open accounts and accept multi-million dollar deposits quickly from major financial donors.  For that reason, it has served as the bank for numerous presidential and congressional campaigns, and is a major banking partner of the Republican National Committee and National Republican Congressional Committee, among other political organizations.

29.     On March 24 at 12:17 PM ET, while Blue Flame was in the process of setting up its account with the Bank, Mr. Gula wrote to Maria Cole, the Bank's Assistant Vice President and Commercial Relationship Manager, and requested the Bank to provide wire instructions that would permit Blue Flame to receive funds at the Bank as soon as its account was opened and its deal with California was finalized.

30.     The next day, March 25, Blue Flame completed opening its business checking account at the Bank and entered an Account Agreement with the Bank.

31.     In connection with opening its account, Blue Flame engaged in extensive additional discussions with Bank personnel, including Mr. Brough and Mr. Evinger, on March 25 about Blue Flame's business, its transaction with California, the anticipated wire transfer from California, and Blue Flame's need to frequently send and receive large wire transfers in connection with its sales to customers and corresponding purchases from manufacturers.

32.     At 11:19 AM ET on March 25, Mr. Gula notified Ms. Cole that Blue Flame would require an immediate email notification "when the wire hits from [California]."

33.     At 11:26 AM ET, Mr. Gula asked Ms. Cole if the Bank could reduce its wire transfer fees, noting that such fees "will add up" for Blue Flame because "[t]his business is strictly wire . . . how can we work a deal here when we will have such large volume of funds and frequency?"  After Ms. Cole responded that the Bank unfortunately could not reduce its wire fees and noted there were less expensive options that could not be completed the same day, Mr. Gula responded, "no problem.  We definitely needs [sic] same day."  Mr. Gula added that Blue Flame would "[n]eed cut off dates/times every day as well" for the Bank's wire transfer services.

34.     At 11:57 AM ET, the Bank sent Blue Flame an email attaching various documents "pertaining to the new business checking account that was opened for Blue Flame

Medical LLC" to officially execute via the DocuSign electronic signature platform.  Mr. Gula

formally executed the Account Agreement for Blue Flame's business checking account with the

Bank shortly thereafter on the afternoon of March 25.

35.     At 3:03 PM ET, in response to Mr. Gula's email stating that Blue Flame would

need an immediate email notification upon receipt of the wire from California, Ms. Cole sent Mr.

Gula wire instructions and a verification letter for Blue Flame's account at the Bank.

36.     At 4:11 PM ET, Ms. Cole asked Mr. Gula to confirm details regarding the

expected wire so that the Bank's wire department could track it as Mr. Gula had requested.  Ms.

Cole asked, "[t]he wire you are waiting for, how much are you expecting and who is the

originator?"  Ms. Cole also requested confirmation that the wire was "coming to your new

account Blue Flame Medical," rather than the account for Blue Flame Strategies.

37.     One minute later, Mr. Gula responded that the expected amount was $450 million,

the originator was California, and that the wire was for Blue Flame Medical's account.

38.     At or around 4:47 PM ET, Mr. Brough and Mr. Evinger—the Bank's senior

executive officers—called Mr. Gula to discuss the anticipated transaction and Blue Flame's

business.

39.     During that call, Mr. Gula provided extensive information concerning Blue

Flame's business, including how it sources medical supplies for its customers, and details

concerning the anticipated transaction with California.  Mr. Gula reiterated to Mr. Brough and

Mr. Evinger that Blue Flame expected to receive a wire transfer of approximately $450 million,

and explained that Blue Flame would immediately begin using those funds to secure the supplies

from two manufacturers with whom Blue Flame's principals had longstanding relationships.  Mr.

Gula also informed the Bank that all of Blue Flame's outbound wire transfers to its

manufacturers would be sent to United States accounts, including for the manufacturers of the masks to be sold to California, whose accounts were held at banks in the states of New Jersey and California.

40.     Mr. Gula also explained to Mr. Brough and Mr. Evinger that Blue Flame anticipated receiving additional orders from state and local governments following the upcoming transaction with California, including additional purchases of equipment by California.

41.     Finally, Mr. Gula also informed Mr. Brough and Mr. Evinger why he and Mr. Thomas chose to found Blue Flame, that Mr. Gula had been looking to change careers following the death of Mr. Graham, and that Mr. Gula planned to shut down his successful Gula Graham Group business and exit the world of politics effective as soon as the transaction with California—the culmination of their efforts to change their careers and lives—was underway.

42.     In response, Mr. Brough and Mr. Evinger indicated to Mr. Gula that the Bank would accept the wire transfer for Blue Flame's account.

43.     During the course of their conversation, Mr. Brough and Mr. Evinger noted that receipt of a wire transfer of that size presented some challenges for the Bank because it would constitute a large percentage of the Bank's total deposits and that it would be in excess of the Federal Deposit Insurance Corporation's coverage limits, but that those were issues the Bank could resolve.

