**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**

**Alexandria Division**

| | |
|---|---|
| **BLUE FLAME MEDICAL LLC,** ) | |
| ) | |
| *Plaintiff,* ) | |
| ) | |
| **v.** ) | **Civil Action No. 1:20-cv-00658** |
| ) | |
| **CHAIN BRIDGE BANK, N.A.,** ) | **The Honorable Leonie Brinkema** |
| **JOHN J. BROUGH, and** ) | |
| **DAVID M. EVINGER,** ) | |
| ) | |
| *Defendants.* ) | |

**BLUE FLAME MEDICAL LLC'S MEMORANDUM**
**IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

SCHULTE ROTH & ZABEL LLP
Peter H. White (VSB # 32310)
Jason T. Mitchell (admitted *pro hac vice*)
Gregory Ketcham-Colwill (admitted *pro hac vice*)
901 Fifteenth Street, NW, Suite 800
Washington, DC 20005
Tel: (202) 729-7476
Fax: (202) 730-4520
pete.white@srz.com
jason.mitchell@srz.com
gregory.ketcham-colwill@srz.com

SCHULTE ROTH & ZABEL LLP
William H. Gussman, Jr. (admitted *pro hac vice*)
919 Third Avenue
New York, New York 10022
Tel: (212) 756-2044
Fax: (212) 593-5955
bill.gussman@srz.com

August 17, 2020                    *Counsel for Blue Flame Medical LLC*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................1

FACTUAL BACKGROUND......................................................................................2

    A.    Blue Flame's Founding and Negotiations with California. ....................................2

    B.    Defendants Confirm That They Can and Will Handle the Transaction with California and Blue Flame's Need to Make Immediate Payments to Suppliers. ..............................................................................................3

    C.    Defendants Accept the Wire Transfer to California and Make Payment to Blue Flame..............................................................................................5

    D.    Defendants Contact California to Falsely Accuse Blue Flame of Fraud, Cause California to Request the Return of the Funds, and Close Blue Flame's Account..............................................................................................6

    E.    Defendants' Actions Destroy Blue Flame's and Its Principals' Reputations and Business Prospects. ...........................................................................9

STANDARD OF REVIEW ........................................................................................9

ARGUMENT ...........................................................................................................10

I.    BLUE FLAME HAS ADEQUATELY ALLEGED VIOLATIONS OF FEDERAL RESERVE REGULATION J AND THE UNIFORM COMMERCIAL CODE.................................................................................10

    A.    California's Payment Order Could Not Have Been Effectively Canceled and the Bank's Obligations Under Section 4A-404(a) Were Not Nullified...............11

    B.    Blue Flame Has Properly Alleged That the Bank Violated Section 4A-204(a). ...15

II.    BLUE FLAME HAS ADEQUATELY ALLEGED NUMEROUS STATE LAW CLAIMS...............................................................................................16

    A.    Blue Flame Has Stated Claims for Tortious Interference with Its Contract and Business Expectancy...............................................................................16

    B.    Blue Flame Has Stated a Claim for Conversion. ..................................................19

    C.    Blue Flame Has Stated Claims for Fraud and/or Constructive Fraud. .................23

    D.    Blue Flame Has Stated a Claim for Defamation....................................................25

    E.    Blue Flame Has Stated Claims for Breach of Contract and/or Negligence...........28

**CONCLUSION** ....................................................................................................................30

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*ADP Inv'r Commc'n Servs., Inc. v. In House Attorney Servs., Inc.*,
 390 F. Supp. 2d 212 (E.D.N.Y. 2005) ....................................................................21

*AdvanFort Co. v. Int'l Registries, Inc.*,
 No. 1:15-CV-220, 2015 WL 2238076 (E.D. Va. May 12, 2015), *amended on
 reconsideration*, No. 1:15-CV-220, 2015 WL 4254988 (E.D. Va. July 13,
 2015) ....................................................................................................................7

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009)................................................................................................9

*AvePoint, Inc. v. Power Tools, Inc.*,
 981 F. Supp. 2d 496 (W.D. Va. 2013) ....................................................................27

*Bain v. Cont'l Title Holding Co.*,
 No. 16-2326-JWL, 2017 WL 264545 (D. Kan. Jan. 20, 2017) ..............................10

*Bell Atl. Corp. v. Twombly*,
 550 U.S. 544 (2007)................................................................................................9

*Bosiger v. U.S. Airways*,
 510 F.3d 442 (4th Cir. 2007) ..................................................................................10

*Brown v. Harms*,
 467 S.E.2d 805 (Va. 1996)......................................................................................29

*Chaves v. Johnson*,
 335 S.E.2d 97 (Va. 1985)....................................................................................16, 18

*Commerce Funding Corp. v. Worldwide Sec. Services Corp.*,
 249 F.3d 204 (4th Cir. 2001) ..................................................................................18

*Creative Trade Group, Inc. v. Int'l Trade Alliance, Inc.*,
 No. 08-c-2561, 2009 WL 3713345 (N.D. Ill. Nov. 4, 2009) ..................................21

*Decatur Auto Ctr. v. Wachovia Bank, N.A.*,
 583 S.E.2d 6 (Ga. 2003)..........................................................................................20

*Duggin v. Adams*,
 360 S.E.2d 832 (Va. 1987)......................................................................................18

*Eisenberg v. Wachovia Bank, N.A.*,
 301 F.3d 220 (4th Cir. 2002) ..................................................................................29

*Enomoto v. Space Adventures, Ltd.*,
624 F. Supp. 2d 443 (E.D. Va. 2009) ..................................................................30

*Eva v. Midwest Nat'l Mortg. Bank, Inc.*,
143 F. Supp. 2d 862 (N.D. Ohio 2001).................................................................20

*First Sec. Bank of N.M., N.A. v. Pan Am. Bank*,
215 F.3d 1147 (10th Cir. 2000) ...........................................................................22

*Georgia Lottery Corp. v. First Nat. Bank of Grady Cty.*,
560 S.E. 2d 345 (Ga. Ct. App. 2002) ...................................................................21

*Guill v. Academy Life Ins. Co.*,
No. 89-1509, 1991 WL 105502 (4th Cir. June 19, 1991).....................................20

*Hatfill v. New York Times Co.*,
416 F.3d 320 (4th Cir. 2005) ...............................................................................27

*Hazaimeh v. U.S. Bank, N.A.*,
94 F. Supp. 3d 741 (E.D. Va. 2015) ...............................................................23, 24

*Hyland v. Raytheon Tech. Servs. Co.*,
670 S.E.2d 746 (Va. 2009)....................................................................................27

*Jones v. Bank of Am. Corp.*,
No. 4:09 CV 162, 2010 WL 6605789 (E.D. Va. Aug. 24, 2010) .....................19, 20

*Kancor Ams., Inc. v. ATC Ingredients, Inc.*,
No. 1:15-cv00589-GBL-IDD, 2016 WL 740061 (E.D. Va. Feb. 25, 2016)...........20

*Lowe v. Wells Fargo Bank, N.A.*,
No. 3:18CV00126 (REP), 2018 WL 3748418 (E.D. Va. July 9, 2018) .................19

*Ma v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
597 F.3d 84 (2d Cir. 2010).................................................................................15, 16

*McCauley v. Home Loan Inv. Bank*,
710 F.3d 551 (4th Cir. 2013) ...............................................................................23

*Morris v. Hamilton*,
302 S.E.2d 51 (Va. 1983).......................................................................................29

*Mylan Laboratories, Inc. v. Matkari*,
7 F.3d 1130 (4th Cir. 1993) ..............................................................................10, 16

*Phoenix Packaging Operations LLC v. M&O Agencies, Inc.*,
Civil Action No. 7:15-cv-569, 2016 WL 3181172 (W.D. Va. June 3, 2016).........30

*Roderick Dev. Inv. Co. v. Cmty. Bank of Edgewater*,
    668 N.E.2d 1129 (Ill. App. Ct. 1996) ....................................................20

*Sheerbonnet, Ltd. v. Am. Exp. Bank, Ltd.*,
    951 F. Supp. 403 (S.D.N.Y. 1995), *as amended* (May 1, 1996) ..............................30

*St. Paul Travelers Cas. & Sur. Co. of Am. v. Manley*,
    No. 05–cv–01195–REB–BNB, 2006 WL 3019673 (D. Colo. Oct. 23, 2006)........................21

*Steele v. Goodman*,
    382 F. Supp. 3d 403 (E.D. Va. 2019) ............................................27, 28

*Tharpe v. Saunders*,
    737 S.E.2d 890 (Va. 2013)........................................................25

*Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC*,
    723 S.E.2d 744 (N.C. 2012)......................................................21

*Viano v. THD At-Home Servs.*,
    Civil Action No. 1:19-cv-1272, 2020 U.S. Dist. LEXIS 62990 (E.D. Va. Apr.
    9, 2020) ....................................................................24, 25

