**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**

**Alexandria Division**

| | |
|---|---|
| **BLUE FLAME MEDICAL LLC** ) | |
| ) | |
| *Plaintiff,* ) | |
| ) | |
| **v.** ) | **Civil Action No. 1:20-cv-00658** |
| ) | |
| **CHAIN BRIDGE BANK, N.A.,** ) | **The Honorable Leonie Brinkema** |
| **JOHN J. BROUGH, and** ) | |
| **DAVID M. EVINGER,** ) | |
| ) | |
| *Defendants.* ) | |
| ) | |
| ) | |
| **CHAIN BRIDGE BANK, N.A.** ) | |
| ) | |
| *Counterclaim Plaintiff,* ) | |
| ) | |
| **v.** ) | |
| ) | |
| **BLUE FLAME MEDICAL LLC** ) | |
| ) | |
| *Counterclaim Defendant.* ) | |

**MEMORANDUM IN SUPPORT OF PLAINTIFF/COUNTERCLAIM DEFENDANT
BLUE FLAME MEDICAL LLC'S MOTION TO DISMISS COUNTERCLAIMS**

SCHULTE ROTH & ZABEL LLP

901 Fifteenth Street, NW, Suite 800          919 Third Avenue
Washington, DC 20005                              New York, New York 10022
Tel:  (202) 729-7476                                 Tel:  (212) 756-2044

*Counsel for Plaintiff/Counterclaim Defendant
Blue Flame Medical LLC*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................1

BACKGROUND ...................................................................................................................1

    A.    Blue Flame Enters the Account Agreement.........................................................1

    B.    Blue Flame Discusses Its Contract with the State of California with
        Defendants. ........................................................................................................2

    C.    California Sends the Wire Transfer for Blue Flame's Benefit. ..............................3

    D.    Defendants Unilaterally Raise "Fraud Concerns" Regarding Blue Flame with
        California Officials and Agree to Return the Funds Without Blue Flame's
        Consent. ............................................................................................................4

    E.    The Bank "Voids" Blue Flame's Account Agreement Without Explanation.........5

STANDARD OF REVIEW ......................................................................................................5

ARGUMENT .......................................................................................................................6

I.    THE BANK CANNOT ENFORCE A CONTRACT IT HAS ALREADY
     TERMINATED.......................................................................................................6

II.    THE FEE-SHIFTING PROVISION IS UNCONSCIONABLE UNDER VIRGINIA
      LAW. ...............................................................................................................11

III.    THE FEE-SHIFTING PROVISION IS VOID AS AGAINST PUBLIC POLICY
       UNDER VIRGINIA LAW. ...................................................................................14

CONCLUSION...................................................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)........................................................................................................5

*Devine v. Buki*,
   767 S.E.2d 459 (Va. 2015)..............................................................................................8

*Flint Hill Sch. v. McIntosh*,
   No. 181678, 2020 WL 33258 (Va. Jan. 2, 2020)......................................................12, 13, 14

*Great Am. Ins. Co. v. GRM Mgmt., LLC*,
   C.A. No. 3:14-CV-295, 2014 WL 6673902 (E.D. Va. Nov. 24, 2014)....................................6

*HGS Homes v. Kelly Residential Grp., Inc.*,
   948 S.W.2d 251 (Mo. Ct. App. 1997)...............................................................................10

*Jeffrey J. Nelson & Assocs., Inc. v. LePore*,
   No. 4:11CV75, 2012 WL 2673242 (E.D. Va. July 5, 2012) .................................................5

*JTH Tax, Inc. v. Williams*,
   310 F. Supp. 3d 648 (E.D. Va. 2018) ...............................................................................8

*McIntosh v. Flint Hill Sch.*,
   No. CL-2018-1929, 2018 WL 9393020 (Va. Cir. Ct. Sep. 17, 2018) .................12, 13, 14, 15

*Menorah Chapels At Millburn v. Needle*,
   899 A.2d 316 (N.J. App. Div. 2006)..................................................................................9

*Mylan Laboratories, Inc. v. Matkari*,
   7 F.3d 1130 (4th Cir. 1993) ............................................................................................8

*Oil Workers Int'l Union, Local No. 463 v. Texoma Nat. Gas Co.*,
   146 F.2d 62 (5th Cir. 1944), *cert. denied* 324 U.S. 872 .....................................................9

*Sanders v. Certified Car Ctr., Inc.*,
   93 Va. Cir. 404, 2016 WL 9076185 (2016)...................................................................11, 12

