**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)**

| | |
|---|---|
| BLUE FLAME MEDICAL LLC, | |
| Plaintiff, | |
| v. | **Civil Action No. 1:20-cv-00658 (LMB/IDD)** |
| CHAIN BRIDGE BANK, N.A., JOHN J. BROUGH, and DAVID M. EVINGER, | |
| Defendants. | |
| CHAIN BRIDGE BANK, N.A., | |
| Third-Party Plaintiff, | |
| v. | |
| JPMORGAN CHASE BANK, N.A., | |
| Third-Party Defendant. | |

**JPMORGAN CHASE BANK, N.A.'S
MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................................................iii

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................... 3

        A.     Local Rule 56(B) Statement Of Undisputed Facts ................................. 3

                1.     March 25, 2020, the day before the wire ....................................... 3

                2.     March 26, 2020, the day of the wire ............................................. 5

                        a.     JPMC releases the wire to Chain Bridge ........................... 5

                        b.     Chain Bridge immediately holds the wire and contacts California .......................................................... 5

                        c.     Chain Bridge seeks the wire's return ................................. 6

                        d.     The parties' agreement concerning the wire's return ..................... 10

                        e.     Chain Bridge severs its relationship with Blue Flame ................. 10

                        f.     JPMC returns the funds in full to California ................................. 12

        B.     This Lawsuit ......................................................................................... 12

LEGAL STANDARD ........................................................................................................ 13

ARGUMENT .................................................................................................................. 13

I.     CHAIN BRIDGE'S INDEMNIFICATION CLAIM FAILS ................................................. 13

        A.     Indemnification Under U.C.C. § 4A-211(f) Is Inapplicable Because The Receiving Bank—Chain Bridge—Requested And Directed The Cancellation ..... 14

                1.     Chain Bridge expressly requested the cancellation .................... 16

                 2.     Chain Bridge directed—not accommodated—the cancellation for its own reasons ......................................................................... 18

         B.     The Parties' Agreement Did Not Include Any Obligation By JPMC To Indemnify Chain Bridge ..................................................................... 21

        C.     Chain Bridge Cannot Establish Causation ............................................ 24

i

II.    CHAIN BRIDGE'S UNJUST-ENRICHMENT CLAIM FAILS ........................................................26

CONCLUSION..................................................................................................................................29

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Abdelhamid v. Secretary of the Navy*,
  __ F. Supp. 3d __, 2021 WL 954844 (E.D. Va. 2021) ......................................................13

*Adkinson v. International Harvester Co.*,
  975 F.2d 208 (5th Cir. 1992) ...............................................................................................15

*Anderson v. Fluor Intercontinental, Inc.*,
  2021 WL 837335 (E.D. Va. Jan. 4, 2021) ...................................................................26, 27

*Barr v. S-2 Yachts, Inc.*,
  883 F.2d 68 (4th Cir. Aug. 11, 1989) (per curiam) ....................................................16, 24

*Bouchat v. Baltimore Ravens Football Club, Inc.*,
  346 F.3d 514 (4th Cir. 2003) .............................................................................................13

*Burrage v. United States*,
  571 U.S. 204 (2014) ...........................................................................................................24

*Dataflow, Inc. v. Peerless Insurance Co.*,
  2014 WL 148685 (N.D.N.Y. Jan. 13, 2014) ....................................................................23

*Dobson Brothers Construction Co. v. Arr-Maz Products, L.P.*,
  2013 WL 12141246 (D. Neb. May 7, 2013) .....................................................................21

*Donmar Enterprises, Inc. v. Southern National Bank of North Carolina*,
  64 F.3d 944 (4th Cir. 1995) ...............................................................................................14

*Gallagher v. Kline Imports Arlington Inc.*,
  133 F.3d 914 (4th Cir. 1998) (per curiam) .......................................................................25

*Holmes v. Securities Investment Protection Corp.*,
  503 U.S. 258 (1992) ...........................................................................................................24

*Horton v. United States*,
  622 F.2d 80 (4th Cir. 1980) .........................................................................................16, 24

*Integrated Direct Marketing, LLC v. May*,
  129 F. Supp. 3d 336 (E.D. Va. 2015), *aff'd*, 690 F. App'x 822 (4th Cir. 2017) ...............28

*James G. Davis Construction Corp. v. FTJ, Inc.*,
  841 S.E.2d 642 (Va. 2020) .................................................................................................26

*Johnson v. D & D Home Loans Corp.*,
2008 WL 850870 (E.D. Va. Jan. 23, 2008), *aff'd sub nom. Johnson v. Washington*,
559 F.3d 238 (4th Cir. 2009) ........................................................................27

*National Organization for Marriage, Inc. v. United States*,
24 F. Supp. 3d 518 (E.D. Va. 2014) .............................................................24

*New South Federal Savings Bank v. Flatbush Federal Savings & Loan Ass'n of Brooklyn*,
2003 WL 1888678 (S.D.N.Y. Apr. 15, 2003)...............................................22

*Paroline v. United States*,
572 U.S. 434 (2014)......................................................................................24

*Service & Training, Inc. v. Data General Corp.*,
963 F.2d 680 (4th Cir. 1992) ........................................................................23

*T. Musgrove Construction Co. v. Young*,
840 S.E.2d 337 (Va. 2020)............................................................................28

*U. S. Industries, Inc. v. Semco Manufacturing, Inc.*,
562 F.2d 1061 (8th Cir. 1977) ......................................................................21

*United States v. Seckinger*,
397 U.S. 203 (1970)................................................................................16, 24

*W.A. Stratton Construction v. Butler Manufacturing Co.*,
1992 WL 159107 (W.D. Va. June 23, 1992).................................................23

*White v. Johns-Manville Corp.*,
662 F.2d 243 (4th Cir. 1981) ...............................................................*passim*

## STATUTES, RULES, AND REGULATIONS

12 C.F.R.
§ 210.25................................................................................................12
Subpart B of Part 210, App. A..............................................................12

Fed. R. Civ. P. 56(a) ...............................................................................13

iv

U.C.C.

§ 1-103 ...................................................................................................15
§ 1-103 cmt. 2 .........................................................................................15
§ 1-201 ...............................................................................................21, 22
§ 2-204 ...................................................................................................21
§ 4A-204 .................................................................................................12
§ 4A-207 cmt. 2 ......................................................................................22
§ 4A-210 .................................................................................................16
§ 4A-211 ...........................................................................................*passim*
§ 4A-211 cmt. 5 ..................................................................................*passim*
§ 4A-404A ...............................................................................................12

## OTHER AUTHORITIES

42 C.J.S. Indemnity § 2 ...................................................................16, 21, 24

Federal Reserve Operating Cir. No. 6 (Dec. 20, 2019) ................................17

Fedwire® Funds Service - Annual Statistics, The Federal Reserve,
   https://www.frbservices.org/resources/financial-services/wires/volume-
   value-stats/annual-stats.html (last visited May 6, 2021) ..........................5

Fedwire® Funds Service – Format Reference Guide (Nov. 19, 2011),
   https://citeseerx.ist.psu.edu/viewdoc/download?doi=
   10.1.1.445.7645&rep=rep1&type=pdf .....................................................9

*Indemnification Clauses in Commercial Contracts*, PRACTICAL LAW PRACTICE NOTE
   5-517-4808 ...........................................................................................24

Restatement (Second) of Contracts (1981) ................................................23

*Webster's Ninth New Collegiate Dictionary* (1990) ...............................15, 19

## INTRODUCTION

Chain Bridge seeks indemnification from JPMC on the theory that JPMC canceled the $456 million Blue Flame wire. But the undisputed facts show that, from the moment Chain Bridge first learned about the incoming wire, it had no intention of ever allowing the funds to make their way to Blue Flame. Chain Bridge took decisive, affirmative steps to ensure that the funds remained inaccessible to Blue Flame, and ultimately requested that JPMC facilitate the return of the funds to California—as Chain Bridge's own wire transfer policy required it to do. Against these facts, Chain Bridge's claim to indemnification falls flat. Indemnification is not meant to protect a party from its own independent decision-making.

