**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)**

| | |
|---|---|
| BLUE FLAME MEDICAL LLC,<br><br>            Plaintiff,<br><br>v.<br><br>CHAIN BRIDGE BANK, N.A., JOHN J.<br>BROUGH, and DAVID M. EVINGER,<br><br>            Defendants. | **Civil Action No. 1:20-cv-00658** |
| CHAIN BRIDGE BANK, N.A,<br><br>            Third-Party Plaintiff,<br><br>v.<br><br>JPMORGAN CHASE BANK, N.A.,<br><br>            Third-Party Defendant. | |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT AGAINST PLAINTIFF BLUE FLAME MEDICAL LLC**

ROBBINS, RUSSELL, ENGLERT, ORSECK
  & UNTEREINER LLP

Gary A. Orseck (admitted *pro hac vice*)
Matthew M. Madden (admitted *pro hac vice*)
Donald Burke (VA Bar No. 76550)
2000 K Street, N.W., 4th Floor
Washington, D.C. 20006
Tel: (202) 775-4500
Fax: (202) 775-4510
dburke@robbinsrussell.com

*Counsel for Defendants*

May 6, 2021

# TABLE OF CONTENTS

Page

INTRODUCTION .................................................................................................................. 1

STATEMENT OF UNDISPUTED FACTS ......................................................................... 3

    A.   Blue Flame Procures California's Order For 100 Million N95 Masks Through Misrepresentations And Concealment ........................................................ 3

    B.   Blue Flame Fraudulently Induces Chain Bridge To Open An Account .................. 8

    C.   Chain Bridge Bank Learns Of Blue Flame's Expected Incoming Wire And Begins To Investigate ........................................................ 8

    D.   California's Wire Transfer ................................................................ 10

    E.   Blue Flame Fails To Persuade California To Proceed With The Order And Fails To Fulfill Other Orders For N95 Masks .................................................. 14

ARGUMENT ...................................................................................................................... 15

  I.   Chain Bridge Is Entitled To Summary Judgment On Blue Flame's Claim Under UCC Section 4A-404(a) (Count I) ............................................................ 15

    A.   Chain Bridge Is Not Liable Under Section 4A-404(a) ........................................ 16

    B.   Blue Flame Cannot Establish Damages Resulting From Chain Bridge's Refusal To Pay ........................................................................................ 22

        1.   Blue Flame Could Not Have Forced California To Proceed With Its Mask Order ........................................................................................ 22

        2.   The Record Is Devoid Of Evidence That Blue Flame Could Have Fulfilled California's Order ........................................................ 24

        3.   In All Events, Blue Flame Cannot Recover Damages Based On Other Transactions ........................................................................................ 26

  II.   Chain Bridge Is Entitled To Summary Judgment On Blue Flame's Claim Under UCC Section 4A-204 Because Chain Bridge Did Not Accept A Payment Order "Issued In The Name Of Its Customer As Sender" (Count II) ....................................... 27

  III.  Defendants Are Entitled To Summary Judgment On Blue Flame's State-Law Claims (Counts IV, V, and IX) ........................................................................... 28

    A.   Blue Flame's Defamation Claim Fails As A Matter Of Law (Count IX) .............. 28

    B.   Blue Flame's Tortious Interference Claims Fail As A Matter Of Law (Counts IV and V) ................................................................................................... 29

    C.   Blue Flame Cannot Establish Damages On Its State-Law Claims ........................ 30

# TABLE OF AUTHORITIES

Cases:                                                                                      Page

*Adler v. Virginia Commonwealth Univ.*,
   259 F. Supp. 3d 395 (E.D. Va. 2017) ................................................................29

*Anderson v. School Bd. of Gloucester Cty., Virginia*,
   No. 3:18cv745, 2020 WL 2832475 (E.D. Va. May 29, 2020)........................................29

*Banca Commerciale Italiana, N.Y. Branch v. Northern Tr. Int'l Banking
Corp.*,
   160 F.3d 90 (2d Cir. 1998)................................................................17

*Cashion v. Smith*,
   749 S.E.2d 526 (Va. 2013)................................................................29

*CFTC v. Rust Rare Coin Inc.*,
   469 F. Supp. 3d 1211 (D. Utah 2020)................................................................17

*Commerce Funding Corp. v. Worldwide Sec. Servs. Corp.*,
   249 F.3d 204 (4th Cir. 2001) ................................................................30

*Cumis Ins. Soc'y, Inc. v. Citibank, N.A.*,
   921 F. Supp. 1100 (S.D.N.Y. 1996)................................................................17

*Devine v. Buki*,
   767 S.E.2d 459 (Va. 2015)................................................................18

*Eisenberg v. Wachovia Bank, N.A.*,
   301 F.3d 220 (4th Cir. 2002) ................................................................30

*Hyland v. Raytheon Tech. Servs. Co.*,
   670 S.E.2d 746 (Va. 2009)................................................................28, 29

*Professional Recovery Servs., Inc. v. General Elec. Capital Corp.*,
   642 F. Supp. 2d 391 (D.N.J. 2009) ................................................................29

*Regions Bank v. Provident Bank, Inc.*,
   345 F.3d 1267 (11th Cir. 2003) ................................................................21

*Saunders v. General Servs. Corp.*,
   659 F. Supp. 1042 (E.D. Va. 1987) ................................................................18, 22

*Saylor v. Pinnacle Credit Servs., LLC*,
   118 F. Supp. 3d 881 (E.D. Va. 2015) ................................................................15

*Schaecher v. Bouffault*,
   772 S.E.2d 589 (Va. 2015)................................................................29

Cases—Continued:                                                                    Page

    *Shirvinski v. United States Coast Guard*,
       673 F.3d 308 (4th Cir. 2012) ........................................................30

    *Sutherland v. SOS Int'l, Ltd.*,
       541 F. Supp. 2d 787 (E.D. Va. 2008) ............................................26

Statutes, regulations, and rule:

Uniform Commercial Code:

    § 1-304 ..............................................................................21, 28

    § 1-304 cmt. 1 ..............................................................................21

    § 1-304 cmt. 2 ..............................................................................21

    § 4A-204(a) ..................................................................................27

    § 4A-211(a) ..................................................................................17

    § 4A-211(c) ..............................................................................17, 18

    § 4A-211(c)(2) ..............................................................................17

    § 4A-211(c)(2)(ii) ......................................................................17, 18

    § 4A-211 cmt. 4 ............................................................................17

    § 4A-211(e) ..............................................................................16, 18

    § 4A-404(a) ..........................................................................15, 16, 24

    § 4A-404(a) cmt. 3 ........................................................................21

    § 4A-404 cmt. 2 ............................................................................27

12 C.F.R.:

    pt. 210:

       subpt. B, app. B ......................................................................3

       §§ 210.25-210.32. ..................................................................3

       § 210.25(b)(1) ........................................................................3

Fed. R. Civ. P. 56(a) ..............................................................................15

Other authorities:                                                                                    Page

Restatement (Second) of Contracts (1981) ..................................................................18, 27

Leslie Stahl, CBS News, *Inside the Chaotic PPE Market Where Shortages of
    Critical Supplies Persist* (Dec. 6, 2020),
    https://www.cbsnews.com/news/ppe-production-company-investigation-
    charges-60-minutes-2020-12-06/ .......................................................................................25

iv

Defendants Chain Bridge Bank, N.A. (Chain Bridge), John J. Brough, and David M. Evinger submit this memorandum in support of their motion for summary judgment against Plaintiff Blue Flame Medical LLC (Blue Flame).

## INTRODUCTION

As the COVID-19 pandemic began to wreak havoc across the United States in March 2020, California officials wired more than $456 million to Blue Flame's account at Chain Bridge as a down payment on a $609 million purchase of 100 million N95 masks. But when California's wire transfer arrived on March 26, 2020, Chain Bridge knew that Blue Flame had come into existence only three days earlier and had opened its bank account just the previous day. Chain Bridge also understood that the brand-new company was run by a pair of political operatives, not by medical supply professionals. California, by contrast, knew none of this—Blue Flame had concealed it. Instead, Blue Flame plied California with false representations that it had—and had already delivered—massive quantities of N95 masks to other purchasers (it had not) and with a fictitious delivery schedule promising that 100 million masks would arrive within 30 days of California's order (a physical impossibility).

