**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**(Alexandria Division)**

| | |
|---|---|
| BLUE FLAME MEDICAL LLC,<br><br>　　　　　　　Plaintiff,<br><br>v.<br><br>CHAIN BRIDGE BANK, N.A., JOHN J.<br>BROUGH, and DAVID M. EVINGER,<br><br>　　　　　　　Defendants. | **Civil Action No. 1:20-cv-00658** |
| CHAIN BRIDGE BANK, N.A,<br><br>　　　　　　　Third-Party Plaintiff,<br><br>v.<br><br>JPMORGAN CHASE BANK, N.A.,<br><br>　　　　　　　Third-Party Defendant. | |

**MEMORANDUM IN SUPPORT OF THIRD-PARTY PLAINTIFF CHAIN**
**BRIDGE BANK, N.A.'S MOTION FOR SUMMARY JUDGMENT AGAINST**
**THIRD-PARTY DEFENDANT JPMORGAN CHASE BANK, N.A.**

ROBBINS, RUSSELL, ENGLERT, ORSECK
　& UNTEREINER LLP

Gary A. Orseck (admitted *pro hac vice*)
Matthew M. Madden (admitted *pro hac vice*)
Donald Burke (VA Bar No. 76550)
2000 K Street, N.W., 4th Floor
Washington, D.C. 20006
Tel: (202) 775-4500
Fax: (202) 775-4510
dburke@robbinsrussell.com

*Counsel for Third-Party Plaintiff*
*Chain Bridge Bank, N.A.*

May 6, 2021

# TABLE OF CONTENTS

Page

Introduction ........................................................................................................................... 1

Background ............................................................................................................................ 3

    A.  Legal Background ................................................................................................ 3

    B.  Statement Of Undisputed Facts .......................................................................... 5

    C.  Procedural History ............................................................................................ 10

Legal Standard .................................................................................................................... 12

Argument ............................................................................................................................ 12

    I.    Chain Bridge Is Entitled To Summary Judgment On Its Indemnification Claims (Counts I And II) .............................................................................................................. 12

        A.  JPMorgan Is Liable To Chain Bridge Under UCC Section 4A-211(f) Because Chain Bridge Agreed To Cancellation Of The Wire Transfer By JPMorgan And The Parties Did Not Agree To Displace That Indemnification Obligation ............. 13

        B.  JPMorgan's Legal Arguments To The Contrary Are Baseless .............................. 16

    II.   Chain Bridge Is Entitled To Summary Judgment On Its Claim For Unjust Enrichment (Count III) .................................................................................................... 23

Conclusion .......................................................................................................................... 24

i

## TABLE OF AUTHORITIES

Cases:                                                                              Page

    *Anderson v. Liberty Lobby, Inc.*,
       477 U.S. 242 (1986)...................................................................................12

    *Banca Commerciale Italiana, N.Y. Branch v. Northern Tr. Int'l Banking*
       *Corp.*, 160 F.3d *90* (2d Cir. 1998) ............................................................ *passim*

    *Centennial Life Ins. Co. v. Poston*,
       88 F.3d 255 (4th Cir. 1996) ......................................................................12

    *Cumis Ins. Soc'y, Inc. v. Citibank, N.A.*,
       921 F. Supp. 1100 (S.D.N.Y. 1996)...........................................................14

    *Donmar Enters., Inc. v. Southern Nat'l Bank of N.C.*,
       64 F.3d 944 (4th Cir. 1995) ........................................................................3

    *Hibbs v. First Nat'l Bank of Alexandria*,
       112 S.E. 669 (Va. 1922) ............................................................................23

    *J.J.B. Hilliard, W.L. Lyons, Inc. v. Fox*,
       735 F. Supp. 674 (W.D. Va. 1990) ...........................................................23

    *Regions Bank v. Provident Bank, Inc.*,
       345 F.3d 1267 (11th Cir. 2003) .................................................................15

    *Saylor v. Pinnacle Credit Servs., LLC*,
       118 F. Supp. 3d 881 (E.D. Va. 2015) ........................................................12

    *Webb v. City Council of Alexandria*,
       74 Va. 168 (1880) .....................................................................................23

Statutes, regulations, and rules:

    28 U.S.C. § 2201 ...........................................................................................12

    Uniform Commercial Code:

       § 4A-103(a)(1) ...........................................................................................3

       § 4A-103(a)(3) ...........................................................................................3

       § 4A-104(a) ................................................................................................3

       § 4A-104(c) ................................................................................................3

Statutes, regulations, and rules—Continued:                                                    Page

   § 4A-107 ...................................................................................16

   § 4A-209 .....................................................................................3

   § 4A-209(b)(2) ..........................................................................13

   § 4A-211 ................................................................15, 17, 19

   § 4A-211(a) ...................................................................4, 14, 17

   § 4A-211(b) ................................................................................4

   § 4A-211(c) .....................................................................4, 17, 19, 20

   § 4A-211(c)(1) ...........................................................................4

   § 4A-211(c)(2) ...........................................................................4

   § 4A-211(f) ........................................................................ *passim*

   § 4A-211 cmt. 4 .......................................................................19

   § 4A-211 cmt. 5 ....................................................4, 5, 19, 20, 22

   § 4A-403(a)(1) ..........................................................................13

   § 4A-403 cmt. 1 .......................................................................13

   § 4A-404(a) ................................................................................3

   § 4A-404(b) ................................................................................3

12 C.F.R.:

   §§ 210.25-210.32 .......................................................................3

   § 210.25(b)(1) ............................................................................3

   § 210.25(c) ................................................................................16

Fed. R. Civ. P. 56(a) ...................................................................12

Fed. R. Civ. P. 57 .......................................................................12

Other authorities:                                                                                          Page

Fedwire® Funds Service – Monthly Statistics, The Federal Reserve,
   https://perma.cc/2GHJ-NT6K ..................................................................................................6

Restatement (Third) of Restitution and Unjust Enrichment (2011)........................................23

Third-Party Plaintiff Chain Bridge Bank, N.A. (Chain Bridge) submits this memorandum in support of its motion for summary judgment against Third-Party Defendant JPMorgan Chase Bank, N.A. (JPMorgan) on its indemnification and unjust enrichment claims.

## INTRODUCTION

On March 26, 2020, JPMorgan sent Chain Bridge a wire transfer, originated by the State of California, directing payment of $456,888,600 for the benefit of Blue Flame Medical LLC (Blue Flame). That wire was California's down payment on a $609 million purchase of 100 million N95 masks from Blue Flame—an entity that was created three days earlier, had opened its bank account just the day before, and was run by a pair of political operatives with no relevant experience.