44.     After approximately 19 minutes, Mr. Gula's call with Mr. Brough and Mr. Evinger concluded.

45.     At no point during the March 25 call, or at any other point before or after, did Mr. Brough, Mr. Evinger, or any other Bank representative discourage the transaction or raise any concerns that they believed the transaction might be fraudulent or otherwise suspicious.  Nor did

they ever indicate to Blue Flame that the Bank was unable to handle the wire transfer from

California, that it might reject or did not wish to receive the wire transfer, or that the Bank could

not accept the wire transfer unless certain prerequisites were met.

46.     Based on Mr. Gula's conversation with Mr. Brough and Mr. Evinger, Blue Flame

felt comfortable that the Bank would accept the wire transfer from California and that Blue

Flame therefore did not need to seek services from a different bank in order to accept

California's wire transfer and otherwise complete the transaction.

47.     Blue Flame relied upon the representations by Mr. Brough, Mr. Evinger, and

other Bank representatives that the Bank could and would accept a wire transfer of the size that

California would send and that they were sufficiently comfortable with the transfer for the

transaction to proceed.

48.     Later, during the evening of March 25, Mr. Evinger sent Mr. Gula an email

following up on their phone conversation, asking "just one question":  whether Blue Flame sent

"any money to China or others as a 'fee' for these transactions?"

49.     Mr. Gula replied moments later that Blue Flame had not sent any funds to China

and stated that when Blue Flame would wire money out, "this is where we are sending it,"

attaching wire instructions that identified the bank account held in the state of California for the

manufacturer that was to provide the majority of the N95 masks for California's order.

50.     Mr. Gula's response was consistent with his representations during his

conversation with Mr. Brough and Mr. Evinger earlier that day that Blue Flame would not send

any funds to China or non-United States bank accounts, as well as his description of Blue

Flame's plans to purchase the majority of the equipment ordered by California from a

manufacturer with a California bank account.  His response also was consistent with Blue

Flame's agreement with its manufacturing partner that was to supply the majority of the equipment ordered by California.  Neither Mr. Brough, Mr. Evinger, nor any other representative from the Bank asked any further questions or indicated at any point that Mr. Gula's response was a problem.

51.     At the same time that Blue Flame was making arrangements with the Bank to ensure that California's payment would be processed smoothly, Blue Flame was finalizing the details of its transaction with California officials.  Throughout Blue Flame's negotiations with California officials, it told representatives of California's Department of General Services ("DGS") and other state officials that Blue Flame needed to receive payment as quickly as possible to secure the first shipment of N95 masks from its manufacturer.

52.     Following several days of negotiations and discussions between Blue Flame's principals and California officials, on the evening of March 24, a representative from DGS requested that Blue Flame prepare an invoice for California's order.

53.     At 2:50 PM ET on March 25, at the request of Mr. Thomas, Blue Flame's counsel provided wiring instructions for its account at Chain Bridge Bank to a DGS representative.

54.     At 5:00 PM ET on March 25, Blue Flame provided an invoice for the transaction to a DGS representative, in response to DGS's request the previous evening.

55.     Shortly after 6:00 PM ET on March 25, Blue Flame was told by a DGS representative that the California State Controller's Office would send payment for the transaction via wire transfer the next morning.

56.     As Mr. Gula had indicated to the Bank on March 25, it was vital for Blue Flame to know the wire had been accepted as quickly as possible, since—as Blue Flame had explained to both the Bank and California—Blue Flame would need to immediately wire a portion of the

purchase amount to an equipment manufacturer in New Jersey to secure inventory for the first shipment due to California.

57.     Throughout the morning of March 26, Blue Flame representatives were in frequent contact with both California officials and the Bank to confirm that the wire transfer was received by the Bank, and continually updated their online view of Blue Flame's account at the Bank to confirm that the wire had been accepted by the Bank.

58.     That morning, Mr. Thomas had numerous telephone conversations with Ms. Cole, waiting for confirmation that the wire had been received.  At no point that morning did Ms. Cole or any other bank representative indicate that there would be any problems with receiving the wire.

59.     Upon information and belief, at approximately 11:20 AM ET on March 26, California's bank executed the wire transfer to the Bank for Blue Flame's account.  Immediately thereafter, the State Treasurer's Office contacted California's bank to ensure the wire was processed quickly.

60.     At approximately 11:50 AM ET on March 26, the California State Controller confirmed to Mr. Thomas that California had sent the wire transfer and that California was awaiting confirmation from the Bank.

61.     At 11:57 AM ET on March 26, the Bank issued a Wire Transfer Notice that it had received an incoming wire transfer of $456,888,600.00 that was sent by California.  The Notice identifies the Originator as the California State Treasurer, JPMorgan Chase as the Originating Bank, Blue Flame as the Beneficiary, with Blue Flame's account at the Bank listed as the Credit Account, and included a message to the Beneficiary:  "By Order of Department of General Services."  Approximately two minutes later, Mr. Gula received an email from the Bank's Wire

Department with the subject "INCOMING WIRE CONFIRMATION," containing a link to a

copy of the Wire Transfer Notice.  Immediately upon receipt of that email, Mr. Gula confirmed

that the funds sent by California appeared in Blue Flame's account at the Bank through the

Bank's online account access portal.