*Warren v. Bank of Marion*,
    618 F. Supp. 317 (W.D. Va. 1985) .................................................27

*Yarney v. Ocwen Loan Servicing, LLC*,
    929 F. Supp. 2d 569 (W.D. Va. 2013) ..............................................30

*Yuzefovsky v. St. John's Wood Apartments*,
    540 S.E.2d 134 (Va. 2001).......................................................25

*Zak v. Chelsea Therapeutics Int'l, Ltd.*,
    780 F.3d 597 (4th Cir. 2015) ....................................................10

**Statutes, Regulations, and Rules**

12 C.F.R. pt. 210, subpt. B, app. B ..................................................10

Fed. R. Civ. P. 9(b) ...............................................................23

Fed. R. Civ. P. 12(b)(6)............................................................9

Uniform Commercial Code, Article 4A:

    § 4A-204(a) ....................................................................15

    § 4A-209(b)(2) .................................................................11

    § 4A-209(b), cmt. 6.............................................................11

§  4A-211(c)(2) ..................................................................................13

§ 4A-211(f) .......................................................................................14

§ 4A-211, cmt. 1 ..............................................................................13

§ 4A-211, cmt. 3 ..............................................................................13

§ 4A-211, cmt. 4 ..............................................................................13

§ 4A-211, cmt. 8 .........................................................................13-14

§ 4A-403(a)(1) .................................................................................11

§ 4A-404(a) ......................................................................................14

§ 4A-404, cmt. 3 .........................................................................14-15

§  4A-405 .........................................................................................22

**Other Authorities**

California State Assembly, Video Recording of Accountability & Administrative
       Review Comm. Hearing (May 11, 2020)........................................................8

Katy Grimes, *Public Records Request Reveals CA Sent Half-Billion $ to Newly
       Formed Mask Manufacturer*, California Globe (May 7, 2020) .................................8

Sophia Bollag et al., *'Urgency and Panic': Inside Gov. Gavin Newsom's Rush to
       Buy Coronavirus Gear*, Sacramento Bee (May 6, 2020)..........................................8

iv

## PRELIMINARY STATEMENT

Chain Bridge Bank (the "Bank") and its senior executives, John Brough and David Evinger (together with the Bank, "Defendants"), through their Motion to Dismiss ("Motion"), seek to absolve themselves from liability for recklessly destroying the business of Plaintiff Blue Flame Medical LLC ("Blue Flame") and the reputations of Blue Flame and its principals.  After assuring Blue Flame that the Bank could and would process payments critical to an extraordinary transaction to supply the State of California with desperately needed personal protective equipment ("PPE") in the early days of the COVID-19 pandemic, and after accepting payment from California on Blue Flame's behalf and paying the funds to Blue Flame's account, Defendants chose to radically reverse course.  Rather than uphold their assurances and duties to Blue Flame, Defendants disregarded them and unilaterally reached out to California officials to accuse Blue Flame of fraud without ever discussing their purported concerns with their own customer.  Then, when California predictably responded to Defendants' accusations by requesting that the Bank return the wired funds, Defendants immediately complied with the state's request even though they were under no obligation to do so.  Defendants now must face the consequences of their actions.

Although a motion to dismiss is meant to test the legal sufficiency of a plaintiff's claims, Defendants' Motion instead improperly seeks to revise the factual basis for Blue Flame's claims.  Once stripped to its legal arguments, Defendants' Motion fails beneath its own weight. Defendants argue that Blue Flame's UCC/Regulation J claims and its conversion claim should be dismissed because the Bank agreed to a cancellation of the payment order associated with California's wire transfer to Blue Flame.  However, this "fact" is not alleged in the Complaint, is not established by the unauthenticated documents improperly attached to Defendants' Motion, and cannot be true under the controlling regulations.  Defendants contest several of Blue Flame's common law claims on the basis that Blue Flame's allegation that Defendants unilaterally

contacted California officials to report fraud concerns is "implausible," but that is the only plausible inference that can be drawn from the facts known to Blue Flame, news reports, and public comments by California's State Treasurer.  Defendants also argue that Blue Flame has failed to plead that they acted with the requisite level of intent, despite the Complaint's explicit allegations, supported by facts which must be taken as true, that Defendants knew that contacting California officials would have precisely the consequence that it did.  Read in the light most favorable to Blue Flame, the allegations in the Complaint are more than sufficient to state claims for relief.  As such, Defendants' Motion should be denied.

## FACTUAL BACKGROUND

### A.    Blue Flame's Founding and Negotiations with California.

Blue Flame was founded in March 2020 to provide urgently needed PPE at fair prices to state and local governments, first responders, and healthcare providers to battle the COVID-19 pandemic.  (Complaint, ¶ 15.)  While Blue Flame's principals—its Chief Executive Officer, Michael Gula, and its President, John Thomas—did not have prior experience in medical supply sales before the onset of the public health emergency, they believed that their unique combination of relationships with manufacturers and distributors of PPE as well as governmental officials in need of those supplies would allow them to get life-saving PPE into the hands of those most in need as quickly and cost-efficiently as possible.  (*Id.* at ¶¶ 15-16, 22.)

On March 20, 2020, Thomas began negotiating an urgent agreement with California officials to supply PPE to the state, which culminated in a contract for California to purchase 100 million N95 protective masks.  (*Id.* at ¶¶ 19, 25, 51-55.)  By that time, Blue Flame's principals had completed other transactions involving PPE in which they connected distributors of PPE to states and municipalities through another company they managed, known as Blue Flame Strategies.  (*Id.* at ¶ 20.)  Because the potential transaction with California presented an opportunity to create a

new venture that could serve as a distributor of PPE and thereby provide lower prices to its customers, Blue Flame's principals founded and officially incorporated Blue Flame on March 23, 2020.  (*Id.* at ¶¶ 21, 23.)

**B.    Defendants Confirm That They Can and Will Handle the Transaction with California and Blue Flame's Need to Make Immediate Payments to Suppliers.**

By March 24, the contours of the deal with California had taken shape, and Blue Flame anticipated that California would soon make the customary up-front deposit payment of 75% of the purchase price to secure the N95 masks it contracted to buy from Blue Flame.  (*Id.* at ¶¶ 17, 25.)  Due to the competitive environment in the PPE marketplace at the time, Blue Flame was in need of a bank that could receive large deposit payments from Blue Flame customers and quickly send corresponding payments to PPE suppliers to secure inventory.  (*See id.* at ¶¶ 17-18.) Blue Flame chose to open an account with Chain Bridge Bank based on a 13-year relationship between the Bank and Gula, who had used the Bank for numerous prior business ventures, including Blue Flame Strategies, as well as his personal banking needs.  (*Id.* at ¶¶ 26-27.)  Blue Flame also was aware that the Bank was able to quickly receive and remit multi-million dollar electronic payments due to its principals' prior careers in political consulting, a world in which the Bank is well-known for such services in connection with political campaigns.  (*Id.* at ¶¶ 26-28.) After discussing Blue Flame's expected receipt of a wire for over $450 million from California with Maria Cole, the Bank's Assistant Vice President and Commercial Relationship Manager, Blue Flame completed opening its account at the bank on March 25.  (*Id.* at ¶¶ 29-30.)

Throughout the day on March 25, Blue Flame's principals engaged in extensive discussions with Defendants regarding the transaction with California and Blue Flame's business needs.  (*See id.* at ¶¶ 31-50.)  Throughout the morning and early afternoon on March 25, Gula corresponded with Cole regarding Blue Flame's need for wire instructions to receive California's

wire transfer, Blue Flame's need to be immediately notified once the wire was received, and Blue Flame's need to promptly send outgoing wires to its suppliers.  (*Id.* at ¶¶ 32-33; 35.)  Blue Flame also executed its new Account Agreement with the Bank.  (*Id.* at ¶ 34.)  In response to an inquiry from Cole, Gula confirmed the amount of the expected wire from California and that the wire would be sent to Blue Flame's newly opened account, rather than the existing account for Blue Flame Strategies. (*Id.* at ¶¶ 36-37.)  Shortly thereafter, Gula received a call from Brough, the Bank's Chief Executive Officer, and Evinger, the Bank's President, Chief Credit Officer, and Secretary.  (*Id.* at ¶¶ 10-11, 38.)