*Siskin Enterprises Inc. v. W.B. Stoddard Jr. Inc.*,
   147 F. Supp. 2d 1125 (D. Utah 2001)....................................................................6, 9, 10, 11

*Southeast Lumber Co. v. Friend*,
   164 S.E. 372 (Va. 1932)..................................................................................................7

*State Farm Fire & Cas. Co. v. Sevier*,
   537 P.2d 88 (Or. 1975) ....................................................................................................10

*Sylvania Industrial Corp. v. Lilienfeld's Estate*,
   132 F.2d 887 (4th Cir. 1943) ...........................................................................................8

*Texas Co. v. Northup*,
   153 S.E. 659 (Va. 1930)............................................................................................7, 8, 9

## Other Authorities

Federal Rule of Civil Procedure 12(b)(6) ......................................................................5

Restatement (Second) of Contracts §§ 378, 382 (1981) ...............................................8

## PRELIMINARY STATEMENT

Through its counterclaims, Defendant/Counterclaim Plaintiff Chain Bridge Bank (the "Bank") seeks to hold Plaintiff/Counterclaim Defendant Blue Flame Medical LLC ("Blue Flame") liable for the Bank's costs in this litigation—regardless of its outcome—by enforcing a contract that the Bank admits it unilaterally terminated months ago.  As the case law makes abundantly clear, a party may not terminate one part of a non-divisible contract while reserving the benefits of the remainder.  Once a contractual termination right is exercised, the entire contract is terminated and all rights and obligations thereunder extinguished.  Even if the contract remained in force, the Bank's counterclaims still would fail because the specific provision on which the counterclaims rely is unreasonably one-sided in the Bank's favor and, therefore, unenforceable. In short, there is no basis in contract or under law to hold Blue Flame liable for the Bank's litigation costs, which would be contrary to the "American Rule," unethical under the Virginia Rules of Professional Conduct, and unconscionable under Virginia law.  For these reasons, the Bank's counterclaims should be dismissed.

## BACKGROUND

### A.    Blue Flame Enters the Account Agreement.

On March 25, 2020, Blue Flame entered into an Account Agreement with the Bank to open a commercial banking account for Blue Flame.  Defendants' Answer, Affirmative Defenses, and Counterclaims, ECF No. 38 ("Answer" or "Counterclaims"), ¶ 3; Answer ¶ 34; Complaint ¶ 34.  That Account Agreement incorporated a series of additional documents, including the Terms and Conditions for Blue Flame's account.  Counterclaims, ¶¶ 3-4, Exhibits A and B.  The Terms and Conditions include a fee shifting provision, upon which the Bank's counterclaims rely.  Counterclaims, ¶ 3.  It provides:

> You will be liable for our costs as well as our reasonable attorneys' fees, to the extent permitted by law, whether incurred as a result of collection or in any other dispute involving your account. This includes, but is not limited to, disputes between you and another joint owner; you and an authorized signer or similar party; or a third party claiming an interest in your account. This also includes any action that you or a third party takes regarding the account that causes us, in good faith, to seek the advice of an attorney, whether or not we become involved in the dispute. All costs and attorneys' fees can be deducted from your account when they are incurred, without notice to you.

Exhibit B, § 3. The Terms and Conditions also provide that the Bank "may close this account at any time upon reasonable notice to you and tender of the account balance personally or by mail." *Id.*, § 10. Neither the Terms and Conditions nor the Account Agreement contain any term stating that the fee shifting provision survives termination of the Account Agreement. *See* Exhibits A and B. They also do not include a "choice of law" clause, but the Terms and Conditions state that the "agreement is subject to applicable banking laws, the laws of the state of Virginia and other applicable rules such as the operating letters of the Federal Reserve Banks . . . ." *Id.* at § 2.

Blue Flame was required to execute a copy of the Account Agreement via the DocuSign electronic signature system and accept those Terms and Conditions as a condition of opening its account at the Bank, with no opportunity to negotiate. *See* Counterclaims, ¶¶ 5-6; *see also* Exhibit A.