On March 25, 2020, the day before the wire came in, Chain Bridge's President, CEO, and Chairman viewed the transaction as a "scam." The bank worried that a wire "that massive" could pose "problems on [its] capital ratios." As a result, the bank "would need it off of the books asap." The next day, JPMC confirmed with California that the wire was intended for Blue Flame and released it to Chain Bridge. Chain Bridge, however, immediately placed the funds on hold—before exchanging a word with JPMC. Chain Bridge then reached out to California directly—an extraordinary act for a counterparty bank—and told the State that it "would be happy to return the wire." True to its word to California, Chain Bridge then asked JPMC "to issue a recall for the wire." Meanwhile, when a Chain Bridge employee suggested internally that the bank obtain an indemnity letter from JPMC before returning the funds, the President and CEO waved her concern away: "Just return [the wire] to the same place it came from," and "[d]on't worry about [the indemnity letter]. … [T]his is what we have to do."

Chain Bridge nonetheless insists on a right to indemnification under U.C.C. § 4A-211(f). But indemnification—under § 4A-211(f) and at common law—is not meant to provide a windfall to a party to insure its own conduct undertaken for its own reasons. Nor is that the function of

unjust enrichment.  For these and additional reasons, Chain Bridge's third-party complaint fails as a matter of law.

Chain Bridge's indemnification claim is flawed for three reasons.  *First*, § 4A-211(f) is inapplicable because Chain Bridge, the "receiving bank," sought and obtained the wire's cancellation.  As a result, Chain Bridge is not entitled to indemnification under the statute's plain text and commentary, its underlying policy, and common law.  Under § 4A-211(f), indemnification only applies "if the receiving bank … *agrees to cancellation* … of the order *by the sender*."  (Emphasis added.)  As the commentary underscores, the statute provides for indemnification where the sending bank (here, JPMC) seeks to cancel a wire and the receiving bank (Chain Bridge) complies "as an accommodation to the sender."  That plain-text interpretation is consistent with common law.  Indemnification applies a restitutionary principle designed to allocate costs to those responsible for them.  The § 4A-211(f) commentary thus recognizes that where the sending bank seeks a cancellation, and the receiving bank agrees as an accommodation, the receiving bank "should not incur a risk of loss in doing so."  But that is decidedly not this case.  Chain Bridge seeks to deploy indemnification in the opposite, inequitable way—as a sword, not a shield, insuring itself for its own conduct.

*Second*, even if § 4A-211(f) applied (it does not), an indemnity obligation can be overridden by party agreement.  By statute, that agreement can be express or inferred from circumstances.  As reflected by the parties' discussions and course of conduct, there was an agreement between Chain Bridge and JPMC as to how to proceed with the transaction, and it did not include any indemnity obligation by JPMC.

*Third*, Chain Bridge cannot establish the required element of causation.  Section 4A-211(f) is limited to "loss and expenses … incurred … as a result of the cancellation."  Here, Blue

Flame's damages—if any—are the purported "loss and expenses," and there is no reasonable interpretation of facts that supports Chain Bridge's theory that such damages were caused by JPMC.  To the contrary, the undisputed facts show that Chain Bridge and California caused any such damages:  Chain Bridge unilaterally and immediately placed a hold on the wire, which prevented Blue Flame from accessing any funds; and, once the funds were returned to California, California declined to reissue the wire.

Chain Bridge's unjust-enrichment claim also fails.  Most fundamentally, Chain Bridge did not confer any benefit on JPMC.  Indeed, JPMC did not benefit at all from the wire's reversal, whereas Chain Bridge obtained several benefits.  Nor is there anything inequitable here. To the contrary, Chain Bridge's claim seeks to impose an unjust result—rewarding the party who sought and obtained the cancellation, and who benefited from the cancellation, at the expense of the party who accommodated that request.

## BACKGROUND

### A.      Local Rule 56(B) Statement Of Undisputed Facts

#### 1.        March 25, 2020, the day before the wire

1.        On March 25, 2020, at 3:27 p.m. ET, Mike Gula of Blue Flame called Heather Schoeppe of Chain Bridge and informed the bank that California would be sending "an unbelievably large wire transfer in the amount of $450 million" to Blue Flame.  Stip. of Uncontested Facts ¶ 11 (Dkt. 96); Ex. 1 to Loretta Decl., CBB00002794 at 0:15-0:23.

2.        Schoeppe shared the news with Mike Richardson, another Chain Bridge representative, who called the wire "massive" and instructed Schoeppe to alert John Brough, the bank's Chief Executive Officer, and Joanna Williamson, the bank's Chief Financial Officer, because "that's half our asset size and could be problems on our capital ratios." Ex. 2, CBB00000661 at 670; *see also* Ex. 3, CBB00004312.

3.      Within hours, the top Chain Bridge executives became involved, including Brough, Williamson, David Evinger (President), and Peter Fitzgerald (Chairman of Board of Directors).  *See, e.g.*, Ex. 4, CBB00000761 at 761; Ex. 5, CBB00002797.

4.      Before the wire arrived, Evinger, Brough, and Williamson all expressed concern about the wire's effect on Chain Bridge's capital requirements, as well as a need to get the funds off of the bank's books quickly.  *See* Ex. 6, CBB00002798 at 3:07-3:12; *see also* Ex. 5, CBB00002797 at 2:26-2:30; Ex. 4, CBB00000761 at 761; Ex. 2, CBB00000661 at 662, 667.

5.      Chain Bridge was also concerned that accepting the wire would run afoul of its Bank Secrecy Act obligations.  *See* Ex. 7, Brough Dep. 72:16-22, 200:4-6 ("[T]he bank cannot make any policy exceptions to the Bank Secrecy Act."), 207:6-9; *see also* Ex. 8, Grice BSA/AML Rep. ¶¶ 57, 75, 105.

6.      Chain Bridge engaged its internal Bank Secrecy Act team on March 25, before it ever spoke to JPMC.  Ex. 6, CBB00002798 at 11:51-11:54.

7.      Soon after learning about the expected transaction, Chain Bridge doubted whether Blue Flame had a right to the funds and thought the transaction was a "scam."  *E.g.*, Ex. 4, CBB00000761 at 761; Ex. 6, CBB00002798 at 8:23-8:49; Ex. 9, Evinger Dep. 205:21-206:8; Ex. 8, Grice BSA/AML Rep. ¶ 75.

8.      Chain Bridge's wire transfer policy requires that, with respect to incoming wires, "[i]f there is any question as to the beneficiary's right to the funds … the wire will be returned." Ex. 10, CBB00004294 at 4298.

9.      Chain Bridge had no expectation that it would make an exception to its own internal policies for a $456 million wire.  *See* Ex. 7, Brough Dep. 199:8-21.

2.      **March 26, 2020, the day of the wire**

a.      **JPMC releases the wire to Chain Bridge**

10.      At 11:21 a.m. ET on March 26, 2020, the California State Treasurer's Office (STO), through JPMC, originated the $456,888,600 wire transfer for Blue Flame's benefit using the Federal Reserve's Fedwire platform.  Stip. of Uncontested Facts ¶ 15; Ex. 11, JPMC-00000467 at 467-468.

11.      The wire was approximately 100 times the size of the average Fedwire transfer in 2020. *See, e.g.*, Ex. 12, Fedwire® Funds Service - Annual Statistics, The Federal Reserve, https://www.frbservices.org/resources/financial-services/wires/volume-value-stats/annual-stats.html (last visited May 6, 2021).

12.      Upon arrival at JPMC, the wire triggered an alert in JPMC's systems that screen transactions for suspicious activity. *See, e.g.*, Ex. 13, Korpal Dep. 155:9-12.

13.      As part of its diligence in reviewing the transaction, JPMC promptly called Natalie Gonzales of the STO, who confirmed that the wire was valid. *See* Ex. 13, Korpal Dep. 155:9-12; Ex. 14, JPMC-00000027 at 27.