Happily for California taxpayers, this is a case in which the banking system worked. The nearly half a billion dollars earmarked for a three-day-old company raised concerns at Chain Bridge and at California's own bank, JPMorgan Chase Bank, N.A. (JPMorgan). Chain Bridge immediately placed a hold on the wired funds, and then spoke with California officials and with its counterparts at JPMorgan. Chain Bridge confirmed that Blue Flame's bank account had been opened the day before and that its principals' background was in politics. JPMorgan and California both asked Chain Bridge to continue holding the funds, and within two hours they were both pressing for the prompt return of the funds. JPMorgan formally requested a cancellation of the

wire transfer, and Chain Bridge accommodated that request by returning the funds to JPMorgan. Afterwards, Blue Flame repeatedly sought to entice California into proceeding with a mask purchase—on better terms and through a different bank—but California reaffirmed its decision not to do business with Blue Flame.

Blue Flame now claims that Chain Bridge should pay it more than $165 million—which it says represents Blue Flame's lost profits from the California transaction and other orders that it supposedly would have fulfilled if the California transaction had gone through.  If Blue Flame were to pursue this theory against California, it would doubtless be laughed out of court: California's purchase order incorporated standard procurement terms that gave California a right to terminate for any reason it chose, so there is no basis for Blue Flame's premise that California could have been be forced to go through with the transaction.  Moreover, Blue Flame could not possibly have fulfilled California's order.   According to Blue Flame's own response to congressional investigators, the company consistently failed to fulfill other orders for PPE placed in late March and early April 2020.  Blue Flame attributed those failures to Chinese export restrictions, to the inability of Blue Flame's China-based supplier to source the required products, and to other market and supply-chain disruptions—not anything to do with Defendants.  Given Blue Flame's inability to fulfill much smaller orders for N95 masks, there is no plausible basis to believe that Blue Flame could have supplied 100 million N95 masks for California—a task that would have required Blue Flame to secure more than the total production capacity for the relevant products during this period.  So all of the damages that Blue Flame imagines here are baseless speculation.  And that is all before considering Blue Flame's fabrications and concealment of material facts, which would give California a defense against any claim that Blue Flame could assert against it.

Blue Flame's theory fares no better when asserted against Chain Bridge under Article 4A of the Uniform Commercial Code (the UCC), which is incorporated here by the Federal Reserve regulations governing California's wire transfer.[1]   Article 4A is not some form of alchemy by which a plaintiff can transform its meritless claims against a wire originator into a viable claim against the plaintiff's own bank.   There is no basis to impose liability against Chain Bridge. California's wire transfer was cancelled, and Chain Bridge agreed to that cancellation under circumstances presenting numerous red flags of suspicious and potentially fraudulent activity. Blue Flame's own bad faith also precludes it from availing itself of any UCC remedies.   And in any event, Blue Flame's inability to demonstrate damages remains an insuperable barrier to its Article 4A theory against Chain Bridge.

Nor is there any basis for Blue Flame's additional claims that Defendants defamed Blue Flame or tortiously interfered with its contracts and business by informing California officials that Blue Flame's account had been opened the day before by a political lobbyist.   Sharing that indisputably true information with the responsible California officials was *rightful*, not tortious.

## STATEMENT OF UNDISPUTED FACTS

**A.    Blue Flame Procures California's Order For 100 Million N95 Masks Through Misrepresentations And Concealment**

1.    Even before the COVID-19 pandemic was declared to be a national emergency, Blue Flame's principals, John Thomas and Michael Gula—career "political consult[ants]" who did not "have any experience in the field of medical supplies," the "healthcare industry," or "supply

---

[1] Because California's wire was sent over the Federal Reserve's Fedwire Funds Service, the transactions here are subject to Federal Reserve Board regulations and guidance, including Subpart B of its Regulation J.  12 C.F.R. §§ 210.25-210.32.  Subpart B of Regulation J, in turn, incorporates Article 4A of the UCC.  *Id.* § 210.25(b)(1); 12 C.F.R. pt. 210, subpt. B, app. B.  All references in this brief to provisions of Article 4A of the UCC are to the version of that law incorporated by reference in Subpart B of Regulation J and reprinted as an appendix to Subpart B.

chain management"—were thinking of ways to profit from the crisis as middlemen for in-demand personal protective equipment (PPE).  Compl. ¶ 22; Declaration of Donald Burke, Ex. 1 (Gula Tr.) at 25-28;[2] Ex. 2 (Thomas Tr.) at 19-21, 48-49, 174; Ex. 3.  Thomas and Gula reached out to their network of political contacts and offered referral fees for steering public contracts to them. Ex. 4. On March 23, 2020, they formed Blue Flame.  Ex. 5 at 2571.

2.      On March 25, 2020, California's Department of General Services (DGS) agreed to purchase 100 million N95 masks from Blue Flame.  The terms of the transaction were memorialized in California's purchase order and Blue Flame's invoice, which provided a total purchase price of $609.16 million (inclusive of $37.96 million in sales tax and $95.20 million in estimated shipping costs) and for pre-payment of 75% of that total.  Ex. 6; Ex. 7.  The purchase order and invoice designated four specific models of N95 masks, each of which is manufactured in China.  *Id.*  The purchase order also incorporated a set of standard procurement terms set out in a DGS form.  Ex. 7.

3.      California's purchase order specified a delivery date of April 3, 2020, although the parties understood that to be a deadline for an initial shipment of masks, rather than the full quantity.  Ex. 7; Ex. 8 (Wong Tr.) at 108-09.  During the parties' negotiations, Blue Flame had provided DGS officials with a delivery schedule that contemplated delivery of all 100 million masks by April 24, 2020.  Ex. 9 at 129960.  At a minimum, DGS understood Blue Flame to have guaranteed delivery of 63 million masks within 30 days and expected delivery of all 100 million masks in "days or weeks."  Ex. 8 (Wong Tr.) at 71-72; Ex. 10 at 110970-71; Ex. 11 (Kim Tr.) at 39.

---

[2] Exhibits to the Burke Declaration are hereinafter cited as "Ex. __."

4.      Blue Flame procured California's purchase order by misrepresenting its own capabilities and concealing material facts that would have dissuaded California from moving forward with the order.  Blue Flame got its foot in the door when John Thomas told California State Controller Betty Yee that Blue Flame had 100 million 3M-manufactured N95 masks at the Port of Long Beach.  Thomas asserted that Blue Flame had "almost sold all" of that shipment and was "delivering another 100m units of n95 mask" to "hospitals and a private buyer" in Florida (customers, he said, that non-disclosure agreements prevented him from identifying). Ex. 12 at 200119, 200121, 200124.[3]  But Thomas assured Yee that Blue Flame would have "100m units every week" available for sale to California.  *Id.* at -200119.  These representations were "important" to Controller Yee, as Blue Flame's purported supply and delivery history went "to the credibility of the vendor" and "put[] pressure on the state to get a deal done as soon as possible." Ex. 16 (Chivaro Tr.) at 73-74, 78.  But none of this was true:  As Thomas has acknowledged, Blue Flame never owned or sold any 3M masks stored at the Port of Long Beach, and never delivered 100 million N95 masks to Florida (or anywhere else).  *See* Ex. 2 (Thomas Tr.) at 101, 119-120.

5.      Thomas made similar material misrepresentations to the DGS officials who approved the transaction.  Thomas told DGS Director Daniel Kim and Michael Wong, a DGS contract administrator, that he had "direct access to manufacturers in China," Ex. 11 (Kim Tr.) at

---

[3] Thomas's misrepresentation about Blue Flame's supply of 100 million N95 masks at the Port of Long Beach allowed him to access the highest levels of California's government with remarkable speed.  On March 20, 2020, he related this falsehood to Matthew Littman, one of Blue Flame's "referral partners."  Ex. 2 (Thomas Tr.) at 67-68; Ex. 13 at 200058.  Littman then enlisted his associate, Stephanie Daily Smith, who had worked as a political fundraiser for Controller Yee. Littman told Smith that Blue Flame had 100 million N95 masks at the Port of Long Beach and wanted the State, rather than a private customer, to purchase them.  Ex. 14 at 078-079.  Smith immediately texted Yee and the California Governor's Office, urging them to contact Thomas about his supposed supply of 100 million masks.  Ex. 15.  Yee personally texted Thomas about the transaction, and then—in reliance on what he had hold her—intervened with other California officials to facilitate the order.  Ex. 12 at 200125; Ex. 16 (Chivaro Tr.) at 128-130.

36-37, and referred to his contact Henry Huang as his "preferred manufacturer," Ex. 17 at 200138. As Director Kim explained, he understood that Blue Flame was "operating with a supplier who could manufacture directly as opposed to some middleman." Ex. 11 (Kim Tr.) at 82. But that too was false: As Thomas later testified, Huang and his company, Great Health Companion, did not manufacture N95s themselves, but rather (according to Thomas at least) "contract[ed] out with manufacturers' facilities." Ex. 2 (Thomas Tr.) at 155.