Unsurprisingly, the transfer of nearly half a billion dollars earmarked for a three-day-old company raised concerns both at Chain Bridge, located in McLean, Virginia, and at JPMorgan, the largest bank in the United States. The two banks cooperated with one another as they undertook to investigate the transaction, and Chain Bridge agreed to continue holding California's funds while JPMorgan completed its own inquiries. Along the way, JPMorgan reported to Chain Bridge its "concerns of fraud," that the transaction "does not look right," and that its investigation was "all leading to not-good places." Within two hours, JPMorgan cancelled the wire transfer—advising Chain Bridge that "[w]e're going to be recalling those funds" because "[w]e have enough concerns that we feel we need to claw those funds back." JPMorgan then sent Chain Bridge an official Fedwire service message confirming that cancellation. Chain Bridge honored the cancellation shortly thereafter by returning the wired funds to JPMorgan, which in turn restored them to California's bank account.

Blue Flame alleges that Chain Bridge's decision to honor JPMorgan's cancellation of the wire transfer violated Federal Reserve regulations or was otherwise unlawful. As we explain in

1

our motion for summary judgment on Blue Flame's claims, also filed today, those claims are without merit and Defendants are entitled to judgment as a matter of law against Blue Flame.

In all events, however, Chain Bridge is entitled to indemnification from JPMorgan for its reasonable attorney's fees and any judgment that Blue Flame might obtain.  That result follows from a straightforward application of Section 4A-211(f) of the Uniform Commercial Code (UCC), made applicable here by the Federal Reserve regulations that governed California's wire transfer. Section 4A-211(f) states that, "[u]nless otherwise provided in an agreement of the parties," when a wire transfer's receiving bank (Chain Bridge) agrees to cancellation of the wire transfer by its sender (JPMorgan), "the sender, whether or not cancellation . . . is effective, is liable to the bank for any loss and expenses, including reasonable attorney's fees, incurred by the bank as a result of the cancellation."  That section "imposes *absolute* liability on the sender of an electronic funds transfer to the receiving bank if the sender cancels a payment order that has already been accepted, even though the receiving bank has freely agreed to the cancellation."  *Banca Commerciale Italiana, N.Y. Branch v. Northern Tr. Int'l Banking Corp.*, 160 F.3d 90, 94 (2d Cir. 1998) (emphasis added).

All relevant facts are undisputed.  JPMorgan's *legal* arguments for avoiding indemnification are baseless.  It argues that it was *Chain Bridge*—not JPMorgan—that "cancelled" the California wire transfer within the meaning of the UCC.  But JPMorgan sent Chain Bridge an official service message over the Federal Reserve's Fedwire system requesting that the funds be returned to it.  That unambiguously constituted its cancellation of the payment order directing those funds to Blue Flame.  JPMorgan also contends, in the alternative, that cancellation was a "joint decision" that Chain Bridge suggested, supported, and perhaps even benefited from.  But nothing in Section 4A-211(f) turns on *why* JPMorgan decided to cancel the wire transfer or *why*

2

Chain Bridge agreed to honor that cancellation.  Finally, JPMorgan says that indemnification is unavailable because the parties reached an agreement to cancel the wire that did not include an indemnity term.  But Section 4A-211(f) explicitly requires the *opposite* result.  It provides for automatic indemnification "[u]nless otherwise provided in an agreement of the parties."  There was no agreement between JPMorgan and Chain Bridge to displace Section 4A-211(f)'s default rule of automatic indemnification, and so JPMorgan is liable for all of Chain Bridge's losses and expenses incurred as a result of JPMorgan's cancellation of California's wire transfer.

## BACKGROUND

### A.    Legal Background

This case centers around a wire transfer that was sent, and then cancelled, over the Federal Reserve's Fedwire Funds Service.  Fedwire transactions are subject to regulations promulgated by the Federal Reserve Board, including Subpart B of its Regulation J.  12 C.F.R. §§ 210.25-210.32.  Subpart B of Regulation J, in turn, incorporates Article 4A of the UCC.  *Id.* § 210.25(b)(1); *see also Donmar Enters., Inc. v. Southern Nat'l Bank of N.C.*, 64 F.3d 944, 948 (4th Cir. 1995).

Under Article 4A, a wire transfer is a "funds transfer," or a series of transactions ("payment orders") from senders to recipients.  UCC § 4A-104(a).  Each payment order in the funds transfer has a "sender" and a "receiving bank," *id.* § 4A-103(a)(1), starting with the "originator," *id.* § 4A-104(c).  The originator sends the first payment order to its bank; the originator's bank accepts that payment order by sending a new payment order, for which it is the sender, to the next bank in the transfer.  If the next bank is the "beneficiary's bank"—that is, where the ultimate payee of the funds transfer (the "beneficiary") holds the account to be credited, *id.* § 4A-103(a)(3)—then the bank's "acceptance" of that payment order triggers duties for it to notify and pay the beneficiary, subject to cancellation and other exceptions, *id.* § 4A-404(a), (b); *see also id.* § 4A-209 (acceptance).

Section 4A-211 of the UCC sets forth a series of rules governing the cancellation of a wire transfer before and after its acceptance, including after a payment order has been accepted by the beneficiary's bank.  It provides, first of all, that "[a] communication of the sender of a payment order cancelling or amending the order may be transmitted to the receiving bank orally, electronically, or in writing."  UCC § 4A-211(a).  Prior to acceptance of a payment order by the receiving bank, the sender generally has a unilateral right to cancel its payment order.  *Id.* § 4A-211(b).  After a payment order has been accepted, by contrast, "cancellation . . . is not effective unless the receiving bank agrees or a funds-transfer system rule allows cancellation or amendment without agreement of the bank."  *Id.* § 4A-211(c).  And when a payment order has been accepted by the beneficiary's bank, "cancellation . . . is not effective unless the order was issued in execution of an unauthorized payment order, or because of a mistake by a sender in the funds transfer which resulted in the issuance of a payment order (i) that is a duplicate of a payment order previously issued by the sender, (ii) that orders payment to a beneficiary not entitled to receive payment from the originator, or (iii) that orders payment in an amount greater than the amount the beneficiary was entitled to receive from the originator."  *Id.* § 4A-211(c)(2).

Section 4A-211(f) provides the beneficiary's bank a broad right of indemnification against a payment-order sender that requests cancellation:

> Unless otherwise provided in an agreement of the parties or in a funds-transfer system rule, if the receiving bank, after accepting a payment order, agrees to cancellation or amendment of the order by the sender or is bound by a funds-transfer system rule allowing cancellation or amendment without the bank's agreement, the sender, whether or not cancellation or amendment is effective, is liable to the bank for any loss and expenses, including reasonable attorney's fees, incurred by the bank as a result of the cancellation or amendment or attempted cancellation or amendment.