62.     Simultaneously, at approximately 11:59 AM ET on March 26, Ms. Cole

confirmed to Mr. Thomas by phone that the Bank had received the wire transfer sent by

California and that the funds were available in Blue Flame's account.  At that point, the Bank

had accepted the payment order for California's wire transfer and had made payment to Blue

Flame as a matter of Federal law.

63.     During the course of their conversation, Mr. Thomas reiterated to Ms. Cole that

Blue Flame would need to promptly wire funds to manufacturers of personal protective

equipment that same day in order to start in motion the delivery of inventory to California.  Ms.

Cole responded that she understood and, following her confirmation that the funds were

available in Blue Flame's account, noted that Blue Flame's account did not yet have electronic

wire initiation functionality.  As a result, Ms. Cole informed Mr. Thomas that the Bank would

require some paperwork to initiate the wire and said that she would need to hang up so that she

could get the paperwork started.  Mr. Thomas agreed and awaited Ms. Cole's return call.

64.     At 12:11 PM ET, Ms. Cole emailed the Bank's wire transfer request form to Blue

Flame, following up on her conversation with Mr. Thomas.  Ms. Cole requested that the wire

form be sent back to her once completed.

65.     At 12:14 PM ET, as further follow up to Mr. Thomas and Ms. Cole's discussion

regarding the need for an outbound wire transfer, Blue Flame's counsel provided details to Ms.

Cole specifying the amount, account name and number, wire routing number, and bank for the

outbound wire transfer that Blue Flame needed to send to one of the manufacturers providing the personal protective equipment purchased by California.  Consistent with Blue Flame's prior representations to the Bank, the account for the manufacturer which was to receive the wire was held at a major international commercial bank in New Jersey.

66.     At approximately 12:20 PM ET, in reliance on the Bank's representations that it could and would accept the wire from California, that the wire from California had been received, and that the funds were available in Blue Flame's account, Mr. Gula emailed all clients of the Gula Graham Group.  Mr. Gula announced that he had built another business outside politics and would be no longer be reachable because he was focusing his full attention on those efforts, and wished his former clients the best of luck in politics and life.  In addition to Mr. Gula's desire to immediately transition his career and devote his full attention to Blue Flame, which he had explained to Mr. Brough and Mr. Evinger during their discussion the previous day, Mr. Gula believed that immediately disengaging from politics was the most appropriate and ethical choice given his obligations to the state of California and Blue Flame's other clients, as well as the public nature of those contracts.

67.     Upon information and belief, at approximately 1:20 PM ET, a manager at California's bank emailed a manager in the State Treasurer's Office to inform her that the wire transfer had been completed.

68.     Minutes thereafter, Mr. Gula discovered that he was no longer able to electronically access Blue Flame's account and repeatedly attempted to call representatives of the Bank, but they did not answer.  Mr. Gula informed Mr. Thomas of those developments; Mr. Thomas then immediately tried to call back Ms. Cole, who also would not answer her phone.

69.     At 1:34 PM ET on March 26, Mr. Gula emailed Mr. Brough and Mr. Evinger, requesting that "someone call me ASAP please."

70.     Neither Mr. Brough nor Mr. Evinger called Mr. Gula.  Instead, approximately 20 minutes later, Mr. Brough emailed Mr. Gula, stating:  "We received official notice from the sending bank to return the wire.  Please resolve directly with the state of California."

71.     At 3:36 PM ET on March 26, a Bank representative emailed Mr. Gula a link to copies of Blue Flame's Account Agreement and other account opening documentation, stating that the documents had "been voided for the following reason:  account closing."  The link included copies of Blue Flame's Account Agreement with the word "VOID" superimposed across each page.  The Bank also closed Blue Flame Strategies' account, but has not closed Mr. Gula's personal accounts or accounts related to Mr. Gula's other business ventures.

72.     In the weeks since Mr. Brough emailed Mr. Gula indicating that California's bank requested the wire to be returned and to "resolve directly with the state of California," Blue Flame has learned that, in reality, Chain Bridge Bank was responsible for causing California or California's bank to request the funds to be returned.

73.     Upon information and belief, in the minutes following the Bank's acceptance of the wire transfer on March 26, Mr. Brough and/or Mr. Evinger contacted the California State Treasurer's Office regarding the transaction.  According to multiple news reports and public statements by the California State Treasurer, Fiona Ma, an "executive of the Bank" stated that the Bank was not comfortable with the transaction and was concerned it was fraudulent because Blue Flame's bank account had been opened the previous day by a "political operative."

74.     Defendants' actions were intentional, reckless, and negligent.  Upon information and belief, Defendants contacted the California State Treasurer's Office and asserted that the

Bank believed the transaction was fraudulent not due to the discovery of any information regarding Blue Flame or any inconsistencies in the information provided to the Bank by Blue Flame, but rather due to the Bank's independent and unrelated determination that accepting a wire transfer of that size would not be in the Bank's economic interest.