During that call, Gula explained all of the relevant details concerning the California transaction, Blue Flame's business, and Blue Flame's immediate needs.  Those details included that, upon receipt of California's payment, Blue Flame would need to immediately wire out a portion—not "all," as Defendants falsely state—of California's payment to U.S. bank accounts of its suppliers in order to secure the first shipments of PPE to California.  (*See id.* at ¶¶ 39-44; *see also* Motion at 6).  Gula also explained that Blue Flame anticipated receiving additional orders for state and local governments following the transaction with California, including additional purchases of PPE by California.  (Complaint, ¶ 40.)  In response, Brough and Evinger represented to Gula that the Bank would accept the wire transfer from California and could accommodate Blue Flame's needs, notwithstanding certain challenges for the Bank in receiving a wire transfer of that size.  (*Id.* at ¶¶ 42-43.)  Later that night, Gula then reconfirmed details he had provided to Brough and Evinger in email correspondence, specifically that Blue Flame would send its planned outgoing payment to a domestic bank account for one of its suppliers.  (*Id.* at ¶¶ 48-49.)

At no point before, during, or after those conversations did the Bank ever indicate to Blue Flame that it was concerned about fraud in connection with Blue Flame or the transaction,

that the Bank might not accept the wire transfer from California or otherwise cancel it or return the funds to California, or that Blue Flame would not be able to make the immediate outgoing wire transfers that Gula had previewed.  (*See id.* at ¶ 45.)  Defendants claim that the Bank's funds availability policy for new accounts—notwithstanding Gula's 13-year relationship with the Bank—prevented Blue Flame from obtaining possession of the wired funds or from immediately wiring out a portion of them.  (*See* Motion at 14-15.)  But that policy was never mentioned when the Bank's senior officers assured Gula that the Bank could serve Blue Flame's needs.  (*See* Complaint, ¶ 45.)  Based on Defendants' representations, Blue Flame relied upon the Bank to handle the wire transfers associated with the California transaction.  (*Id.* at ¶¶ 46-47.)

## C.   Defendants Accept the Wire Transfer to California and Make Payment to Blue Flame.

While Gula was having those discussions with Defendants, Blue Flame was hard at work with California officials to finalize the details of the transaction, and was told on the evening of March 25 that the wire transfer would be sent the next morning.  (*See id.* at ¶¶ 51-56.)  Throughout the morning of March 26, Blue Flame was in frequent contact with the Bank to confirm the wire had been received and processed by the Bank.  (*Id.* at ¶¶ 57-58.)  At approximately 11:50AM ET, the California State Controller confirmed to Thomas that the wire had been sent and that California was awaiting confirmation from the Bank.  (*Id.* at ¶ 60.)  Seven minutes later, the Bank issued a Wire Transfer Notice confirming its receipt of the incoming wire transfer from California for Blue Flame's account and all relevant details concerning the payment.  (*Id.* at ¶ 61.)  Two minutes after that, the Bank sent Gula an "INCOMING WIRE CONFIRMATION" with a link to a copy of the Wire Transfer Notice.  (*Id.*)  Immediately upon receipt of that email, Gula confirmed that the funds from California appeared in Blue Flame's account through the Bank's website.  (*Id.*)

5

Simultaneously, at approximately 11:59AM ET, Cole confirmed to Thomas via phone that the Bank had received the wire transfer from California and that the funds were available in Blue Flame's account.  (*Id.* at ¶ 62.)  During that conversation, Thomas reiterated that Blue Flame needed to send a portion of the wired funds to suppliers of California's order on the same day.  (*Id.* at ¶ 63.)  Cole responded that Blue Flame could do so but because its account did not yet have electronic wire initiation functionality, Blue Flame would need to provide some paperwork to complete the outgoing wire.  (*Id.*)  At 12:11PM ET, Cole emailed the wire transfer request form she had discussed to Blue Flame and asked that it be filled out and returned to her.  (*Id.* at ¶ 64.)  At 12:14PM ET, Blue Flame's counsel provided the details requested by Cole, consistent with Blue Flame's prior representations regarding the recipient of the requested outgoing wire.  (*Id.* at ¶ 65.)

>    **D.**     **Defendants Contact California to Falsely Accuse Blue Flame of Fraud, Cause California to Request the Return of the Funds, and Close Blue Flame's Account.**

At around 1:30PM ET, Gula discovered that he was no longer able to electronically access Blue Flame's account and repeatedly attempted to call Bank representatives with no response.  (*See id.* at ¶ 68.)  Four minutes later, he emailed Brough and Evinger, asking for someone to call him as soon as possible.  (*Id.* at ¶ 69.)  Nobody called Gula in response, but Brough responded approximately 20 minutes later, stating:  "We received official notice from the sending bank to return the wire.  Please resolve directly with the state of California."  (*Id.* at ¶ 70.)  Later that afternoon, the Bank emailed Gula copies of Blue Flame's account agreement that were marked "VOID" on the grounds of "account closing."  (*Id.* at ¶ 71.)  The Bank also closed Blue Flame Strategies' account.  (*Id.*)  Defendants have never explained why they took those actions.

In the months since March 26, it has become clear that, shortly after the Bank accepted California's wire transfer and made those funds available to Blue Flame, Defendants

unilaterally contacted California officials and baselessly accused Blue Flame of fraud, which caused California to request that the funds be returned.  As Blue Flame alleged, news reports and public statements from California officials confirmed this chain of events (*see id.* at ¶¶ 72-73), as have additional documents that Blue Flame received through California Public Records Act requests subsequent to the filing of its Complaint.  Defendants selectively cite documents not properly before the Court on this Motion in an attempt to contradict Blue Flame's allegations and create the inaccurate impression that Defendants simply answered questions from California officials, that they did not accuse Blue Flame of fraud, and that the Bank did not cause California's request to return the funds.  (*See, e.g.,* Motion at 8, 8 n.5, 20-21.)  None of Defendants' allegations are true based on information known to Blue Flame or properly before the Court.

As alleged in the Complaint, statements by California officials and documents provided to the press under the California Public Records Act confirm that California requested that the funds be returned in response to Defendants' fraud accusations.  (*See* Complaint,¶¶ 73, 82-84.)[1]  For example, on May 6, 2020, the *Sacramento Bee* reported that Defendants initiated contact with the office of California State Treasurer Fiona Ma and influenced California to request the return of the funds.  Specifically, it reported:

> In the case of the Blue Flame deal, the state had already wired the money to the bank the company was using *when a top executive at the bank called Ma's office with concerns*, Ma said.  The executive told her office that the Blue Flame Medical LLC account had been opened just the day before by a political operative and that they were not comfortable completing the transfer, Ma said.  *'My people were like 'Oh my God, yes, send it back',"* she said.

---

[1] The Court may take judicial notice of these newspaper articles because they discuss the subject matter of the case; they also are incorporated by reference in the Complaint.  *See AdvanFort Co. v. Int'l Registries, Inc.*, No. 1:15-CV-220, 2015 WL 2238076, at *17 n.10 (E.D. Va. May 12, 2015), *amended on reconsideration*, No. 1:15-CV-220, 2015 WL 4254988 (E.D. Va. July 13, 2015).

Sophia Bollag et al., *'Urgency and Panic': Inside Gov. Gavin Newsom's Rush to Buy Coronavirus Gear*, Sacramento Bee (May 6, 2020), https://tinyurl.com/SBBFM (emphases added).[2]  Similarly, on May 7, 2020, the *California Globe* reported that "[t]he original deal with Blue Flame was canceled within 6 hours [of the wire transfer], with no reason given" and that "minutes after the money was wired to Blue Flame Medical LLC, [California State Controller Betty Yee] received a call from the bank warning that the bank account the money went to had only been opened the day before."  Katy Grimes, *Public Records Request Reveals CA Sent Half-Billion $ to Newly Formed Mask Manufacturer*, California Globe (May 7, 2020), https://tinyurl.com/CalGBFM.

   Within a week of those reports, the California State Assembly held a hearing at which Ma spoke concerning the transaction with Blue Flame, among other topics.  (*See* Complaint, ¶ 73.)  Defendants selectively quote from Ma's remarks, stating that "Ma explained it was 'one of [California's] depository banks who flagged the transaction with concerns about possible fraudulent activity,' not Chain Bridge."  (*See* Motion at 8.)  But at that hearing, Ma stated that "the Virginia bank that received the wire called Director Mark Hariri [a senior official in the State Treasurer's Office] and informed him the account was opened a day before by a Washington, D.C.-based lobbyist, and the bank was not comfortable accepting this large wire transfer, *which is why we clawed the money back pending further confirmation of the legitimacy of the payments*."  California State Assembly, Video Recording of Accountability & Administrative Review Comm. Hearing (May 11, 2020), https://tinyurl.com/CalTestimony (at 2:16:25 - 2:17:39).

---

[2] The article goes on to state that California's bank, JPMorgan, also reached out to Ma's office at the same time to say the transaction might be fraudulent and that they were reporting it to law enforcement, and that in response Ma called the Governor's office to say "this is fishy."  (*See id.*)  To the extent that Defendants argue that California requested the return of the funds it had sent to Blue Flame based on concerns raised by its own bank, rather than Defendants (*see* Motion at 21), that is a question of fact that cannot be resolved on a motion to dismiss.