**B.    Blue Flame Discusses Its Contract with the State of California with Defendants.**

On March 25, 2020, Defendants Brough and Evinger engaged in a nearly 20-minute discussion with Mr. Gula regarding Blue Flame's business, its anticipated receipt the next day of a wire transfer from the State of California to purchase urgently needed PPE and Blue Flame's anticipated need to send and receive wire transfers related to that and other PPE transactions. Answer ¶¶ 31, 38-39, 44; Complaint ¶¶ 31, 38-39, 44. During that conversation, Defendants were

2

informed that California had entered into a contract to purchase PPE from Blue Flame Medical and that Blue Flame Medical was anticipating a wire transfer the next day from the State of California to Blue Flame Medical's account at Chain Bridge Bank in an amount of at least $450 million.  *See* Answer ¶¶  38-39, 128; Complaint ¶ 38-39, 128.  Defendants also were informed that Blue Flame was a newly formed company that represented a transition for Mr. Gula, its Chief Executive Officer, who wished to exit his prior career in politics.  Answer ¶ 41, Complaint ¶ 41. During that discussion, Defendants indicated that receipt of a wire transfer of that size would pose operational challenges for the Bank, but did not indicate that the Bank could not accept the transfer or did not wish to do business with Blue Flame.  *See* Answer ¶ 43; Complaint ¶ 43.  Later that evening, Defendants contacted Mr. Gula to ask a follow-up question concerning whether Blue Flame planned to wire any funds to China, and Mr. Gula responded indicating that Blue Flame planned to pay its primary supplier by wiring funds to the supplier's California bank account.  *See* Answer ¶ 49; Complaint ¶ 49.

### C.  California Sends the Wire Transfer for Blue Flame's Benefit.

On March 26, 2020, Blue Flame representatives and representatives of the Bank were engaged in discussions regarding Blue Flame's expected receipt of the wire transfer from California.  Answer ¶ 57, Complaint ¶ 57.  Those discussions included Blue Flame's notice to the Bank that it would need to send an outgoing wire to one of the suppliers for the N95 masks purchased by California immediately upon receipt of the Wire Transfer.  A representative of the Bank confirmed her understanding of Blue Flame's request, and, once the Bank had received the Wire Transfer, the representative solicited the information necessary to initiate the outgoing wire, which Blue Flame promptly provided.  Answer ¶¶ 64-65; Complaint ¶¶ 64-65.

Consistent with Blue Flame's representations, at approximately 11:23 AM eastern time ("ET") on March 26, 2020, California initiated a wire transfer to send $456,888,600 to Blue

Flame's account at the Bank through the Fedwire funds transfer system.   Counterclaims ¶ 7;
Answer ¶ 89; Complaint ¶ 89.   Approximately, 30 minutes later, the Bank received a payment
order for that transfer.   Counterclaims ¶ 7.   Defendants understood that payment was a deposit for
the purchase of N95 masks from the State of California, as Blue Flame had represented.
Counterclaims ¶ 8.   Minutes later, the Bank issued a Wire Transfer Notice confirming its receipt
of the incoming wire transfer from California for Blue Flame's account and sent Mr. Gula an
"INCOMING WIRE CONFIRMATION" with a link to a copy of the Wire Transfer Notice.
Answer ¶ 61, Complaint ¶ 61.

### D.   Defendants Unilaterally Raise "Fraud Concerns" Regarding Blue Flame with California Officials and Agree to Return the Funds Without Blue Flame's Consent.

Despite Defendants' awareness of the nature of Blue Flame's business and the
terms of the transaction between Blue Flame and California, despite Defendants never indicating
to Blue Flame that it was concerned that Blue Flame or the transaction was fraudulent, and despite
the Bank's acceptance of the payment order for Blue Flame's account, Defendants unilaterally
reached out to the California officials to raise concerns regarding the Wire Transfer shortly after
receiving the payment order from California's bank.   *See* Answer ¶¶ 106, 128; Complaint ¶¶ 106,
128.   On that phone call with California officials, Defendants raised "fraud concerns" about the
transaction—that Blue Flame's account had only been opened the previous day, and that Blue
Flame's principals had previous careers in politics.   Complaint ¶ 73; Defendants' Memorandum
in Support of their Motion to Dismiss ("Motion to Dismiss") at 20, 22.   In response to Defendants'
actions, shortly thereafter, California's bank contacted the Bank and requested that the wire
transfer be cancelled and that all funds that California had transferred for the benefit of Blue
Flame's account be returned.   *See* Counterclaims ¶¶ 10-11.