14.      With confirmation from its client, at 11:55 a.m. ET, JPMC sent Chain Bridge the wire via Fedwire message. *See* Stip. of Uncontested Facts ¶¶ 15-16; *see also* Ex. 15, CBB00002779.

b.      **Chain Bridge immediately holds the wire and contacts California**

15.      Chain Bridge placed the funds on hold within minutes of the wire's arrival at the bank, before ever speaking with JPMC. *See, e.g.*, Ex. 16, CBB00000728 at 728; *see also* Ex. 17, CBB00000919 at 920; Ex. 7, Brough Dep. 197:20-198:1.

5

16.     Chain Bridge's hold prevented Blue Flame from accessing any of the wire's funds. *See* Ex. 7, Brough Dep. 197:6-9.

17.     After placing the hold and still before speaking with JPMC, Chain Bridge made three calls to California. *Compare* Ex. 18, CBB00004323 at 4333-4335 (showing calls to California at 12:15:19 p.m. ET, 12:19:26 p.m. ET, and 12:21:33 p.m. ET on March 26), *with* Ex. 19, CBB First Interrogatory Responses at 3 (listing Chain Bridge's first call with JPMC as occurring at 12:32 p.m. ET).

18.     At 12:19 p.m. ET, Evinger and Brough spoke with Jay Perera of the California Department of General Services (DGS) about the wire. *See* Ex. 19, CBB First Interrogatory Responses at 3.

19.     On that 12:19 p.m. ET call, Evinger and Brough explained to Perera that Chain Bridge needed to talk to someone from California about the wire to determine if it was legitimate. *See* Ex. 20, DGS6548 at 6549.

20.     It is rare for a counterparty bank (Chain Bridge) to contact a non-customer (California) to discuss concerns about a wire. *See* Ex. 21, Gonzales Dep. 97:22-98:22; *see also* Ex. 22, Baxter Rep. ¶¶ 42, 74.

**c.      Chain Bridge seeks the wire's return**

21.     Chain Bridge and JPMC communicated and cooperated about how to handle the wire. *See* Ex. 23, CBB00002789 at 2:36-2:44; Ex. 24, Coffey Dep. 97:5-9.

22.     During the course of their communications on March 26, Chain Bridge and JPMC shared information with one another about their concerns with the wire. *See* Ex. 25, CBB00002541 at 0:39-1:17, 2:42-3:16; *see also* Ex. 13, Korpal Dep. 67:14-17.

23.     At approximately 12:30 p.m. ET, Tim Coffey of JPMC called Chain Bridge and spoke with Evinger. *See* Stip. of Uncontested Facts ¶ 19.

24.     On that 12:30 p.m. ET call, Evinger told Coffey that Chain Bridge had concerns about the wire and was holding the funds; he further shared that Chain Bridge had contacted California to discuss the wire.  *See* Ex. 26, JPMC-00000124.

25.     Also on that 12:30 p.m. ET call, Coffey relayed that JPMC had concerns about the wire and would be in further contact with Chain Bridge.  *See* Ex. 24, Coffey Dep. 66:22-67:4.

26.     Shortly thereafter, at 12:44 p.m. ET, Rakesh Korpal of JPMC called Chain Bridge and spoke with Brough and Evinger about the wire.  *See* Stip. of Uncontested Facts ¶ 20.

27.     On that 12:44 p.m. ET call, Chain Bridge told JPMC that the Blue Flame account was brand new, that it was opened by a lobbyist, and that the size of the wire was unusual for this client—none of which JPMC knew before.  *See* Ex. 25, CBB00002541 at 0:39-3:22.

28.     Also on that 12:44 p.m. ET call, Korpal generally shared with Chain Bridge that JPMC had concerns with the wire.  *See* Ex. 25, CBB00002541 at 2:42-3:16.

29.     At the end of the 12:44 p.m. ET call, JPMC and Chain Bridge agreed that both banks would further investigate the wire and remain in contact.  *See* Ex. 25, CBB00002541 at 5:57-6:16.

30.     In a voicemail to Evinger at 12:51 p.m. ET, and in a subsequent phone call at 12:55 p.m. ET with Brough and Evinger, Fee Chang of the California DGS confirmed the legitimacy and amount of the wire with Chain Bridge.  *See* Ex. 27, CBB00000707 at 0:19-0:26; Ex. 28, CBB00002543 at 0:01-0:04; *see also* Ex. 9, Evinger Dep. 247:19-248:1.

31.     On the 12:55 p.m. ET call with Chang, Chain Bridge requested to be put in contact with the STO.  *See* Ex. 28, CBB00002543 at 0:42-0:47.

32.     At 1:19 p.m. ET, Mark Hariri and Natalie Gonzales of the STO called Chain Bridge and spoke with Brough and Evinger about the wire.  *See* Stip. of Uncontested Facts ¶ 23.

33.     On that 1:19 p.m. ET call, Hariri and Gonzales confirmed that Blue Flame was the intended beneficiary of the wire.  *See* Ex. 9, Evinger Dep. 252:10-19.

34.     Also on that 1:19 p.m. ET call, Evinger shared information with the STO about Blue Flame, including that the account had been opened the day before the wire and that the client who opened the account was a political lobbyist.  *See* Ex. 21, Gonzales Dep. 49:21-50:6; *see also* Ex. 29, CBB00004453 at 4466.

35.     On the same 1:19 p.m. ET call, Chain Bridge offered the return of the wire, stating to California that it "would be happy to return the wire."  Ex. 29, CBB00004453 at 4466; *see* Ex. 9, Evinger Dep. 255:18-20.  According to Evinger, California responded that "they did not want [Chain Bridge] to return the money at that stage."  Ex. 9, Evinger Dep. 255:20-21.

36.     Shortly thereafter, at 1:34 p.m. ET, Brough and Evinger called Korpal about the wire.  *See* Stip. of Uncontested Facts ¶ 24.

37.     On that 1:34 p.m. ET call, Evinger asked Korpal if there was "any way for JPMorgan to issue a recall for the wire."  Ex. 30, CBB00002544 at 0:04-0:09; *see also* Stip. of Uncontested Facts ¶ 24.

38.     In response to Evinger's request, Korpal said he felt "comfortable" with Chain Bridge's continued "holding" of the funds but asked for a "few more minutes" to consider the request.  Ex. 30, CBB00002544 at 0:14-0:33.

39.     Chain Bridge, not JPMC, was the party that first raised the reversal of the wire—first with California and then with JPMC.  *See* Ex. 7, Brough Dep. 293:9-10; *see also* Ex. 9, Evinger Dep. 262:18-20; *supra* ¶¶ 35, 37.

40.     Three minutes later, at 1:37 p.m. ET, in response to Evinger's request for a reversal, Korpal instructed Coffey to contact Chain Bridge and accommodate the reversal of the

8

wire. *See* Ex. 26, JPMC-00000124; *see also* Ex. 24, Coffey Dep. 124:22-125:4; Ex. 13, Korpal

Dep. 254:7-15.

41. Immediately thereafter, at 1:37 p.m. ET, Coffey called Chain Bridge as Korpal

had directed him to do and spoke with Brough and Evinger about the wire. *See* Stip. of

Uncontested Facts ¶ 26; Ex. 18, CBB00004323 at 4333-4335.

42. On that 1:37 p.m. ET call, JPMC agreed to Chain Bridge's request for reversal.

*See* Ex. 31, CBB00002545 at 0:06-0:26.

43. Thus, on the 1:37 p.m. ET call, Coffey stated that JPMC would "be recalling

those funds," and asked: "What are you looking for from us?" Ex. 31, CBB00002545 at 0:06-

0:18. Chain Bridge responded that they would "like official communication from JPMorgan to

us to recall the funds," and asked "if [JPMC] could send it over the Fedline platform." *Id.* at

0:18-0:27. Coffey agreed to do so, stating, "Yup, that's not a problem." *Id.* at 0:27-0:30.

44. At 2:05 p.m. ET, in response to Chain Bridge's reversal request, JPMC sent Chain

Bridge a Fedwire service message bearing the Fedwire "Type/Subtype Code" "1001," which, per

the Fedwire Format Reference Guide, refers to a "Request for Reversal." Stip. of Uncontested

Facts ¶ 29; *see also* Ex. 32, CBB00002780; Ex. 33, Fedwire® Funds Service Format Reference

Guide 14 (November 19, 2011). The message stated: "AS PER REM REQ PLS RETURN

FUNDS QUOTING OUR REF. PLS TAKE CARE TO AVOID DUPLICATION." Ex. 32,

CB00002780.