6.     Blue Flame concealed other key details about its operations from California. Thomas failed to disclose to Controller Yee, DGS officials Kim and Wong, or any other California official (1) that Blue Flame was organized only on March 23; (2) that Blue Flame had no bank account until the morning of March 25; (3) that Blue Flame had not yet delivered any N95 masks to any customers; (4) that neither Thomas nor Gula had any experience in medical supply logistics; and (5) that Blue Flame had no office in California. Ex. 11 (Kim Tr.) at 82-84; Ex. 18 (Sturmfels Tr.) at 210-213; Ex. 8 (Wong Tr.) at 120-122; Ex. 16 (Chivaro Tr.) at 127-131. Those omissions were critical: The undisputed evidence is that if "the controller had thought that [Blue Flame] was not legit, she would not have spent a moment further on this matter." Ex. 16 (Chivaro Tr.) at 128, 130. And as DGS Director Kim explained, this information "would have raised alarm bells" if it had been disclosed to DGS. Ex. 11 (Kim. Tr.) at 85.

7.     Blue Flame closed the deal with California by sending DGS a delivery schedule showing that Blue Flame would supply 100 million N95 masks to California by April 24, 2020. Ex. 9. The schedule stated that those masks would come from two putative suppliers: 6 million from Suuchi, Inc., a supply chain software, operations, marketing, and sales company that had recently entered the market to broker for PPE; and the remainder from Great Health Companion

Group (Great Health), a Chinese company. Ex. 19; *see* Ex. 20 at 12838; Ex. 21 (Bearman Tr.) at 249; Ex. 22 (Faulkner Rep.) ¶ 16.

8.     Blue Flame's delivery schedule was fictitious.  The morning of March 25, Thomas told his team that Blue Flame still needed to "source inventory amounts to tell California what we'll be sending them" because it was "still short," and needed to "figure out how to write the invoice with flexibility." Ex. 23.  That night, Blue Flame's attorney, Ethan Bearman, created an initial version of the delivery schedule, using "placeholders" for delivery quantities. Ex. 21 (Bearman Tr.) at 192.  Even those placeholders, however, showed Blue Flame delivering just 58 million masks by April 30—42 million shy of California's order.  Ex. 24.  Just ten minutes later, after conferring with Thomas, Bearman circulated internally a revised version—attached to an email titled "To get to 100MM"—this time showing *100 million* masks arriving by April 24. Ex. 25.  And less than two hours after that, Bearman circulated yet another version—also showing 100 million masks to arrive by April 24, but with dramatically different daily delivery quantities. Ex. 19.  Each schedule pretended that millions of N95 masks would arrive from Great Health day after day—amounts that far exceeded those indicated in the "Products Catalogue" that Blue Flame had received from Great Health, which showed an "Allocatable Inventory" of only 470,000 N95 masks and a total "Monthly Capacity" of only 3.5 million N95 masks for the manufacturers of the four specific models specified in California's order.  Ex. 20; Ex. 22 (Faulkner Rep.) ¶ 67.  Thomas nonetheless forwarded the last of Bearman's schedules to DGS Director Kim, to "instill [in him] a level of trust and confidence" in Blue Flame's "ability to deliver." Ex. 26 at 1566.

9.     In fact, Blue Flame had no ability to fulfill California's order.  It had no inventory of N95 masks at the time it accepted the order.  Ex. 1 (Gula Tr.) at 184-85.  After accepting California's order, Blue Flame in turn placed purchase orders for N95 masks with Great Health

and Suuchi, Inc.  But there is no record evidence that either broker could have, in fact, supplied any N95 masks to Blue Flame.

### B.    Blue Flame Fraudulently Induces Chain Bridge To Open An Account

10.    The evening of March 24, Michael Wong of California's DGS informed Thomas that California "would like a PO for 100M" N95 masks.  Ex. 10 at 110967.  Thomas alerted his Blue Flame colleagues, with evident surprise, and Bearman immediately observed that Blue Flame did not even "have a bank account for sending [Wong] wiring instructions."  Ex. 27 at 202805-06.

11.    On March 25, Thomas and Gula scrambled to finish setting up their two-day-old business.  Ex. 5 at 2571.  Gula visited Chain Bridge Bank's office in McLean, Virginia, to open an account for Blue Flame. Ex. 28 (Evinger Tr.) at 129-130; Ex. 29 (Schoeppe Tr.) at 46.   In response to account-opening diligence questions, Gula falsely reported to Chain Bridge that Blue Flame expected 25 incoming domestic wires per month totaling only $75 million, and that Blue Flame was in the "[m]edical consulting" business.  Ex. 30; Ex. 31.  Gula falsely reported expected wire activity despite having been warned, by Blue Flame's own attorney, to alert the Chain Bridge to the incoming wire because "[o]dd money moves raise red flags and can hold up transactions."  Ex. 32.  Despite that advice, Gula did not tell Chain Bridge when opening Blue Flame's account that Blue Flame was expecting an immediate incoming wire nearly half a billion dollars.  Chain Bridge agreed to open Blue Flame's account on the basis of Gula's representations.  Ex. 33.

### C.    Chain Bridge Bank Learns Of Blue Flame's Expected Incoming Wire And Begins To Investigate

12.    Chain Bridge opened Blue Flame's account and gave Blue Flame wiring instructions, which Blue Flame then promptly provided to California.  Ex. 34; Ex. 35.[4]  Only then,

---

[4] Upon receiving the wiring instructions, Gula began emailing his business clients that "today . . . will be my last day working for you," and that, "[a]fter this e-mail, I will be unreachable."  Ex. 36.

minutes after receiving the wiring instructions, did Gula call Chain Bridge and speak with Heather Schoeppe, Senior Vice President and Branch Manager. Ex. 37.  Gula told Schoeppe that "the state of California is sending an unbelievably large wire transfer in the amount of $450 million."  *Id.*

13.     Schoeppe called Gula back shortly thereafter.  During that call, Gula said that "we're buying 100 million masks for the State of California from China."  Ex. 38.  He stated that the funds would "probably be wired out" from Blue Flame's account "within the next couple days," but then added that "[a]ctually, I don't know the answer."  *Id.*  Schoeppe reported this information to Chain Bridge's Chief Executive Officer, John Brough, and President, David Evinger, and advised that Gula had "been calling all day" and was "really anxious, dying to know when the money hits the account." Ex. 39.

14.     Evinger and Brough immediately called Gula to inquire about the large incoming wire. Ex. 1 (Gula Tr.) at 179-80; Ex. 28 (Evinger Tr.) at 189.  Gula described the California deal as his "pay day" and an opportunity to "leave this all behind" and "get out" from his political work, adding that he would be "not reachable after this." Ex. 40 (Brough Tr.) at 346-47; Ex. 41 at 4454.[5] Gula also stated "he would make enough money to never have to worry about anything."  Ex. 41 at 4454.  Gula further explained that Blue Flame's other principal (Thomas) had a "very good friend with access to lots of manufacturing facilities in China, and they would be working with him to fill extremely large orders for PPE." Ex. 42.  Pursuant to their obligations under the Bank Secrecy Act, Ex. 43,  Evinger and Brough asked for "further documentation" on Gula's new business, including copies "of any contracts [Gula] had in place with purchasers or sellers," and Gula responded that Blue Flame "would be happy to provide whatever information the Bank

---

[5] Internally, when Gula calculated that Blue Flame stood to earn a $21 million profit on the first 30 million masks, he proclaimed "sweet mother of god. And that's only on the first 30." Ex. 27 at 202813.

needed." Ex. 42; Ex. 44, at 4464; Ex. 28 (Evinger Tr.) at 202; Ex. 40 (Brough Tr.) at 142-43. Evinger then followed with an email telling Gula that Chain Bridge "look[ed] forward to receiving your information related to these contracts." Ex. 45 at 13446. Neither Gula nor Thomas ever sent Chain Bridge the requested contracts between Blue Flame and its purchaser or suppliers.

15. On the same call, Evinger and Brough also told Gula that a deposit of over $456 million would not be covered by Federal Deposit Insurance Corporation (FDIC) insurance, and that they would spread the funds across accounts at other institutions to ensure a greater portion of the funds were FDIC-insured. Ex. 42. Evinger and Brough instructed Chain Bridge employees to prepare paperwork so that any incoming funds could be moved into a FDIC-insured sweep account promptly after receipt. Ex. 39; Ex. 46 at 767.