As Section 4A-211's Official Comment explains, "[i]f a receiving bank agrees to cancellation or amendment under subsection (c)(1) or (2), it is *automatically* entitled to indemnification from the sender under subsection (f)."  UCC § 4A-211 cmt. 5 (emphasis added).  This "indemnification

4

provision recognizes that a sender has no right to cancel a payment order after it is accepted by the receiving bank," and that, as a consequence, "[i]f the receiving bank agrees to cancellation, it is doing so as an accommodation to the sender and it should not incur a risk of loss in doing so." *Id.*

In short, Section 4A-211(f)'s indemnification right marks an intentional "depart[ure] from the common law" to afford broad and automatic protection to a receiving bank that agrees to cancellation of a payment order following acceptance. *Banca Commerciale Italiana, N.Y. Branch v. Northern Tr. Int'l Banking Corp.*, 160 F.3d 90, 94 (2d Cir. 1998). It obviates any need to establish "the elements required to establish common law fraud or unjust enrichment," by instead "impos[ing] *absolute* liability on the sender of an electronic funds transfer to the receiving bank if the sender cancels a payment order that has already been accepted, even though the receiving bank has freely agreed to the cancellation." *Id.* (emphasis added).

### B.    Statement Of Undisputed Facts

1.      On March 25, 2020, at approximately 6:00 PM ET, Rakesh Korpal, a JPMorgan Executive Director who led JPMorgan's Fraud Payments Control Team, received a call from June Cantrell of JPMorgan's client service team for the State of California. Declaration of Donald Burke, Ex. 47 (Korpal Tr.) at 56-57, 59.[1] Cantrell asked Korpal to help facilitate a "large-value transaction for 500 million" because "the wire system was about to close" for the day. *Id.* In response, Korpal asked for the details of the wire transfer by which the large-value transaction was to be executed. *Id.* at 56.

2.      On March 26, 2020, at approximately 11:00 AM, Korpal contacted Cantrell to ask if the wire transfer had been executed and again requested the transaction details. *Id.* at 57, 61-62.

---

[1] Exhibits to the Burke Declaration are hereinafter cited as "Ex. ___."

Cantrell told him that "it was early in California" and did not provide the requested details.  *Id.* at 57, 62.

3.      At approximately 11:21 AM, a representative from the California State Treasurer's Office initiated a wire transfer in the amount of $456,888,600 for Blue Flame's benefit by delivering an instruction to California's bank, JPMorgan.  Ex. 88; Stipulation, Dkt. No. 96, at ¶ 15.

4.      California's wire transfer was intended as a down payment for the purchase of 100 million N95 masks from Blue Flame.  Ex. 8 (Wong Tr.) at 79-80.  But neither of Blue Flame's principals, Mike Gula and John Thomas, had any experience in the medical supply industry.  Ex. 1 (Gula Tr.) at 25; Ex. 2 (Thomas Tr.) at 19, 48-49.  To the contrary, both had previously worked as political operatives.  Ex. 1 (Gula Tr.) at 16-25; Ex. 2 (Thomas Tr.) at 13-14.  In fact Blue Flame had no ability, then or ever, to procure and provide the 100 million N95 masks that it had promised to California.  *See* Ex. 22 (Faulkner Rep.) at Section VII.  Blue Flame did not advise California that it had been established only days before, that it had never procured or delivered any medical supplies (let alone PPE), that it neither possessed nor had rights to any PPE, or that its principals had no relevant experience.  Ex. 8 (Wong Tr.) at 120-22.  Blue Flame did, however, promise California that it could provide those masks within days or weeks.  Ex. 11 (Kim Tr.) at 39. California proceeded to initiate the wire transfer under emergency circumstances that caused it to dispense with aspects of its usual procurement process, including typical vendor-vetting procedures and a longstanding requirement that goods be delivered prior to any payment.  *See id.* at 17-19; Ex. 8 (Wong Tr.) at 29, 48-49.

5.      The exceptionally large wire transfer—orders of magnitude larger than the average funds transfer sent over Fedwire[2]—tripped JPMorgan's automated payment-control system, on multiple grounds, for suspicious transaction activity.  Ex. 47 (Korpal Tr.) at 44; Ex. 48.  JPMorgan employee Michelle Long called the State Treasurer's Office to verify that California had intended to send the wire transfer.  Ex. 47 (Korpal Tr.) at 44-45; Ex. 48.  At 11:32 AM, Long emailed Korpal and two other JPMorgan managers—Jenifer Robinson and Tim Coffey—requesting approval for the wire transfer.  Ex. 48.  Exactly one minute later, Coffey approved the request by email.  Ex. 49.  At this point, Korpal still had not received the transaction details he had first requested the night before.  Ex. 47 (Korpal Tr.) at 62.

6.      At 11:55 AM, Chain Bridge received a payment order from JPMorgan, over the Federal Reserve's Fedwire Funds Service, in connection with California's wire transfer to Blue Flame.  Ex. 50.

7.      Within minutes of JPMorgan's transmittal of California's wire transfer to Chain Bridge, Korpal initiated an investigation of the wire transfer in response to his concerns of potential suspicious activity.  Ex. 47 (Korpal Tr.) at 61-63.  As part of that investigation, Korpal directed Coffey to "engage Chain Bridge Bank to . . . hold on to those funds . . . as there was concerns about the validity of the transaction."  Ex. 58 (Coffey Tr.) at 45.  Coffey called Chain Bridge at 12:30 PM and immediately volunteered that JPMorgan had "concerns of fraud" regarding the California wire transfer, and then sought confirmation that Chain Bridge would hold the funds pending further investigation.  Ex. 57; Ex. 58 (Coffey Tr.) at 63-66.  In the meantime, Chain Bridge had placed a hold on the wired funds.  Ex. 89 at 920.

---

[2]  *See* Fedwire® Funds Service – Monthly Statistics, The Federal Reserve, https://perma.cc/2GHJ-NT6K.

8.      At 12:44 PM, Korpal called Chain Bridge and spoke with Chain Bridge's CEO, John Brough, and its President, David Evinger.  Korpal explained that the wire transfer was being investigated by JPMorgan's Global Securities Investigation Team, which had reported that the transaction "does not look right," and that JPMorgan's research was "all leading to not-good places." Ex. 59.

9.      Korpal spoke again with Brough and Evinger at 1:35 PM.  During that conversation, Evinger asked Korpal: "Is there any way for JPMorgan to issue a recall for the wire so that while you intervene in this you have the funds and feel more comfortable?"  Ex. 63.  Korpal responded that that he felt comfortable that Chain Bridge was "holding the money right now," but stated that he could "issue a recall" and asked for "a few more minutes" to determine JPMorgan's next steps. *Id*.