75.     As described above, Mr. Brough and Mr. Evinger indicated to Mr. Gula the previous day that the size of the transaction would present challenges for the Bank given that it would constitute a substantial percentage of its total deposits and exceed FDIC insurance limits, though they assured Mr. Gula that those issues would not prevent the Bank from accepting the wire.

76.     Upon information and belief, notwithstanding Mr. Evinger's and Mr. Brough's assurances to Mr. Gula the day before that the Bank could and would solve the challenges presented by the size of the wire transfer from California, Blue Flame has since learned that the wire from California would have increased the Bank's deposits drastically, which would have triggered additional capital reserve requirements for the Bank that may have rendered the Bank's business relationship with Blue Flame unprofitable.  On January 30, 2020, the Bank reported that its total deposits as of December 31, 2019 totaled approximately $762 million.  Accordingly, upon information and belief, the wire transfer from California would have increased the Bank's total deposits by more than 50 percent.

77.     As a result of Defendants' actions, California officials requested the return of the funds wired by California.

78.     Upon information and belief, Defendants agreed to the California officials' request immediately, and the funds wired by California were returned to California's bank in

violation of the Uniform Commercial Code and applicable Federal Reserve regulations as well as state law and standard banking industry practice.

79.     As a result of Defendants' actions, California determined it would no longer move forward with its purchase order and breached its contract with Blue Flame.

80.     Accordingly, Defendants' wrongful statements to California officials and the return of the completed wire transfer caused Blue Flame to lose all profits it expected to receive from the transaction as well as substantial future business opportunities with California and other governmental entities.

81.     The unraveling of the California transaction has caused enormous harm to Blue Flame's business, as well as its reputation and that of its principals.  As a result of Defendants' wrongful actions, governmental law enforcement agencies have commenced investigations concerning Blue Flame and the transaction.  Moreover, reports of the breakdown in the deal between Blue Flame and California caused Blue Flame to be wrongfully typecast as a price gouger for critical medical supplies.  For example, on April 8, 2020, Katie Porter, the United States Congressional Representative for the 45th District of California and a member of the House Financial Services Committee, wrote a letter to the Principal Deputy Inspector General of the Department of Health and Human Services concerning potential price gouging regarding personal protective equipment during the COVID pandemic that identified Blue Flame and suggested it was a "potentially costly and burdensome middleman," despite the fact that Blue Flame's mission is to provide such equipment at the best possible prices and that it offered California below-market prices at the time of the transaction.  Indeed, Representative Porter stated in her letter than no information was available at the time regarding the pricing under Blue Flame's contract with California.

82.     In early May 2020, multiple news outlets began reporting on the failed transaction with California, including the reversal of the wire transfer following the initial communication by Defendants to the California State Treasurer's Office.  Those reports have destroyed the reputations of Blue Flame and its principals, in the medical community and elsewhere.

83.     As a result of the negative press coverage triggered by Defendants' actions, several other governmental customers that had negotiated purchase contracts with Blue Flame decided to demand their money back or cancel their orders, including a more than $19 million contract with a state government that was on the verge of execution.

84.     In addition to the harms to Blue Flame, Defendants' actions have caused grave reputational harms to Mr. Gula and Mr. Thomas.  Both have received death threats following the intense negative press coverage regarding Blue Flame triggered by the Bank's actions and California's subsequent breach of the purchase agreement.  In addition to the closure of his successful political consulting business in reliance on the Bank's misrepresentations and intense reputational damage from being baselessly labeled a fraudster, Mr. Gula has been rejected by other banks from opening new accounts.  Mr. Thomas had an active political consulting business, Thomas Partners Strategies, at the time the negative press coverage began.  As a result of the negative reports concerning Blue Flame, all of Mr. Thomas's clients have terminated his services.  Mr. Thomas's reputation within the healthcare industry also has been severely tarnished, devastating the future business prospects of Thomas Partners Properties, which is focused on developing properties for commercial healthcare providers.  Mr. Thomas also was fired from his job as a radio commentator as a result of the intense negative press coverage resulting from the California transaction and has not been invited back to the cable news network on which he previously appeared on a regular basis.

85.     Finally, Defendants' actions and California's resulting breach of its agreement with Blue Flame have caused unnecessary harm to the people of California, by delaying the receipt of personal protective equipment needed by medical personnel, first responders, and other public service providers during the pandemic.  Notably, recent press reports have revealed that, following California's breach of its agreement with Blue Flame, the state entered an agreement to purchase approximately $1.4 billion of N95 masks from a manufacturer based in China called BYD.  Upon information and belief, BYD has yet to deliver any N95 masks to California that have been certified to meet national safety and health standards, has had to request several delivery extensions and has partially refunded California's payment as a result, required a greater up-front payment than Blue Flame, and employed prominent California lobbyists to influence the Governor's Office to enter the contract who may have taken undisclosed percentage fees of BYD's contract in exchange for its procurement.  Indeed, upon information and belief, Blue Flame already has delivered more N95 masks to the City of Chicago than BYD has delivered under its $1.4 billion contract with California.