**E.**    **Defendants' Actions Destroy Blue Flame's and Its Principals' Reputations and Business Prospects.**

The natural consequences of Defendants' actions have devastated Blue Flame's business prospects, including by causing California to breach its contract to purchase PPE and by causing other potential purchasers to cease discussions with Blue Flame. As a result of Defendants' actions, law enforcement investigations were launched regarding Blue Flame and the resulting press coverage has falsely branded Blue Flame and its principals as fraudsters. (Complaint, ¶¶ 81-84.) Several other governmental customers that had negotiated purchases with Blue Flame canceled their orders or demanded their money back as a result of the negative press coverage triggered by Defendants' actions. (*Id.* at ¶ 83.)[3]

## STANDARD OF REVIEW

To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when the plaintiff pleads facts that "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). When determining whether the plaintiff has stated a claim, the Court must assume that the well-pleaded allegations in the Complaint are true, view all allegations in the light most favorable to the plaintiff, and draw all reasonable inferences in favor of the plaintiff. *See Mylan Laboratories, Inc. v. Matkari,* 7 F.3d 1130, 1134 (4th Cir.

---

[3] Blue Flame has had to issue refunds at the requests of certain customers, including as a result of seizure of PPE earmarked for its customers by the Chinese government, as detailed in the letter to the United States House of Representatives Committee on Energy and Commerce attached to Defendants' Motion. (Motion, Exhibit A.) However, as Defendants admit, those facts are irrelevant to the motion currently before the Court. (*See* Motion at 3.) Notably, Defendants do not dispute the extraordinary harm to Blue Flame and its principals caused by Defendants' actions.

1993).  The motion should be denied unless it appears "certain that the plaintiff can prove no set of facts which would support its claims and entitle it to relief."  *Id.*

The Court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss."  *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007).[4]  "Consideration of extrinsic documents by a court during the pleading stage of litigation improperly converts the motion to dismiss into a motion for summary judgment . . . [which] is not appropriate when the parties have not had an opportunity to conduct reasonable discovery."  *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015).

## ARGUMENT

### I.   BLUE FLAME HAS ADEQUATELY ALLEGED VIOLATIONS OF FEDERAL RESERVE REGULATION J AND THE UNIFORM COMMERCIAL CODE.

Blue Flame has asserted two claims against the Bank under UCC Article 4A, as incorporated into Federal Reserve Board Regulation J.[5]  The first alleges that the Bank failed to make payment to Blue Flame as required by UCC Section 4A-404(a); the second alleges that the Bank, in order to return the funds wired to Blue Flame by California, executed an unauthorized payment order on behalf of Blue Flame for which it is liable under Section 4A-204(a).

---

[4] Rather than treat Blue Flame's allegations as true, as is required on a motion to dismiss, Defendants inappropriately inject disputed issues of fact into their Motion by attaching and mischaracterizing documents that they claim contradict Blue Flame's factual allegations. Defendants claim those documents are either incorporated by reference into the Complaint or are judicially noticeable, yet provide no analysis or support for their position.  *See* Motion at 5. Defendants claim Exhibits D and E are notifications concerning California's wire transfer to Blue Flame and California's subsequent request that the funds be returned.  These Exhibits are not subject to judicial notice, are not incorporated into the Complaint, and are not integral to or specifically relied on in the Complaint.  Indeed, Blue Flame has no way of verifying their authenticity.  Accordingly, the Court must disregard them for purposes of Defendants' Motion. *See, e.g.*, *Bosiger*, 510 F.3d at 450; *Bain v. Cont'l Title Holding Co.*, No. 16-2326-JWL, 2017 WL 264545 (D. Kan. Jan. 20, 2017) (rejecting motion to take judicial notice of wire transfer report and affidavit concerning wire transfer offered by defendant to support Rule 12 motion).

[5] *See* 12 C.F.R. pt. 210, subpt. B, app. B.  Citations below to the provisions of UCC Article 4A, as incorporated into Regulation J, will be made directly to the relevant section of UCC Article 4A.

The Bank's effort to dismiss the Section 4A-404(a) claim fails because it hinges on a disputed issue of fact that cannot be resolved on a motion to dismiss. In any event, Defendants' assertion that California's payment order was "canceled" after it had been accepted by the Bank is not established by the documents improperly attached to their Motion. Even if those documents did establish that the Bank agreed to a request to cancel the payment order, the Bank's argument would fail because it relies on an interpretation of the relevant regulatory provisions that is inconsistent with their language and structure and with the official UCC comments explaining those regulations. The Court should deny Defendants' Motion as to both claims.

**A.    California's Payment Order Could Not Have Been Effectively Canceled and the Bank's Obligations Under Section 4A-404(a) Were Not Nullified.**

Defendants' argument that Blue Flame cannot demand payment as a beneficiary of California's wire transfer under UCC Section 4A-404(a) because the payment order was "canceled" is squarely foreclosed by the terms of the statute and the official UCC commentary.

As Defendants admit, Section 4A-404(a) provides that where a beneficiary's bank accepts a payment order, the bank is required to pay the amount of the order to the beneficiary. (Motion at 10.) There can be no dispute—and Defendants appear to concede—that the Bank accepted California's payment order for the account of its beneficiary, Blue Flame. (*See* Motion at 9-11.)[6] However, Defendants argue that because the payment order was "canceled," the Bank's acceptance of the payment order was "nullified" and therefore it had no obligation to pay Blue

---

[6] Pursuant to Section 4A-209(b), Chain Bridge Bank accepted the payment order for two independent reasons. First, the payment order was automatically accepted because it was transmitted via the Fedwire Funds Service. (*See* Complaint, ¶ 89, 99; Motion at 6.) Accordingly, under Section 4A-209(b)(2), California's payment order was automatically accepted by Chain Bridge Bank. *See* UCC § 4A-209(b)(2); UCC § 4A-403(a)(1); *see also* UCC § 4A-209(b), cmt. 6 (Am. Law Inst. 2017) ("Section 4A-209(b)(2) results in automatic acceptance of payment orders issued to a beneficiary's bank by means of Fedwire"). Second, Chain Bridge Bank's notification to Blue Flame of its receipt of the payment order through both electronic confirmation and over the phone constituted acceptance under Section 4A-209(b). (*See* Complaint, ¶¶ 61-62.)

Flame, pursuant to Section 4A-211(e).  (Motion at 10.)  Defendants' argument ignores both Blue Flame's allegations and the law.

As an initial matter, Blue Flame did not allege that the payment order was canceled after it was accepted.  Indeed, because cancellation was impossible under the controlling regulations concerning wire transfers (explained below), Blue Flame alleged that Defendants "agreed to the California officials' request [to return the funds] immediately" (*see* Complaint, ¶¶ 77-78) and expressly alleged that the payment order could *not* have been canceled or amended after the Bank accepted it (*id.* at ¶¶ 4, 88, 93).  Defendants seek to contradict Blue Flame's allegations by inappropriately attaching unauthenticated banking records that supposedly show that the payment order was canceled at California's request.  (*See* Motion, Ex. E; Motion at 7 (referring to Exhibit E as "Fedwire transmission memorializing cancellation request").)  As stated above, Defendants may not use extrinsic documents to resolve factual disputes on a motion to dismiss.  In any event, the document is inscrutable, does not use the word "cancel" anywhere, and appears to reflect, at most, a request to "please return funds."  In fact, that document does not even show that the Bank carried out California's request.  That California requested the funds to be returned in response to Defendants' improper accusations is not in dispute.  (*See* Complaint, ¶ 77.)

Regardless, even if Defendants agreed to cancel California's payment order after acceptance without Blue Flame's consent, that action would not nullify Blue Flame's right to payment.  The circumstances under which a payment order already accepted by the beneficiary's bank may be canceled are narrowly and expressly defined under Section 4A-211(c), and the obligation to pay a beneficiary under an accepted payment order cannot be nullified unless the specific enumerated circumstances are present.  None of those circumstances were present here.  Therefore, the payment order could not have been canceled post-acceptance.

Section 4A-211(c)(2) specifically limits the circumstances where a payment order may be canceled after acceptance by a beneficiary's bank, and provides:

> With respect to a payment order accepted by the beneficiary's bank, *cancellation or amendment is not effective* unless the [payment] order was issued in execution of an unauthorized payment order, or because of a mistake by a sender in the funds transfer which resulted in the issuance of a payment order (i) that is a duplicate of a payment order previously issued by the sender, (ii) that orders payment to a beneficiary not entitled to receive payment from the originator, or (iii) that orders payment in an amount greater than the amount the beneficiary was entitled to receive from the originator.

UCC § 4A-211(c)(2) (emphasis added). In other words, where the sender has intentionally sent a single payment order containing accurate payment and beneficiary information, as California did here, the payment order cannot be canceled after acceptance under Section 4A-211, as the official comments to that Section repeatedly and expressly confirm. As examples:

- "If the conditions stated in this section are not met the attempted cancellation or amendment is not effective." UCC § 4A-211, cmt. 1 (Am. Law Inst. 2017).