After Blue Flame noticed that the funds from California no longer appeared in Blue Flame's online account view on the Bank's website, Mr. Gula contacted Mr. Brough and Mr. Evinger at 1:34 PM ET requesting that "someone call me ASAP please."  *See* Answer ¶ 69; Complaint ¶ 69.  Neither Mr. Brough nor Mr. Evinger did so, and instead Mr. Brough emailed Mr. Gula approximately 20 minutes later, stating "We received official notice from the sending bank to return the wire.  Please resolve directly with the State of California."  Answer ¶ 70; Complaint ¶ 70.  According to the Bank, at 2:05 PM ET, California's bank officially requested cancellation of the payment order that the Bank had accepted.  *See* Counterclaims ¶ 11.  At 3:21 PM ET, the Bank accepted the request by California's bank to return the funds without Blue Flame's consent. *See id.* ¶ 12.

### E.    The Bank "Voids" Blue Flame's Account Agreement Without Explanation.

Approximately 15 minutes after returning the funds it had accepted for Blue Flame's account, the Bank notified Blue Flame via email that its Account Agreement had been voided.  Counterclaims ¶ 13.  Specifically, the Bank sent Blue Flame copies of its Account Agreement and other account opening documentation with the word "VOID" superimposed across each page, along with a message stating that the account had "been voided for the following reason: account closing."  Answer ¶ 71; Complaint ¶ 71.  That two-word message—"account closing"— is the only explanation Blue Flame has ever received for the Bank's unilateral decision to terminate Blue Flame's Account Agreement.

### <u>STANDARD OF REVIEW</u>

A motion to dismiss counterclaims under Federal Rule of Civil Procedure 12(b)(6) should be granted if the counterclaims do not "contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Jeffrey J. Nelson & Assocs., Inc. v. LePore*, No. 4:11CV75, 2012 WL 2673242, at *3 (E.D.

Va. July 5, 2012) (applying *Iqbal* standard on motion to dismiss counterclaims).  In evaluating a Rule 12(b)(6) motion to dismiss, the Court may consider public records, documents central to the claims, and documents sufficiently referred to in the counterclaims so long as the authenticity of the documents is not disputed.  *Great Am. Ins. Co. v. GRM Mgmt., LLC*, C.A. No. 3:14-CV-295, 2014 WL 6673902, at *2 (E.D. Va. Nov. 24, 2014) (considering contract attached to counterclaim on motion to dismiss).

## ARGUMENT

The Bank's counterclaims, which seek to recover all of the Bank's attorney's fees and costs in defending this Action, fail for three independent reasons.  First, the Bank terminated Blue Flame's Account Agreement immediately after returning the Wire Transfer to California and thereby abandoned all rights and obligations it had under that agreement.  Second, even if the Account Agreement remained enforceable, its fee-shifting provision could not be enforced because its extreme breadth and one-sided nature render it unconscionable under Virginia law.  Third, the fee-shifting provision is void as against public policy because it operates as a bar to potentially meritorious suits and contravenes the Virginia Rules of Professional Conduct.  Therefore, the Bank's counterclaims should be dismissed.

## I.   THE BANK CANNOT ENFORCE A CONTRACT IT HAS ALREADY TERMINATED.

Defendants admit that the Bank unilaterally terminated the Account Agreement immediately after it returned the Wire Transfer to California.  *See* Counterclaims ¶¶ 13, 17. Nevertheless, the Bank now seeks to enforce that terminated Account Agreement in order to recover its attorney's fees and costs in defending this Action and to obtain a corresponding declaratory judgment.  "It is hornbook law that in the absence of an express provision therefor, a contract cannot be partially abrogated under a provision for its termination."  *Siskin Enterprises*

*Inc. v. W.B. Stoddard Jr. Inc.*, 147 F. Supp. 2d 1125, 1129 (D. Utah 2001) (citation omitted). Accordingly, the Bank cannot enforce the terminated Account Agreement, and its counterclaims should be dismissed.

Under Virginia law, a contract "cannot be partially terminated by one party so as to take to himself all the substantial benefits of the contract and at the same time repudiate all of its own obligations to the [other party]." *Texas Co. v. Northup*, 153 S.E. 659, 664 (Va. 1930); *see also Southeast Lumber Co. v. Friend*, 164 S.E. 372, 374 (Va. 1932). Yet that is precisely what the Bank seeks to do through its counterclaims. Section 10 of the Account Agreement's Terms and Conditions, labeled "Amendments and Termination," provides that the Bank "may [] close this account at any time upon reasonable notice to you and tender the account balance personally or by mail." Exhibit B to Counterclaims ("Exhibit B") at 6. Pursuant to that provision, the Bank terminated Blue Flame's Account Agreement immediately after returning the Wire Transfer to California.[1] Complaint ¶ 71. Far from disputing that fact, Defendants have consistently alleged it in their counterclaims (*see* Counterclaims ¶¶ 12, 13, 17) and in their efforts to dismiss Blue Flame's Complaint (Defendants' Memorandum in Support of their Motion to Dismiss at 8, 27; Defendants' Reply in Support of their Motion to Dismiss at 20).[2] The Bank's allegations must be taken as true

---

[1] Section 10 does not require a court order or judicial intervention of any kind for the termination to take effect. *See* Exhibit B.