45. If Chain Bridge had not requested the reversal, JPMC would not have issued the

reversal message. *See* Ex. 13, Korpal Dep. 23:6-9.

46. Chain Bridge planned to hold the funds in the absence of a reversal message. *See*

Ex. 7, Brough Dep. 223:4-6.

47.     At 3:21 p.m. ET, Chain Bridge returned the wire to JPMC via Fedwire message. *See* Stip. of Uncontested Facts ¶ 32; *see also* Ex. 34, CBB00002781.

**d.     The parties' agreement concerning the wire's return**

48.     The agreement to reverse the wire was made pursuant to certain conditions, including, by Chain Bridge's express request, that JPMC send a request for the wire's return via Fedwire. *See* Ex. 31, CBB00002545 at 0:16-0:35; *see also* Ex. 9, Evinger Dep. 266:4-5; Ex. 23, CBB00002789 at 1:47-1:51; *see also supra* ¶¶ 21-29, 36-41.

49.     During their discussions regarding the wire's reversal, JPMC and Chain Bridge never discussed indemnity. *See, e.g.*, Ex. 24, Coffey Dep. 149:4-5.

50.     Chain Bridge's President and CEO disclaimed the need for indemnification upon inquiry from one of the bank's employees. *See* Ex. 23, CBB00002789 at 2:09-2:49.

51.     On a call ending at approximately 1:43 p.m. ET on March 26, 2020, Claudia Mojica-Guadron of Chain Bridge asked, "Are we getting an indemnity letter from Chase? … Normally, you want to get that from the other bank[.]" Ex. 23, CBB00002789 at 1:18-1:25, 2:16-2:22. Evinger and Brough responded, "It's okay. Don't worry about it … It is what it is." *Id.* at 2:27-2:34. Brough further replied, "David and I have been working on this with both the State of California and J.P. Morgan and this is what we have to do." *Id.* at 2:36-2:49.

52.     Chain Bridge instructed Mojica-Guadron to "just return [the wire] to the same place it came from." Ex. 23, CBB00002789 at 1:37-1:42.

**e.     Chain Bridge severs its relationship with Blue Flame**

53.     Minutes after receiving the wire and before speaking with JPMC, Chain Bridge instructed employees to cease communications with Blue Flame. *See* Ex. 35, CBB00000748; *see also* Ex. 17, CBB00000919 at 919.

10

54.     At 2:36 p.m. ET, before Chain Bridge returned the wire to JPMC, Brough directed Chain Bridge personnel to close the "BlueFlame accounts," including Blue Flame's account as well as the accounts for Blueflame Strategies and Redline Strategies—other accounts that Mike Gula had recently opened. *See* Stip. of Uncontested Facts ¶ 31; *see also* Ex. 36, CBB00000594 at 594, 598.

55.     By 2:39 p.m. ET, Chain Bridge closed the Blueflame Strategies account. *See* Ex. 36, CBB00000594 at 597-598.

56.     By 2:53 p.m. ET, Chain Bridge closed the Redline Strategies account. *See* Ex. 36, CBB00000594 at 596.

57.     Chain Bridge could not close Blue Flame's account until Chain Bridge returned the wire to JPMC. *See* Ex. 36, CBB00000594 at 596; Ex. 37, Schoeppe Dep. 123:2-15; Ex. 38, CBB00000815.

58.     At 3:26 p.m. ET, five minutes after it returned the wire to JPMC, Chain Bridge closed Blue Flame's account. *See* Stip. of Uncontested Facts ¶ 33.

59.     Chain Bridge subsequently cut all ties with Blue Flame. *See, e.g.*, Ex. 39, CBB00000527; Ex. 40, CBB00004452; Ex. 36, CBB00000594 at 0598; Ex. 29, CBB00004453 at 4467.

60.     Based on independent reporting, news outlets portrayed Blue Flame as a party seeking to exploit a global pandemic. *See* Compl. ¶ 83 (June 12, 2020) (Dkt. 1); *see also* Ex. 41, DGS0294 at 306.

**f.      JPMC returns the funds in full to California**

61.      By 4:02 p.m. ET, JPMC returned the wire to California's account at JPMC.  *See* Stip. of Uncontested Facts ¶ 34; *see also* Ex. 42, JPMC-00000170 at 174.

62.      JPMC returned all $456,888,600 to California; JPMC retained nothing.  *See* Ex. 42, JPMC-00000170 at 0174; *see also* Ex. 43, STO0001.

63.      California decided not to reissue the wire or move forward with the Blue Flame transaction.  *See* Ex. 44, DGS0085 at 089; *see also* Ex. 45, DGS0329.

**B.      This Lawsuit**

Three months after the wire's reversal, Blue Flame commenced this lawsuit.  But it did not sue California, the counterparty that decided not to proceed with the transaction.  Instead, Blue Flame sued Chain Bridge and its President and CEO.  Blue Flame's principal claims arise under Regulation J and Article 4A of the Uniform Commercial Code, which govern wire transfers executed over Fedwire, as this one was.  *See* Compl. ¶¶ 86-97 (Count I:  violation of U.C.C. § 4A-404A); *id.* ¶¶ 98-112 (Count II:  violation of U.C.C. § 4A-204).[1]  Blue Flame also asserted a mix of state-law claims.  *See id.* ¶¶ 113-179 (Counts III-X).  The Court granted in part Chain Bridge's motion to dismiss, but allowed five claims to proceed:  the two U.C.C. claims and the state-law claims for tortious interference with contract and business expectancy, and defamation.  *See* Order 1 (Sept. 8, 2020) (Dkt. 31).

One month later, Chain Bridge filed its third-party complaint against JPMC, seeking indemnification from JPMC for any loss and expenses that Chain Bridge might incur as a result of the wire's reversal.  *See generally* Third-Party Compl. (Oct. 13, 2020) (Dkt. 43).  Chain Bridge asserts three third-party claims:  indemnification under Regulation J and U.C.C. § 4A-

---

[1]      Regulation J incorporates Article 4A of the U.C.C. and the Federal Reserve's relevant operating circulars.  *See* 12 C.F.R. § 210.25(b)(1)-(2); *see also id.* Subpart B, App. A.

211(f) (Count I) and a derivative declaratory-judgment claim (Count II); and unjust enrichment

(Count III).

Discovery concluded on April 12, 2021.  JPMC now seeks summary judgment on each of

Chain Bridge's third-party claims.

## LEGAL STANDARD

A motion for summary judgment under Rule 56 must be granted if "there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  "A genuine dispute about a material fact exists if 'after reviewing the record as

a whole, a court finds that a reasonable jury could return a verdict for the nonmoving party.'"

*Abdelhamid v. Secretary of the Navy*, __ F. Supp. 3d __, 2021 WL 954844, at *6 (E.D. Va. 2021)

(Brinkema, J.).  "All inferences must be made in favor of the nonmoving party … ; however, if

the nonmoving party's evidence is 'merely colorable' or 'not significantly probative,' then

summary judgment may be granted.'"  *Id.*; *see also Bouchat v. Baltimore Ravens Football Club,*

*Inc.*, 346 F.3d 514, 526 (4th Cir. 2003).

## ARGUMENT

### I.   CHAIN BRIDGE'S INDEMNIFICATION CLAIM FAILS

Chain Bridge's indemnification claim (the direct U.C.C. claim and derivative

declaratory-judgment claim) is based on U.C.C. § 4A-211(f), which concerns the

indemnification obligations that can arise from the cancellation of a payment order.  It states:

> Unless otherwise provided in an agreement of the parties or in a funds-transfer
> system rule, if the receiving bank, after accepting a payment order, agrees to
> cancellation or amendment of the order by the sender or is bound by a funds-
> transfer system rule allowing cancellation or amendment without the bank's
> agreement, the sender, whether or not cancellation or amendment is effective, is
> liable to the bank for any loss and expenses, including reasonable attorney's fees,
> incurred by the bank as a result of the cancellation or amendment or attempted
> cancellation or amendment.