16. In response to an email from Brough asking whether Blue Flame intended to transfer funds to China, Gula provided outgoing wire instructions to Wingar Industrial Inc., which he represented was "where [Blue Flame is] sending" funds. Ex. 45 at 13445, 448. Evinger searched online for Wingar Industrial Inc. and discovered that the company was a cutlery and flatware wholesaler. Ex. 40 (Brough Tr.) at 159-61; *see* www.wingar.com.

### D.   California's Wire Transfer

17. On March 26, 2020, at 11:21 AM ET, a representative from the California State Treasurer's Office (STO) originated a wire transfer in the amount of $456,888,600, for Blue Flame's benefit, through California's bank, JPMorgan. Stipulation, Dkt. No. 96, at ¶ 15. The wire tripped JPMorgan's automated payment-control system, on multiple grounds, for suspicious transaction activity. Ex. 47 (Korpal Tr.) at 44; Ex. 48. But the transfer was approved by JPMorgan shortly thereafter. Ex. 49.

18.     At 11:55 AM, Chain Bridge received JPMorgan's payment order transmitting California's wire transfer over the Federal Reserve's Fedwire system.  Ex. 50.  Minutes later, Gula received an automated email notification that the funds had been received. Ex. 51; Ex. 52.

19.     Chain Bridge was confronted with multiple indicia of "potentially suspicious activity" associated with the wire transfer. Ex. 53 (Grice Rep.) ¶ 66.  Among other things, Chain Bridge:

- had received an extremely large wire earmarked for a three-day-old company's one-day-old bank account;

- understood that Blue Flame's principals had no experience in medical supply or international importation;

- knew the California wire to be many times larger than what Blue Flame had initially disclosed would be its new account's expected wire activity;

- was now being told that Blue Flame planned to funnel large amounts to operators in a high-risk industry (PPE supply) and high-risk jurisdiction (China);

- received outgoing wire instructions from Blue Flame, minutes after California's wire arrived, contradicting information that Gula had given Chain Bridge the night before (*see* Ex. 54 at 656); and

- had asked for, but not been provided, documentation to validate the transaction with California and agreements with PPE suppliers.

Ex. 53 (Grice Rep.) ¶¶ 40, 75, 93-97.

20.     While Chain Bridge investigated these and other indicia of suspicious activity, it placed a hold on the funds and Brough instructed bank employees not to contact Blue Flame about the wire until further notice. Ex. 55 at 728; Ex. 56 at 742.

21.     Within minutes of JPMorgan's transmittal of California's wire transfer, Rakesh Korpal, a JPMorgan Executive Director who led JPMorgan's Fraud Payments Control Team, was undertaking additional investigation of the wire transfer in response to his independent concerns of potential suspicious activity.  Ex. 47 (Korpal Tr.) at 61-63.  As part of Korpal's investigation,

his colleague, Tim Coffey, called Chain Bridge at 12:30 PM.  Coffey advised Chain Bridge that JPMorgan had "concerns of fraud" regarding the California wire transfer, and then sought confirmation that Chain Bridge would hold the funds pending further investigation.  Ex. 57; Ex. 58 (Coffey Tr.) at 15.

22.     At 12:44 PM, Korpal called Chain Bridge and spoke with Brough and Evinger. Korpal explained that the wire transfer was being investigated by JPMorgan's Global Securities Investigation Team, which had reported the transaction "does not look right," and that JPMorgan's research was "all leading to not-good places."  Ex. 59.

23.     At 12:51 PM, Fee Chang of DGS returned a 12:19 PM call that Chain Bridge had placed to DGS's main line.  Stipulation, Dkt. No. 96, at ¶ 21.  She left a voicemail for Evinger in which she asserted that the wire transfer was "legitimate," but requested a follow-up call.  Ex. 60.

24.     Minutes later, Brough and Evinger spoke with Chang.  Evinger asked her for "documentation" to support the transfer and told Chang that Chain Bridge wanted to "make sure that [the] funds were transferred properly" because it was "obviously a sizable amount." Ex. 61. Chang said that she believed it to be a "good transfer," but directed Chain Bridge to speak with Natalie Gonzales in the California State Treasurer's Office because Gonzales was the person actually "in charge of the transfers." *Id*.

25.     At 1:19 PM, Natalie Gonzales and Mark Hariri in the STO called Brough and Evinger, who told them that "a client of Chain Bridge Bank" who was "a political lobbyist" "had opened Blue Flame Medical's bank account the previous day" and Chain Bridge "wanted to make sure that [Gonzales and Hariri] were comfortable wiring in the money to the account that had just been opened." Ex. 62 (Gonzales Tr.) at 50-51, 130; Ex. 28 (Evinger Tr.) at 252; *see id.* at 282; Ex. 40 (Brough Tr.) at 283-84.  Gonzales and Hariri were "surprised" to learn this information. Ex. 28

(Evinger Tr.) at 282; Ex. 40 (Brough Tr.) at 283, and asked Chain Bridge to "wait" to "credit[] the client account" until they could "find out additional information." Ex. 62 (Gonzales Tr.) at 50. Brough and Evinger never said that "Blue Flame Medical was a fraud" or that its principals "who had opened the account w[ere] engaged in fraud." *Id.* at 71.

26.     Korpal spoke again with Brough and Evinger at 1:35 PM.  During that conversation, Evinger asked Korpal:  "Is there any way for JPMorgan to issue a recall for the wire, so that while you intervene in this you have the funds and feel more comfortable?"  Ex. 63.  Korpal responded that he felt comfortable that Chain Bridge was "holding the money right now," but that he could "issue a recall" and asked for "a few more minutes" to determine JPMorgan's next steps.  *Id.*

27.     Two minutes later, at 1:37 PM, Coffey called Brough and Evinger.  Coffey stated that JPMorgan was "going to be recalling those funds," explaining that JPMorgan had "enough concerns that we feel like we need to claw those funds back."  Ex. 64.  Coffey asked whether Chain Bridge needed a "recall message" from JPMorgan to confirm JPMorgan's request to reverse the wire transfer.  *Id.*  Chain Bridge responded that it did need an "official communication from JPMorgan to us to recall the funds" sent over the Fedwire system.  *Id.*  Coffey promised to send such a message "in the next couple of minutes."  *Id.*  Coffey emphasized to Chain Bridge that "as quickly as you can return it, that'd be great."  *Id.*

28.     At 2:05 PM, JPMorgan sent a Fedwire service message to Chain Bridge requesting reversal of the California wire transfer.  *See* Ex. 65.

29.     In the meantime, California officials pressed for return of the funds.  By approximately 2:00 PM, the STO requested that the funds be recalled, telling JPMorgan that it was not comfortable with the due diligence conducted by DGS. Ex. 47 (Korpal Tr.) at 21-22.  Gonzales asked JPMorgan "to reach out to the Chain Bridge Bank to see where the wire-recall is in the

13

process." Ex. 66.  Gonzales also followed up by phone with Chain Bridge.  Stipulation, Dkt. No. 96, at ¶¶ 28, 30.

30.     Brough informed Gula by email that Chain Bridge had "received official notice from the sending bank to return the wire" and told Gula to "[p]lease resolve directly with the state of California."  Ex. 67 at 74101.  Gula went to Chain Bridge and met with Brough and Evinger around 2:30 PM.  Gula apologized for the transaction and did not object to the return of the funds to JPMorgan.  Ex. 40 (Brough Tr.) at 305-06.

31.     At 3:21 PM, Chain Bridge honored JPMorgan's reversal request by returning $456,888,600 to JPMorgan, noting that the return was being done "PER YOUR REQUEST."  Ex. 68.  By 4:02 PM, JPMorgan had posted the amount of the wire transfer to California's account at JPMorgan.  Stipulation, Dkt. No. 96, at ¶ 34.

### E.     Blue Flame Fails To Persuade California To Proceed With The Order And Fails To Fulfill Other Orders For N95 Masks

32.     After the reversal of California's wire transfer, California officials did not re-initiate a payment to Blue Flame.  Ex. 69.

33.     In the following weeks, Blue Flame approached California DGS and sought to convince California to move forward with a purchase of N95 masks, this time without requiring prepayment.  Ex. 12 at 200132-33; Ex. 70; Ex. 71; Ex. 72; Ex. 2 (Thomas Tr.) at 243-44.  On March 27, Controller Yee told Thomas that the conflicting and untrustworthy information he had provided California had created a "credibility issue" for him and Blue Flame, Ex. 12 at 200133, and the State's procurement official, Michael Wong, testified that he broke off discussions with Thomas because he believed he had received unreliable information about the type of masks that Blue Flame was proposing to sell, Ex. 8 (Wong. Tr.) at 145.  California reaffirmed the State's decision not to purchase from Blue Flame.  *Id*.