10.      Korpal then directed Coffey "to engage Chain Bridge Bank to recall the funds." Ex. 58 (Coffey Tr.) at 124-25.  At 1:37 PM, Coffey called Chain Bridge and spoke with Brough and Evinger.  Coffey advised that JPMorgan was "going to be recalling those funds," explaining that JPMorgan had "enough concerns that we feel we need to claw those funds back." Ex. 64. Coffey asked whether Chain Bridge needed a "recall message" from JPMorgan to confirm JPMorgan's request to reverse the wire transfer.  *Id*.  Chain Bridge responded that it did indeed need an "official communication from JPMorgan to us to recall the funds" sent over the Fedwire system. *Id*.  Coffey promised to send such a message "in the next couple of minutes." *Id*.  He also told Brough and Evinger that JPMorgan "appreciate[d]" their "cooperation in this" and twice commended them for doing "a great job." *Id*.  Coffey emphasized to Chain Bridge that "as quickly as you can return it, that'd be great."  *Id*.  Coffey later explained that such haste was called for

because there was a "need to get word out to senior management" at JPMorgan "that the situation has been taken control of" and to "put the situation to rest." Ex. 58 (Coffey Tr.) at 130.

11.     At 1:42 PM, after his call with Brough and Evinger, Coffey emailed Debra Naughton of JPMorgan, copying Korpal, to ask Naughton to "send a FED service message requesting a straight recall." Ex. 90.  Naughton prepared a draft recall message, which Coffey then reviewed and approved. Ex. 58 (Coffey Tr.) at 139, 141.  Coffey considered it to be "common for a bank to want to have a written official record of a request for the return of funds." *Id.* at 128.

12.     At 2:05 PM, JPMorgan sent a Fedwire service message to Chain Bridge requesting reversal of the California wire transfer. Ex. 65.  The service message's Type/Subtype code was "1001." *Id.*; Stipulation, Dkt. No 96, at ¶ 29.  Both parties' experts agree that type code 10 is a "funds transfer," and subtype code 01 is a "request for reversal."  *See* Ex. 91 (Grice Indemn. Rep. ) at 4-5; Ex. 92 (Baxter Tr.) at 42.  JPMorgan's Fedwire service message stated that the requested reversal was "AS PER REM REQ," Ex. 65, meaning that JPMorgan was delivering the message "as per remitter's request."  JPMorgan's service message provided Chain Bridge a reference number, and asked Chain Bridge to refer to that number when returning the funds. *Id.*

13.     After JPMorgan sent its 2:05 PM Fedwire service message, but before Chain Bridge returned the funds, Korpal continued to ask Coffey whether the funds had been returned yet. *See* Ex. 58 (Coffey Tr.) at 150.  During this interval, JPMorgan twice called Chain Bridge to ask about the status of JPMorgan's recall request.  Ex. 47 (Korpal Tr.) at 87-88.  California's State Treasurer's Office also called Chain Bridge to follow up on the wire recall.  Stipulation, Dkt. No. 96, at ¶¶ 28, 30.

14.     At 3:21 PM, Chain Bridge honored JPMorgan's reversal request by returning $456,888,600 to JPMorgan.   Ex. 68.   The Fedwire payment order by which Chain Bridge

effectuated that return had a Type/Subtype code of "1002." *Id.*; Stipulation, Dkt. No. 96, at ¶ 32. Type code 10 is a "funds transfer" and subtype code 02 is a "reversal of transfer." Ex. 91 (Grice Indem. Rep.) at 5. Chain Bridge's payment order used the reference number in JPMorgan's reversal message and noted that the return was being done "PER YOUR REQUEST." Ex. 68.

15.     By 4:02 PM, JPMorgan had restored the amount of the wire transfer to California's account at JPMorgan. Stipulation, Dkt. No. 96, at ¶ 34. In the immediate aftermath of the wire reversal, officials from California's State Treasurer's Office communicated to JPMorgan that they were "extremely grateful for [JPMorgan's] intervention," "leadership," and the "steps [it] took to get this money recovered." Ex. 93 at 392, 393. Almost two months later, California State Treasurer Fiona Ma wrote to JPMorgan Chase & Co. Chairman and CEO Jamie Dimon, offering her "personal thanks for the bank's efforts and the dedication of" the JPMorgan employees involved in "assist[ing] us in reversing the payment and protecting public money." Ex. 94.

**C.     Procedural History**

On June 12, 2020, Blue Flame filed this lawsuit, naming Chain Bridge, Brough, and Evinger as defendants. Blue Flame's complaint seeks to impose liability based on Chain Bridge's decision to honor JPMorgan's cancellation of California's wire transfer and based on communications between Messrs. Brough and Evinger and California government officials in connection with the wire transfer. On September 8, 2020, this Court issued an order granting in part and denying in part Defendants' motion to dismiss Blue Flame's complaint. *See* Dkt. No. 31.

Chain Bridge filed its third-party complaint against JPMorgan on October 13, 2020. *See* Dkt. No. 43. In Counts I and II, the third-party complaint alleges that JPMorgan is liable to indemnify Chain Bridge under UCC Section 4A-211(f) for "any loss and expenses, including reasonable attorney's fees, incurred . . . as a result of the cancellation" of JPMorgan's payment order. UCC § 4A-211(f); *see* Dkt. No. 43, ¶¶ 16-25. Count I requests an award of money damages,

and Count II requests a corresponding declaratory judgment.  Count III of the third-party complaint states an alternative claim for unjust enrichment in the event that (i) Chain Bridge is found liable for damages to Blue Flame; and (ii) indemnification is determined to be unavailable under UCC Section 4A-211(f).  *See* Dkt. No. 43, ¶¶ 26-31.

On December 28, 2020, JPMorgan (through its counsel) sent a reservation-of-rights letter to the California State Treasurer's Office in connection with the third-party claims asserted by Chain Bridge.  Ex. 95.  In that letter, JPMorgan stated that, after the Treasurer's Office had "initiated and validated" California's wire to Blue Flame, California "decided that the wire should be recalled."  *Id.*  JPMorgan then stated that, "after consultation with Chain Bridge, [JPMorgan] successfully recalled the funds in full."  *Id.*

On March 20, 2021, JPMorgan submitted a formal claim to the California State Treasurer's Office.  Ex. 96. In the addendum to its claim, JPMorgan stated that it was *California* that had "decided to reverse the payment" to Blue Flame, and that JPMorgan had "assisted the State in recovering the entire amount of its funds."  *Id.* at 536.  JPMorgan stated that, "[d]espite having originated and validated the Wire Transfer," California's "Agencies and Employees subsequently decided that the Wire Transfer should be reversed."  *Id.* at 538; *see also id.* at 539 (noting that California's "Agencies and Employees were eager to obtain a return of the funds" and that California had "request[ed] that the Wire Transfer be reversed").  JPMorgan also stated that its actions concerning the Blue Flame wire transfer, "including, in particular, the reversal[,] . . . were taken on behalf of, at the direction of, and/or for the benefit of the [California] Agencies and Employees."  *Id.* at 540; *see also id.* at 539 (highlighting State Treasurer Ma's testimony before California's State Assembly that her office "clawed the money back pending further confirmation of the legitimacy of the payment").  On this basis, JPMorgan asserted claims for statutory,

contractual, and equitable indemnification against California. *Id.* at 542. Of particular relevance here, JPMorgan asserted that "U.C.C. § 4A-211(f) as incorporated into Subpart B of the Federal Reserve Board's Regulation J, require[s] indemnification," *id.*, a claim apparently premised on California's cancellation of the payment order that it issued to JPMorgan to originate its wire transfer to Blue Flame.