## COUNT I
### VIOLATION OF FEDERAL RESERVE REGULATION J
### AND SECTION 4A-404(a) OF UNIFORM COMMERCIAL CODE
### (Against the Bank)

86.     The allegations in Paragraphs 1 through 85 of this Complaint are incorporated herein as if set forth in their entirety.

87.     The Bank is a member of the Federal Reserve's Fedwire Funds Service transfer system and is subject to regulations promulgated by the Federal Reserve Board, including Regulation J.  Regulation J, among other things, incorporates Section 4A-404(a) of the Uniform Commercial Code.

88.     Section 4A-404(a) of the Uniform Commercial Code (codified under Federal law as 12 C.F.R. § Pt. 210, Subpt. B, App. B, at Section 4A-404) provides a private right of action for a beneficiary account holder against a bank that violates specific rules concerning how, when, and under what circumstances a payment order addressed to a beneficiary account holder in connection with a wire transfer can be rejected, canceled, or amended.

89.     Upon information and belief, the payment order for California's wire transfer was sent via the Fedwire Funds Service from California's bank to the Bank as payment to Blue Flame and in satisfaction of California's obligation to Blue Flame.

90.     At or before approximately 11:59 AM ET on March 26, the Bank had accepted the payment order for California's wire transfer to Blue Flame pursuant to the Uniform Commercial Code and Regulation J by, among other things, receiving notice of the payment order from the Federal Reserve Bank, receiving payment in the amount of the payment order from the Federal Reserve Bank, providing the Incoming Wire Confirmation to Blue Flame, verbally confirming the receipt of the wire transfer to Blue Flame and the availability of the funds for Blue Flame's use, and showing the funds as available in Blue Flame's account via the Bank's online account access portal.

91.     While the wire transfer was being processed by the parties to the transfer, representatives of Blue Flame maintained nearly constant contact with the Bank.  As soon as Blue Flame received notice from the Bank that California's wire transfer had been received, Blue Flame demanded payment so that Blue Flame, in turn, could make necessary payments to the manufacturers of the personal protective equipment purchased by California.

92.     Pursuant to Article 4A of the Uniform Commercial Code and Regulation J, the Bank's acceptance of the payment order obligated the Bank to make payment in the amount of the payment order to Blue Flame.

93.     Pursuant to Article 4A of the Uniform Commercial Code and Regulation J, under these circumstances the Bank could not cancel or amend the payment order after it had been accepted, and the Bank had no basis to agree to cancel or amend the payment order or to otherwise return the transferred funds.

94.     The Bank was aware at the time it accepted the wire transfer that Blue Flame's transaction with California and Blue Flame's ability to profit therefrom depended on its receipt of, and immediate access to, the wired funds in order to promptly wire payments to the manufacturers of the personal protective equipment purchased by California.

95.     The Bank was aware at the time it accepted the wire transfer that Blue Flame's plans to secure additional business from California as well as other government purchasers depended upon its ability to successfully complete the transaction with California.

96.     Despite the fact that the Bank's acceptance of the payment order obligated it to pay Blue Flame, and despite Blue Flame's demand for payment, the Bank refused to pay Blue Flame.

97.     The Bank's violations of Regulation J and the Uniform Commercial Code caused Blue Flame to suffer damages including, among other harms, its lost profits for the transaction with California, lost future business opportunities with California and other customers, and reputational damage as a result of the subsequent media coverage of the incident.

## COUNT II
### VIOLATION OF FEDERAL RESERVE REGULATION J
### AND SECTION 4A-204 OF UNIFORM COMMERCIAL CODE
### (Against the Bank)

98.     The allegations in Paragraphs 1 through 85 of this Complaint are incorporated herein as if set forth in their entirety.

99.     The Bank is a member of the Federal Reserve's Fedwire Funds Service transfer system and is subject to regulations promulgated by the Federal Reserve Board, including Regulation J.  Regulation J, among other things, incorporates Sections 4A-405 and 4A-204 of the Uniform Commercial Code.

100.     Section 4A-405 of the Uniform Commercial Code (codified under Federal law as 12 C.F.R. § Pt. 210, Subpt. B, App. B, at Section 4A-405) governs the payment by a beneficiary's bank to a beneficiary pursuant to a payment order addressed to the beneficiary and accepted by the beneficiary's bank, including which actions by the beneficiary's bank constitute payment of the bank's obligation to the beneficiary.

101.     Upon information and belief, the payment order for California's wire transfer was sent via the Fedwire Funds Service from California's bank to the Bank as payment to Blue Flame and in satisfaction of California's obligation to Blue Flame.

102.     After accepting the payment order for California's wire transfer to Blue Flame, upon information and belief, the Bank credited the account of Blue Flame in the amount of the payment order.

103.     At approximately 11:59 AM ET on March 26, 2020, funds in the amount of the payment order for California's wire transfer appeared in Blue Flame's account, as confirmed by Blue Flame when viewing its account through the Bank's online account access portal, and as verbally confirmed to Mr. Thomas by Ms. Cole.

104.    Pursuant to Section 4A-405 of the Uniform Commercial Code and Regulation J, the appearance of the funds in Blue Flame's account via the Bank's online account access portal constituted payment of the Bank's obligation to Blue Flame with respect to California's wire transfer.