- "If the receiving bank has accepted the order, it is possible to cancel or amend but *only* if the requirements of subsection (c) are met." *Id.*, cmt. 3 (emphasis added).

- "Since acceptance affects the rights of the originator and the beneficiary *it is not appropriate to allow the beneficiary's bank to agree to cancellation or amendment except in unusual cases*. Except as provided in subsection (c)(2), cancellation or amendment after acceptance by the beneficiary's bank *is not possible unless all parties affected by the order agree*. Under subsection (c)(2), cancellation or amendment is possible *only in the four cases stated*." *Id.*, cmt. 4 (emphases added).

- "A funds transfer system rule cannot allow cancellation of a payment order accepted by the beneficiary's bank if the rule conflicts with subsection (c)(2). Because rights of the beneficiary and the originator are directly affected by acceptance, subsection (c)(2) *severely limits cancellation*." *Id.*, cmt, 8 (emphasis added).

Because California intentionally issued the payment order and that order was accepted by the Bank, Defendants did not have the ability to "cancel" that payment order under Section 4A-211.

Recognizing this fatal defect in their argument, Defendants baldly assert that it does not matter whether an attempted cancellation meets the requirements of Section 4A-211(c), and that even an *ineffective* cancellation is sufficient to extinguish a beneficiary bank's payment obligation under Section 4A-404(a).  (*See* Motion at 10, n.6.)  Defendants unsurprisingly identify no support for their assertion, which would render the requirements of Section 4A-211(c) meaningless.[7]  In addition to being contradicted by Section 4A-211's plain text and structure, Defendants' illogical argument is explicitly contradicted by Section 4A-404(a)'s official comments.  Addressing the portion of Section 4A-404(a) that provides that a beneficiary bank can avoid its payment obligation if there is "reasonable doubt concerning the right of the beneficiary to payment," the comments clarify that the concept of "reasonable doubt" is not triggered by suspicions of potential fraud:

> The fraud or breach of contract claim of the originator may be grounds for recovery by the originator from the beneficiary after the beneficiary is paid, but it *does not affect the obligation of the beneficiary's bank to pay the beneficiary. Unless the payment order has been canceled pursuant to Section 4A-211(c), there is no excuse for refusing to pay the beneficiary* and, in a proper case, the refusal may result in consequential damages.

UCC § 4A-404, cmt. 3 (Am. Law. Inst. 2017) (emphasis added).  Indeed, those comments note that a bank "may safely ignore any instruction by the originator to withhold payment to the beneficiary."  *Id.*  Defendants chose not to "safely ignore" California's request to return the funds or otherwise withhold payment to Blue Flame, and therefore must be required to answer Blue Flame's claim under Section 4A-404(a), including for consequential damages.

---

[7] Defendants' assertion also is inconsistent with paragraph (f) of Section 4A-211, which expressly provides that "if the receiving bank, after accepting a payment order, agrees to cancellation or amendment of the order by the sender . . . [then] the sender, *whether or not cancellation or amendment is effective*, is liable to the bank for any loss and expenses, including reasonable attorney's fees, incurred by the bank as a result of the cancellation or amendment or *attempted cancellation or amendment*."  UCC § 4A-211(f) (emphases added).

**B.      Blue Flame Has Properly Alleged That the Bank Violated Section 4A-204(a).**

Blue Flame likewise has stated a claim for violating Section 4A-204(a) of the UCC, as incorporated under Regulation J.  Again, Defendants ignore Blue Flame's factual allegations and seek to inappropriately substitute their version of events, in which Defendants agreed to a cancellation of California's accepted payment order (*see* Motion at 9-11), despite the fact that no circumstances allowing for such cancellation under Section 4A-211(c) then existed.

Because the Bank could not have effectively canceled California's payment order pursuant to Section 4A-211, Blue Flame reasonably alleged that the Bank must have caused the return of California's funds by "accepting" and issuing a new and unauthorized payment order on behalf of Blue Flame.  (*See* Complaint, ¶ 110.)  Accordingly, despite Defendants' efforts to split hairs in the phrasing of the Complaint, Blue Flame has alleged that the Bank violated Section 4A-204(a), which specifies that a bank that accepts a payment order issued in the name of its customer that is unauthorized and not effective (under Section 4A-202) or unenforceable against the customer (under Section 4A-203) is liable for a refund of such payment.  *See* UCC § 4A-204(a); *see also*, *e.g.*, *Ma v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 597 F.3d 84, 88 (2d Cir. 2010) ("If a receiving bank accepts a payment order issued in its customer's name, and the customer did not authorize the payment order, the bank is obligated to refund any payment made pursuant to the payment order.   In other words . . . banks bear the risk of loss from unauthorized wire transfers . . ."). Thus, Defendants' authorities concerning Blue Flame's Section 4A-204(a) claim are inapplicable to their argument, but do establish that banks may be liable for accepting unauthorized payment orders, as Blue Flame alleges here.  *See*, *e.g.*, *Ma*, 597 F.3d at 87-88.[8]

---

[8] If discovery establishes that Defendants accomplished their unauthorized return of the funds by accepting a cancellation request made by California's bank, Blue Flame agrees that this Count would not survive upon a motion for summary judgment.  However, that factual predicate is not

## II.     BLUE FLAME HAS ADEQUATELY ALLEGED NUMEROUS STATE LAW CLAIMS.

In addition to its UCC/Regulation J claims, Blue Flame has adequately pled eight state law claims aimed at the Bank's wrongful conduct in inducing Blue Flame to rely on the Bank to facilitate the California transaction, interfering in the California transaction, and triggering California's breach of contract, and removing the funds wired by California from Blue Flame's account.  Defendants attempt to defeat these claims by improperly contesting Blue Flame's factual allegations, asserting new purported facts, and narrowly construing Blue Flame's pleadings to hide the deficiencies in their arguments.  The Court should reject Defendants' efforts to subvert the pleading standard and deny Defendants' motion as to those claims.

### A.     Blue Flame Has Stated Claims for Tortious Interference with Its Contract and Business Expectancy.

Blue Flame has stated claims for tortious interference with its contract with California and with business expectancy under Virginia law by alleging "(1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted." *Chaves v. Johnson*, 335 S.E.2d 97, 102 (Va. 1985). Malice is not an element of the causes of action.  *Id.* at 102-03.

Blue Flame has alleged all of those elements.  Defendants were aware of the contract between Blue Flame and California, as well as Blue Flame's expectations for future business with California.  (*See, e.g.,* Complaint at ¶¶ 39-41.)  Defendants intentionally contacted California officials to accuse Blue Flame of fraud, causing California to breach its contract by

---

established by Defendants' Motion or any materials properly before the Court, and the Court must accept Blue Flame's allegations as true.  *See Mylan Laboratories, Inc.*, 7 F.3d at 1134.

demanding the return of the funds paid to Blue Flame.  (*See, e.g., id.* at ¶¶ 131-32, 138, 140-41.)
In doing so, Defendants caused damage to Blue Flame's business.  (*See id.* at ¶¶ 80, 133, 142.)

Defendants first try to attack Blue Flame's well-pleaded allegations, arguing that
Defendants in fact did not "state a fraud concern" to California.  (*See* Motion at 20.)  That argument
is flatly contradicted by Blue Flame's allegations that must be taken as true, as well as by numerous
public reports and statements by California officials, detailed above.  It is also nonsensical.
Defendants do not deny—indeed, they quote—California State Treasurer Ma's testimony to the
California State Assembly that Defendants "called Director Mark Hariri and informed him the
account was opened a day before by a Washington, D.C. based lobbyist and the bank was not
comfortable accepting this large wire transfer."  (*See* Motion at 21.)  Defendants, contradicting
themselves, also urge that the facts reported to the State Treasurer's Office "*are* fraud concerns."
(*See id.* at 20.)  Yet after conceding that they told California officials that Blue Flame's account
was opened the previous day by a political operative and insisting that such facts "*are* fraud
concerns," Defendants nevertheless deny as "implausible" the allegation that they stated a fraud
concern to California.  (*See id*.)  Clearly, Blue Flame's allegations are plausible and consistent
with those public statements.