[2] Even if Defendants' allegations did not have to be taken as true, both parties' actions demonstrate a mutual understanding that the Account Agreement was terminated. Upon terminating the Account Agreement, the Bank immediately gave notice to Blue Flame by sending an email stating that the Account Agreement "ha[d] been voided" and linking to copies of the Account Agreement with the word "VOID" stamped across each page. Complaint ¶ 71. In addition to closing Blue Flame's account, the Bank closed the account of an affiliated company, further underscoring its intention to terminate its relationship with Blue Flame. *Id.* Indeed, the Bank's counterclaims are the only indication that the Bank has not completely renounced the Account Agreement. For its

on this Motion, *Mylan Laboratories, Inc. v. Matkari,* 7 F.3d 1130, 1134 (4th Cir. 1993), and the

Bank is bound by them in any event.  *See JTH Tax, Inc. v. Williams*, 310 F. Supp. 3d 648, 653-54

(E.D. Va. 2018) ("[T]o the extent that any factual or legal allegations in the Plaintiffs' Opposition

contradict or diverge from those in the Amended Complaint, the court will consider only the

version of the allegations that appears in the Amended Complaint.") (citing *Marks v. Dann*, 600

F. App'x 81, 89 (4th Cir. 2015)).[3]  Under the rule announced by Virginia's Supreme Court in

*Northup*, the Bank's termination of the Account Agreement served to terminate every provision of

the Agreement, including the fee-shifting provision.[4]  *Northup*, 153 S.E. at 664.  That is, when the

Bank terminated the contract, the entire relationship between the Bank and Blue Flame under the

contract ended.  As such, the Bank cannot enforce a selected provision of the Account Agreement

six months after terminating the agreement.

        *Northup*, which involved a contract for the purchase and distribution of oil, is

instructive.  *Id.* at 660.  There, the contract at issue provided a non-judicial mechanism that allowed

---

part, Blue Flame has sought other banking providers.  Complaint ¶ 84.  Thus, the conduct of the
parties confirms the Bank's allegation that the Account Agreement was terminated.

[3] Defendants' allegations concerning the termination of the Account Agreement use the word
"voided."  Terminating the contract in this way, though, does not "void" it in the legal sense.  The
contract was not "voided" by operation of law; rather, it was terminated by the exercise of Section
10 of the Terms and Conditions.  Regardless, whether a party terminates a contract pursuant to a
contractual termination right or it is voided on the basis of a purported misrepresentation by the
other party, the result is the same:  the contract is abrogated and all rights and obligations under it
are extinguished.  *See Devine v. Buki*, 767 S.E.2d 459, 467 (Va. 2015) ("If rescission is granted,
the contract is terminated for all purposes, and the parties are restored to the *status quo* ante.")
(quoting *McLeskey v. Ocean Park Investors, Ltd.,* 405 S.E.2d 846, 847 (Va. 1991)); *Sylvania
Industrial Corp. v. Lilienfeld's Estate*, 132 F.2d 887, 893 (4th Cir. 1943) ("It is elementary that
one who rescinds a contract for fraud in its procurement, or for any other cause, may not assert
any right under it.") (citation omitted); Restatement (Second) of Contracts §§ 378, 382 (1981).

[4] The Account Agreement does not contain any survival provision that would allow for the
enforcement of the fee-shifting provision, or any other provision, after the Agreement's
termination.  *See* Exhibit B.

the oil company to unilaterally terminate the contract upon thirty days' notice to the distributor. *Id.* After invoking that provision to terminate the contract, the oil company claimed that its termination was limited to two of the three agreements comprising the contract, claiming that the third, purportedly non-terminated agreement permitted the oil company to rent the distributor's property for a mere $25 per year. *Id.* at 660-61. The Supreme Court of Virginia determined that the three agreements "must be considered together" as a single contract, and held that the contract could "not be so construed as to leave [the oil] company in possession of the leased property . . . at a nominal rent after it has exercised its rights to terminate the sales and the license agreement." *Id.* at 663.