13

U.C.C. § 4A-211(f).

Chain Bridge's indemnification claim fails for three independent reasons. *First*, § 4A-211(f) only provides for indemnification where the sender (JPMC) seeks cancellation, and the receiving bank (Chain Bridge) accommodates the request. As the undisputed facts show, the situation here is the reverse. Chain Bridge sought and obtained the cancellation for its own reasons—expressly requesting the cancellation, and directing the cancellation through its own decisive, affirmative steps. *Second*, Chain Bridge and JPMC agreed that there would be no indemnity, thereby overriding any indemnification obligation under § 4A-211(f). *Third*, Chain Bridge cannot establish causation because any loss or expenses incurred are "the result of" its own conduct and others'—not JPMC's.

### A.   Indemnification Under U.C.C. § 4A-211(f) Is Inapplicable Because The Receiving Bank—Chain Bridge—Requested And Directed The Cancellation

Under § 4A-211(f), indemnification applies only "if the receiving bank … agrees to cancellation … of the order by the sender." The text of the statute therefore contemplates a cancellation sought and obtained by the sender:  an affirmative request "by the sender," to which the receiving bank "agrees." U.C.C. § 4A-211(f).

The official commentary to Article 4A underscores the point. *See Donmar Enters., Inc. v. Southern Nat. Bank of N.C.*, 64 F.3d 944, 948 (4th Cir. 1995) (relying on the official commentary, which may "'be useful in interpreting Article 4A'"). As the commentary explains, "[t]he indemnification provision recognizes that a sender has no right to cancel a payment order after it is accepted by the receiving bank." U.C.C. § 4A-211(f) cmt. 5. Thus, "a receiving bank may agree to cancellation … but is not required to do so regardless of the circumstances." *Id.* Indeed, it is likely "reluctant" to do so. *Id.* The commentary recognizes that a receiving bank that "agrees to cancellation" risks "alienat[ing] its customer, the beneficiary, by denying the

customer the funds," and further may incur legal exposure.  *Id.*  So where the receiving bank

does agree to cancellation in these circumstances, it is doing so *not* for its own benefit, but rather

"as an accommodation to the sender."  *Id.*  In other words, the receiving bank is agnostic to the

cancellation, or even reluctant, but agrees to the cancellation "for convenience or to satisfy a

need" of the sending bank.  *Webster's Ninth New Collegiate Dictionary* 49 (1990) (defining

"accommodation").

   This straightforward reading accords with indemnification at common law, which can

inform and supplement the U.C.C.  *See* U.C.C. § 1-103(b) ("Unless displaced by the particular

provisions of this Act, the principles of law and equity … supplement its provisions."); *id.* cmt. 2

("The Uniform Commercial Code was drafted against the backdrop of existing bodies of law,

including the common law and equity, and relies on those bodies of law to supplement it

provisions in many important ways."); *see also, e.g.*, *Adkinson v. International Harvester Co.*,

975 F.2d 208, 215 (5th Cir. 1992) ("[E]quitable principles of contribution and indemnity" "have

not been displaced by" Mississippi's Uniform Commercial Code, but rather "supplement" the

Code).  As the Fourth Circuit has explained, indemnification "applies a restitutionary principle"

that allows an indemnitee whose liability is merely "technical, passive or secondary" to "shift[]"

"the burden for the entire loss … to the indemnitor whose actual fault caused the injury."  *White

v. Johns-Manville Corp.*, 662 F.2d 243, 249-50 (4th Cir. 1981).  Thus, indemnification applies

where, for example, "the indemnitee has been held absolutely liable for the wrongful acts of

another," "the indemnitee was induced to act by … the indemnitor," or "where the indemnitee

acted pursuant to directions of the indemnitor."  *Id*. at 249.

   Where, by contrast, as here, a purported indemnitee "active[ly]" caused the injury to the

plaintiff, "an essential predicate to [indemnitee's] right to indemnification is necessarily

15

missing."  *White*, 662 F.2d at 250.[2]  "The rationale behind indemnification is to ensure that the losses are borne by the party responsible for the damages. … The right to indemnity stands upon the principle that everyone is responsible for the consequences of his or her own acts[.]"  42 C.J.S. Indemnity § 2.

Consistent with the text of the statute and its common law roots, a § 4A-211(f) indemnification claim fails where the receiving bank requests the cancellation or otherwise directs the cancellation by its own actions.  In either event, there is no cancellation "by the sender" with a corresponding "accommodation" by the receiving bank.  Chain Bridge's indemnification claim therefore fails because Chain Bridge—the receiving bank—expressly requested and directed the cancellation.

### 1.    Chain Bridge expressly requested the cancellation

At 1:34 p.m. ET, Chain Bridge's President (Evinger) called JPMC and asked if "there [was] any way for JPMorgan to issue a recall for the wire."  Statement of Undisputed Facts (SUF) ¶ 37 (quoting Ex. 30, CBB00002544 at 0:04-0:09).  Chain Bridge's oral request to return the funds constitutes a cancellation request under Article 4A.  *See* U.C.C. § 4A-211(a) ("A communication … cancelling … the order may be transmitted … orally, electronically, or in writing."); *see also id*. § 4A-210(a) ("A payment order is rejected by the receiving bank by a notice of rejection transmitted to the sender orally, electronically, or in writing.").  The

---

[2]    *See also United States v. Seckinger*, 397 U.S. 203, 210-211 (1970) (declining to allow an indemnitee to recover losses caused by his own actions; "a contractual provision should not be construed to permit an indemnitee to recover for his own negligence unless the court is firmly convinced that such an interpretation reflects the intention of the parties"); *Horton v. United States*, 622 F.2d 80, 82 (4th Cir. 1980) (relying on *Seckinger* to reverse the district court's grant of indemnification because the indemnitee "was a joint tortfeasor"); *Barr v. S-2 Yachts, Inc.*, 883 F.2d 68, at *5 (4th Cir. Aug. 11, 1989) (per curiam) (unpublished table decision) (indemnification claims "are based on principles of equity and restitution," and so an indemnitee must "be without fault" and "should be able to demonstrate that their liability is merely constructive, vicarious, or derivative").

cancellation here was therefore not "by the sender," JPMC—thus removing it from § 4A-211(f)'s scope.

To be sure, JPMC issued the Fedwire reversal message shortly thereafter.  SUF ¶ 44.  But that subsequent reaction does not alter the legal import of Chain Bridge's original cancellation request.  JPMC's responsive message was an accommodation to Chain Bridge's request.  At the conclusion of the 1:34 p.m. ET call, Korpal instructed Coffey to accommodate Evinger's request. *Id.* ¶ 40.  Coffey immediately followed his supervisor's instructions when he called Evinger at 1:37 p.m. ET—within two minutes of Evinger's cancellation request—to indicate that JPMC would "be recalling those funds," at which point Chain Bridge's CEO (Brough) asked "if [JPMC] could send [the reversal message] over the Fedline platform," to which Coffey agreed. *Id.* ¶¶ 41-43 (quoting Ex. 31, CBB00002545 at 0:06-0:30).  Coffey's statements during the 1:37 p.m. ET call and the reversal message were therefore statements and actions by JPMC, the sender, to "agree" and "accommodat[e]" Evinger's oral cancellation.  U.C.C. § 4A-211 cmt. 5.  The "agree[ment]" and "accommodation" to the cancellation was not by the receiving bank, as required by § 4A-211(f).[3]

---

[3]     It does not matter that JPMC's reversal message did not include the text "NO INDEMNITY."  Chain Bridge will likely argue otherwise, invoking the Federal Reserve's Operating Circular 6.  But that circular makes clear that this text operates only as a disclaimer— it does not impose any liability; and it is only one way, but not the only way, to avoid liability that would otherwise exist.  Fed. Rsrv. Operating Cir. No. 6, Section 14.1 (Dec. 20, 2019) ("By requesting cancellation … of a Payment Order, the sender *may* be liable under Section 4A-211 of Article 4A unless the request states 'NO INDEMNITY.'" (emphasis added)).  Thus, regardless of Operating Circular 6, a receiving bank is entitled to indemnification only if the requirements of § 4A-211(f) are satisfied.  Moreover, the operating circular suggests the "NO INDEMNITY" disclaimer where a "sender" requests a cancellation.  Here, as already explained, the sender, JPMC, did not request the cancellation; the receiving bank, Chain Bridge, did so.