34.     Between March 30 and April 9, 2020, by its own account, Blue Flame received at least 13 orders from other federal, state, or local governments for a total quantity of 2.82 million N95 masks (and a variety of other PPE items). Ex. 73 at 163508-13; *see also* Ex. 22 (Faulkner Rep.) ¶¶ 72-73.  As Blue Flame acknowledged in a response to congressional investigators, it was able to fulfill only a single order for 96,000 N95 masks (purchased for Chicago by an anonymous buyer) by June 22, 2020.  Ex. 73 at 163513.  Blue Flame blamed its failure to fulfill these orders on Chinese export restrictions, on Blue Flame's China-based supplier, and on other market and supply-chain disruptions—not anything to do with Defendants.  *Id.* at 163506; *see also* Ex. 22 (Faulkner Rep.) ¶¶ 72-73 & Ex. 2.

## ARGUMENT

Summary judgment is appropriate when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine issue of material fact exists only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Saylor v. Pinnacle Credit Servs., LLC*, 118 F. Supp. 3d 881, 885 (E.D. Va. 2015).  As demonstrated below, the undisputed facts in this case demonstrate that each of Blue Flame's claims fails as a matter of law.

## I.     Chain Bridge Is Entitled To Summary Judgment On Blue Flame's Claim Under UCC Section 4A-404(a) (Count I)

Under UCC Section 4A-404(a), "if a beneficiary's bank accepts a payment order, the bank is obliged to pay the amount of the order to the beneficiary of the order."  Section 4A-404(a) also sets forth the measure of damages for breach of that payment obligation:  "If the bank refuses to pay after demand by the beneficiary and receipt of notice of particular circumstances that will give rise to consequential damages as a result of nonpayment, the beneficiary may recover damages resulting from the refusal to pay to the extent the bank had notice of the damages."  *Id.*  The

beneficiary may not recover any such damages, however, if "the bank proves that it did not pay because of a reasonable doubt concerning the right of the beneficiary to payment." *Id.*

As explained below, the undisputed evidence demonstrates that Blue Flame cannot establish that Chain Bridge is liable under Section 4A-404. And even if Blue Flame could establish liability, it has no evidence of recoverable damages.

### A.    Chain Bridge Is Not Liable Under Section 4A-404(a)

Blue Flame is not entitled to payment of California's wire transfer under UCC Section 4A-404(a) because the wire transfer was cancelled, and Chain Bridge's agreement to return California's funds to JPMorgan was consistent with the bank's duties and obligations to detect and prevent potentially suspicious activity. In addition, Blue Flame's misrepresentations to both California and Chain Bridge amounted to a failure to act in good faith which, under the UCC, renders unavailable and unenforceable any payment rights that Blue Flame otherwise might have had.

1. Blue Flame's claim under Section 4A-404(a) fails because California's wire transfer was cancelled, which nullified Chain Bridge's obligation to pay. Section 4A-404(a)'s general rule that a bank must pay the beneficiary following acceptance of a payment order is expressly "[s]ubject to Section[] 4A-211(e)." And Section 4A-211(e) provides, in turn, that "[i]f an accepted payment order is canceled, the acceptance is nullified and no person has any right or obligation based on the acceptance." Thus, when a payment order has been cancelled, the beneficiary's bank is no longer under any obligation to pay the beneficiary.

There can be no dispute that California's funds were returned to its bank, JPMorgan, in response to JPMorgan's cancellation of the payment order it had sent Chain Bridge. JPMorgan's 2:05 PM Fedwire service message requested that Chain Bridge return the wired funds instead of

paying them to Blue Flame, as JPMorgan's payment order had directed.  SUF ¶ 28.  That is a "[a] communication of the sender of a payment order cancelling . . . the order."  UCC § 4A-211(a).[6]

Section 4A-211(e) provides broadly that any cancellation of a payment order nullifies the consequences of acceptance.  But even if cancellation must be "effective" within the meaning of UCC Section 4A-211(c) to nullify the consequences of acceptance, that requirement is satisfied here as well.  First, Chain Bridge plainly agreed to JPMorgan's cancellation by returning the funds in response to JPMorgan's service message, as was required to make JPMorgan's post-acceptance cancellation effective.  *See* UCC § 4A-211(c).  Second, the payment order was eligible for effective cancellation because there was "a mistake by a sender in the funds transfer which resulted in the issuance of a payment order that order[ed] payment to a beneficiary not entitled to receive payment from the originator."  *Id.* § 4A-211(c)(2)(ii).

California's payment order initiating the wire transfer was issued by "mistake," as provided in Section 4A-211(c)(2), because California originated the funds transfer only as a result of having been misled about Blue Flame's bona fides as a PPE supplier.  Blue Flame was not what California thought it was—as evidenced by California's decision to seek return of the funds after learning the truth.[7]

---

[6] *See Cumis Ins. Soc'y, Inc. v. Citibank, N.A.*, 921 F. Supp. 1100, 1105 (S.D.N.Y. 1996) (equating an "agree[ment] to return . . . funds" transferred by wire with cancellation of payment order); *Banca Commerciale Italiana, N.Y. Branch v. Northern Tr. Int'l Banking Corp.*, 160 F.3d 90, 92-93 (2d Cir. 1998) (request that bank "return" funds treated as cancellation).

[7] The court in *CFTC v. Rust Rare Coin Inc.*, 469 F. Supp. 3d 1211 (D. Utah 2020), erred by holding that UCC Section 4A-211(c)(2)(ii)'s reference to "mistake" refers only to "mistaken identity"—*i.e.*, cases in which a wire transfer is sent to someone other than the intended recipient. 469 F. Supp. 3d at 1218.  The court attributed that conclusion to Section 4A-211's Official Comments, but the cited comment merely treats a case of mistaken identity as an *example* of the sort of mistake encompassed by Section 4A-211(c)(2)(ii).  *See* 469 F. Supp. 3d at 1218-19 (quoting UCC § 4A-211 cmt. 4).  Neither the text of the Section 4A-211(c)(2)(ii) nor anything in the Official Comments suggests that Section 4A-211(c)(2)(ii)'s generic reference to "mistake" is limited to mistaken identity.

Blue Flame was "not entitled to receive payment from" California, UCC § 4A-211(c)(2)(ii), because it had procured the California order through a combination of misrepresentations and concealment of material facts.  *See* SUF ¶¶ 4-9.  Blue Flame repeatedly misstated its own capabilities, and made up non-existent supply sources and fictitious sales and deliveries.  SUF ¶ 4-5.  It presented California officials with a fabricated delivery schedule that bore no resemblance to reality.  SUF ¶ 7-8.  And it concealed basic (and undisputed) facts about its own operations.  SUF ¶ 6.  California officials' uncontradicted testimony confirms that those misstatements and omissions were absolutely critical to California's decision-making.  SUF ¶ 6.

To state the obvious, a vendor that has procured an order from its customer through fraudulent misrepresentations has no entitlement to the customer's payment.  Fraud in the inducement renders any contract voidable at the instance of the defrauded party.  *See, e.g.*, *Saunders v. General Servs. Corp.*, 659 F. Supp. 1042, 1057 (E.D. Va. 1987); *Devine v. Buki*, 767 S.E.2d 459, 466 (Va. 2015); Restatement (Second) of Contracts § 164(1) (1981).  Blue Flame thus was "not entitled to receive payment from" California, making JPMorgan's cancellation of California's wire transfer effective.  UCC § 4A-211(c)(2)(ii).  Chain Bridge therefore had no obligation to pay Blue Flame.  *See id.* § 4A-211(e).

2. Chain Bridge would have put itself in substantial regulatory jeopardy if it had *refused* JPMorgan's cancellation request and paid Blue Flame.  The circumstances surrounding the wire transfer were chock full of red flags—including the size of the wire transfer, the fact that Blue Flame was a brand-new business without any medical-supply experience, and California's evident unfamiliarity with Blue Flame's background.  *See* SUF ¶¶ 19, 28.  Those concerns were heightened when JPMorgan reported its own "concerns of fraud," explained that its investigation was "all

leading to not-good places," and then cancelled the wire transfer because it had "enough concerns that we feel like we need to claw those funds back."  SUF ¶¶ 21-22, 27.