## LEGAL STANDARD

Summary judgment is appropriate when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Saylor v. Pinnacle Credit Servs., LLC*, 118 F. Supp. 3d 881, 885 (E.D. Va. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)); *see also Anderson*, 477 U.S. at 247-48 ("[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.").

## ARGUMENT

## I.   Chain Bridge Is Entitled To Summary Judgment On Its Indemnification Claims (Counts I And II)

The undisputed evidence demonstrates that JPMorgan is liable to Chain Bridge, under UCC Section 4A-211(f), for any loss or expenses that Chain Bridge incurred as a result of JPMorgan's cancellation of California's wire transfer. JPMorgan's strained legal arguments to the contrary are plainly wrong and should be rejected. Chain Bridge therefore is entitled to partial summary judgment of JPMorgan's liability on Count I, and the entry of declaratory judgment on Count II.[3]

---

[3] Partial summary judgment of JPMorgan's liability on Count I would conclusively resolve that "part of [that] claim," Fed. R. Civ. P. 56(a), and leave only the future determination of Chain

**A.      JPMorgan Is Liable To Chain Bridge Under UCC Section 4A-211(f) Because Chain Bridge Agreed To Cancellation Of The Wire Transfer By JPMorgan And The Parties Did Not Agree To Displace That Indemnification Obligation**

There is no genuine dispute of fact as to any of the elements necessary to establish JPMorgan's liability for indemnification under UCC Section 4A-211(f).  Chain Bridge, the "receiving bank" of the payment order transmitting California's wire transfer, "agree[d] to cancellation . . . of the order by the sender," JPMorgan, after having accepted the payment order.  UCC § 4A-211(f).  Because there was no "agreement of the parties" to displace indemnification, JPMorgan is liable "for any loss and expenses, including reasonable attorney's fees, incurred by [Chain Bridge] as a result of the cancellation."  *Id.*

*First*, Chain Bridge accepted JPMorgan's payment order for California's wire transfer, by operation of law, when the payment order was transmitted to Chain Bridge at 11:55 AM on March 26, 2020.  *See* Ex. 50.  In the Fedwire system, transmittal of the payment order is accompanied by an immediate credit to the receiving bank's Federal Reserve account, which constitutes final settlement of the sender's obligation to pay the receiving bank and triggers immediate, automatic acceptance of the payment order.  *See* UCC §§ 4A-209(b)(2), 4A-403(a)(1); *see also id.* § 4A-403 cmt. 1.

*Second*, after accepting JPMorgan's payment order, Chain Bridge received JPMorgan's cancellation of the payment order.  JPMorgan's cancellation was communicated through a service message sent via the Fedwire system at 2:05 PM.  *See* Ex. 65.  On its face, JPMorgan's service

---

Bridge's losses or expenses (which continue to accrue) for trial or other future proceeding. Declaratory judgment is also appropriate, under 28 U.S.C. § 2201, because it would "serve a useful purpose in clarifying and settling the legal relations in issue" and will "terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding."  *Centennial Life Ins. Co. v. Poston*, 88 F.3d 255, 256 (4th Cir. 1996); *see also* Fed. R. Civ. P. 57 (declaratory judgment is available notwithstanding the "existence of another adequate remedy").

message was a cancellation of its payment order:  The service message's Type/Subtype code was "1001," indicating that it was a request for reversal.  *See* Stipulation, Dkt. No. 96, at ¶ 29; Ex. 91 (Grice Indemn. Rep.) at 4-5; Ex. 92 (Baxter Tr.) at 42.  According to the Federal Reserve's guidance for the formatting of messages sent across its platform, subtype code "01" is what a bank uses to convey a "non-value request for reversal of a funds transfer originated on the current business day."  Ex. 91 (Grice Indemn. Rep.) at 5; Ex. 92 (Baxter Tr.) at 39 ("[Subtype code '01'] is a request for a reversal associated with a funds transfer that was already processed.").

For good measure, JPMorgan's Fedwire service message also contained the text "AS PER REM REQ PLS RETURN FUNDS QUOTING OUR REF."  Ex. 65.  The first part of this message, "AS PER REM REQ," means "as per remitter's request," and "PLS RETURN FUNDS QUOTING OUR REF" is a request by JPMorgan that Chain Bridge return California's wire transfer using the reference number that JPMorgan included in its message.  *See* Ex. 91 (Grice Indemn. Rep.) at 5; Ex. 92 (Baxter Tr.) at 47-48.  And to ensure that Chain Bridge knew precisely which payment order JPMorgan wished to cancel, JPMorgan's Fedwire message also included a "Previous Message Identifier" corresponding to the IMAD unique identifier for JPMorgan's 11:55 AM payment order.  *See* Ex. 65; Ex. 91 (Grice Indemn. Rep.) at 5; Ex. 92 (Baxter Tr.) at 39.

In short, JPMorgan's Fedwire service message requested that Chain Bridge return the wired funds, rather than pay them to Blue Flame as JPMorgan's payment order had directed.  Thus, the message can be understood only as a "communication of the sender of a payment order cancelling . . . the order."  UCC § 4A-211(a); *see Banca Commerciale Italiana, N.Y. Branch v. Northern Tr. Int'l Banking Corp.*, 160 F.3d 90, 92-93 (2d Cir. 1998) (request that bank "return" funds treated as cancellation of payment order); *Cumis Ins. Soc'y, Inc. v. Citibank, N.A.*, 921 F. Supp. 1100, 1105 (S.D.N.Y. 1996) (equating an "agree[ment] to return . . . funds" transferred by wire with

cancellation of the payment order at issue).  Indeed, JPMorgan's own expert witness acknowledged the message to be a communication cancelling a payment order "of the type described in 4A-211(a)." Ex. 92 (Baxter Tr.) at 50.