105.    Pursuant to Article 4A of the Uniform Commercial Code and Regulation J, California's wire transfer was completed once the Bank made payment to Blue Flame, and the Bank could not recover the payment or otherwise agree to return the transferred funds.

106.    Upon information and belief , after California's wire transfer was completed, Defendants unilaterally contacted California and accused Blue Flame of fraud, without basis.

107.    Upon information and belief, as a result of Defendants' actions, California requested that the Bank return the funds which California already had wired to the Bank and which the Bank already had paid to Blue Flame.

108.    Upon information and belief, the Bank immediately acceded to California's request to return the funds.

109.    Section 4A-204 of the Uniform Commercial Code (codified under Federal law as 12 C.F.R. § Pt. 210, Subpt. B, App. B, at Section 4A-204) provides a private right of action to a bank customer whose bank issues a payment order that purports to be on behalf of the customer but in fact is not authorized and not effective as the order of the customer.

110.    Upon information and belief, in complying with California's request to return the funds, the Bank issued a new payment order on behalf of Blue Flame which was neither authorized by Blue Flame nor effective as Blue Flame's order.  In fact, the Bank did not even notify Blue Flame that it was issuing a new payment order to return the funds to California.

24

111.    As a result of the new payment order, the funds that had been wired to the Bank and paid to Blue Flame were removed from Blue Flame's account and returned to California without Blue Flame's authorization or consent.

112.    The Bank's violations of Regulation J and the Uniform Commercial Code entitle Blue Flame to a refund of the full amount of the payment order issued by the Bank in returning the funds to California.  Blue Flame also is entitled to the payment of interest on the refundable amount calculated from March 26, 2020, the date the Bank issued the payment order, to the date of the refund.

## COUNT III
## CONVERSION
### (Against all Defendants)

113.    The allegations in Paragraphs 1 through 85 of this Complaint are incorporated herein as if set forth in their entirety.

114.    Upon information and belief, the payment order for California's wire transfer was sent via the Fedwire Funds Service from California's bank to the Bank as payment to Blue Flame and in satisfaction of California's obligation to Blue Flame.

115.    After accepting the payment order for California's wire transfer to Blue Flame, upon information and belief, the Bank credited the account of Blue Flame in the amount of the payment order.

116.    At approximately 11:59 AM ET on March 26, 2020, funds in the amount of the payment order for California's wire transfer appeared in Blue Flame's account, as confirmed by Blue Flame when viewing its account through the Bank's online account access portal, and as verbally confirmed to Mr. Thomas by Ms. Cole.

117.    Once the Bank made payment to Blue Flame, California's wire transfer was completed and Defendants could not recover the payment or otherwise agree to return the transferred funds.

118.    As contemplated by Defendants and Blue Flame in their discussion of the California transaction the day before, and as confirmed by the Bank following the completion of the wire transfer, Blue Flame had a right to immediately possess and use the funds wired by California.

119.    Upon information and belief, after California's wire transfer was completed, Defendants unilaterally contacted California and accused Blue Flame of fraud, without basis.

120.    Upon information and belief, as a result of Defendants' actions, the payment from California was reversed or otherwise returned to California and the corresponding credit was removed from Blue Flame's account at the Bank.

121.    Upon information and belief, Mr. Evinger and Mr. Brough directed, participated in, ratified, or otherwise authorized the removal of the funds wired by California from Blue Flame's account at the Bank.

122.    Defendants had no legal justification to remove the funds wired by California from Blue Flame's account.

123.    In removing the funds from Blue Flame's account, Defendants wrongfully exercised dominion and control over those funds and thereby deprived Blue Flame of their possession.

124.    Defendants' wrongful conversion of Blue Flame's funds has caused Blue Flame to suffer damages including, among other harms, its lost profits for the transaction with

California, lost future business opportunities with California and other customers, and reputational damage as a result of the subsequent media coverage of the incident.

## COUNT IV
## TORTIOUS INTERFERENCE WITH CONTRACT
### (Against all Defendants)

125.    The allegations in Paragraphs 1 through 85 of this Complaint are incorporated herein as if set forth in their entirety.

126.    Blue Flame had a valid contractual relationship with California, which, without improper interference by Defendants, would have provided substantial future economic benefit to Blue Flame.

127.    Blue Flame expended significant effort in negotiating its contractual relationship with California and in preparing to source the equipment California agreed to purchase.

128.    Defendants knew of the contractual relationship between Blue Flame and California at the time Defendants unilaterally contacted California officials and accused Blue Flame of fraud, without basis.

129.    Defendants' actions caused California to breach its agreement to purchase medical supplies from Blue Flame.

130.    Defendants' actions violated the Bank's obligations pursuant to the Uniform Commercial Code and applicable Federal Reserve Board regulations, as well as standard practice in the banking industry even where a transaction is appropriately deemed suspicious.

131.    But for Defendants' actions, Blue Flame would have completed its transaction with California pursuant to its contract with California and earned significant profits from that sale.