Defendants further argue that Blue Flame's tortious interference claims fail because
Defendants did not utilize "improper means" to interfere with Blue Flame's contract rights or
business prospects.  (Motion at 25.)  While it is true that a claim for tortious interference requires
the use of "improper means," Defendants erroneously assume that the only possible "improper
means" were their defamatory statements to California officials, which Defendants argue are non-
actionable as defamation because they are privileged.  (*See id.* at 23-25.)  Although Defendants
are mistaken regarding those defamatory statements, the "improper means" to allege tortious

interference are not limited to defamatory statements.  Rather, they can include any improper conduct that is "illegal or independently tortious, such as violations of statutes, regulations, or recognized common law rules," as well as "fraud, misrepresentation or deceit . . . ."  *Duggin v. Adams*, 360 S.E.2d 832, 836 (Va. 1987).  Here, Defendants' improper means included their reversal of California's wire transfer, which constituted conversion and violated Regulation J.  Blue Flame has thus alleged multiple "improper means" that support its tortious interference claims.  (Complaint, ¶¶ 130, 139.)

Finally, Defendants argue that the tortious interference claims fail because Blue Flame did not allege "that Defendants harbored a wrongful intent to interfere with its contracts or business expectancy."  (Motion at 26.)  But a claim of tortious interference does not require malice, only intentionality.  *See Chaves*, 335 S.E.2d at 102.  It is sufficient "if the interferor knows that the interference is certain or substantially certain to occur as a result of his [or her] actions." *Commerce Funding Corp. v. Worldwide Sec. Services Corp.*, 249 F.3d 204, 212-13 (4th Cir. 2001). Defendants were fully aware that their statements to California officials and their unilateral decision to return the funds to California would interfere with the contract and business relationship between Blue Flame and California.  Defendants were aware of the essential terms of that contract and were explicitly told that it was vitally important for Blue Flame to be able to wire the funds received from California to pay its suppliers.  (*See* Complaint, ¶ 39.)  Defendants knew that they were returning funds paid to Blue Flame under the contract with California and that, without those funds, Blue Flame would not be able to make the payments necessary to perform the contract with California.  Defendants cannot credibly claim that reversing payment for a sale is not substantially certain to interfere with the sale.  In addition, Defendants certainly were aware

that contacting California officials to report "fraud concerns" with Blue Flame was substantially certain to interfere with the transaction.

**B.**     **Blue Flame Has Stated a Claim for Conversion.**

Blue Flame has stated a claim for conversion by alleging that Defendants, in removing the funds wired by California from Blue Flame's account, wrongfully deprived Blue Flame of funds which it was entitled to immediately possess.  (Complaint, ¶¶ 113-24); *Jones v. Bank of Am. Corp.*, No. 4:09 CV 162, 2010 WL 6605789, at *4 (E.D. Va. Aug. 24, 2010).

Neither of Defendants' arguments to dismiss Blue Flame's conversion claim withstand scrutiny.  First, Defendants argue that Blue Flame could not have acquired a right to possess the specific funds wired for its benefit by California because it was a general depositor, and therefore merely a creditor, of the Bank.  Defendants recite the general rule that a creditor cannot sustain a conversion claim against a debtor who fails to repay.  (*See* Motion at 13.) According to Defendants, "a depositor has no right to possession of particular funds that are 'sufficiently specific and identifiable, in relation to the bank's other funds, to state a claim for conversion against the bank.'"  (Motion at 13.)

Defendants' recitation of the law is backwards.  Contrary to the general rule that Defendants articulate regarding bank depositors as creditors, a bank customer *can* state a claim for conversion against a bank in exactly this situation:  where the funds are sufficiently specific and identifiable.  *See, e.g., Lowe v. Wells Fargo Bank, N.A.*, No. 3:18CV00126 (REP), 2018 WL 3748418, at *13 (E.D. Va. July 9, 2018), *report and recommendation adopted*, No. 3:18CV126, 2018 WL 3749391 (E.D. Va. Aug. 7, 2018) (denying motion to dismiss conversion claim against bank where plaintiff alleged that bank applied plaintiff's loan payments to accrued unpaid interest despite agreement not to do so); *Jones v. Bank of Am. Corp.*, 2010 WL 6605789, at *5 (finding that plaintiff "may maintain an action for the conversion of an identifiable fund of money" under

19

Virginia law).[9]  Indeed, Defendants' own authorities confirm that, notwithstanding any debtor-creditor relationship, a claim for conversion can be stated so long as the money that is the subject of the claim is specifically identifiable.  *See Kancor Ams., Inc. v. ATC Ingredients, Inc.*, No. 1:15-cv00589-GBL-IDD, 2016 WL 740061, at *9 (E.D. Va. Feb. 25, 2016) ("Under Virginia law, money can only be the subject of a conversion claim . . . when it is part of a segregated or identifiable fund."); *Guill v. Academy Life Ins. Co.*, No. 89-1509, 1991 WL 105502, at *3 (4th Cir. June 19, 1991) (affirming verdict in favor of plaintiffs on conversion claim where plaintiffs had "identified specific amounts of money that the jury could find belonged to them.").

Here, Blue Flame has alleged that the funds converted by Chain Bridge were in a specific, easily identifiable form and for a sum certain—a wire transfer documented by a payment order to Chain Bridge in the amount of $456,888,600.00 that Defendants unlawfully removed immediately after making payment to Blue Flame.  (*See* Complaint, ¶¶61, 115-122.)  Those funds, which were the subject of the accepted payment order from California and which constituted the entire balance of Blue Flame's account at the time, were thus sufficiently specific and identifiable to be distinguished from the Bank's other funds and therefore are subject to a conversion claim.

---

[9] Courts outside Virginia have similarly construed common law conversion claims.  *See, e.g.*, *Eva v. Midwest Nat'l Mortg. Bank, Inc.*, 143 F. Supp. 2d 862, 897 (N.D. Ohio 2001) (finding that, under Ohio common law, funds paid to mortgage servicer were sufficiently identifiable to support conversion claim against mortgage servicer because funds "were specific in amount" and "went into the individual accounts for payment of the mortgage"); *Decatur Auto Ctr. v. Wachovia Bank, N.A.*, 583 S.E.2d 6, 9 (Ga. 2003) (rejecting argument that funds commingled with those of other depositors could not be separately identified and therefore could not be subject of conversion claim where money was identifiable by reference to a specific check that the bank had paid over the customer's objection); *Roderick Dev. Inv. Co. v. Cmty. Bank of Edgewater*, 668 N.E.2d 1129, 1137 (Ill. App. Ct. 1996)  (collecting cases from numerous jurisdictions; holding that "money may be identified not only by segregation but also by its source or description.  In this case, the allegedly converted funds were adequately identified by description, five percent of the final payment under the purchase agreement, and their source, the payment transferred to the Bank.").

*See Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC*, 723 S.E.2d 744, 750-51 (N.C. 2012) (rejecting argument that particular funds deposited into a bank account could not be subject of conversion claim because they were commingled with deposits of bank's other customers, where funds were identifiable through electronic transfer record identifying the funds' specific source, amount, and destination); *Georgia Lottery Corp. v. First Nat. Bank of Grady Cty.*, 560 S.E. 2d 345, 347 (Ga. Ct. App. 2002) (holding that actions by bank that "prevented the [customer] from receiving its own property and allowed that property to be used for unauthorized purposes . . . is the very essence of conversion").[10]

Defendant's second argument to dismiss Blue Flame's conversion claim—that Blue Flame had no right to possess the funds because payment was not complete—again ignores Blue Flame's allegations and the applicable provision of UCC Article 4A.  Defendants are correct that Section 4A-405 of the UCC, as incorporated into Regulation J, governs whether the Bank made payment to Blue Flame.  (*See* Motion at 14.)  It provides, in pertinent part, that if a beneficiary's bank has credited the beneficiary's account with a payment order, payment occurs when either "(i) the beneficiary is notified of the right to withdraw the credit, . . . or (iii) funds with

---

[10] Numerous authorities from other jurisdictions confirm that funds paid by wire transfer are sufficiently identifiable to support a common law conversion claim.  *See, e.g.*, *Creative Trade Group, Inc. v. Int'l Trade Alliance, Inc.*, No. 08-c-2561, 2009 WL 3713345, at *9 (N.D. Ill. Nov. 4, 2009) (denying motion for summary judgment and stating that "the court assumes the wire transfer fund, which is a specific and documented amount of money . . . transferred to McGrath from an outside source ([plaintiff's] account), is sufficiently identifiable to support [plaintiff's] conversion claim"); *St. Paul Travelers Cas. & Sur. Co. of Am. v. Manley*, No. 05–cv–01195–REB–BNB, 2006 WL 3019673, at *1 n. 2 (D. Colo. Oct. 23, 2006) (unpublished order) ("It thus appears to be the consensus among courts that a claim of conversion is cognizable when it relates to a wire transfer of funds which are traceable to a specific bank account."); *ADP Inv'r Commc'n Servs., Inc. v. In House Attorney Servs., Inc.*, 390 F. Supp. 2d 212, 224-25 (E.D.N.Y. 2005) (holding plaintiff alleged conversion claim by naming specific bank account to which wire transfer was addressed and amount of wire transfer).  Blue Flame is not aware of any reason why the result should be different under Virginia law.

respect to the order are otherwise made available to the beneficiary by the bank." UCC § 4A-405. Under that provision, payment to Blue Flame was completed because (1) the Bank credited Blue Flame's account with the funds from the payment order (Complaint, ¶ 115-16) and (2) Blue Flame was explicitly assured by a Bank representative that the funds were available for Blue Flame's use immediately after the account was credited (*id.* at ¶ 62). Accordingly, the Bank effected payment to Blue Flame. *See First Sec. Bank of N.M., N.A. v. Pan Am. Bank*, 215 F.3d 1147, 1159 (10th Cir. 2000) ("[W]e hold that payment may occur under § [4A-405(a)(iii)] when a beneficiary's account is credited and the funds immediately are made available to the beneficiary.").