The Bank's position in this case is no different than that of the oil company in *Northup*. The Bank is attempting to enforce a contract that it terminated through the exercise of an express, unilateral contract right.[5] Yet the Bank seeks a result that would be equally inequitable to that sought in *Northup*: a court order granting the Bank the benefits of a contract under which it abandoned all of its own obligations months ago. Virginia law does not permit such an inequitable result. *Northup*, 153 S.E. at 664.

Virginia courts are not alone in preventing a party from enforcing a contract it previously terminated. *See, e.g.*, *Oil Workers Int'l Union, Local No. 463 v. Texoma Nat. Gas Co.*, 146 F.2d 62, 64 (5th Cir. 1944), *cert. denied* 324 U.S. 872 ("A party to an agreement may exercise his option to cancel it, but he may not, when unauthorized by the agreement and in the absence of consent of the other party, cancel it in part."); *Siskin Enterprises Inc. v. W.B. Stoddard Jr. Inc.*, 147 F. Supp. 2d 1125 (D. Utah 2001); *Menorah Chapels At Millburn v. Needle*, 899 A.2d 316, 322

---

[5] Because the fee-shifting provision at issue here is contained in the Terms and Conditions to the Account Agreement, the contractual analysis in this case is even more straightforward than in *Northup*. *See* Exhibit B.

(N.J. App. Div. 2006) ("A party may not repudiate one part of a nondivisible contract and claim the benefit of the residue, because to do so would amount to unjust enrichment and would bind the parties to a contract which they did not contemplate.") (citations omitted); *HGS Homes v. Kelly Residential Grp., Inc.*, 948 S.W.2d 251, 255 (Mo. Ct. App. 1997) (when a contract is terminated all provisions are terminated and all contracted rights are wholly abandoned); *State Farm Fire & Cas. Co. v. Sevier*, 537 P.2d 88, 93 (Or. 1975) ("one who rescinds a contract must ordinarily rescind the entire contract and cannot, at the same time, recognize the continued existence and enforceability of a portion of the contract").

The facts of *Siskin Enterprises* closely mirror those of this case.  As here, the contract at issue in *Siskin Enterprises* included a fee-shifting provision and a provision for the non-judicial termination of the contract by one party (the only relevant difference being that the *Siskin Enterprises* provisions were bilateral, while the provisions in the Account Agreement here benefit only the Bank).  147 F. Supp. 2d at 1126.  When one of the parties defaulted on the contract, the other party exercised the non-judicial termination right, as the Bank did here.  *Id.* at 1129.  The terminating party then tried to enforce the contract in court.  *Id.* at 1126.  The United States District Court for the District of Utah held that the terminating party could not enforce the fee-shifting provision because:

> [The party's] actions in terminating the contract caused an end to the agreement.  In terminating its relationship with defendant [], plaintiff terminated all provisions of the agreement, including the attorney fees provision.  No language in the contract provided a means whereby the contract could be partially abrogated.  It is hornbook law that "in the absence of an express provision therefor, a contract cannot be partially abrogated under a provision for its termination."  18 C.J.S. Contracts § 447 (1999).  Consequently, when Siskin terminated the contract, the entire relationship between the parties under the contract ended.
>
> This court finds that plaintiff purposely and deliberately, after due consideration, elected to terminate the [contract] between the parties

10

> without requesting or awaiting any judicial declaration of the right
> to do so.  Plaintiff did not require any order or action by the court,
> and did not make any request for judicial declaration or otherwise
> concerning the right or efficacy of plaintiff's abrogation of the
> contract and termination of defendant's [rights thereunder].

*Id.* at 1129-30 (citation omitted).  Because "the contract had been unilaterally [and] completely abrogated," the terminating party could not "enforce other terms of the then non-existent contract." *Id.* at 1130.

That analysis in *Siskin Enterprises* directly supports dismissal of the Bank's counterclaims.  Here, the Bank unilaterally terminated the Account Agreement, of its own volition. No language in the Account Agreement or its Term and Conditions provided for a partial termination or abrogation, nor did any provision of the contract provide for the fee-shifting provision to survive the Account Agreement's termination.  Accordingly, having decided to terminate the Account Agreement, the Bank cannot enforce a contractual term it chose to extinguish.