### 2. Chain Bridge directed—not accommodated—the cancellation for its own reasons

Even assuming there could be a genuine dispute about the meaning of Evinger's request to return the wire, Chain Bridge's indemnification claim still fails because it—not JPMC—directed the cancellation at every material turn. The undisputed evidentiary record is clear that Chain Bridge did not "accommodat[e]" the cancellation. U.C.C. § 4A-211(f) cmt. 5.

The day before receiving the wire, Chain Bridge's President, CEO, and Chairman called the wire a "scam" and engaged the bank's Bank Secrecy Act team—suspicious of its own client. SUF ¶¶ 5-7. The next day, Chain Bridge immediately placed the funds on hold. *Id.* ¶ 15. Chain Bridge then repeatedly called California—an extraordinary act for a counterparty bank—to raise concerns about Blue Flame and the legitimacy of the transaction. *Id.* ¶¶ 17-20. As a California representative testified, she was not aware of "any other instance" where a counterparty bank sought to contact California about a wire's return. Ex. 21, Gonzales Dep. 97:22-98:22; *see* SUF ¶ 20. And in speaking with California and then JPMC, Chain Bridge communicated red flags about Blue Flame that were known exclusively to Chain Bridge because of information it had about its own client. SUF ¶¶ 19, 27.

Then Chain Bridge was the first party to raise the return of funds—*twice*. It did so first with California—again, an extraordinary act—saying that it would be "happy to return the wire." SUF ¶ 35 (quoting Ex. 29, CBB00004453 at 4466). By Chain Bridge's own account, California demurred, expressing that it "did not want [Chain Bridge] to return the money at that stage." *Id.* (quoting Ex. 9, Evinger Dep. 255:20-21). But Chain Bridge was not deterred. Just minutes after that call with California, Chain Bridge then expressly asked JPMC to "issue a recall for the wire." *Id.* ¶¶ 36-37 (quoting Ex. 30, CBB00002544 at 0:04-0:09). Chain Bridge further gave specific instructions to JPMC as to the logistics of the reversal, *i.e.*, that it be returned via

Fedwire. *Id.* ¶ 43. There can be no reasonable dispute about what the evidentiary record shows: Chain Bridge did not "accommodate" any cancellation here; Chain Bridge laid the foundation for the cancellation and ensured its execution.

Moreover, Chain Bridge's actions were driven by powerful incentives—all of which reaffirm that Chain Bridge was not agnostic or reluctant to the cancellation, much less did it agree to cancellation "for convenience or to satisfy a need" of JPMC. *Webster's Ninth New Collegiate Dictionary* 49 (1990) (defining "accommodation"). The wire's size, for instance, represented about half of Chain Bridge's total assets. SUF ¶ 2. As the bank warned internally, a wire that "massive" could pose "problems on [its] capital ratios." *Id.* (quoting Ex. 2, CBB00000661 at 670); *see also id.* ¶ 4. Absent a return of the funds, Chain Bridge had no easy alternative to deal with such an extraordinary wire: best case scenario, Chain Bridge "would need [the wire] off of the books asap" (Ex. 2, CBB00000661 at 667; *see* SUF ¶ 4), exposing itself to the risk that others would second guess any decisions made on how to do just that. Worst case scenario, an error in handling the wire could deplete Chain Bridge's capital.

Chain Bridge was also worried the wire would run afoul of its obligations under the Bank Secrecy Act and anti-money laundering rules and regulations. SUF ¶¶ 5-7. Indeed, it engaged its BSA team the day before the wire came in, and Chain Bridge's President and CEO repeatedly testified that it was a central concern with the wire. *Id.* Returning the wire minimized, if not obviated, any potential regulatory scrutiny or exposure, if not worse.

Critically, Chain Bridge's own wire transfer policy for incoming wires provides: "If there is any question as to the beneficiary's right to the funds … the wire *will* be returned." SUF ¶ 8 (quoting Ex. 10, CBB00004294 at 4298 (emphasis added)). In language virtually parroting the policy, Chain Bridge's own expert concluded that "Chain Bridge [had] reasonable doubt

19

concerning whether Blue Flame Medical had a right to the payment sent by the State of California." Ex. 8, Grice BSA/AML Rep. ¶ 75; *see* SUF ¶ 7.  The bank was thus *required* by its own policy to return the wire, and the return of funds alleviated any issues with retaining the funds under that policy.

In sum, the undisputed facts show that *Chain Bridge* took independent and unilateral actions to ensure that the wire's funds remained inaccessible to Blue Flame; *Chain Bridge* expressed substantive concerns about the wire to both California and JPMC; *Chain Bridge* advocated for the wire's return to both California and JPMC for its own independent reasons; and *Chain Bridge* expressly asked JPMC to reverse the wire.  Moreover, it bears emphasis that concern for alienating its client—a policy rationale underlying § 4A-211(f)—was not one of Chain Bridge's reasons for directing the reversal.  *See* U.C.C. § 4A-211(f) cmt. 5 (recognizing that a recipient bank may be "reluctant to alienate its customer").  Rather, *Chain Bridge* ceased all communications with Blue Flame upon receipt of the wire, decided to close Blue Flame's account before returning the funds to JPMC, closed Blue Flame's account immediately upon reversal of the wire, and cut all ties with Blue Flame.  SUF ¶¶ 53-59.  As Chain Bridge's CEO instructed his employees:  "Do not open any new accounts for Mike Gula or his business partner, John Thomas."  Ex. 39, CBB00000527; *see* SUF ¶ 59.

On the record here, there can be no genuine dispute that Chain Bridge laid the foundation for the cancellation and directed its ultimate execution.  Accordingly, indemnification under § 4A-211(f) is inapplicable.  This conclusion accords with indemnification at common law.  Because Chain Bridge "active[ly]" directed the reversal of the funds, "an essential predicate to [its] right to indemnification is necessarily missing."  *White*, 662 F.2d at 250.  "The right to indemnity stands upon the principle that everyone is responsible for the consequences of his or

20

her own acts[.]" 42 C.J.S. Indemnity § 2.  The Court should not countenance its use here to provide a windfall to Chain Bridge to insure its own conduct.[4]

### B.   The Parties' Agreement Did Not Include Any Obligation By JPMC To Indemnify Chain Bridge

There is another, independent reason to reject Chain Bridge's indemnification claim:  the parties' agreement overrides any purported indemnification obligation.

Under § 4A-211(f), if the statutory requirements are satisfied (they are not satisfied here, for the reasons already stated), then indemnification applies "[u]nless otherwise provided in an agreement of the parties."  Thus, indemnification is predicated on the absence of an "agreement" between the sending and receiving bank.  U.C.C. § 4A-211(f).  Such an agreement—a defined term meaning "the bargain of the parties in fact," as "distinguished from 'contract'"—can be found in the parties' "language or inferred from other circumstances, including course of performance, course of dealing, or usage of trade."  U.C.C. § 1-201(b)(3); *see also U. S. Indus., Inc. v. Semco Mfg., Inc.*, 562 F.2d 1061, 1067 n.8 (8th Cir. 1977) (under U.C.C. §§ 1-201(b)(3) and 2-204(1), the parties' "negotiation[s] and the exchange of purchase order and acknowledgment forms clearly show [an] agreement"); *Dobson Bros. Constr. Co. v. Arr-Maz*

---

[4]   Even if, counterfactually, the record revealed that the cancellation was a joint decision of the two banks, Chain Bridge's claim would still fail.  For the same reasons stated above, a joint decision by the two banks does not constitute a cancellation request "by the sender" (JPMC) and an "accommodation" by the receiving bank (Chain Bridge).  Assuming such a joint-decision scenario, "an essential predicate" for Chain Bridge's indemnification would still be "necessarily missing" because Chain Bridge would have played an "active" role in the cancellation.  *White*, 662 F.2d at 250.