In fact, the wire transfer involved many of the "potentially suspicious activities" that the Federal Financial Institutions Examination Council's Bank Secrecy Act/Anti-Money Laundering Manual characterizes as "red flags that, when encountered, may warrant additional scrutiny," Ex. 43, at F-1, including:

- A customer's "background" differing from "that which would be expected on the basis of his or her business activities;"

- A funds transfer activity that is "unexplained . . . or shows unusual patterns;"

- Receipt of payments "with no apparent links to legitimate contracts, goods, or services;"

- A customer "conducting business in higher-risk jurisdictions;" and

- A business being "reluctant, when establishing a new account, to provide complete information about the nature and purpose of its business [and] anticipated account activity."

Ex. 53 (Grice Rep.) ¶ 55.  Blue Flame's own expert witness acknowledged that the transaction raised "red flags" and "questions that you'd want to get answered."  Ex. 74 (O'Malley Tr.) at 96.

Regulators and law enforcement warned bankers in no uncertain terms to guard against PPE fraud.  The Financial Crimes Enforcement Network (FinCEN) had already urged financial institutions to "remain alert about malicious or fraudulent transactions" in connection with the COVID-19 pandemic, including "Product Scams" involving fraudulent marketing of COVID-19-related supplies."  Ex. 75. [8]  Weeks later, the problem had become so acute that FinCEN warned

---

[8] Just three days after California's wire transfer, moreover, the FBI warned of "an increased potential for fraudulent activity dealing with the purchase of COVID-19-related medical equipment"—specifically flagging "[u]nusual payment terms" and an "[u]nexplained source of bulk supply" as indicia of concern.   Ex. 76; *see also* Ex. 53 (Grice Rep.) Ex. 1 (collecting similar news releases and regulatory guidance).

banks that "[d]etecting, preventing and reporting COVID-19-related scams and illicit activity is critical to our national security . . . and protecting innocent people from harm." Ex. 77.  In that notice, FinCEN described "red flag indicators" of potential fraud in PPE transactions, several of which matched the Blue Flame transaction to a tee:

- "[t]he merchant does not appear to have a lengthy corporate history;"

- "[m]erchants are reluctant to provide . . . the financial institution that is processing the transactions with invoices or other documentation supporting the stated purpose of trade-related payments;"

- "the financial institution does not understand the merchant's business model, and has difficultly determining the true nature of the company and its operations;" and

- "[a] newly-opened account receives a large wire transaction that the accountholder failed to mention during the account opening process."

*Id.* at 4-5.[9]

Paying California's funds to Blue Flame in the face of all these red flags would have exposed Chain Bridge to substantial risks, including potential enforcement actions by regulatory agencies, the imposition of substantial financial penalties, and perhaps even criminal jeopardy. *See* Ex. 53 (Grice Rep.) ¶ 57 & n.127 (collecting examples of criminal and regulatory enforcement actions).  That fact provides additional grounds for concluding that Chain Bridge acted properly in honoring JPMorgan's cancellation of California's wire transfer.[10]

---

[9] Discovery has conclusively refuted Blue Flame's allegation that Chain Bridge agreed to return California's funds to JPMorgan, not because Chain Bridge actually viewed the transaction as potentially suspicious, but rather because the transfer "would have increased the Bank's deposits drastically" and thus "triggered additional capital reserve requirements."  Compl. ¶ 76.  Chain Bridge's witnesses testified, without contradiction, that retaining the funds on the bank's balance sheet would not have affected Chain Bridge's risk-based capital ratios, and would have had only an immaterial effect on its leverage ratio.  *E.g.*, Ex. 40 (Brough Tr.) at 90-91, 114; Ex. 78 (Williamson Tr.) at 84-85.

[10] These same red flags of potential wire fraud, in combination with JPMorgan's request for cancellation, also gave rise to Chain Bridge's "reasonable doubt concerning [Blue Flame's] right to payment" under UCC § 4A-404(a), which provides an independent ground for rejecting Blue

3. Blue Flame's claim under UCC Section 4A-404(a) is independently barred by its patent failure to act in good faith. "Every contract or duty within the [Uniform Commercial Code] imposes an obligation of good faith in its performance and enforcement." UCC § 1-304. The "'[p]erformance and enforcement' of contracts and duties within the Uniform Commercial Code include the exercise of rights created by the Uniform Commercial Code." *Id.* § 1-304 cmt. 2. Thus, a party that has breached its obligation of good faith cannot enforce rights created by the UCC, including the alleged obligation under Section 4A-404(a) that Blue Flame seeks to enforce against Chain Bridge here. *See* § 1-304 cmt. 1 (breach of good faith obligation will "make[] unavailable, under the particular circumstances, a remedial right or power"). Here, Blue Flame failed to act in good faith in at least two respects.

First, Blue Flame's lack of good faith is evident from the misrepresentations and concealment it used to procure California's order. *See* pp. 3-8, *supra*. That is incompatible with Blue Flame's effort to enforce any payment right otherwise created by the UCC against Chain Bridge. *See Regions Bank v. Provident Bank, Inc.*, 345 F.3d 1267, 1276 (11th Cir. 2003) (relying on the UCC's good faith requirement in holding that "it could hardly have been the intent of the drafters to enable a party to succeed in engaging in fraudulent activity, so long as it complied with the provisions of Article 4A").

Second, Blue Flame breached its obligation of good faith by inducing Chain Bridge Bank to open its account with misrepresentations about its anticipated account activity and the nature of

---

Flame's claim under that section. In contending otherwise, Blue Flame relies on an inapposite Official Comment directed at circumstances in which only *the originator* alleges fraud, and a wire transfer has *not* been cancelled by its sender. *See* UCC § 4A-404(a) cmt. 3. Here, by contrast, Chain Bridge agreed to a cancellation request from JPMorgan—the sender of the payment order Chain Bridge received—and it was not unreasonable to doubt Blue Flame's right to receive payment under these circumstances.

its business.  When opening Blue Flame's account, Gula misdescribed Blue Flame as a "consulting" business and misstated the account's expected wire activity—thereby causing Chain Bridge to open an account that it otherwise would not have opened without additional investigation.  SUF ¶ 11.  Gula then waited until after Chain Bridge had already opened the account and provided wiring instructions to disclose the massive incoming wire expected and the true nature of the business he was planning.  Thus, Blue Flame induced Chain Bridge to do business with it through its bad-faith misrepresentations, which further forecloses Blue Flame's claim under Section 4A-404(a).[11]

### B.  Blue Flame Cannot Establish Damages Resulting From Chain Bridge's Refusal To Pay

#### 1.  Blue Flame Could Not Have Forced California To Proceed With Its Mask Order

Blue Flame's theory of damages starts from the premise that, if California's wire transfer had not been returned, then Blue Flame would have fulfilled California's order for 100 million N95 masks and derived substantial profits from the transaction.  But that counterfactual overlooks the undisputed point that, within hours of initiating the wire transfer, *California officials decided that they no longer wanted to move forward with the Blue Flame transaction*.  When officials in the California STO learned that Blue Flame was a days-old enterprise, with no relevant expertise or experience, they immediately asked Chain Bridge not to release the funds to Blue Flame.  Ex. 28 (Evinger Tr.) at 256-60; Ex. 62 (Gonzales Tr.) at 50.  Later on March 26, California officials eagerly supported reversal of the wire transfer, urging JPMorgan "to reach out to the Chain Bridge Bank and see where the wire-recall is in the process."  Ex. 66.  Indeed, California thereafter decided

---

[11] For the same reasons, Chain Bridge is entitled to summary judgment on its affirmative defense of fraudulent inducement.  *See Saunders*, 659 F. Supp. at 1055 (holding that fraudulent inducement "may exist based on the suppression or concealment of true facts, as well as on the affirmative representation of a false set of facts").

not to proceed with its purchase from Blue Flame, and later reaffirmed that decision when Blue Flame urged California officials to move forward with the transaction.  SUF ¶ 32-34.

There is no basis to conclude that this chain of events would have been different if Chain Bridge had ignored JPMorgan's cancellation request and instead had released the funds to Blue Flame.  Indeed, after California concluded that Blue Flame was not what California thought it was—and sought the return of its funds—it is inconceivable that California would have proceeded with a transaction for more than $600 million just because funds were released to Blue Flame.