*Third*, Chain Bridge agreed to cancellation of JPMorgan's payment order by returning the funds to JPMorgan, through a payment order transmitted via the Fedwire system at 3:21 PM.  *See* Ex. 68.  Chain Bridge made it unmistakably clear that the funds were returned in response to JPMorgan's cancellation of its payment order:  Chain Bridge included the text "RTING YR IMAD . . . PER YOUR REQUEST." *Id.*  "RTING YR IMAD" means "returning your IMAD," with "IMAD" referring to Fedwire's unique identifier of the 11:55 AM Wire Transfer.  Ex. 91 (Grice Indemn. Rep.) at 6.  The phrase "PER YOUR REQUEST" confirms that Chain Bridge's Fedwire message was issued in response to JPMorgan's 2:05 PM cancellation, and Chain Bridge also included the reference number that JPMorgan's 2:05 PM cancellation request had asked Chain Bridge to use in connection with the wire reversal.  *Compare* Ex. 68, *with* Ex. 65; *see also* Ex. 91 (Grice Indemn. Rep.) at 6-7.

*Fourth,* there was no agreement between the parties to displace Section 4A-211(f)'s indemnification obligation.[4]  As JPMorgan's Tim Coffey confirmed, "[t]he word 'indemnity' was never mentioned by either party, be it [JPMorgan] or Chain Bridge." Ex. 58 (Coffey Tr.) at 149. JPMorgan did not, for example, include the phrase "No Indemnity" in its 2:05 PM cancellation message, *see* Ex. 65, as would be customary if a sender requesting cancellation of its payment order intended to disclaim its indemnification obligation.  *See, e.g.*, *Regions Bank v. Provident*

---

[4] Section 4A-211(f) also provides that the default rule of automatic indemnification may be displaced by a "funds-transfer system rule."  UCC § 4A-211(f).  The Federal Reserve's rules governing the Fedwire system do not contain any such rule displacing automatic indemnification under Section 4A-211(f).

*Bank, Inc.*, 345 F.3d 1267, 1272 (11th Cir. 2003) (sender's recall message to beneficiary's bank expressly specified "no indemnity").  The Federal Reserve's official guidance for how banks should handle Fedwire funds transfers—Fedwire Operating Circular No. 6—expressly warns that "[b]y requesting cancellation or amendment of a Payment Order, the sender may be liable under Section 4A-211 of article 4A *unless* the request states 'NO INDEMNITY.'"  Ex. 86 (Fed. Res. Operating Circular 6 (2019) at ¶ 14.1 (emphasis added); *see also* Regulation J, 12 C.F.R. § 210.25(c) (Federal Reserve Operating Circulars govern funds-transfer operations); UCC § 4A-107 (Operating Circulars supersede anything inconsistent in UCC article 4A).  JPMorgan did not include "No Indemnity" or any other similar phrase on its 2:05 PM cancellation message, nor was there any other agreement between Chain Bridge and JPMorgan to displace Section 4A-211(f)'s rule of automatic indemnification.

None of these facts is disputed.  Because no different result was "otherwise provided in an agreement of the parties," JPMorgan is automatically "liable to [Chain Bridge] for any loss and expenses, including reasonable attorney's fees, incurred by [Chain Bridge] as a result of the cancellation" as a matter of law.  UCC § 4A-211(f).

### B.    JPMorgan's Legal Arguments To The Contrary Are Baseless

Attempting to escape the indemnification obligation that arises from a straightforward application of Section 4A-211(f) to the undisputed facts, JPMorgan resorts to a series of tortured counterarguments.  Each of them is explicitly foreclosed by the UCC's text.

1.    JPMorgan asserts that Chain Bridge (the receiving bank), not JPMorgan (the sender), cancelled California's wire transfer.  *See* Ex. 97 (Interrogatory Responses) at 4-6.  It bases that argument on a recorded telephone call during which Chain Bridge's President, David Evinger, asked JPMorgan's Rakesh Korpal, "[i]s there any way for JPMorgan to issue a recall for the wire so that while you intervene in this you have the funds and feel more comfortable?"  Ex. 63.  Korpal

responded that he was "comfortable" with Chain Bridge "holding the money right now," but asked for "a few more minutes" to decide how JPMorgan would proceed. *Id.* Shortly thereafter, JPMorgan's Tim Coffey called back and advised Chain Bridge that "[w]e're going to be recalling those funds, okay? We have enough concerns that we feel we need to claw those funds back." Ex. 64. JPMorgan contends that because Coffey's recall request followed Evinger's inquiry, Chain Bridge did not "agree[] to cancellation . . . of the order by the sender," and so Section 4A-211(f) is inapplicable.

That is nonsensical. To begin with, Section 4A-211 does not provide for cancellation of a payment order by a receiving bank. To the contrary, cancellation requires "[a] communication *of the sender* of a payment order cancelling . . . the order." UCC § 4A-211(a) (emphasis added). Then, if the payment order has already been accepted, the cancellation "is not effective unless the *receiving bank* agrees." *Id.* § 4A-211(c) (emphasis added). In other words, cancellation is something the *sender* does, while agreeing to cancellation is something the *receiving bank* does. The receiving bank is necessarily agreeing to the *sender's* cancellation of *its* payment order. It therefore does not make sense to speak of a receiving bank, such as Chain Bridge, "direct[ing]" cancellation of a payment order, as JPMorgan's expert has suggested occurred here. Ex. 98 (Baxter Rep.) ¶ 19.

Nor does the application of Section 4A-211(f) turn on the sender's *reasons* for cancelling a payment order. JPMorgan's witnesses have testified that it would not have made the cancellation request were it not for Chain Bridge's question about whether JPMorgan was able to "issue a recall for the wire so that while you intervene in this you have the funds and feel more comfortable." Ex. 63. But JPMorgan's asserted motivation for cancelling the order is irrelevant. Under the provision's plain text, the sender's indemnification obligation is triggered *whenever* "the receiving

bank, after accepting a payment order, agrees to cancellation . . . of the order by the sender." UCC § 4A-211(f). It therefore makes no difference whether JPMorgan decided to cancel the order in response to a suggestion from Chain Bridge, as JPMorgan maintains happened here.[5]

For the same reason, it makes no difference whether *Chain Bridge* had reasons of its own for honoring JPMorgan's cancellation request. JPMorgan asserts that Chain Bridge was pleased—even eager—to return the funds because it had its own independent concerns about the suspiciousness of the transaction or about some purported effect it might have on the bank's balance sheet. But nothing in Section 4A-211(f)'s text makes the receiving bank's reasons for agreeing to cancellation relevant. JPMorgan's expert witness insists that Section 4A-211(f) was enacted to address only a "paradigm case" in which "the beneficiary's bank is acting on information communicated by the sending bank and with respect to facts and circumstances outside the beneficiary's bank's knowledge." Ex. 98 (Baxter Rep.) ¶ 51. But Section 4A-211(f) says nothing about limiting indemnification in this manner—as JPMorgan's expert acknowledged when he stated that he was "not aware" of anything "to support the proposition" that