132.     Defendants, through improper methods, interfered with Blue Flame's contractual relationship with California.

133.     Blue Flame's damages include, among other harms, its lost profits for the transaction with California and reputational damage as a result of the subsequent media coverage of the incident.

## COUNT V
## TORTIOUS INTERFERENCE WITH BUSINESS EXPECTANCY
### (Against all Defendants)

134.     The allegations in Paragraphs 1 through 85 of this Complaint are incorporated herein as if set forth in their entirety.

135.     Blue Flame had a valid business expectancy with California, including its contract to purchase 100 million N95 masks and opportunities for future personal protective equipment orders which, without improper interference by Defendants, would have provided substantial future economic benefit to Blue Flame.

136.     Blue Flame expended significant effort in building its relationship with California officials, negotiating the purchase contract for California's initial purchase of 100 million N95 masks, and marketing potential future sales to California and other government purchasers.

137.     Defendants knew of Blue Flame's business expectancy at the time Defendants unilaterally contacted California and accused Blue Flame of fraud, without basis.

138.     Defendants' actions caused California to disengage from potential future business with Blue Flame, as well as breach its agreement to purchase 100 million N95 masks from Blue Flame.

139.     Defendants' actions violated the Bank's obligations pursuant to the Uniform Commercial Code and applicable Federal Reserve Board regulations, as well as standard practice in the banking industry even where a transaction is appropriately deemed suspicious.

140.     But for Defendants' actions, Blue Flame would have completed additional sales of personal protective equipment with California and other government purchasers.  Indeed, California told Blue Flame on March 25 that it was interested in procuring vast amounts of additional personal protective equipment from Blue Flame, including, among other things, 500 million additional N95 masks, 200 million face shields, 1,000 ventilators, 1 billion gloves, 20 million swabs, 100 million gowns, and 50 million coveralls.

141.     Defendants, through improper methods, interfered with Blue Flame's business expectancy.

142.     Blue Flame's damages include, among other harms, its lost profits related to future business opportunities with California and other governmental purchasers and reputational damage as a result of the subsequent media coverage of the incident.

## COUNT VI
### FRAUD
### (Against all Defendants)

143.     The allegations in Paragraphs 1 through 85 of this Complaint are incorporated herein as if set forth in their entirety.

144.     Prior to Blue Flame's decision to use the Bank for its transaction with California, Blue Flame disclosed all relevant details regarding the transaction to the Bank, including in Mr. Gula's discussion with Mr. Brough and Mr. Evinger.  Defendants were informed of the urgent and important nature of the transaction and that Blue Flame required the Bank to process the anticipated large money transfers quickly.

145.     At no point did Defendants indicate in response to those details any concern regarding the legitimacy of the transaction or indicate that the Bank might not wish to complete the transaction.  To the contrary, Defendants enthusiastically sought to secure Blue Flame's business.

146.     Upon information and belief, Defendants reversed course and decided to take action to undo the transaction, which caused it to unlawfully contact Blue Flame's counterparty and accuse Blue Flame of fraud, without basis.

147.     Defendants' misrepresentations to Blue Flame that the Bank was willing and able to complete the transaction were intentionally and knowingly made, were false, and were either made deliberately or recklessly.

148.     Defendants' misrepresentations to Blue Flame that the Bank was willing and able to accept the transfer from California were material to Blue Flame's decision to use the Bank as its bank for the wire transfer from California.

149.     Blue Flame relied on Defendants' misrepresentations to its detriment.

150.     Had Defendants identified concerns or indicated that the Bank could not accept such a large transfer, Blue Flame would have arranged for the transaction to flow through a different bank.

151.     Blue Flame has been damaged by its reliance upon Defendants' misrepresentations, including by its loss of all profits associated with the transaction with California and other lost business.

## COUNT VII
## CONSTRUCTIVE FRAUD
### (Against all Defendants)

152.    The allegations in Paragraphs 1 through 85 of this Complaint are incorporated herein as if set forth in their entirety.

153.    Prior to Blue Flame's decision to use the Bank for its transaction with California, Blue Flame disclosed all relevant details regarding the transaction to the Bank, including in Mr. Gula's discussion with Mr. Brough and Mr. Evinger.  Defendants were informed of the urgent and important nature of the transaction and that Blue Flame required the Bank to process the anticipated large money transfers quickly.

154.    At no point did Defendants indicate in response to those details any concern regarding the legitimacy of the transaction or indicate that the Bank might not wish to complete the transaction.  To the contrary, Defendants enthusiastically sought to secure Blue Flame's business.

155.    Upon information and belief, Defendants reversed course and decided to take action to undo the transaction, which caused it to unlawfully contact Blue Flame's counterparty and accuse Blue Flame of fraud, without basis.

156.    Defendants' misrepresentations to Blue Flame that the Bank was willing and able to complete the transaction were intentionally and knowingly made, were false, and were negligent.

157.    Blue Flame relied on Defendants' misrepresentations to its detriment.

158.    Had Defendants indicated that the Bank would not or could not accept such a large transfer, or raised doubts as to the Bank's ability to accept such a large transfer, Blue Flame would have arranged for the transaction to flow through a different bank.