Defendants simply ignore Blue Flame's allegation that the Bank expressly represented that the funds were available for Blue Flame's use. Instead, Defendants argue that under the Bank's funds availability policy, Blue Flame could not withdraw the funds until the first business day after the deposit and therefore the funds were not available to Blue Flame on the day that Defendants chose to return the funds to California. (*See* Motion at 15; Exhibit C.) But that policy does not contradict Blue Flame's allegations, given Defendants' numerous indications that they would not enforce it. In addition to the express representation by the Bank's representative that the funds were available and could be wired to Blue Flame's supplier immediately after the funds appeared in Blue Flame's account, Defendants Brough and Evinger had a conversation with Gula—a customer of the Bank since 2007—in which they represented that the Bank could and would facilitate the inbound transfer from California and the outbound transfers that Blue Flame planned to make immediately upon receipt of California's transfer. (*See* Complaint, ¶¶ 27, 38-45.) Defendants, who were aware of their own policies, cannot use those internal policies to contradict and override their express representations to Blue Flame that induced Blue Flame to rely on the Bank to process the transaction. Indeed, if Defendants are correct that Blue Flame could not have

22

acquired a possessory right to the funds wired by California due to the Bank's invocation of the funds availability policy (*see* Motion at 14-15), then Defendants' representations to Blue Flame that they were willing and able to facilitate Blue Flame's need to make immediate outbound wire transfers to its suppliers were obviously and knowingly false.

Because the Bank completed payment to Blue Flame by crediting its account with the funds wired by California, notifying Blue Flame it had done so, and expressly representing to Blue Flame that the funds were available for its use, Defendants unlawfully converted those specifically identifiable funds when they unlawfully returned them to California.

**C.    Blue Flame Has Stated Claims for Fraud and/or Constructive Fraud.**

Blue Flame has likewise alleged claims for fraud and/or constructive fraud that satisfy the pleading standards of Rule 9(b).  To state a claim for fraud, a plaintiff must allege "(1) a false [representation], (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to the party misled."  *See, e.g., Hazaimeh v. U.S. Bank, N.A.*, 94 F. Supp. 3d 741, 748 (E.D. Va. 2015).  Constructive fraud has the same essential elements, except that the false representation may be innocent or negligent, as opposed to intentional and knowing.  *Id.*  Rule 9(b) requires that allegations of fraud specify the time, place, and contents of the false representation, the identity of the person making the misrepresentation, and what they obtained thereby.  *See McCauley v. Home Loan Inv. Bank*, 710 F.3d 551, 559 (4th Cir. 2013).

Blue Flame's allegations satisfy all of those elements.  Blue Flame has alleged that, during a 19-minute phone call on March 25, 2020, Brough and Evinger represented to Gula, with full knowledge of the facts that they later recklessly flagged as "fraud concerns," that the Bank was willing and able to facilitate Blue Flame's receipt of a wire transfer in excess of $450 million from California and Blue Flame's need to make immediate outbound transfers to its suppliers.

(Complaint, ¶¶ 38-44.)  In reliance on those representations, Blue Flame proceeded to use the Bank to carry out the transaction.  The Bank then acted in a manner completely contrary to its express representations, accusing Blue Flame of fraud without basis and causing California to breach its contract with Blue Flame, resulting in damage to Blue Flame's business and reputation.  (*See, e.g., id.* at ¶¶ 46-47, 144-151.)   Accordingly, Blue Flame has alleged the claims with the level of specificity required by Rule 9(b).

Defendants are incorrect that Brough and Evinger's statements are not actionable because they were merely "unfulfilled promises or statements of future events."  (*See* Motion at 19.)  Representations concerning competence, ability to perform, and ability to meet a customer's needs are actionable as fraud under Virginia law.  *See Viano v. THD At-Home Servs.*, Civil Action No. 1:19-cv-1272, 2020 U.S. Dist. LEXIS 62990, at *14-17 (E.D. Va. Apr. 9, 2020) ("a promisor who makes a promise without an intent to perform on that promise makes a misrepresentation of present fact, and if made to induce the promisee to act to his detriment . . . is actionable as an actual fraud"); *Hazaimeh*, 94 F. Supp. 3d at 749 (holding that representation by defendant mortgage servicer constituted a misrepresentation of a present fact where the defendant did not intend to perform as promised).

Blue Flame has not alleged that Defendants merely made unfulfilled promises.  It has alleged that Defendants, with knowledge of Blue Flame's specific needs in connection with the imminent wire transfers associated with the California transaction, misrepresented their intention or ability to handle those transfers.  (Complaint, ¶¶ 38-45.)[11]  Blue Flame is thus similarly

---

[11] This misrepresentation is supported by Defendants' insistence that the Bank planned to invoke its funds availability policy for new accounts to prevent Blue Flame from making the prompt outbound transfers that it specifically informed Defendants it needed to make and which Defendants affirmed the Bank could make.  (*See, e.g.,* Complaint, ¶¶ 39, 49, 56, 63-65.)

situated to the plaintiffs in *Viano*, who were in need of roofing repair services and advised the defendant regarding their specific needs.  *Viano*, 2020 U.S. Dist. LEXIS 62990, at *2.  The plaintiffs alleged that the defendant expressly represented that it could provide the needed roofing services in order to obtain plaintiffs' business.  *Id.* at *11-12.  When the defendant failed to perform, the plaintiffs sued for fraud.  *Id.* at *6-7.  The court denied the defendant's motion to dismiss the fraud claim, rejecting the argument that its representations were nonactionable and explaining that "by alleging that [the defendant] knowingly and intentionally made false statements and did not intend to perform in accordance with those statements, plaintiffs assert a misrepresentation of a present fact regarding [defendant]'s intention."  *Id.* at *14; *see also Yuzefovsky v. St. John's Wood Apartments*, 540 S.E.2d 134, 142 (Va. 2001) (distinguishing between statements volunteered as part of a sales pitch to all tenants/customers, which were opinions, and specific statements made in response to an "expressed concern," which were factual in nature).  Because Defendants' representations to Blue Flame concerning their willingness and ability to facilitate the transaction were not mere promises concerning future events, but factual statements regarding their present intent and ability to handle wire transfers to be executed *the very next day*, Blue Flame has stated claims for actual and constructive fraud.

   **D.**  **Blue Flame Has Stated a Claim for Defamation.**

     Blue Flame's defamation allegations are sufficient.  In Virginia, "[t]he elements of defamation are (1) publication of (2) an actionable statement with (3) the requisite intent."  *Tharpe v. Saunders*, 737 S.E.2d 890, 892 (Va. 2013).  Blue Flame has satisfied those elements by alleging that Defendants, with knowledge of all essential details regarding the California transaction and of

Gula's status as a longtime customer of the Bank, unilaterally contacted California officials and accused Blue Flame of fraud, without basis.  (Complaint, ¶¶38-45, 72-75.)

Defendants' arguments that they did not accuse Blue Flame of fraud and that their statements to California officials were nonactionable or privileged should be rejected.  As to the content of Brough and Evinger's statements to California officials, Blue Flame's allegations must be taken as true and the extrinsic materials attached to Defendants' Motion do not and cannot contradict them.  Blue Flame has alleged that Defendants accused Blue Flame of fraud, without basis.  (Complaint, ¶¶ 106, 119, 128, 137, 172.)  As Blue Flame alleged, and as California officials have publicly stated, Brough and Evinger independently reached out to California officials to say that the Bank was not comfortable with the transfer because Blue Flame's account had been opened the day before by a political operative—both of which were facts known to them the day before when discussing the transaction with Gula, and in response to which Defendants raised no concerns.  (*See* Complaint, ¶¶38-45, 73.)  Moreover, Defendants admit that they were raising fraud concerns to California by identifying those facts and stating their purported discomfort, despite incoherently arguing that the public record establishes that it was only "*California's* bank that suggested the possibility of a fraudulent transaction to California."  (*See* Motion at 20.)  Although Blue Flame cannot know without the benefit of discovery exactly what words Defendants spoke to California officials regarding why they were uncomfortable with the transaction (which California officials have publicly stated is the reason they requested the return of the funds), Defendants plainly indicated that they refused to be associated with Blue Flame's sale to California due to fraud.  Indeed, they insist there is no other reason for their actions.  (*See* Motion at 26.)