## II. THE FEE-SHIFTING PROVISION IS UNCONSCIONABLE UNDER VIRGINIA LAW.

Even if the Bank could enforce the Account Agreement after terminating it, the fee-shifting provision cannot be enforced because it is procedurally and substantively unconscionable under Virginia law.  The fee-shifting provision is procedurally unconscionable because it is a contract of adhesion offered to Blue Flame on a take-it-or-leave-it basis; it is substantively unconscionable because it benefits only the Bank, rather than the prevailing party, and covers attorney's fees and costs generated entirely by the actions of third parties.  Because an unconscionable contract is unenforceable, the Bank's counterclaims should be dismissed.

Virginia courts "will not enforce a contract or contract provision if [. . .] it is both procedurally and substantively unconscionable."  *Sanders v. Certified Car Ctr., Inc.*, 93 Va. Cir.

404, 2016 WL 9076185, at *2 (2016). "Procedural unconscionability arises from inequities, improprieties, or unfairness in the bargaining process and the formation of the contract . . . . Substantive unconscionability involves unfairness in the terms of the contract itself . . . ." *Id.* (citation omitted). "In determining whether a contractual provision is [procedurally] unconscionable, a relevant factor to consider is whether the contract was an adhesion contract." *Flint Hill Sch. v. McIntosh*, No. 181678, 2020 WL 33258, at *5 (Va. Jan. 2, 2020) [hereinafter "*McIntosh II*"]. "An adhesion contract is a standard-form contract prepared by one party, to be signed by another party in a weaker position, usually a consumer, who adheres to the contract with little choice about the terms." *Id.* (quoting Black's Law Dictionary 403 (11th ed. 2019)). A contract provision is substantively unconscionable if it is "one that no man in his senses and not under a delusion would make, on the one hand, and as no fair man would accept, on the other." *Id.*

　　　　Applying those general principles, the Virginia Supreme Court recently refused to enforce a unilateral fee-shifting provision similar to the one at issue here. *McIntosh II* at *6. In *McIntosh*, the parent of a student enrolled in the defendant school challenged the fee-shifting provision in the enrollment contract between the parent and the school. The fee-shifting provision required that the parent "agree to pay all attorneys' fees and costs incurred by [the school] in any action arising out of or relating to this Enrollment Contract." *McIntosh v. Flint Hill Sch.*, No. CL-2018-1929, 2018 WL 9393020 at *3 (Va. Cir. Ct. Sep. 17, 2018) [hereinafter "*McIntosh I*"]. In finding that the fee-shifting provision was procedurally unconscionable, the Virginia Circuit Court emphasized that "[a]ssent to the Contract's terms is done by online electronic signature leaving no room for bargaining." *Id.* at *14-15. The Virginia Supreme Court agreed, noting that the school prepared the contract and that the parent had no "meaningful choice regarding the terms," making

12

it "a classic example of an adhesion contract." *McIntosh II* at *6. The Virginia Supreme Court also found the enrollment contract substantively unconscionable because it was "overly broad," *id.*, requiring parents to pay the school's attorney's fees even "if [the parents] litigate with success against the school or are sued by the School and yet prevail," *McIntosh I* at *15.

The fee-shifting provision in the Account Agreement bears all of the traits that the Virginia Supreme Court found unenforceable in *McIntosh*. The Account Agreement was prepared by the Bank and presented to Blue Flame for its assent via DocuSign. Complaint ¶ 34. Since Blue Flame had no "meaningful choice regarding the terms," the Account Agreement is a contract of adhesion and thus may be deemed procedurally unconscionable under Virginia law. *See McIntosh II* at *6. The fee-shifting provision also is substantively unconscionable because it is "overly broad." *See id.* Like the fee-shifting provision in *McIntosh*, the Bank's fee-shifting provision requires Blue Flame to pay the Bank's attorney's fees even if Blue Flame successfully sues the Bank or the Bank unsuccessfully sues Blue Flame. *See* Exhibit B, § 3. In fact, the Account Agreement's fee-shifting provision is substantially broader than that in *McIntosh*, as it purports to hold Blue Flame liable for attorney's fees incurred entirely as a result of the actions of third parties. *See id.* (obligation to pay attorneys' fees and costs "includes any action that you *or a third party* takes regarding the account that causes us, in good faith, to seek the advice of an attorney, whether or not we become involved in the dispute") (emphasis added). Taken at face value, the fee-shifting provision would oblige Blue Flame to pay the Bank's fees and costs in defending an unknown third party's frivolous claim to an interest in Blue Flame's account. Because "no one with his or her senses and not under delusion would agree" to pay for attorney's fees and costs he or she had no part in causing, the Account Agreement's fee-shifting provision is unconscionable. *See*