*Prods., L.P.*, 2013 WL 12141246, at *3 (D. Neb. May 7, 2013) (under U.C.C. § 1-201(b)(3), the parties' "agreement" involves their "course of dealing").[5]

Here, JPMC and Chain Bridge reached an agreement, through their discussions and course of conduct, about how to handle the wire. It did not include any indemnity obligation.

Chain Bridge told JPMC it had placed a hold on the funds, had not credited Blue Flame's account, and had called California to raise concerns about Blue Flame. SUF ¶ 24. Chain Bridge also told JPMC it did not "like the smell" of the transaction because, among other things, Blue Flame's account was "brand new," the account had been opened by "a lobbyist," and the account holder did not "maintain[] that kind of money." Ex. 25, CBB00002541 at 0:39-3:22; *see* SUF ¶ 27. In turn, JPMC shared its own concerns about the wire, but explained that it was comfortable with Chain Bridge holding the funds. SUF ¶¶ 28, 38. The bankers from both Chain Bridge and JPMC agreed to keep each other apprised of their respective bank's investigations, and did just that. *See, e.g.*, *id.* ¶ 29. Both Chain Bridge and JPMC understood that the purpose of these calls was to reach an agreement as to how to proceed with the wire. *Id.* ¶ 48.

Chain Bridge's actions and substantive concerns—along with its repeated advocacy for a reversal and independent decision to continue to hold the funds after receiving confirmation that the wire was intended for Blue Flame—made clear to JPMC that Chain Bridge's actions were motivated by its own concerns, including that the wire would run afoul of the BSA. SUF ¶¶ 5-6. Indeed, Brough repeatedly underscored the point during his deposition. *See* Ex. 7, Brough Dep.

---

[5]      Article 4A incorporates general terms defined in Article 1 of the U.C.C. *See* U.C.C. § 1-201(a) ("[W]ords or phrases defined [therein] … have the meanings stated," unless "the context otherwise requires."); *see also* U.C.C. § 4A-207 cmt. 2 (noting that the word "know" as used in Article 4A is "defined" in Article 1 of the U.C.C., specifically Section 1-201(25)); *New S. Fed. Sav. Bank v. Flatbush Fed. Sav. & Loan Ass'n of Brooklyn*, 2003 WL 1888678, at *1 (S.D.N.Y. Apr. 15, 2003) (observing same).

207:6-9; SUF ¶ 5.  So when Chain Bridge called JPMC to request a recall, JPMC agreed to do

just that without any discussion of indemnity—as it was evident from the parties'

communications and course of conduct that none was needed or appropriate to effectuate the

reversal.

That indemnification was not a term of the parties' agreement is further demonstrated by

an internal Chain Bridge call during which the bank's President and CEO pointedly disclaimed

the need for JPMC to indemnify Chain Bridge.  *See, e.g.*, *Dataflow, Inc. v. Peerless Ins. Co*.,

2014 WL 148685, at *4 (N.D.N.Y. Jan. 13, 2014) ("[A party's] internal communications

evincing its interpretation of … [an] agreement are relevant to … [the] interpretation of" that

agreement.).[6]  When an employee asked if Chain Bridge "[was] getting an indemnity letter from

Chase," the President and CEO of the bank waived away her concerns:  "Just return [the wire] to

the same place it came from," and "[d]on't worry about [the indemnity letter]. … [T]his is what

we have to do."  SUF ¶¶ 50-52 (quoting Ex. 23, CBB00002789 at 1:18-2:49).

Importantly, at the time Chain Bridge's President and CEO made those statements, they

did not know what JPMC's reversal message would ultimately say—for example, whether it

would seek to disclaim liability with the words "NO INDEMNITY."  *See supra* n.3.  Indeed, the

parties had never discussed the issue of indemnification.  Nevertheless, the President and CEO

gave their employees a clear and unequivocal instruction:  "Just return [the wire] to the same

---

[6]      *See also Service & Training, Inc. v. Data Gen. Corp.*, 963 F.2d 680, 689 (4th Cir. 1992)
("Circumstantial evidence of appellants' behavior after the signing of the … agreement confirms
[how] they interpreted the agreement."); *W.A. Stratton Constr. v. Butler Mfg. Co.*, 1992 WL
159107, at *8 (W.D. Va. June 23, 1992) (party's post-agreement conduct "indicate[d] strongly
that it never understood the terms of the agreement to forbid such conduct"); Restatement
(Second) of Contracts § 202(1) (1981) ("Words and other conduct are interpreted in the light of
all the circumstances, and if the principal purpose of the parties is ascertainable it is given great
weight.").

23

place it came from"—period.  SUF ¶ 52 (quoting Ex. 23, CBB00002789 at 1:37-1:42).  The only

reasonable interpretation of these words, and the communications and course of conduct between

the banks, is that Chain Bridge understood it had reached an agreement with JPMC to return the

wire, and that this agreement did not include an indemnity.

### C.    Chain Bridge Cannot Establish Causation

Chain Bridge's indemnification claim fails for another reason.  Assuming,

counterfactually, that Chain Bridge did not request the recall but instead that JPMC canceled the

transaction, Chain Bridge cannot establish causation.

Section 4A-211(f) limits indemnification to "loss and expenses … incurred … as a result

of the cancellation."  U.C.C. § 4A-211(f).  The statute's plain text—"as a result of"—imposes a

clear causal limitation on a purported indemnitor's liability.  Thus, to recover from JPMC, Chain

Bridge must prove both "but for" and proximate causation.  *See, e.g.*, *Burrage v. United States*,

571 U.S. 204, 212, 210-211 (2014) ("courts regularly read phrases like 'results from' to require

but-for causality"); *Holmes v. Securities Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992) ("by reason

of" requires both but for and proximate cause); *National Org. for Marriage, Inc. v. United States*,

24 F. Supp. 3d 518, 529 (E.D. Va. 2014) (citing *Paroline v. United States*, 572 U.S. 434, 445

(2014) for the "common maxim that a plaintiff must prove both proximate cause and actual

cause to recover damages that are 'a result of' a particular defendant's conduct").  That reading

is again consistent with common law indemnification principles, which reaffirm that indemnity

provisions exclude damages not caused by the indemnitor.  *See supra* pp.15-16; *see also White*,

662 F.2d at 250; *Seckinger*, 397 U.S. at 210-211; *Horton*, 622 F.2d at 82; *Barr*, 883 F.2d at *5;

42 C.J.S. Indemnity § 2; *Indemnification Clauses in Commercial Contracts*, PRACTICAL LAW

PRACTICE NOTE 5-517-4808 (indemnity provisions that contain the "narrow nexus phrase"

"[r]esulting from" "exclude[] damages unrelated to the indemnifying party's own acts or omissions").

Here, Blue Flame's damages—if any—constitute the relevant "loss and expenses" for which Chain Bridge seeks indemnification.  As the undisputed facts show, those purported damages would have resulted from other parties and conduct, not any "cancellation" by JPMC, assuming that is what happened here (which it did not).  U.C.C. § 4A-211(f); *see Gallagher v. Kline Imps. Arlington Inc.*, 133 F.3d 914, at *1 (4th Cir. 1998) (per curiam) (unpublished table decision) (affirming summary judgment for a defendant where a third party's "negligence was an intervening cause that superseded any alleged negligence on the part of [the defendant]").

Chain Bridge planned to deprive Blue Flame of access to the funds regardless of JPMC's actions, thereby causing Blue Flame's alleged damages—again, if any.  For example, not only did Chain Bridge place a hold on the funds without ever speaking to JPMC, but Chain Bridge's CEO (Brough) testified that he was "almost sure that [Chain Bridge] would have held the funds" indefinitely had it "not received the request to return the wire."  Ex. 7, Brough Dep. 223:4-6; *see* SUF ¶ 46.  Moreover, as discussed, Chain Bridge's own wire transfer policy required the return of funds to California, and Chain Bridge would not have made an exception to its own policies for a $456 million wire.  SUF ¶¶ 8-9.  Thus, because Blue Flame's alleged damages would have followed even in the absence of JPMC's purported cancellation (indeed, in the absence of JPMC's involvement in the transaction whatsoever), those damages, if any, are not "a result of the cancellation."