Blue Flame's theory thus must assume that, if Blue Flame had received California's money, then it could have pressed ahead with the transaction over California's objections.  But that assumption is baseless.  California's purchase order for the Blue Flame transaction incorporated by reference standard procurement terms that would have prevented any such gambit.  In particular, the purchase order incorporated "Form GSPD 401 Non-IT Commodities Revision Date: 6/8/2010."  Ex. 7.  Those standard terms permitted California to issue a "Stop Work Order" that would have required Blue Flame to immediately suspend its work on the purchase order.  Ex. 79 § 39(a).  In addition, California could terminate the purchase order "for the convenience of the State"—that is, based upon a determination that "termination is in the State's interest."  *Id.* § 23(a). In other words, California had a *unilateral* right to cancel the purchase order if it concluded that it was no longer a prudent use of the State's resources, and there is no reason to think that California would not have exercised that right if Blue Flame had received California's funds and sought to press ahead with the transaction.  Moreover, Blue Flame's fraudulent inducement of California's order allowed California to rescind it.  *See* p. 18, *supra*.[12]

---

[12] Blue Flame has also acknowledged that California had a right to inspect any masks that Blue Flame delivered and return them for a refund within a 48-hour period.  Ex. 2 (Thomas Tr.) at 147-48.

In sum, Blue Flame's transaction with California was doomed because California decided not to move forward with it—and that would have been true whether or not Chain Bridge released California's funds to Blue Flame. Accordingly, whatever profits Blue Flame contends it could have derived from the California transaction are not "damages resulting from [Chain Bridge's] refusal to pay," UCC § 4A-404(a), and they are not recoverable under Section 4A-404(a).

### 2. The Record Is Devoid Of Evidence That Blue Flame Could Have Fulfilled California's Order

Blue Flame also cannot establish damages resulting from Chain Bridge's refusal to pay because there is no record evidence that Blue Flame would have successfully fulfilled California's order even if Blue Flame had received California's funds. Indeed, the notion that Blue Flame could have fulfilled California's order is incredible on its face: Blue Flame agreed to supply 100 million units of four specific models of Chinese-manufactured N95 masks, a quantity that exceeded China's *total* exports of N95 masks to the United States between March and mid-April of 2020. Ex. 22 (Faulkner Rep.) ¶ 48. Even by the end of April 2020—*after* Blue Flame had told California that its 100 million masks would have arrived—total Chinese production of N95 masks stood at roughly 5 million per day. *Id.* ¶ 30. Of course, supplies of the particular N95 models that Blue Flame had agreed to supply were much more limited. *Id.* ¶¶ 53-55. And Blue Flame faced fierce competition from other purchasers for whatever limited supplies of masks might have been available. *Id.* ¶ 51. It was simply impossible for Blue Flame to fulfill California's order for 100 million N95 masks on the expedited timeframe that the parties had agreed. *Id.* ¶¶ 45-46.[13]

---

[13] When interviewed by CBS's *60 Minutes*, Thomas acknowledged—albeit with considerable understatement—that Blue Flame had "underestimated the challenges, where the entire world was looking for these same supplies." Leslie Stahl, CBS News, *Inside the Chaotic PPE Market Where Shortages of Critical Supplies Persist* (Dec. 6, 2020), https://www.cbsnews.com/news/ppe-production-company-investigation-charges-60-minutes-2020-12-06/.

In fact, Blue Flame lacked any source of supply to fulfill California's order. Blue Flame placed purchase orders with two other purported mask brokers—Great Health Companion and Suuchi, Inc.—but there is no admissible evidence that either broker could have supplied Blue Flame with the N95 masks it needed to fulfill California's order.[14] Tellingly, Blue Flame was unable to use those supply partners—or any others—to fulfill other customers' much smaller orders for N95 masks. SUF ¶ 34. As of June 22, 2020, Blue Flame had delivered only 96,000 N95 masks in response to a single, anonymous customer's order, and it took Blue Flame 40 days to source that paltry quantity—10 days *longer* than Blue Flame had told California it would need to supply more than one thousand times as many. Ex. 73 at 163513. As Blue Flame acknowledged to congressional investigators, its failures to fulfill other orders were caused by Great Health's inability to supply masks, as well as by Chinese export restrictions and other market and supply-chain disruptions. SUF ¶ 34; Ex. 22 (Faulkner Rep.) ¶¶ 72-74. Those same barriers would have prevented fulfillment of California's order even if the wire transfer had not been returned.

Blue Flame's only response is to contend that things would have been different because the large size of California's payment would have allowed Blue Flame to secure supplies that were unavailable for smaller orders. Ex. 82. But there is no record support for that contention, which is inconsistent with the reality that smaller orders were *easier* to fulfill at a time when spiking

---

[14] The initial version of Great Health's purchase order provided for delivery of 100 million N95 masks, but without any limitation to the specific models designated in California's order. Ex. 80. That led Blue Flame's chief legal officer to become "very concerned" that Great Health "doesn't have access to the masks we need." Ex. 27 at 202859. Coincidentally enough, Great Health's purchase order was modified shortly thereafter to list the four models that California had ordered, but without any adjustments to the contemplated delivery timeline—even though those four models made up only a small share of overall Chinese production that would presumably have been envisioned for fulfilment of the original version. Ex. 81. Under these circumstances, the purchase orders that Blue Flame placed with its putative suppliers cannot supply evidence that masks would actually have been delivered.

demand far outstripped supply.  Ex. 22 (Faulkner Rep.) ¶ 74.  There is no evidence, for example, that Blue Flame or its putative supply partners had agreements with any manufacturers to expand production in response to California's order—or even that they had connections with manufacturers to pursue such an arrangement.[15]  In short, Blue Flame's insistence that it could have fulfilled California's order—despite failing to supply N95 masks to other customers—is nothing but "[u]nsupported speculation" of the sort that "is not enough to withstand a motion for summary judgment."  *Sutherland v. SOS Int'l, Ltd.*, 541 F. Supp. 2d 787, 789 (E.D. Va. 2008).

### 3.   In All Events, Blue Flame Cannot Recover Damages Based On Other Transactions

In addition to the damages that Blue Flame attributes to the failure of its transaction with California, Blue Flame also seeks approximately $26.9 million in damages that it attributes to transactions that it says "either were canceled or never executed due [to] Blue Flame's financial and reputational troubles following the aborted order by the State of California."  Ex. 84 (Baskett Rep.) ¶ 19.  Chain Bridge is entitled to summary judgment that no such damages are recoverable.

Under Section 4A-404(a), a bank is liable only if it has "notice of particular circumstances that will give rise to consequential damages."  Consistent with ordinary limitations on the recovery of remote consequential damages, *see* Restatement (Second) of Contracts § 351 (1981), that rule "requires that the bank have notice of the general type or nature of the damages that will be suffered as a result of the refusal to pay and their general magnitude."  UCC § 4A-404 cmt. 2.  Permitting

---

[15] The suggestion that Great Health could have secured a larger order is belied by the words of its own principal.  On April 7, 2020, Henry Huang warned Blue Flame against accepting orders for 10 to 50 million N95 masks, explaining that they "would be *impossible* to fulfill given the number of people that all want it."  Ex. 83 (emphasis added).  He further explained that "there is infinite demand but limited supply," and that "[t]here are only a set [] number of n95 masks throughout the country being produced every day."  *Id.*  And he noted that "most" of that limited supply was consumed by "existing long term contracts dating back to February"—that is, well before California's late-March order.  *Id.*

recovery for every transaction Blue Flame now says it would have consummated—none of which were disclosed to Chain Bridge at the time—would deprive that limitation of any significance.

In any event, there is no evidence that any of these unrelated transactions would have been completed but for the return of California's wire transfer. Although Blue Flame's damages expert included them in his calculations, he did so only because he was "asked to assume . . . that Defendants' actions caused those other sales to be aborted." Ex. 84 (Baskett Rep.) ¶ 6. There is no evidence of that assumed causal link, and in fact these counterparties declined to do business with Blue Flame for unrelated reason. *See* Ex. 85 (Stamm Rep.) ¶¶ 27-34.