---

[5] Even if JPMorgan's theory that application of Section 4A-211(f) turns on the sender's subjective motivation for cancelling a payment order, that would not serve as a basis to avoid summary judgment in favor of Chain Bridge. First, it is undisputed that when Tim Coffey called Chain Bridge to recall the California wire transfer, he stated that "*[w]e're* going to be recalling those funds," and added that "*[w]e* have enough concerns that *we* feel *we* need to claw those funds back." Ex. 64 (emphasis added). Second, JPMorgan's cancellation message included the text, "AS PER REM REQ," conveying that JPMorgan's customer—California, the remitter in this wire transfer—had asked JPMorgan to cancel the transfer. Ex. 65. Third, JPMorgan is now, in a different forum, simultaneously maintaining a claim against California that *California*, not Chain Bridge, "sought the reversal of the Wire Transfer" and that JPMorgan's reversal of the wire transfer was "taken on behalf of, at the direction of, and/or for the benefit of the [California] Agencies and Employees," Ex. 96 at 540, 542—*not* at Chain Bridge's behest. Finally, there is no support for JPMorgan's absurd suggestion that it did not act "on its own volition" when it cancelled California's wire transfer. Ex. 97 (Interrogatory Responses) at 5. JPMorgan is the largest bank in the United States, and among the largest banks in the world. No bank could force JPMorgan to do something it did not wish to do, let alone a bank the size of Chain Bridge.

indemnification is available only in the "paradigm scenario" he posits.  Ex. 92 (Baxter Tr.) at 111.

To the contrary, Section 4A-211(f) contains an unambiguous default rule of automatic

indemnification by the sender *whenever* a receiving bank agrees to cancellation of a payment order,

which governs unless the parties agree to displace such indemnification or it is modified by a

funds-transfer rule.  *See* UCC § 4A-211(f).

      JPMorgan's expert also relies on an Official Comment to Section 4A-211, which notes

that, "[i]f the receiving bank agrees to cancellation, it is doing so as an accommodation to the

sender."  Ex. 98 (Baxter Rep.) ¶ 52 (emphasis omitted) (quoting UCC § 4A-211 cmt. 5).  Based

on that comment, JPMorgan posits that, for a receiving bank to be indemnified, it must establish

that it agreed to a sender's cancellation request only as an accommodation to the sender.  But that

is not what the comment says.  The comment merely observes that a receiving bank that has

accepted a payment order is under no obligation to honor a sender's cancellation request,

"regardless of the circumstances," and so is *always* "doing so as an accommodation to the sender."

UCC § 4A-211 cmt. 5.  That observation does not graft onto the UCC provision an unstated

requirement that receiving banks must demonstrate, on the specific facts of individual cases, that

they agreed to cancellation solely to please the sender.

      What is more, the cancellation of a wire transfer that has been accepted by a beneficiary's

bank *always* requires the beneficiary's bank's agreement.  *See* UCC § 4A-211(c).  Because a

beneficiary's bank's agreement to such a cancellation is voluntary and not without risk, *see* UCC

§ 4A-211 cmt. 4, a beneficiary's bank that agrees to a sending bank's cancellation request

presumably has good reasons for doing so—including, often, that it too believes cancellation to be

appropriate under the circumstances.  JPMorgan's proposed reading would thus preclude

indemnification in every case governed by Section 4A-211(f).

In a similar vein, but in the alternative, JPMorgan argues that indemnification under Section 4A-211(f) is unavailable because the cancellation of California's wire transfer should be viewed as a "joint decision" by JPMorgan and Chain Bridge, rather than as a cancellation by JPMorgan as the sender.  Ex. 97 (Interrogatory Responses)  at 6; Ex. 92 (Baxter Tr.) at 177-78. But, once again, cancellation under Section 4A-211(f) is, by definition, an action taken by *the sender*.  *See* p. 17, *supra*.  And *every* cancelled wire after acceptance by the beneficiary's bank *requires* a "joint" decision—in the sense that JPMorgan appears to use that term—because such a cancellation "is not effective unless the receiving bank agrees."  UCC § 4A-211(c).  Here, too, JPMorgan's argument would preclude indemnification in every case governed by Section 4A-211(f), thereby rendering that provision a nullity.  That cannot possibly be correct.

In the end, there is no basis in Section 4A-211(f)'s text for JPMorgan's suggestion that the availability of indemnification turns on an inquiry into the state of mind of the sender that cancelled a payment order or of the receiving bank that agreed to cancellation.  That suggestion is also incompatible with Section 4A-211(f)'s underlying purpose:  As the Second Circuit has observed, Section 4A-211(f) "departs from the common law" by "impos[ing] *absolute* liability on the sender of an electronic funds transfer to the receiving bank if the sender cancels a payment order that has already been accepted, even though the receiving bank has freely agreed to the cancellation." *Banca Commerciale Italiana*, 160 F.3d at 94 (emphasis added).  Section 4A-211(f) thus establishes an "automatic[]" indemnification right, in order to assure the receiving bank that it may act on the sender's cancellation request without "incur[ring] a risk of loss in doing so."  UCC § 4A-211 cmt. 5.  Indemnification under Section 4A-211(f) would be neither "absolute" nor "automatic" if it turned on the sort of elaborate inquiry into the parties' subjective motivations that JPMorgan proposes here.

2.      JPMorgan also says that indemnification is unavailable here because JPMorgan and Chain Bridge *did* reach an "agreement"—that the cancellation order would be transmitted via a Fedwire service message from JPMorgan—that did not include an indemnity term.   Ex. 97 (Interrogatory Responses) at 3, 6-7; Ex. 92 (Baxter Tr.) at 133-34.   But Section 4A-211(f) makes automatic indemnification the default rule "[u]nless otherwise provided in an agreement of the parties."  UCC § 4A-211(f).   JPMorgan's proposed rule, by contrast, would make indemnification available only when expressly provided in an agreement of the parties.   JPMorgan's argument thus reverses the rule actually stated in Section 4A-211(f)'s text.

3.      JPMorgan separately fashions a causation argument, contending that Chain Bridge would not have paid the wire transfer to Blue Flame, and would have cancelled it, regardless of JPMorgan's request.   Ex. 97 (Interrogatory Responses) at 8-10.   JPMorgan argues that all of the damages alleged by Blue Flame in this case, and expenses Chain Bridge has incurred, would have followed even in the absence of JPMorgan's cancellation of the wire transfer, and therefore do not represent "loss and expenses . . . incurred by [Chain Bridge] as a result of the cancellation."  UCC § 4A-211(f).