159.    Blue Flame has been damaged by its reliance upon Defendants'
misrepresentations, including by its loss of all profits associated with the transaction with
California and other lost business.

## COUNT VIII
### NEGLIGENCE
**(Against all Defendants)**

160.    The allegations in Paragraphs 1 through 85 of this Complaint are incorporated
herein as if set forth in their entirety.

161.    As a result of the Bank's agreement to provide banking services to Blue Flame
and Mr. Brough and Mr. Evinger's assurances to Mr. Gula that the Bank could and would
process the wire transfer from California, Defendants undertook a duty of care in providing
banking services to Blue Flame.

162.    Defendants' actions in unilaterally contacting California and accusing Blue Flame
of fraud were negligent, lacked a factual basis, and breached Defendants' duties to Blue Flame.

163.    The Bank has declared that Blue Flame's Account Agreement with the Bank is
"void" as a result of the Bank's decision to close Blue Flame's account, without basis.

164.    Defendants' negligent actions caused Blue Flame to suffer damages including,
among other harms, its lost profits for the transaction with California, lost future business
opportunities with California and other customers, and reputational damage as a result of the
subsequent media coverage of the incident.

## COUNT IX
### DEFAMATION
**(Against all Defendants)**

165.    The allegations in Paragraphs 1 through 85 of this Complaint are incorporated
herein as if set forth in their entirety.

166.     Upon information and belief, following its acceptance of the wire transfer from California for Blue Flame's account, Mr. Brough and/or Mr. Evinger contacted the California State Treasurer's Office and/or the Director of the Governor's Office of Emergency Services, and claimed that the transaction was fraudulent and made other false statements casting aspersions on the business and character of Blue Flame.

167.     The statements by Mr. Brough and/or Mr. Evinger were false, and they either knew them to be false or, believing them to be true, lacked reasonable grounds for such belief or acted negligently in failing to ascertain the facts upon which the statements were based.

168.     Defendants' false and defamatory claim that Blue Flame's transaction with California was fraudulent has caused Blue Flame to suffer damages including, among other harms, its lost profits for the transaction with California, lost future business opportunities with California and other customers, and reputational damage as a result of the subsequent media coverage of the incident.

## COUNT X
## BREACH OF CONTRACT
### (Against the Bank)

169.     The allegations in Paragraphs 1 through 85 of this Complaint are incorporated herein as if set forth in their entirety.

170.     In reliance on Defendants' representations that the Bank could and would accept the wire transfer from California, Blue Flame entered into an Account Agreement with the Bank.

171.     The Account Agreement between Blue Flame and the Bank included express terms and conditions regarding deposits in Blue Flame's account as well as wire transfers sent to or from Blue Flame's account.

172.     Notwithstanding the Bank's subsequent efforts to "void" Blue Flame's Account Agreement, the terms of the Account Agreement were in full force and effect at the time Defendants unilaterally contacted California officials and accused Blue Flame of fraud, without basis.

173.     Pursuant to the Account Agreement and its accompanying terms and conditions, the Bank had no contractual right to return the funds paid to Blue Flame by California following the Bank's acceptance of the payment order from California.

174.     Accordingly, the Bank breached the Account Agreement by causing the payment from California to Blue Flame to be reversed or otherwise returned to California.

175.     In addition to breaching the Account Agreement, Defendants' actions breached the covenant of good faith and fair dealing, which is implied in every contract.

176.     The same day that Blue Flame entered the Account Agreement, Mr. Gula disclosed all relevant details regarding the transaction to Mr. Brough and Mr. Evinger.

177.     At no point did Defendants indicate in response to those details any concern regarding the legitimacy of the transaction or indicate that the Bank might be unwilling or unable to facilitate the transaction.

178.     Given Defendants' representations to Mr. Gula regarding the Bank's willingness and ability to facilitate Blue Flame's transaction with California, Defendants' actions to cause the return of California's payment to Blue Flame breached the implied covenant of good faith and fair dealing.

179.     Blue Flame's damages include, among other harms, its lost profits for the transaction with California, lost future business opportunities with California and other customers, and reputational damage as a result of the subsequent media coverage of the incident.

## **PRAYER FOR RELIEF**

WHEREFORE, based upon the foregoing allegations and claims, Plaintiff demands judgment for compensatory, as well as punitive, damages in an amount to be established at trial, in addition to all interest, costs, attorneys' fees, and any other relief permitted by law and that the Court deems appropriate, and prays that the Court award relief against Defendants for the allegations set forth in Counts I through X.

TRIAL BY JURY IS DEMANDED.

Dated: June 12, 2020                               Respectfully submitted,

                                                    /s/ *Peter H. White*
                                                   Peter H. White, Esq. (VSB # 32310)
                                                   SCHULTE ROTH & ZABEL LLP
                                                   901 Fifteenth Street, NW, Suite 800
                                                   Washington, DC 20005
                                                   Tel: 202-729-7476
                                                   Fax: 202-730-4520
                                                   peter.white@srz.com

                                                   *Counsel for Plaintiff*