Defendants also argue that Blue Flame has failed to state a claim for defamation because their unsolicited warnings to California officials were nonactionable statements of

opinion.  (*See* Motion at 22.)  But whether Blue Flame or the specific transaction were fraudulent "is capable of being proved false," and therefore a statement that they were fraudulent is a statement of fact.  *See Hyland v. Raytheon Tech. Servs. Co.*, 670 S.E.2d 746, 751 (Va. 2009); *see also Steele v. Goodman*, 382 F. Supp. 3d 403, 421 (E.D. Va. 2019) (rejecting argument that defendant's accusations of fraud against plaintiff were nonactionable statements of opinion where statements were specific enough to be proven true or false)).

Further, Defendants' suggestion that they were not specifically accusing *Blue Flame* of fraud and that the fraud could have been related to another participant in the transaction is implausible.  (*See* Motion at 23.)  The only other participant in the transaction was the State of California.  Defendants were speaking as Blue Flame's bank, and the only facts Defendants raised concerning the transaction were specific to Blue Flame and had nothing to do with California.  Moreover, defamatory words that cause prejudice to a person in their business—such as an accusation of fraud—are actionable as defamation per se.  *See Hyland*, 670 S.E.2d at 750; *see also Hatfill v. New York Times Co.*, 416 F.3d 320, 330 (4th Cir. 2005) (stating that "statements that impute to a person the commission of some criminal offense involving moral turpitude, for which the party, if the charge is true, may be indicted and punished" constitutes a statement actionable as defamation *per se* under Virginia law); *AvePoint, Inc. v. Power Tools, Inc.*, 981 F. Supp. 2d 496, 506 (W.D. Va. 2013) ("Certain statements are considered defamatory per se under Virginia law, including those which prejudice a plaintiff in its profession or trade.").  In any event, the suggestion that a plaintiff has been a party to a fraudulent transaction raises a sufficient "defamatory sting" to form the foundation for a defamation claim.  *See Warren v. Bank of Marion*, 618 F. Supp. 317, 323 (W.D. Va. 1985) (denying summary judgment on defamation claim concerning statement that defendants had filed a suit against plaintiff and her son "to set aside as fraudulent and void certain

deeds made by [plaintiff and her son]").   Thus, Defendants' statements carry the requisite "defamatory 'sting' to Blue Flame's reputation" (*see* Motion at 22-23), contrary to Defendants' arguments.

Finally, Defendants' argument that Blue Flame's defamation claim should be dismissed because their statements were privileged fails because Blue Flame has alleged their statements were made with reckless disregard for the truth.  Again, Defendants narrowly construe Blue Flame's allegations and claim that Defendants only told California officials facts concerning the age of the account and Gula's professional background, ignoring that they expressly raised those facts as reasons to be concerned the transaction was fraudulent and to explain why the Bank was not comfortable keeping the funds.  (*See* Motion at 23-24.)  Defendants knew or should have known exactly how California would (and did) react to that information, all of which was known to Defendants when they discussed the transaction with Gula, a 13-year customer of the Bank, the day before.  (*See* Complaint, ¶¶38-45.)  *Steele v. Goodman*, 382 F. Supp. 3d 403, 422 (E.D. Va. 2019) (finding that plaintiff's allegation that defendant had reviewed and learned about plaintiff's good governance campaign before making defamatory statements was sufficient, "at this deferential stage, to support the conclusion that [defendant] acted with reckless disregard for the truth of her statements").

E.   **Blue Flame Has Stated Claims for Breach of Contract and/or Negligence.**

Blue Flame's breach of contract and negligence claims both address the Bank's failure to faithfully discharge its duties to Blue Flame in handling its banking transactions and its

violation of those duties by permanently removing funds from Blue Flame's account and improperly returning them to California.[12]

The elements of a breach of contract action are (1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation. *Brown v. Harms*, 467 S.E.2d 805, 807 (Va. 1996). Blue Flame has identified its contract with the Bank—the Account Agreement—as well as a number of ways in which the Bank breached that contract. First, to the extent that the Bank's removal of the funds from Blue Flame's account does not support a conversion claim, it supports a breach of contract claim because the Account Agreement and the Bank's funds availability policy obligate the Bank to make deposits available for withdrawal. (*See* Motion at 5; Exhibits B, C.) Blue Flame's claim is not preempted by UCC Article 4A or Regulation J because it does not address the Bank's handling of California's wire transfer; rather, it addresses the improper and permanent removal of funds from Blue Flame's account. *See Eisenberg v. Wachovia Bank, N.A.*, 301 F.3d 220, 224 (4th Cir. 2002) ("State law claims premised on conduct not covered by Subpart B cannot create a conflict with or duplicate the rules established in Subpart B."). Therefore, Blue Flame's allegations concerning the Bank's removal of funds from Blue Flame's account are alone sufficient to state a claim for breach of contract.

---

[12] At some point on or before March 26, 2020, the Bank, for reasons unknown to Blue Flame, purports to have voided Blue Flame's Account Agreement. (*See* Motion at 8.) Blue Flame's negligence claim is pled in the alternative to its breach of contract claim to account for the possibility that the Account Agreement was somehow voided by the time that the Bank received California's wire transfer. Under that factual scenario, the Bank would have assumed a duty of ordinary care to Blue Flame vis-à-vis the funds wired to Blue Flame's account because it charged Blue Flame for wire transfer fees. *Morris v. Hamilton*, 302 S.E.2d 51, 53 (Va. 1983) (bailee who is paid for bailment services "owes a duty of reasonable or ordinary care" to bailor).

Blue Flame also has stated a breach of contract claim based the implied covenant of good faith and fair dealing, which is implied in every contract under Virginia law. *Enomoto v. Space Adventures, Ltd.*, 624 F. Supp. 2d 443, 450 (E.D. Va. 2009). To the extent that the express provisions of the Account Agreement do not completely prohibit the Bank from removing funds from Blue Flame's account, the Bank's permanent removal of the funds wired by California violated the implied covenant of good faith. In the event the Court finds that Section 4A-204(a) does not cover a bank's deliberate sending of a payment order not authorized by its customer, the Bank also violated the implied covenant by returning California's wire payment. *See Sheerbonnet, Ltd. v. Am. Exp. Bank, Ltd.*, 951 F. Supp. 403, 412-14 (S.D.N.Y. 1995), *as amended* (May 1, 1996) (internal quotation marks omitted) (refusing to dismiss common law claims where plaintiff's allegations "and the circumstances giving rise to them do not fit neatly into any of Article 4-A's precise and detailed rules").

Blue Flame has alleged that the Bank returned the funds to California after its senior executives—with full knowledge of the age of the account and Gula's background—specifically discussed all relevant details of the transaction with Blue Flame's Chief Executive Officer and assured him that the Bank could and would facilitate all wire transfers associated with the transaction. (*See id.* at ¶¶38-45, 78.) Because the implied covenant of good faith requires "faithfulness to an agreed common purpose and consistency with the justified expectations of the other party," *Yarney v. Ocwen Loan Servicing, LLC*, 929 F. Supp. 2d 569, 581 (W.D. Va. 2013), Blue Flame's allegations adequately plead a violation of the implied covenant of good faith.

## **CONCLUSION**

For the foregoing reasons, Defendants' Motion should be denied in its entirety.

Dated: August 17, 2020                Respectfully submitted,

  /s/ *Peter H. White*
Peter H. White, Esq. (VSB # 32310)
Jason T. Mitchell (admitted *pro hac vice*)
Gregory Ketcham-Colwill (admitted *pro hac vice*)
SCHULTE ROTH & ZABEL LLP
901 Fifteenth Street, NW, Suite 800
Washington, DC 20005
Tel:  (202) 729-7476
Fax:  (202) 730-4520
pete.white@srz.com
jason.mitchell@srz.com
gregory.ketcham-colwill@srz.com

William H. Gussman, Jr. (admitted *pro hac vice*)
SCHULTE ROTH & ZABEL LLP
919 Third Avenue
New York, New York 10022
Tel:  (212) 756-2044
Fax:  (212) 593-5955
bill.gussman@srz.com

*Counsel for Blue Flame Medical LLC*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 17th day of August, 2020, I caused the foregoing document to be filed and served electronically using the Court's CM/ECF system, which automatically sent a notice of electronic filing to all counsel of record.

Dated: August 17, 2020

           /s/ *Peter H. White*
Peter H. White, Esq. (VSB# 32310)
SCHULTE ROTH & ZABEL LLP
901 Fifteenth Street, NW, Suite 800
Washington, DC 20005
Tel: 202-729-7476
Fax: 202-730-4520
peter.white@srz.com

*Counsel for Blue Flame Medical LLC*