*McIntosh II* at *6. Therefore, even if the Bank had not already terminated the entire Account Agreement, the fee-shifting provision would nevertheless be void and unenforceable.[6]

## III.   THE FEE-SHIFTING PROVISION IS VOID AS AGAINST PUBLIC POLICY UNDER VIRGINIA LAW.

In addition to being unconscionable, the fee-shifting provision under the Account Agreement also is void as against public policy under Virginia law. Again, *McIntosh* is instructive. *McIntosh I* held that the school's fee-shifting provision discussed above could not be enforced for the independent reason that it was void as against public policy. *McIntosh I* at *16. Public policy is "the principle which declares that no one can lawfully do that which has a tendency to be injurious to the public welfare." *Id.* (quoting *Reading & Language Learning Ctr. v. Sturgill*, 94 Va. Cir. 94, 106 (2016)). As explained in *McIntosh I*, provisions like the one in the school's enrollment contract and the Bank's Account Agreement allow potential wrongdoers to insulate themselves from liability for their misconduct by making it financially impractical to file suit against them. *Id.* at 15-16. The *McIntosh I* court further explained that, under Rule 1.5 of the Virginia Rules of Professional Conduct, it would be unethical for the court "to approve contractual attorney's fees . . . to a non-prevailing party." *Id.* at 17. The court concluded that the school's fee-shifting provision was "void as against public policy in contravening the public welfare by significantly barring potentially meritorious resort to the courts by [parents of the school's

---

[6] That the Account Agreement's fee-shifting provision is limited to "reasonable" attorney's fees "to the extent permitted by law" does not rescue it under Virginia law. In *McIntosh*, the school argued that its fee-shifting provision was not unconscionable because any attorney's fees paid by parents would be limited by a reasonableness standard imposed by Virginia law. *McIntosh II* at *6. The Virginia Supreme Court rejected that argument, clarifying that "[t]he issue is not whether the amount of attorneys' fees would be unconscionable; the issue is whether the *obligation* to pay the School's attorneys' fees as stated in the provision is unconscionable." *Id.* (emphasis in original). Accordingly, the Account Agreement's fee-shifting provision is unconscionable despite its purported "reasonableness" limitation.

students], and in flouting the corollary principle expressed in the Rules of Professional Conduct not to punish the prevailing party in litigation with payment of the loser's expenses."  *Id.*

As explained above, the Account Agreement's unilateral fee-shifting provision shares the essential features of that of the enrollment contract in *McIntosh*.  It does not require the Bank to prevail in any litigation, nor does it require the accountholder to play a part in the initiation of any litigation that triggers the provision.  *See* Counterclaims, Exhibit B, § 3.  Accordingly, the fee-shifting provision at issue here also poses a bar to potentially meritorious lawsuits and serves to punish prevailing parties in litigation.  Since those effects "contraven[e] the public welfare," the Account's Agreement's fee-shifting provision is void as against public policy.  *See McIntosh I* at *17.

## **CONCLUSION**

For the foregoing reasons, the Counterclaims should be dismissed in their entirety.

Dated: October 20, 2020                    Respectfully submitted,

  /s/ *Peter H. White*

Peter H. White, Esq. (VSB # 32310)
Jason T. Mitchell (admitted *pro hac vice*)
Gregory Ketcham-Colwill (admitted *pro hac vice*)
SCHULTE ROTH & ZABEL LLP
901 Fifteenth Street, NW, Suite 800
Washington, DC 20005
Tel:  (202) 729-7476
Fax:  (202) 730-4520
pete.white@srz.com
jason.mitchell@srz.com
gregory.ketcham-colwill@srz.com

William H. Gussman, Jr. (admitted *pro hac vice*)
SCHULTE ROTH & ZABEL LLP
919 Third Avenue
New York, New York 10022
Tel:  (212) 756-2044
Fax:  (212) 593-5955
bill.gussman@srz.com

*Counsel for Blue Flame Medical LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 20th day of October, 2020, I caused the foregoing document to be filed and served electronically using the Court's CM/ECF system, which automatically sent a notice of electronic filing to all counsel of record.

Dated: October 20, 2020

 /s/ *Peter H. White*

Peter H. White, Esq. (VSB# 32310)
SCHULTE ROTH & ZABEL LLP
901 Fifteenth Street, NW, Suite 800
Washington, DC 20005
Tel: 202-729-7476
Fax: 202-730-4520
pete.white@srz.com

*Counsel for Blue Flame Medical LLC*