Chain Bridge's CEO also repeatedly testified that the bank's actions were informed by its concern that making the funds available to Blue Flame would run afoul of the BSA (SUF ¶ 5), and further testified that "the bank cannot make any policy exceptions to the Bank Secrecy Act"

25

(*id.* (quoting Ex. 7, Brough Dep. 200:4-6)).  Chain Bridge cannot foist onto JPMC whatever "loss and expenses" Chain Bridge might incur as a result of its own risk mitigation choices, whether those choices were rooted in the BSA or Chain Bridge's urgency in getting the wire "off of its books."

Nor would it be acceptable for Chain Bridge to recoup from JPMC "loss and expenses" caused by third parties.  Here, California—having first learned concerning information about Blue Flame directly from Chain Bridge—decided not to reissue the wire or move forward with the Blue Flame transaction, thereby causing Blue Flame's purported damages.  SUF ¶ 63. Indeed, had California reissued the wire, Blue Flame would almost certainly not be alleging any damages in connection with the California transaction or any subsequent deals.  Likewise, whatever alleged reputational damage the news media caused Blue Flame by reporting on the wire's reversal and California's decision not to proceed with the Blue Flame deal—weeks after the reversal had actually taken place—has nothing to do with JPMC's purported cancellation.  *Id.* ¶ 60.

## II.  CHAIN BRIDGE'S UNJUST-ENRICHMENT CLAIM FAILS

As the Virginia Supreme Court has cautioned, unjust enrichment is a limited claim.  *See James G. Davis Constr. Corp. v. FTJ, Inc.*, 841 S.E.2d 642, 647 (Va. 2020) ("[T]he law of restitution is very far from imposing liability for every instance of what might plausibly be called unjust enrichment.").  To prevail, Chain Bridge must establish three elements:  "'(1) a benefit conferred on the defendant by the plaintiff; (2) knowledge on the part of the defendant of the conferring of the benefit; and (3) acceptance or retention of the benefit by the defendant in circumstances that render it inequitable for the defendant to retain the benefits without paying for its value.'"  *Anderson v. Fluor Intercontinental, Inc.*, 2021 WL 837335, at *14 (E.D. Va. Jan. 4, 2021).

26

Here, Chain Bridge pleads the claim in the alternative, where Blue Flame prevails but the bank's indemnification claim against JPMC fails. *See* Third-Party Compl. ¶ 30. "In that scenario," Chain Bridge alleges that it would have voluntarily transferred $456 million to JPMC and then leaps to this conclusion: "it would be inequitable for [JPMC] to retain that benefit." *Id.* Chain Bridge's obscure reference to "that benefit" betrays the fundamental problem with this claim—JPMC did not obtain (or retain) *any* benefit from the wire's return, let alone a benefit *from Chain Bridge*. Therefore, Chain Bridge cannot satisfy its burden on any element.

*First*, Chain Bridge did not confer any benefit on JPMC as a result of the wire's reversal. *See* SUF ¶¶ 61-62. To be clear, the requirement is that *Chain Bridge* confer a benefit on JPMC *and* that JPMC retain the benefit; that JPMC may have benefited in some other way does not suffice. *See, e.g., Johnson v. D & D Home Loans Corp.*, 2008 WL 850870, at *6 (E.D. Va. Jan. 23, 2008), *aff'd sub nom. Johnson v. Washington*, 559 F.3d 238 (4th Cir. 2009) (granting summary judgment where the plaintiffs failed to establish that they had conferred any benefit on defendant). But in any event, JPMC did not benefit at all here, whether as a result of Chain Bridge's conduct or otherwise.

The funds at issue were and are California's—not JPMC's. Once Chain Bridge returned the funds to JPMC, JPMC promptly returned them to California—retaining nothing. SUF ¶¶ 61-62. Thus, because Chain Bridge cannot establish "a benefit conferred on the defendant by the plaintiff," *Anderson*, 2021 WL 837335, at *14, Chain Bridge's claim must fail. *See, e.g., id.* at *15 (granting summary judgment because defendant "lack[ed] any entitlement" to the financial benefit allegedly conferred); *Johnson v. D & D Home Loans Corp.*, 2008 WL 850870, at *6 (E.D. Va. Jan. 23, 2008) (granting summary judgment where defendants did not "own any

27

interest" in the property alleged to be their benefit), *aff'd sub nom. Johnson v. Washington*, 559 F.3d 238 (4th Cir. 2009).

*Second*, the record is devoid of any evidence even remotely suggesting that JPMC understood that Chain Bridge's reversal of the wire was intended to confer a benefit on JPMC, or that JPMC reasonably should have expected to repay the funds to Chain Bridge. *See, e.g.*, *Integrated Direct Mktg., LLC v. May*, 129 F. Supp. 3d 336, 374 (E.D. Va. 2015) (Brinkema, J.) (granting summary judgment where plaintiff had "not provided sufficient evidence from which a reasonable jury could find that [defendants] knowingly used any trade secret or confidential … information to benefit themselves"), *aff'd*, 690 F. App'x 822 (4th Cir. 2017).

*Third*, as already discussed, *Chain Bridge* sought cancellation of the wire and benefited from it in multiple ways. *See supra* pp.18-20. Thus, there is no inequity to rectify through unjust enrichment. Quite the contrary—inequity would result from a judgment for Chain Bridge by rewarding the party who sought and obtained the cancellation, and who benefited from the cancellation, at the expense of the party who accommodated that request.

*Finally*, even if Chain Bridge could prove its claim for unjust enrichment, it could not establish entitlement to any damages. Chain Bridge seeks "an award of damages against JPMorgan in the amount of any judgment entered in favor of Blue Flame on its claims against Chain Bridge Bank, N.A." Third-Party Compl. ¶ 31. That is not how unjust enrichment works. "The measure of recovery for unjust enrichment is limited to the benefit realized and retained by the defendant." *T. Musgrove Constr. Co. v. Young*, 840 S.E.2d 337, 341 (Va. 2020). Here, the record is again clear: JPMC returned the wire in full to California on March 26, 2020. SUF ¶¶ 61-62. JPMC retained no benefit from the cancellation because it retained nothing. Thus, there is no benefit that may be recovered through unjust enrichment.

**CONCLUSION**

The Court should grant summary judgment for JPMC on all three claims in Chain

Bridge's third-party complaint.

Dated: May 6, 2021

Respectfully submitted,

**WILMER CUTLER PICKERING HALE AND DORR LLP**

*/s/ Meredith K. Loretta*
Meredith K. Loretta (92369)
Albinas J. Prizgintas (*pro hac vice*)
Whitney Russell (*pro hac vice*)
1875 Pennsylvania Avenue N.W.
Washington, DC  20006
Tel.: (202) 663-6981
Fax: (202) 663-6363
meredith.loretta@wilmerhale.com

Alan E. Schoenfeld (*pro hac vice*)
Marissa W. Medine (*pro hac vice*)
7 World Trade Center
250 Greenwich Street
New York, NY  10007
Tel.: (212) 230-8800
Fax: (212) 230-8888
alan.schoenfeld@wilmerhale.com

Felicia Ellsworth (*pro hac vice*)
60 State Street
Boston, MA  02109
Tel.: (617) 526-6000
Fax: (617) 526-5000
felicia.ellsworth@wilmerhale.com

Margarita M. Botero (*pro hac vice*)
1225 17th Street, Suite 2600
Denver, CO 80202
Tel.: (720) 274-3135
Fax: (720) 274-3133
margarita.botero@wilmerhale.com

*Attorneys for Third-Party Defendant*
*JPMorgan Chase Bank, N.A.*

**CERTIFICATE OF SERVICE**

I certify that on this 6th day of May, 2021, I electronically filed the foregoing using the Court's CM/ECF system, which will then send a notification of such filing to all counsel of record.

/s/ Meredith K. Loretta
Meredith K. Loretta
1875 Pennsylvania Avenue N.W.
Washington, DC  20006
Tel.: (202) 663-6981
Fax: (202) 663-6363
meredith.loretta@wilmerhale.com