## II. Chain Bridge Is Entitled To Summary Judgment On Blue Flame's Claim Under UCC Section 4A-204 Because Chain Bridge Did Not Accept A Payment Order "Issued In The Name Of Its Customer As Sender" (Count II)

Count II asserts a claim against Chain Bridge under UCC Section 4A-204, which requires a "receiving bank" to refund its customer when the bank "accepts a payment order issued in the name of its customer as sender" that is either unauthorized and not effective (under Section 4A-202) or unenforceable against the customer (under Section 4A-203). UCC § 4A-204(a). That provision is inapplicable here, however, because there is no evidence that Chain Bridge ever received a payment order purporting to come from Blue Flame, let alone accepted such a payment order. To the contrary, Chain Bridge returned the California wire transfer to JPMorgan in response to JPMorgan's cancellation request. That request was transmitted via a Fedwire "nonvalue message" (not a payment order) that came from JPMorgan (not from Blue Flame). *See* Ex. 65.[16]

At the motion to dismiss stage, Blue Flame conceded that, "[i]f discovery establishes that" the California wire transfer was returned in response to "a cancellation request made by

---

[16] In the Fedwire system, messages bearing the subtype code "01" for "request for reversal," as JPMorgan's message did here, are treated as "Nonvalue Messages" because they "do not generate an accounting entry by the Fedwire Funds system." Ex. 86, Federal Reserve Operating Circular 6, at ¶ 13.1 (2019). Nonvalue Messages "are not payment orders." *Id.*

California's bank, . . . this Count would not survive upon a motion for summary judgment." Dkt. No. 27, at 15 n.8.  Because that is precisely what the undisputed evidence shows, summary judgment should be granted in Chain Bridge's favor on Count II.[17]

### III.    Defendants Are Entitled To Summary Judgment On Blue Flame's State-Law Claims (Counts IV, V, and IX)

#### A.    Blue Flame's Defamation Claim Fails As A Matter Of Law (Count IX)

Blue Flame's defamation claim alleges that, in the course of Chain Bridge's investigation of California's wire transfer, Brough and Evinger contacted California officials and "claimed that the transaction was fraudulent and made other false statements casting aspersions on the business and character of Blue Flame."  Compl. ¶ 166.  But there is no evidence that Defendants made any false statement of fact to California officials, as would be required to support a claim for defamation.  *See, e.g.*, *Hyland v. Raytheon Tech. Servs. Co.*, 670 S.E.2d 746, 750 (Va. 2009).

When Brough and Evinger spoke by phone with Mark Hariri and Natalie Gonzales of the California STO, they explained that "a client of Chain Bridge Bank" who was "a political lobbyist" "had opened Blue Flame Medical's bank account the previous day."  Ex. 62 (Gonzales Tr.) at 50-51, 130; Ex. 28 (Evinger Tr.) at 252; *see* Ex. 28 (Evinger Tr.) 282.  There is no evidence that Defendants told California officials that Blue Flame was a fraud or that its principals were engaged in fraud.  *See* Ex. 62 (Gonzales Tr.) at 71.  Moreover, the information that Defendants did relate about Blue Flame was indisputably *true*:  Blue Flame had opened its account with Chain Bridge

---

[17] As explained above (at 21-22), compliance with the "obligation of good faith" is a predicate to "enforcement" of any duties under the UCC.  UCC § 1-304.  Blue Flame's bad-faith misconduct described above also forecloses its Section 4A-204 claim.

the previous day, and Gula had identified one of his businesses as "lobbying."  *See* Ex. 31; Ex. 87.

Blue Flame's defamation claim thus fails as a matter of law.  *E.g.*, *Hyland,* 670 S.E.2d at 750.[18]

Defendants' statements to California officials also cannot support a defamation claim because they were privileged as communications "between persons on a subject in which the persons have an interest or duty." *Adler v. Virginia Commonwealth Univ.*, 259 F. Supp. 3d 395, 409 (E.D. Va. 2017).  Both Chain Bridge and California had a shared interest in investigating the wire transfer to verify its validity.[19]  And there is no evidence that Defendants acted with malice, as would be required to overcome the privilege.  *Cashion v. Smith*, 749 S.E.2d 526, 533 (Va. 2013).  Defendants' statements were true, so they could not have been made with "knowledge that they were false or with reckless disregard for their truth."  *Id.*  Nor is there evidence that the statements "were not made in good faith."  *Id.*

### B.    Blue Flame's Tortious Interference Claims Fail As A Matter Of Law (Counts IV and V)

1.  Blue Flame's claims for tortious interference with contract (Count IV) and business expectancy (Count V) are also premised on allegations that Defendants "unilaterally contacted California officials and accused Blue Flame of fraud, without basis."  Compl. ¶¶ 128, 137.  But those statements were truthful and otherwise privileged against a claim for defamation, so they cannot supply the "improper methods" necessary to support a claim for tortious interference.  *See Shirvinski v. United States Coast Guard,* 673 F.3d 308, 322 (4th Cir. 2012); pp. 28-29, *supra*.

---

[18] Defendants' statements also lacked defamatory "sting."  *Anderson v. School Bd. of Gloucester Cty., Virginia*, No. 3:18cv745, 2020 WL 2832475, at *41 (E.D. Va. May 29, 2020).  Defendants' statements would not "tend[] to injure one's reputation in the common estimation of mankind" or "hold him up to scorn, ridicule, or contempt, or . . . render him infamous, odious, or ridiculous."  *Schaecher v. Bouffault*, 772 S.E.2d 589, 594 (Va. 2015).

[19] *See also Professional Recovery Servs., Inc. v. General Elec. Capital Corp.*, 642 F. Supp. 2d 391, 401 (D.N.J. 2009) (defendant's statements to other financial institutions regarding plaintiff debt collector were privileged because the financial institutions shared "a legitimate interest and duty to prevent consumer fraud and . . . the theft of sensitive financial records").

2.  Blue Flame has separately argued (Dkt. No. 27, at 18) that the reversal of California's wire transfer constitutes improper means because, according to Blue Flame, it was done in violation of Regulation J.  But Chain Bridge's decision to return the funds was lawful.  *See* pp. 16-22, *supra*.  Even if that were not true, moreover, this version of Blue Flame's tortious interference theory would be preempted.  Subpart B of Regulation J "preempts any state law cause of action premised on conduct falling within the scope of Subpart B, whether the state law conflicts with or is duplicative of Subpart B."  *Eisenberg v. Wachovia Bank, N.A.*, 301 F.3d 220, 223 (4th Cir. 2002).  Because Chain Bridge's decision to honor JPMorgan's cancellation request is governed by Subpart B, Blue Flame cannot use a state-law cause of action to challenge that decision.  *See id.*

3.  Blue Flame's tortious inference claims also fail because there is no evidence that Defendants acted with "the purpose of, or a partial desire to, interfere with the performance of" Blue Flame's contract rights, or with knowledge that speaking to California officials was "certain or substantially certain" to cause California to breach any contractual commitments to Blue Flame.  *Commerce Funding Corp. v. Worldwide Sec. Servs. Corp.*, 249 F.3d 204, 212-13 (4th Cir. 2001).

4.  Finally, Chain Bridge did not induce any breach of contract by California.  As we have explained (at 23-24), California had a unilateral right to terminate its purchase order, and Blue Flame's fraudulent misrepresentations to California rendered the purchase order voidable at California's instance.  Blue Flame thus cannot establish any breach of contract by California.

**C.  Blue Flame Cannot Establish Damages On Its State-Law Claims**

Even if there were triable issues as to liability on Blue Flame's state-law claims, summary judgment would still be warranted in Defendants' favor because Blue Flame cannot establish damages resulting from Defendants' conduct.  *See* pp. 24-27, *supra*.

Date: May 6, 2021

Respectfully submitted,

/s/ Donald Burke
Gary A. Orseck (admitted *pro hac vice*)
Matthew M. Madden (admitted *pro hac vice*)
Donald Burke (VA Bar No. 76550)
ROBBINS, RUSSELL, ENGLERT, ORSECK
   & UNTEREINER LLP
2000 K Street, N.W., 4th Floor
Washington, D.C. 20006
Tel: (202) 775-4500
Fax: (202) 775-4510
dburke@robbinsrussell.com

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on May 6, 2021, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing to the following:

Peter H. White, Esq. (VA Bar No. 32310)
**SCHULTE ROTH & ZABEL LLP**
901 Fifteenth Street, NW, Suite 800
Washington, DC 20005
Phone: (202) 729-7476
Fax: (202) 730-4520
Email: peter.white@srz.com
*Counsel for Plaintiff*

Meredith K. Loretta, Esq. (VA Bar No. 92369)
**WILMER CUTLER PICKERING HALE & DORR LLP**
1875 Pennsylvania Avenue NW
Washington, DC 20006
Phone: (212) 663-6981
Email: meredith.loretta@wilmerhale.com
*Counsel for Third-Party Defendant*

/s/ Donald Burke
Donald Burke (VA Bar No. 76550)
ROBBINS, RUSSELL, ENGLERT,
ORSECK & UNTEREINER LLP
2000 K Street, N.W., 4th Floor
Washington, D.C. 20006
Tel: (202) 775-4500
Fax: (202) 775-4510
dburke@robbinsrussell.com