But there is zero evidentiary basis for JPMorgan's speculation that Chain Bridge would have returned the wire transfer without a cancellation by JPMorgan.   The fact that Chain Bridge placed a hold on the wire funds immediately after they arrived does not show that reversal of the wire transfer was somehow inevitable even if JPMorgan had not sent its cancellation message. Chain Bridge's CEO testified that Chain Bridge probably would have continued to hold the funds if it had not received JPMorgan's cancellation message, Ex. 40 (Brough Tr.) at 222, but he did not say it would have done so in perpetuity or would have eventually returned the funds to JPMorgan absent a cancellation request.   To the contrary, he explained that "the funds were going to be held"

only until Chain Bridge had completed its investigation of the wire transfer, *id.* at 196-97, and noted that Chain Bridge would have consulted legal counsel to determine whether to continue the hold beyond the period stated in the funds availability policy governing Blue Flame's account, *id.* at 225-26.  In short, there is no record evidence to support JPMorgan's speculation that Chain Bridge would have returned the funds on its own initiative if JPMorgan—rather than informing Chain Bridge that it had "enough concerns that we feel we need to claw those funds back," Ex. 64—had instead confirmed that neither JPMorgan nor California objected to the release of the funds to Blue Flame.[6]

* * * * *

The text of Section 4A-211(f) could not be clearer.  Unless there is a contrary agreement between the sender and the receiving bank, a receiving bank's agreement "to cancellation . . .  of the order by the sender" entitles it to indemnification by the sender "for any loss and expenses, including reasonable attorney's fees, incurred by the bank as a result of the cancellation."  Under that clear text, the receiving bank "is *automatically* entitled to indemnification from the sender under subsection (f)," UCC § 4A-211 cmt. 5 (emphasis added), and the sender incurs "*absolute* liability . . . even though the receiving bank has freely agreed to the cancellation," *Banca Commerciale Italiana*, 160 F.3d at 94 (emphasis added).  JPMorgan did not seek or obtain any

---

[6] JPMorgan has asserted (Ex. 97 (Interrogatory Responses) at 5-6, 8-9) that the return of California's funds was inevitable, even absent JPMorgan's cancellation, because Chain Bridge's wire transfer policy provided that, "[i]f there is any question as to the beneficiary's right to the funds, such as a discrepancy between name and account number, the wire will be returned." Ex. 99 at 4298.  But that policy is not evidence that Chain Bridge was bound to return California's funds even absent any cancellation request by the sender.  Rather, the record is clear that, in fact, Chain Bridge required an official cancellation message from JPMorgan prior to returning any funds.

contrary agreement—either by use of the phrase "no indemnity" on its recall message or otherwise. That is the beginning and end of the matter.[7]

## II.  Chain Bridge Is Entitled To Summary Judgment On Its Claim For Unjust Enrichment (Count III)

If Chain Bridge is ultimately found liable to Blue Flame for having agreed to JPMorgan's cancellation request, and indemnification is for some reason not available under Section 4A-211(f), then Chain Bridge would be entitled to recover from JPMorgan on its unjust enrichment claim.  Chain Bridge presents this claim in the alternative to its indemnification claims, and the Court need resolve this claim only if it concludes that indemnification under Section 4A-211(f) is unavailable.

JPMorgan's liability for unjust enrichment follows from the proposition that "[a] person who is unjustly enriched at the expense of another is subject to lability in restitution."  Restatement (Third) of Restitution and Unjust Enrichment § 1 (2011).  More particularly, "[p]ayment by mistake gives the payor a claim in restitution against the recipient to the extent payment was not due."  *Id.* § 6; *see also, e.g.*, *J.J.B. Hilliard, W.L. Lyons, Inc. v. Fox*, 735 F. Supp. 674, 676 (W.D. Va. 1990); *Hibbs v. First Nat'l Bank of Alexandria*, 112 S.E. 669, 673-74 (Va. 1922).  Under the circumstances here, Chain Bridge returned the California wire transfer to JPMorgan in response to JPMorgan's request and based on the parties' shared (and, we submit, correct) belief that cancellation was appropriate and lawful.  If Blue Flame is nevertheless able to recover from Chain

---

[7] Although irrelevant to the legal analysis under Section 4A-211(f), it bears noting that an award of indemnification against JPMorgan in this case is unlikely to result in JPMorgan ultimately bearing the economic burden of any loss associated with the cancellation of California's wire transfer.  As explained above (at 11-12), JPMorgan has asserted claims for statutory, contractual, and equitable indemnification against California—including a claim under UCC Section 4A-211(f) premised on California's cancellation of the payment order it issued to JPMorgan to originate its wire transfer to Blue Flame.

Bridge on its claim that it had a right to payment of the wire transfer, and that cancellation was unlawful, then that would establish that the parties' shared understanding was mistaken.  In that scenario, JPMorgan, as "the party benefited by the mistake cannot in conscience retain the benefit or advantage so acquired."  *Webb v. City Council of Alexandria*, 74 Va. 168, 176 (1880). JPMorgan benefited when it received Chain Bridge's return of the $456 million, returned those funds to California's account at JPMorgan, and then accepted its happy customer's effusive praise for protecting $456 million of California taxpayer's money.

## CONCLUSION

Chain Bridge's motion for summary judgment against JPMorgan should be granted.

Date: May 6, 2021

Respectfully submitted,

/s/ Donald Burke
Gary A. Orseck (admitted *pro hac vice*)
Matthew M. Madden (admitted *pro hac vice*)
Donald Burke (VA Bar No. 76550)
ROBBINS, RUSSELL, ENGLERT, ORSECK
   & UNTEREINER LLP
2000 K Street, N.W., 4th Floor
Washington, D.C. 20006
Tel: (202) 775-4500
Fax: (202) 775-4510
dburke@robbinsrussell.com

*Counsel for Third-Party Plaintiff Chain Bridge Bank, N.A.*

## CERTIFICATE OF SERVICE

I hereby certify that on May 6, 2021, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing to the following:

Peter H. White, Esq. (VA Bar No. 32310)
**SCHULTE ROTH & ZABEL LLP**
901 Fifteenth Street, NW, Suite 800
Washington, DC 20005
Phone: (202) 729-7476
Fax: (202) 730-4520
Email: peter.white@srz.com
*Counsel for Plaintiff*

Meredith K. Loretta, Esq. (VA Bar No. 92369)
**WILMER CUTLER PICKERING HALE & DORR LLP**
1875 Pennsylvania Avenue NW
Washington, DC 20006
Phone: (212) 663-6981
Email: meredith.loretta@wilmerhale.com
*Counsel for Third-Party Defendant*

/s/ Donald Burke
Donald Burke (VA Bar No. 76550)
ROBBINS, RUSSELL, ENGLERT,
   ORSECK & UNTEREINER LLP
2000 K Street, N.W., 4th Floor
Washington, D.C. 20006
Tel: (202) 775-4500
Fax: (202) 775-4510
dburke@robbinsrussell.com