**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)**

| | |
|---|---|
| BLUE FLAME MEDICAL LLC, <br><br>          Plaintiff, <br><br> v. <br><br> CHAIN BRIDGE BANK, N.A., JOHN J. BROUGH, and DAVID M. EVINGER, <br><br>          Defendants. | **Civil Action No. 1:20-cv-00658** |
| CHAIN BRIDGE BANK, N.A, <br><br>          Third-Party Plaintiff, <br><br> v. <br><br> JPMORGAN CHASE BANK, N.A., <br><br>          Third-Party Defendant. | |

**THIRD-PARTY PLAINTIFF CHAIN BRIDGE BANK, N.A.'S
MEMORANDUM IN OPPOSITION TO THIRD-PARTY DEFENDANT
JPMORGAN CHASE BANK, N.A.'S MOTION FOR SUMMARY JUDGMENT**

ROBBINS, RUSSELL, ENGLERT, ORSECK
& UNTEREINER LLP

Gary A. Orseck (admitted *pro hac vice*)
Matthew M. Madden (admitted *pro hac vice*)
Donald Burke (VA Bar No. 76550)
2000 K Street, N.W., 4th Floor
Washington, D.C. 20006
Tel: (202) 775-4500
Fax: (202) 775-4510
dburke@robbinsrussell.com

*Counsel for Third-Party Plaintiff
Chain Bridge Bank, N.A.*

May 20, 2021

# TABLE OF CONTENTS

Page

Introduction ........................................................................................................................ 1

Counterstatement of Undisputed Facts .............................................................................. 2

    A.   Events Prior To JPMorgan's Cancellation Of Its Payment Order ........................... 2

    B.   JPMorgan's Cancellation Of Its Payment Order ...................................................... 7

    C.   Additional Materials Facts (JPMorgan's Claim Against California) ..................... 11

Argument ......................................................................................................................... 12

  I.   JPMorgan Is Not Entitled To Summary Judgment On Chain Bridge's Indemnification Claims (Counts I and II) 12

    A.   Section 4A-211(f)'s Indemnification Provision Applies Here ................................ 13

    B.   There Was No Agreement Between JPMorgan And Chain Bridge That "Otherwise Provided" That JPMorgan Would Not Indemnify Chain Bridge ......... 20

    C.   Chain Bridge's Legal Expenses, And Any Judgment That Blue Flame Obtains, Are A Result Of JPMorgan's Cancellation Of Its Payment Order ........... 21

  II.  JPMorgan Is Not Entitled To Summary Judgment On Chain Bridge's Unjust Enrichment Claim (Count III) ................................................................................. 23

Conclusion ....................................................................................................................... 25

# TABLE OF AUTHORITIES

Cases:                                               Page

*Anderson v. Fluor Intercontinental, Inc.*,
   No. 1:19-cv-0289, 2021 WL 837335 (E.D. Va. Jan. 4, 2021) ........................................... 24

*Banca Commerciale Italiana, N.Y. Branch v. Northern Tr. Int'l Banking Corp.*, 160 F.3d 90 (2d Cir. 1998) .............................................................................. 17, 18

*Bernardini v. Cent. Nat'l Bank of Richmond*,
   290 S.E.2d 863 (Va. 1982) .............................................................................................. 24

*Daniels v. Twin Oaks Nursing Home*,
   692 F.2d 1321 (11th Cir. 1983) ....................................................................................... 22

*Smith v. Schlage Lock Co.*,
   986 F.3d 482 (4th Cir. 2021) ........................................................................................... 22

*Terry v. Bank of Am., N.A.*,
   350 F. Supp. 2d 727 (W.D. Va. 2004) ............................................................................. 24

Cases—Continued:                                                                                  Page

    *White v. Johns-Manville Corp.*,
       662 F.2d 243 (4th Cir. 1981) ..............................................................................17

Regulations and rules:

    Uniform Commercial Code:

       § 1-103(b)................................................................................................................17

       § 4A-209(b)(2).......................................................................................................13

       § 4A-210(d)............................................................................................................14

       § 4A-211(a).......................................................................................................14, 15

       § 4A-211(b)............................................................................................................14

       § 4A-211(c)............................................................................................................21

       § 4A-211(f) ......................................................................................................*passim*

       § 4A-211 cmt. 5................................................................................................16, 17

       § 4A-403(a)(1).......................................................................................................13

       § 4A-403 cmt. 1......................................................................................................13

    12 C.F.R.

       § 229.16(a)...............................................................................................................4

       § 229.17...................................................................................................................4

       § 229.18(e)...............................................................................................................4

Other Authorities:

    Press Release, Board of Governors of the Federal Reserve, Federal Reserve
       Actions to Support the Flow of Credit to Households and Businesses (Mar.
       15, 2020), https://perma.cc/PU6C-2GYY ...........................................................3

Third-Party Plaintiff Chain Bridge Bank, N.A. (Chain Bridge) submits this memorandum in opposition to the motion for summary judgment filed by Third-Party Defendant JPMorgan Chase Bank, N.A. (JPMorgan or JPMC).

## INTRODUCTION

Chain Bridge and JPMorgan agree on this much: Recorded phone calls and admissible documents contain all of the facts relevant to Chain Bridge's indemnification and unjust enrichment claims.  There is no dispute over what happened on March 26, 2020.  Chain Bridge's third-party claims therefore are ripe for summary judgment.

But it is not *JPMorgan* that is entitled to summary judgment.  Its motion turns on a series of not-colorable legal theories that are expressly foreclosed by the plain text of UCC Section 4A-211(f), its official commentary, and all the relevant case law.

JPMorgan's lead argument is that it was *Chain Bridge* that cancelled JPMorgan's payment order, not *JPMorgan*, but that is both demonstrably false and a legal impossibility under the UCC.  As a softer version of the same argument, JPMorgan asserts that Chain Bridge, at a minimum, "directed" or "laid the foundation" for the cancellation, and thereby forfeited its right to indemnification.  But upon Chain Bridge's agreement to honor JPMorgan's "request for reversal" sent over Fedwire, JPMorgan's liability for indemnity was "absolute," regardless whether Chain Bridge, as the receiving bank, played any role in JPMorgan's decision to send that request.

Next, JPMorgan argues, with a straight face, that its liability is precluded by Section 211(f) because, although Chain Bridge agreed to JPMorgan's request for reversal, the parties "never discussed the issue of indemnification."  But Section 4A-211(f) compels the opposite result, because indemnification is automatic unless "otherwise provided" in an agreement between the parties.  Not surprisingly, JPMorgan provides no support whatsoever for it counter-textual reading of the UCC.  Finally, JPMorgan asserts that Chain Bridge's fees and expenses, and any liability it

may incur to Blue Flame, somehow did not result from Chain Bridge agreeing to JPMorgan's cancellation of its payment order. That ahistorical theory is contradicted by all relevant evidence.

JPMorgan fares no better when it seeks summary judgment on Chain Bridge's alternative, unjust enrichment claim. In the unlikely event that Chain Bridge is liable to Blue Flame, but not indemnified by JPMorgan under the UCC, then JPMorgan will have been unjustly enriched by the benefit that Chain Bridge conferred on it when Chain Bridge returned the wire.

## COUNTERSTATEMENT OF UNDISPUTED FACTS

There is no dispute as to the facts that are material to Chain Bridge's claims against JPMorgan. They arise entirely from Fedwire messages transmitted by the parties, as well as recorded phone calls between them. *See* Chain Bridge Memo. For S.J. Against JPMorgan at 5-10 (Statement of Undisputed Facts). Chain Bridge is nevertheless constrained, by Local Rule 56(B), to respond to JPMorgan's mischaracterization and selective recitation of those undisputed facts.[1]

### A.    Events Prior To JPMorgan's Cancellation Of Its Payment Order

4.    Chain Bridge does not dispute that some Chain Bridge employees, immediately after learning of the expected wire transfer, expressed concern about its potential effect on Chain Bridge's capital requirements, although the cited materials do not support the assertion that its President, David Evinger, ever did so. They also discussed the possibility of moving some portion of the wired funds from the bank's balance sheet, where most of it would not be insured, into an

---

[1] Chain Bridge responds only to paragraphs of JPMorgan's Statement of Undisputed Facts ("SUF") with which it disagrees or to state additional material facts. JPMorgan's SUF contains section headings that are not themselves supported by record citations. Chain Bridge does not understand those headings to be stating assertedly undisputed facts, but for the avoidance of doubt Chain Bridge disputes the assertions contained in headings 2c, 2d, and 2f for the reasons stated in response to the numbered paragraphs that follow each of those headings. "JPMC Ex." refers to the exhibits to the Declaration of Meredith K. Loretta (ECF No. 113), and "CBB Ex." refers to the exhibits to the two Declarations of Donald Burke—(i) ECF Nos. 130 & 131 (CBB Exs. 1-99) and (ii) the one being filed today in support of this memorandum (CBB Exs. 100-112).

Insured Cash Sweep (ICS) account that would maximize the customer's benefit from FDIC insurance.  *See* JPMC Ex. 2 at 662-63, CBB Ex. 78 (Williamson Tr.) at 80-82, CBB Ex. 100 (Brough Tr.) at 253-55.  As additional material facts, Chain Bridge states that (i) on March 15, 2020, in response to the COVID-19 pandemic, the Federal Reserve Board reduced reserve ratio requirements to *zero percent*, effective on March 26, 2020, CBB Ex. 100 (Brough Tr.) at 55; *see also* Press Release, Board of Governors of the Federal Reserve, Federal Reserve Actions to Support the Flow of Credit to Households and Businesses (Mar. 15, 2020), https://perma.cc/PU6C-2GYY; (ii) Blue Flame told Chain Bridge that it intended to spend most of the wired funds fairly rapidly, meaning that most of those funds were not expected to remain on Chain Bridge's balance sheet for very long, *see* JPMC Ex. 2 at 669; and (iii) Chain Bridge's CEO John Brough and CFO Joanna Williamson explained, without contradiction, that Chain Bridge could have retained *all* of the wired funds on its balance sheet, if necessary, without adversely affecting its risk-based capital ratios, CBB Ex. 40 (Brough Tr.) at 90-91; CBB Ex. 78 (Williamson Tr.) at 84-85.[2]

5.      Chain Bridge disagrees with JPMorgan's mischaracterization that Chain Bridge was concerned that "accepting the wire" would "run afoul of its Bank Secrecy Act obligations." Chain Bridge automatically accepted the wire, by operation of the Fedwire system, when it received JPMorgan's payment order at 11:55 AM on March 26, 2020.  Chain Bridge does not dispute, however, that it evaluated the wire transfer consistent with its substantial and important obligations under the Bank Secrecy Act.  *See* JPMC Ex. 7 (Brough Tr.) at 72 (Bank Secrecy Act applies to "every single transaction that runs through the bank"), 200 ("[I]f there is a transaction

---

[2] The only conceivable effect, bank officials testified, would have been on Chain Bridge's leverage ratio.  But that ratio is measured and reported as a quarterly average, and so a large deposit received on March 26—just five days before the quarter's end—would have had a negligible effect on the leverage ratio (which also had plenty of cushion).  CBB Ex. 101 (Williamson Tr.) at 90-91.

that is unusual or out of pattern, then it must be investigated."), 207 ("We considered the impact of the transaction in regards to the Bank Secrecy Act and our requirements under the Bank Secrecy Act along with all the other unanswered questions that we had.").

7.      Chain Bridge does not dispute that, prior to receiving JPMorgan's payment order, it considered whether Blue Flame's anticipated transaction might be a scam (including, potentially, a scam being perpetrated *against* Blue Flame and its principals).  Chain Bridge denies that, "[s]oon after learning about the expected transaction," and prior to JPMorgan's payment order, it reached any conclusion about Blue Flame's right to funds that the bank had not even received yet.

8.      Chain Bridge does not dispute that its internal wire transfer policy states that "[i]f there is any question as to the beneficiary's right to the funds, such as a discrepancy between name and account number, the wire will be returned."  As an additional material fact, Chain Bridge states that its internal wire transfer policy also states, in the immediately preceding sentence, that "[i]f the Bank notices a discrepancy between the beneficiary account number and the beneficiary name, the Bank reserves the right to return the wire *although it is not obligated to do so*."  JPMC Ex. 10 at 4298 (emphasis added).

9.      Chain Bridge disputes, in part, JPMorgan's contention that Chain Bridge "had no expectation that it would make an exception to its own internal policies for a $456 million wire." JPMorgan relies on testimony, not in dispute, that Chain Bridge did not expect to make an exception *to its funds availability policy* for the $456 million wire transfer, such that those funds would not have been made available to Blue Flame any earlier than March 27, 2020.  *See* JPMC Ex. 7 (Brough Tr.) at 199.  Chain Bridge's funds availability policy, unlike its internal guidance on processes and procedures, is required by federal regulation and must be disclosed to customers, who must be notified of any changes to that policy.  *See* 12 C.F.R. §§ 229.16(a), 229.17, 229.18(e).

There is no testimony or other record evidence supporting JPMorgan's suggested proposition that Chain Bridge expected that it would not make an exception to *any* internal policy in connection with the $456 million wire transfer.

14.     Chain Bridge does not dispute that JPMorgan sent Chain Bridge a payment order, as part of the wire transfer, by Fedwire at 11:55 AM ET after—unbeknownst to Chain Bridge— JPMorgan had received confirmation from its customer.  As additional material facts, JPMorgan sent its payment order to Chain Bridge after the wire triggered JPMorgan's automated fraud alert system and before JPMorgan had completed its investigation into the highly suspicious wire transfer.  JPMorgan also sent its payment order to Chain Bridge before Rakesh Korpal had received wire-transfer details that he had requested the previous night and again that morning.  *See* CBB Ex. 47 (Korpal Tr.) at 56-62; CBB Ex. 58 (Coffey Tr.) at 45, 60.

20.     Chain Bridge disputes that it is "rare" for a counterparty bank to contact a non-customer to verify a transaction, particularly in light of the rise of cyber fraud and computer hacking.  Heather Schoeppe, Chain Bridge's Senior Vice President and Branch Manager, testified that calling non-customers is "pretty standard practice," and recalled numerous situations in which she had called non-customers to verify transactions.  CBB Ex. 102 (Schoeppe Tr.) at 258-60. Chain Bridge's Bank Secrecy Act compliance expert likewise testified that, in his current capacity as the Chief Compliance Officer for a bank in New York, he "routinely" contacts his customers' wire-transfer counterparties to understand those transactions, including directing other bank employees to contact just one specific non-customer originator about once a month to conduct due diligence.  CBB Ex. 103 (Grice Tr.) at 291-95.  Based on his experience, that expert testified that "the decisions by Chain Bridge personnel to ask questions of the State of California regarding the

5

California Wire Transfer" "were reasonable and consistent with industry standards and practices." *Id.* at 294; *see also* CBB Ex. 53 (Grice Rep.) at 55.

23.     Chain Bridge does not dispute that, at approximately 12:30 PM ET, Tim Coffey of JPMorgan called Chain Bridge and spoke with Evinger.  As additional material facts, Chain Bridge states that (i) Coffey called Chain Bridge unprompted by Chain Bridge, and at Rakesh Korpal's direction that he "engage" Chain Bridge to hold the funds that JPMorgan had just sent to Chain Bridge, CBB Ex. 58 (Coffey Tr.) at 60-61; and (ii) before Coffey spoke with Evinger, he first spoke with another Chain Bridge representative to whom Coffey reported that JPMorgan had "concerns of fraud" involving the wire transfer, CBB Ex. 57, CBB Ex. 58 (Coffey Tr.) at 63-64.

28.     Chain Bridge does not dispute that, when Korpal called Evinger and Brough at 12:44 PM, he reiterated to Chain Bridge that JPMorgan had concerns with the wire transfer that it had already sent to Chain Bridge.  As additional material facts, and more specifically, Korpal stated that JPMorgan's "global security investigations team is coming back to me and saying that this does not look right" and that his own research into the transaction was "all leading to not-good places."  CBB Ex. 59 at 2:42-2:51, 3:00-3:16.  Korpal stated that, as part of his ongoing investigation, he would contact the JPMorgan banker who works with the State of California.  *Id.* at 2:10-2:30, 4:11-4:15.

30.     Chain Bridge does not dispute that, by voicemail and telephone call, Fee Chang of the California Department of General Services stated that she believed the wire transfer to be legitimate, and confirmed its amount.  As an additional material fact, Chang also stated that Natalie Gonzales at the State Treasurer's Office was "the one in charge of the transfers" and offered to have that office contact Chain Bridge.  *See* JPMC Ex. 28 at 0:20-0:42.

32, 33, 34 & 35.   Chain Bridge does not dispute JPMorgan's account of Chain Bridge's short call with the California State Treasurer's Office.  As additional material facts, Chain Bridge states that Gonzales and Mark Hariri told Chain Bridge that they were unsure about the wire transfer, and asked Chain Bridge not to make the funds available to Blue Flame until they spoke with officials at the California Department of General Services and gathered additional information about the transaction.  JPMC Ex. 29 at 4466; CBB Ex. 62 (Gonzales Tr.) at 50.

### B.      JPMorgan's Cancellation Of Its Payment Order

37 & 38.  Chain Bridge disagrees with JPMorgan's misleading and selective description of the 1:34 PM call between Korpal and Evinger and Brough.  Korpal told Chain Bridge that California is "a bit unsure" about the transaction.  JPMC Ex. 30 at 0:00-0:02.  Evinger responded by asking Korpal (in a question that JPMorgan's brief never quotes in full):  "Is there any way for JPMorgan to issue a recall for the wire, so that while you intervene in this you have the funds and feel more comfortable?"  *Id.* at 0:04-0:14.  Korpal replied, "[w]ell, I feel comfortable that you're holding the money right now.  I can issue a recall.  But I don't think you and I want to get onto the front page of the Wall Street Journal, especially if this is a legitimate transaction."  *Id.* at 0:14-0:28.  After Brough said, "OK," Korpal continued "give me a few more minutes."  *Id.* at 0:30-0:32. The call concluded with Evinger telling Korpal that "[w]e look forward to hearing back from you."  *Id.* at 0:32-0:35.

40.     Chain Bridge disagrees with JPMorgan's mischaracterization of Evinger's question to Korpal as having been a "request for a reversal" that JPMorgan then "accommodate[d]."  *See* ¶¶ 37 & 38 *supra*; *see also* pp. 13-15 *infra* (addressing the legal impossibility of a receiving bank's cancellation of a sender's payment order).  Chain Bridge also disagrees that Korpal's instruction to Coffey to recall the wired funds was made only "[i]n response to" Evinger's question.  Korpal

7

testified that his instruction to Coffey was to "call Chain Bridge Bank and confirm that *we're going to recall the funds*." JPMC Ex. 13 (Korpal Tr.) at 254 (emphasis added). Coffey testified that he understood that instruction as "a directive from [Korpal] to me to engage Chain Bridge Bank to recall the funds." CBB Ex. 58 (Coffey Tr.) at 124-25. And Coffey did so by calling Chain Bridge and telling it that *JPMorgan* was "going to be recalling those funds"—*not* because of, or in response to, Evinger's question, but rather because "*we* have enough concerns that *we* feel *we* need to claw those funds back." JPMC Ex. 31 at 0:07-0:14 (emphasis added). JPMorgan coded its subsequent Fedwire service message to Chain Bridge as a request for reversal *from JPMorgan*. JPMC Ex. 32. It asked Chain Bridge, "PER REM REQ PLS RETURN FUNDS QUOTING OUR REF"—meaning "per remitter's request please return funds quoting our reference." *Id.*; JPMC Ex. 33 at 14. And when Chain Bridge honored that cancellation, its Fedwire message was coded as a responsive "reversal of transfer" being sent "PER YOUR REQUEST"—meaning per *JPMorgan's* request. JPMC Ex. 34; *see also* JPMC Ex. 33 at 14. There is no record support for JPMorgan's contention that it cancelled its payment order only in response to Evinger's inquiry—and that unsupported contention is certainly not "undisputed."

42 & 43. Chain Bridge disagrees with JPMorgan's misleading and selective description of the 1:37 PM call from Coffey to Evinger and Brough. Chain Bridge could not, and did not, make a "request for reversal" that JPMorgan then "agreed to." *See* ¶¶ 37-38, 40 *supra*. At the beginning of the 1:37 PM call, Coffey stated: "We're going to be recalling those funds, OK? We have enough concerns that we feel we need to claw those funds back." JPMC Ex. 31 at 0:07-0:14. Coffey then asked Chain Bridge whether Chain Bridge needed "a recall message from us." *Id.* at 0:14-0:16. Evinger responded that "[w]e'd like official communication from JPMorgan to us to recall the funds," and Brough added that it should be sent "over the Fedline platform." *Id.* at 0:17-0:25.

Coffey said "that's not a problem.  We'll send that over.  We can get that out to you in the next couple of minutes."  *Id.* at 0:28-0:32.  Coffey then thanked Chain Bridge for its "cooperation in this," reiterated that JPMorgan would "get that service message out now," and emphasized to Chain Bridge that "as quickly as you can return [the wire], that'd be great."  *Id.* at 0:36-0:49.  As an additional material fact, Chain Bridge states that Coffey asked Chain Bridge to return the funds quickly because there was "need to get word out to senior management" at JPMorgan "that the situation has been taken control of" and to "put the situation to rest."  CBB Ex. 58 (Coffey Tr.) at 130.

44.     Chain Bridge does not dispute the substance of JPMorgan's 2:05 PM Fedwire service message, which is JPMC Ex. 32, but disagrees with JPMorgan's characterization of that service message as having been sent "in response to Chain Bridge's reversal request."  *See* ¶¶ 37-38, 40, 42-43.  As additional material facts, Chain Bridge states that Coffey had instructed his colleague to draft a "straight recall" message, not one that specified "NO INDEMNITY," and then reviewed and approved that "straight recall" message.  JPMC Ex. 42.  After issuing that straight recall, JPMorgan twice called Chain Bridge to ask about the status of that recall request, CBB Ex. 47 (Korpal Tr.) at 87-88, and California's State Treasurer's Office also called Chain Bridge to follow up on the wire recall, Stipulation, Dkt. No. 96, at ¶¶ 28, 30.

45.     Disputed.  *See* ¶¶ 37-38, 40, 42-44.  In any event, for the reasons explained below (pp. 15-19), it is immaterial whether, in fact, JPMorgan cancelled its payment order only in response to Evinger's question.

46.     Chain Bridge does not dispute that, when JPMorgan cancelled its payment order, Chain Bridge was holding the wired funds and had not made them available to Blue Flame—just as JPMorgan and California requested that it continue to do.  *See* CBB Ex. 58 (Coffey Tr.) at 45,

63-66.  To the extent that JPMorgan means to say that Chain Bridge would have continued that hold indefinitely, in the absence of any cancellation by JPMorgan of its payment order, that is disputed.  In the testimony that JPMorgan relies on, Brough states that "the funds were going to be held" only while Chain Bridge "conducted our investigation," and that Chain Bridge would have consulted legal counsel to determine whether to make funds available to Blue Flame the next day.  CBB Ex. 40 (Brough Tr.) at 196-97, 225-26.

47.     Undisputed.  As an additional material fact, Chain Bridge states that Chain Bridge's 3:21 PM Fedwire message contained the text "RTNG YR IMAD" "PER YOUR REQUEST," indicating that Chain Bridge was returning the wire transfer that JPMorgan had sent at 11:55 AM ET, and doing so at JPMorgan's request.  *See* CBB Ex. 68; CBB Ex. 91 (Grice Indem. Rep.) at 6-7.

48.     Chain Bridge disagrees with JPMorgan's mischaracterization of there having been any "agreement" concerning JPMorgan's cancellation of its payment order other than JPMorgan's 2:05 PM Fedwire service message requesting the reversal of that payment order and Chain Bridge's agreement to that cancellation by returning the funds via its responsive 3:21 PM Fedwire payment order.  Chain Bridge does not dispute that when Coffey told Brough and Evinger, on their 1:37 PM call, that JPMorgan would be recalling the funds, Brough and Evinger asked that it do so by "official communication from JPMorgan to us to recall the funds" over the Fedwire platform. JPMC Ex. 31 at 0:17-0:25.

50 & 51.  Disputed.  Neither Chain Bridge's President nor its CEO disclaimed the need for indemnification upon inquiry from one of the bank's employees.  When Evinger first told Chain Bridge employee Claudia Mojica-Guadron, a technician who works in wire-transfer operations, that JPMorgan would be recalling the California wire, Mojica-Guadron asked Brough and Evinger

whether Chain Bridge would be "getting an indemnity letter from Chase."  Evinger explained that "you're going to get a service bureau message through Fedline . . . a recall."  JPMC Ex. 23 at 1:20-1:30.  Chain Bridge "didn't view there was a need for an indemnification [letter] based on the recall because the recall had that indemnification built in, and we viewed JPMorgan, you know, as our counterparty."  CBB Ex. 28 (Evinger Tr.) at 261.  Federal Reserve Bank Operating Circular No. 6—the Federal Reserve's official guidance for wire transfers sent over Fedwire—states that "[b]y requesting cancellation or amendment of a Payment Order, the sender may be liable under Section 4A-211 of article 4A unless the request states 'NO INDEMNITY.'"  CBB Ex. 86 at ¶ 14.1.  There is no dispute that JPMorgan's 2:05 PM cancellation message, sent over Fedwire's Fedline platform, did not say "No Indemnity" or include any other disclaimer of JPMorgan's indemnification obligation.  CBB Ex. 65.

62.     As explained below, at p. 24, Chain Bridge disputes, as a matter of law, that JPMorgan "retained nothing" after crediting the funds to California's account at JPMorgan.

### C.     Additional Material Facts (JPMorgan's Claim Against California)

63.     On March 20, 2021, while this case was pending, JPMorgan submitted a formal claim against its customer, the State of California.  CBB Ex. 96.  In that formal claim, JPMorgan:

(a)     asserts that California "decided to reverse the payment—because of concerns about the vendor—and JPMC assisted the State in recovering the entire amount of its funds," which JPMorgan was "honored" to do (*id.* at 1);

(b)     admits that California, after originating the Wire Transfer, "subsequently decided that the Wire Transfer should be reversed" and was "eager to obtain a return of the funds in full and inquired with JPMC about the status of the reversal before and until the funds had been returned" (*id.* at 3-4);

(c)     identifies California as the entity "requesting that the Wire Transfer be reversed" and "having decided that the funds should be returned to the State" (*id.* at 4);

(d)     emphasizes that the State Treasurer's Office "has taken responsibility for having procured the reversal of the Wire Transfer" through JPMorgan (*id.*);

(e)     states that "JPMC's actions concerning the Wire Transfer, *including, in particular, the reversal* . . . were taken on behalf of, at the direction of, and/or for the benefit of the [California] Agencies and Employees" (*id.* at 5 (emphasis added); *see also id.* at 3 (similar));

(f)     claims that "to the extent JPMC suffers any loss (including attorneys' fees) and/or incurs any liability to Chain Bridge for any loss (including any attorneys' fees) in the *Blue Flame* litigation . . . the [California] Agencies and Employees are fully responsible" (*id.* at 5);

(g)     describes the basis of California's liability to JPMorgan as that California is "required to indemnify JPMC for any and all loss JPMC incurs in the *Blue Flame* litigation," including because (i) "[g]overning statutory provisions, including U.C.C. § 4A-211(f) as incorporated into Subpart B of the Federal Reserve Board's Regulation J, require indemnification here" and (ii) "[e]quity further requires [California] to make JPMC whole" based on other causes of action "including but not limited to unjust enrichment" (*id.* at 7).

## ARGUMENT

**I.     JPMorgan Is Not Entitled To Summary Judgment On Chain Bridge's Indemnification Claims (Counts I and II)**

As explained in Chain Bridge's motion for summary judgment, the undisputed material facts compel the conclusion that JPMorgan is liable under Section 4A-211(f) to indemnify Chain Bridge for any liability Chain Bridge may have to Blue Flame, and for Chain Bridge's attorney's

fees and other expenses.  The three arguments JPMorgan asserts in support of its competing motion for summary judgment each read the UCC to mean the opposite of what it actually says.

### A.    Section 4A-211(f)'s Indemnification Provision Applies Here

Section 4A-211(f) provides that when a receiving bank accepts a sender's payment order, and later agrees to the sender's cancellation of that payment order, the receiving bank is indemnified by the sender for any resulting losses and expenses, unless an agreement between the parties states otherwise.  JPMorgan is wrong that Section 4A-211(f) is "inapplicable" here.  Br. 14-21.  That section's unambiguous terms afford Chain Bridge an indemnification right against JPMorgan, and Chain Bridge did not lose that right, as JPMorgan incorrectly contends, by either cancelling JPMorgan's payment order itself or "directing" JPMorgan to cancel it.

1.    Section 4A-211(f)'s application to the undisputed facts follows from the plain text of Article 4A's cancellation provision.  There is no dispute that JPMorgan sent Chain Bridge a payment order directing Chain Bridge to pay $456 million to Blue Flame Medical LLC.  JPMC SUF ¶ 14.  Nor is there any dispute that Chain Bridge, by operation of the Fedwire system, automatically accepted that payment order upon its receipt.  *See* Counterstatement of Undisputed Facts ("CSUF") ¶ 5; UCC §§ 4A-209(b)(2), 4A-403(a)(1), 4A-403 cmt. 1.  And there is no dispute that there was a "cancellation" of JPMorgan's payment order within the meaning of Section 4A-211(a).  JPMorgan's brief refers to "the cancellation" of its payment order no less than 20 times. *See* Br. 3, 14, 16, 17 n.3, 18, 19, 20, 21 n.4, 28.

JPMorgan nevertheless contends that Section 4A-211(f) does not apply because *Chain Bridge*, not JPMorgan, cancelled JPMorgan's payment order.  Br. 16-17.  It argues that Chain Bridge President David Evinger's question to JPMorgan's Rakesh Korpal—"Is there any way for JPMorgan to issue a recall for the wire so that while you intervene in this you have the funds and feel more comfortable?" (CSUF ¶¶ 37-38)—amounted to Chain Bridge's "oral request to return

the funds" that "constitutes a cancellation request under Article 4A."  Br. 16; *see also id.* at 17 (referring to "Evinger's oral cancellation").

That argument is foreclosed by Section 4A-211(a), which states that *every* cancellation of a payment order results from "[a] communication *of the sender* of a payment order . . . transmitted *to the receiving bank*."   UCC § 4A-211(a) (emphasis added); *see also* UCC § 4A-211(b) (describing when "a communication *by the sender* cancelling or amending a payment order" is effective prior to a payment order's acceptance) (emphasis added).  The UCC does not allow a receiving bank to cancel a sender's payment order; only JPMorgan could cancel JPMorgan's payment order.  Chain Bridge was powerless to do what JPMorgan says it did.[3]

JPMorgan tries to obscure that critical point by replacing with ellipses the phrases within Section 4A-211(a) that identify the respective roles of senders and receiving banks in a payment-order cancellation.  *See* Br. 16 (presenting Section 4A-211(a) as stating that "[a] communication . . . cancelling . . . the order may be transmitted . . . orally, electronically, or in writing" (all omissions JPMorgan's)).  But JPMorgan cannot make Section 4A-211(a) mean something other than what it says simply by leaving out the unhelpful words.[4]

"Cancellation" of a sender's payment order is something that only the sender of that payment order can do.  And that is what JPMorgan did here, via its 2:05 PM "Fedwire reversal

---

[3] JPMorgan also cites Section 4A-210(a) as support for its argument that Evinger's question to Korpal cancelled JPMorgan's payment order.  Br. 16.  But Section 4A-210(a) governs a receiving bank's "rejection" (not cancellation) of a payment order, which can take place only before a receiving bank accepts a payment order.  *See* UCC § 4A-210(d).  Section 4A-210 thus has no bearing on JPMorgan's liability to indemnify Chain Bridge.

[4] JPMorgan's motion fails for the additional reason that, even if a receiving bank *could* cancel a sender's payment order (and it cannot), a reasonable jury could not find that Evinger's question to Korpal accomplished that feat.  There is no dispute that all Evinger asked Korpal was whether there was "any way for JPMorgan to issue a recall for the wire so that while you intervene in this you have the funds and feel more comfortable."  CSUF ¶¶ 37-38.

14

message." Br. 17. That message was not some "subsequent reaction" to "Chain Bridge's original cancellation request." *Id*. It *was* the "communication *of the sender* of a payment order"—*i.e.*, JPMorgan—"cancelling or amending the order"—*i.e.*, JPMorgan's 11:55 AM payment order— "transmitted *to the receiving bank*"—*i.e.*, Chain Bridge. UCC § 4A-211(a) (emphasis added). JPMorgan's own expert agreed that JPMorgan's 2:05 PM service message was a communication cancelling JPMorgan's payment order under Section 4A-211(a). *See* CBB Ex. 92 (Baxter Tr.) at 50.

2. There is also no merit to JPMorgan's argument that, even if JPMorgan did cancel its own payment order, Chain Bridge is not entitled to indemnification because it either "directed" or "laid the foundation for" JPMorgan's cancellation. *See* Br. 18-21.

As an initial matter, JPMorgan mischaracterizes the undisputed factual record when it says that Chain Bridge "directed the cancellation at every material turn." Br. 18. There is no dispute that JPMorgan called Chain Bridge first to report its "concerns of fraud" and to ask Chain Bridge to hold the funds and not pay Blue Flame. CSUF ¶ 23. There is also no dispute that JPMorgan warned Chain Bridge that its own investigation was "all leading to not-good places" and that JPMorgan thought the transaction "does not look right." CSUF ¶ 28. Then, when JPMorgan's Tim Coffey called Chain Bridge to set the cancellation in motion, he told Chain Bridge that ***JPMorgan*** would be "recalling those funds" because "*we* have enough concerns that *we* feel *we* need to claw those funds back." CSUF ¶¶ 42-43 (emphasis added). Coffey was under pressure, from JPMorgan's "senior management," to "take[] control of" the bank's misbegotten payment order and "put the situation to rest." *Id*. To that end, after cancelling the wire, JPMorgan called Chain Bridge twice to follow up on Chain Bridge's return of the funds. CSUF ¶ 44. And as if that were not enough, JPMorgan *concedes*, as part of its formal claim against California, that *California* (not

Chain Bridge) "decided to reverse the payment," and that JPMorgan "assisted" *California* in doing so.  CSUF ¶ 63(a); *see also id.* ¶ 63(e) (JPMorgan's further admission that its actions, "including, in particular, the reversal" of the wire transfer, "were taken on behalf of, *at the direction of*, and/or for the benefit of" California (emphasis added)).  That evidence conclusively establishes that JPMorgan cancelled its payment order for its own reasons—just as Coffey told Brough and Evinger—*not* that JPMorgan's cancellation of its payment order was orchestrated by Chain Bridge.

More to the point, none of this makes any difference for purposes of Section 4A-211(f). That provision states a straightforward rule that, absent a contrary agreement between the parties, a sender is *always* liable to a receiving bank that, after accepting the sender's payment order, agrees to the sender's cancellation of that payment order and incurs losses and expenses as a result. Whether the sender cancels its payment order of its own accord, or because the receiving bank asks it to, is of no consequence.

JPMorgan nevertheless would graft onto the UCC's clear rule a bevy of fact-specific exceptions that reviewing courts would have to consider on a case-by-case basis.  According to JPMorgan's amended version of Section 211(f), indemnification happens *unless* the receiving bank raised the topic of cancellation first, or *unless* the receiving bank was happy to agree to cancellation, or *unless* the receiving bank asked the sender to put its cancellation in writing.  Of course, Section 211(f)'s text does not contain any such caveats, or otherwise exclude from its ambit receiving banks that "sought," "directed," "requested," "obtained," or "laid the foundation" for a sender's cancellation of its payment order.

JPMorgan tries to locate those caveats in Section 4A-211's Official Comments, or common-law indemnification principles, but neither source supports its departure from the UCC's clear text.  Indeed, Section 4A-211's Official Comments reinforce that "[if] a receiving bank

16

agrees to cancellation . . . it is *automatically* entitled to indemnification from the sender under subsection (f)."  UCC § 4A-211 cmt. 5 (emphasis added).  JPMorgan's brief omits that part of the Comment.  It fixates only on the next two sentences, which observe that this automatic "indemnification provision recognizes that a sender has no right to cancel a payment order after it is accepted by the receiving bank.  If the receiving bank agrees to cancellation, it is doing so as an accommodation to the sender and it should not incur a risk of loss in doing so."  *Id.*  But that passage merely acknowledges that a receiving bank that has accepted a payment order is *never* required to agree to its cancellation, such that any agreement to cancellation is *always* done as an accommodation to the sender (and at some risk to the receiving bank).  That commentary is not an invitation to add to Section 4A-211(f) a requirement that receiving banks, to be indemnified, must prove that they initially were "reluctant" or "agnostic" (Br. 15), yet ultimately agreed to the cancellation just to be nice.  A receiving bank need not prove that its agreement to cancellation accommodated *only* the sender's wishes.  *Banca Commerciale Italiana, N.Y. Branch v. Northern Tr. Int'l Banking Corp.*, 160 F.3d 90, 94 (2d Cir. 1998) (a sender incurs "absolute liability" under Section 4A-211(f) "even though the receiving bank has freely agreed to the cancellation").

JPMorgan also resorts to common-law limitations on indemnification rights and obligations, arguing (at Br. 15) that those principles should "inform and supplement" the text of Section 4A-211(f).  But Section 4A-211(f) marks an intentional "depart[ure] from the common law" that was designed to release receiving banks from any requirement to prove "the elements required to establish common law fraud or unjust enrichment" before they can recover their losses and expenses from a sender.  *Banca Commerciale Italiana*, 160 F.3d at 94.  As JPMorgan

17

acknowledges (Br. 15), common-law principles do not "supplement" UCC provisions that intentionally "displaced" them with a default rule. UCC § 1-103(b).[5]

What is more, supplanting the UCC's clear indemnification rule with a case-specific comparison of the motives and interests of senders and receiving banks would generate the very uncertainty about those parties' rights and obligations that Section 4A-211(f) is designed to eliminate. *See Banca Commerciale Italiana,*, 160 F.3d at 95 ("Indeed, it is widely recognized that Article 4A was enacted to correct the perceived inadequacy of attempting to define rights and obligations in funds transfers by general principles of common law." (alterations and quotation marks omitted)). Section 4A-211(f) provides that parties can expressly agree that there will be no indemnification between them; it does not contemplate after-the-fact avoidance of indemnification based on commentary and common law.

3.    For the same reasons, Chain Bridge's supposedly "powerful incentives" (Br. 19) for wanting JPMorgan to cancel its payment order are beside the point. Chain Bridge agrees that it was investigating the wire transfer consistent with its obligations under the Bank Secrecy Act to detect and prevent fraudulent and suspicious financial activity. CSUF ¶ 5. So too was JPMorgan. Tim Coffey testified that JPMorgan's senior management was especially eager to "put the situation to rest" after realizing that JPMorgan had directed payment of $456 million of its customer's funds

---

[5] In any case, common-law principles of indemnification and restitution would not bar Chain Bridge's recovery from JPMorgan even if they were relevant. In *White v. Johns-Manville Corp.*, 662 F.2d 243 (4th Cir. 1981), the admiralty case JPMorgan cites for the metes and bounds of common-law indemnification, the Fourth Circuit held that "indemnity may be awarded . . . where the indemnitee acted pursuant to directions of the indemnitor which he reasonably believed to be lawful." *Id.* at 249. Here, Chain Bridge agreed to JPMorgan's cancellation of its payment order, believing cancellation to be lawful, based in substantial part on JPMorgan's representations to Chain Bridge that JPMorgan's Global Security and Investigations Team was working with California's banker, and that its investigation was "all leading to not-good places" and had determined that the wire transfer did "not look right." CSUF ¶ 28.

to a three-day-old company before having completed its own investigation into the highly suspicious nature of that transaction. *See* CSUF ¶¶ 42-43. And JPMorgan's expert explained that JPMorgan, as the largest bank in the country, faces especially rigorous regulatory scrutiny, including from a dedicated team of permanently on-site bank examiners. CBB Ex. 104 (Pesce Rep.) at 6-7, 9. It "would have been out-of-line with regulatory expectations" of JPMorgan for it to have "knowingly let[] such a large sum go to an entity with limited, if any internet presence, with no medical supply history, that had established accounts only the day before, that was controlled by a political lobbyist . . . , and whose own bank was uncomfortable with the transaction." *Id.* at 11.

It likewise does not matter whether Chain Bridge had its own business reasons for agreeing to JPMorgan's cancellation request. In any event, JPMorgan misstates the record on that score. Chain Bridge officials have explained—without contradiction—that a $456 million deposit into Blue Flame's account would not have adversely affected the bank's risk-based capital ratios, leverage ratio, or any "reserve" requirements, the latter of which had been reduced to zero as of the date of the wire transfer. *See* CSUF ¶ 4 & n.2. And contrary to JPMorgan's unsupported assertion that Chain Bridge "had no easy alternative to deal with such an extraordinary wire" (Br. 19), the record shows that: (i) Blue Flame told Chain Bridge that it was going to spend (*i.e.*, withdraw) most of the incoming funds quickly, CSUF ¶ 4; (ii) Chain Bridge was preparing to use at least one of many available financial products to allow it to place at least $150 million of any remaining funds into FDIC-insured accounts located at other banks, *id.*; and (iii) as Blue Flame's own expert conceded, if for any reason Chain Bridge did not wish to hold the deposit on its balance sheet, it could have handed Blue Flame a cashier's check for the balance and closed the account, CBB Ex. 105 (O'Malley Tr.) at 67-69. There is no merit to the suggestion that Chain Bridge was

19

"driven" to agree to JPMorgan's cancellation request because of concerns about its own balance sheet.

**B.      There Was No Agreement Between JPMorgan And Chain Bridge That "Otherwise Provided" That JPMorgan Would Not Indemnify Chain Bridge**

There is no support—literally *none*—for JPMorgan's assertion that "Chain Bridge and JPMC agreed that there would be no indemnity." Br. 14. That never happened. Indeed, JPMorgan concedes that "indemnification was not a term of the parties' greement," Br. 23, and that the two parties "never discussed indemnity," Br. 10 at ¶ 49. That is the end of the matter, so far as Section 4A-211(f) is concerned. It holds that its indemnification obligation applies "[u]nless otherwise provided in an agreement of the parties or a funds-transfer system rule."[6]

JPMorgan nevertheless disclaims its liability for Chain Bridge's losses and expenses on the theory that the two banks had *an* agreement—"to keep each other apprised of their respective bank's investigations," and "about how to handle the wire" (Br. 22)—that "did not include any obligation by JPMC to indemnify Chain Bridge" (Br. 21). In other words, JPMorgan professes to read Section 4A-211(f) to require the parties to any agreement concerning the cancellation of a payment order to expressly state that the sender *will* indemnify the receiving bank. *See* Br. 21. According to JPMorgan, if the receiving bank "agrees to cancellation" (Section 4A-211(f)), but that agreement is *silent* as to indemnification (as the parties were here) then the sender has no obligation to the receiving bank.

The UCC states the opposite rule. The sender's obligation to indemnify the receiving bank is automatic "[u]nless otherwise provided" in the parties' agreement. UCC § 4A-211(f). The parties' agreement does not need to *include* the indemnification obligation that is already stated in

---

[6] It is undisputed that no funds-transfer system rule displaced Section 4A-211(f)'s indemnification provision on the facts of this case.

the UCC.  The law could not possibly be understood otherwise.  Once a receiving bank has accepted a sender's payment order, its agreement is required for cancellation of that payment order to be effective.  UCC § 4A-211(c).  There is thus *always* an "agreement of the parties" to such a cancellation.  If JPMorgan were right that every such agreement must affirmatively state the cancelling sender's obligation to indemnify the agreeing receiving bank, then Section 4A-211(f) would cease to have any force in every case to which it applies.

Nor is there any basis in the record for JPMorgan's assertion that Chain Bridge "disclaimed the need for JPMC to indemnify Chain Bridge."  Br. 23.  JPMorgan cites to Brough's and Evinger's response to a Chain Bridge wire-operations employee, that Chain Bridge did not require an "indemnity letter" from JPMorgan, because JPMorgan would be sending a service message over the Fedwire system, documenting its cancellation of its payment order.  JPMC Ex. 23.  The unrebutted evidence is that Chain Bridge "didn't view there was a need for an indemnification [letter] based on the recall because the recall had that indemnification built in, and we viewed JPMorgan, you know, as our counterparty."  CBB Ex. 28 (Evinger Tr.) at 261; *see also* CSUF ¶¶ 50-51; CBB Ex. 86 (Fed. Res. Operating Circular 6 (2019)) at ¶ 14.1 ("By requesting cancellation or amendment of a Payment Order, the sender may be liable under Section 4A-211 of Article 4A unless the request states 'NO INDEMNITY.'").

### C.   Chain Bridge's Legal Expenses, And Any Judgment That Blue Flame Obtains, Are A Result Of JPMorgan's Cancellation Of Its Payment Order

Chain Bridge agreed to JPMorgan's cancellation of its payment order and, accordingly, returned $456 million to it instead of paying that sum to Blue Flame.  Blue Flame claims that Chain Bridge should not have agreed to cancellation and was required to pay the funds to it.  It alleges that Chain Bridge "had no basis to agree to cancel or amend the payment order or to otherwise return the transferred funds." Compl. ¶ 93.  The fees and expenses Chain Bridge must bear to

defend its agreement to JPMorgan's cancellation, and any damages Chain Bridge may be ordered to pay, therefore are amounts incurred "as a result of" JPMorgan's cancellation within the meaning of Section 4A-211(f). Indeed, that is exactly what JPMorgan is claiming against California based on *California's* cancellation of *its* payment order *to JPMorgan*. *See* CSUF ¶ 63(g) (JPMorgan's assertion that California is "required to indemnify JPMC for any and all loss JPMC incurs in the *Blue Flame* litigation" because Section 4A-211(f) "require[s] indemnification here").

JPMorgan again asks the Court to ignore what is before its eyes. It argues that Chain Bridge's damages are not the "result" of JPMorgan's cancellation of the payment order because, it speculates, Chain Bridge would have incurred the same losses and expenses either way. Br. 24-26. It asserts, without any factual basis, that Chain Bridge would have permanently "deprive[d] Blue Flame of access to the funds" no matter what JPMorgan did. Br. 25. But JPMorgan cannot even defeat Chain Bridge's motion for summary judgment based on such speculation. *See Smith v. Schlage Lock Co.*, 986 F.3d 482, 486 (4th Cir. 2021) (per curiam) ("Of course, unsupported speculation is not sufficient to defeat a summary judgment motion." (alteration omitted)); *see also Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983) ("[A]n inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence, but is pure conjecture and speculation." (quotation marks omitted)). JPMorgan certainly cannot *obtain* summary judgment on that basis.

In any event, the facts JPMorgan cites as grounds for its speculation do not support its counterfactual theory. *See* Br. 25-26. The fact that Chain Bridge placed a temporary "hold" on the wired funds shortly after receiving them is not evidence that it *never* would have paid Blue Flame if JPMorgan had not cancelled the payment order. To the contrary, Brough explained that Chain Bridge's hold would have continued only until its investigation was complete, and that he

would have consulted legal counsel on whether it had to pay Blue Flame the day after the wire was received.  CSUF ¶ 46.  Nor is JPMorgan's speculation supported by the fact that Chain Bridge was investigating the transaction consistent with the Bank Secrecy Act.  *See* CSUF ¶¶ 5, 46.  There is no evidence that if JPMorgan had cleared the wire for payment to Blue Flame, instead of cancelling it, Chain Bridge would have sent the funds back to JPMorgan anyway.

There likewise is no basis for JPMorgan's assertion (Br. 19-20, 25) that Chain Bridge's internal wire transfer policy compelled Chain Bridge to return the funds even if JPMorgan had not issued its reversal.  The relevant passage, which JPMorgan fails to quote in full, provides: "If the Bank notices a discrepancy between the beneficiary account number and the beneficiary name, the Bank *reserves the right* to return the wire *although it is not obligated to do so*.  If there is any question as to the beneficiary's right to the funds, such as a discrepancy between name and account number, the wire will be returned."  CSUF ¶ 8 (emphasis added).  JPMorgan would transform that internal policy—the express purpose of which is to remind bank employees that they have the right, but not the obligation, to return funds in certain circumstances—into a binding legal requirement that the bank return funds even without any request to do so from their sender.  This sort of internal procedural guidance, not to mention the policy's actual text, do not bear that weight.

## II.   JPMorgan Is Not Entitled To Summary Judgment On Chain Bridge's Unjust Enrichment Claim (Count III)

In the unlikely event that Chain Bridge is liable for damages to Blue Flame, and indemnification against JPMorgan is unavailable, JPMorgan will have been unjustly enriched at Chain Bridge's expense.  JPMorgan's contrary argument is based on the proposition that Chain Bridge conferred no benefit on JPMorgan when it returned the wire transfer because JPMorgan ultimately credited those funds to California's account.  Br. 27.  But Chain Bridge sent $456,888,600 *to JPMorgan*, not to California, when it returned those funds at JPMorgan's request.

The funds immediately became JPMorgan's property, and conferred a benefit on it.  JPMorgan correctly acknowledges (at Br. 26) that a party's acceptance *or* retention of a benefit can result in its liability for unjust enrichment.[7]

In any event, JPMorgan "retained" those funds even after it credited them to California's bank account.  Funds credited to a depositor's account remain the bank's property, offset by the bank's obligation to pay its depositor according to the account's terms.  *See Terry v. Bank of Am., N.A.*, 350 F. Supp. 2d 727, 730 (W.D. Va. 2004) (funds are deposited in a customer's bank account remain "the property of the bank"); *Bernardini v. Cent. Nat'l Bank of Richmond*, 290 S.E.2d 863, 864 (Va. 1982) ("[M]oneys deposited immediately become the property of the bank, and the [bank] becomes debtor of the depositor.").  There is no evidence that the funds are no longer JPMorgan's property, or that JPMorgan is otherwise unable to satisfy a judgment for Chain Bridge.

Finally, JPMorgan asserts that it would be inequitable to "reward" Chain Bridge with an unjust enrichment judgment against JPMorgan.  Br. 28.  That is exactly backwards.  If Blue Flame is entitled to damages from Chain Bridge because Chain Bridge agreed to return the wire transfer to JPMorgan, and if Section 4A-211(f) indemnification is not available, then the only possible "inequity" would result from saddling Chain Bridge with that liability while JPMorgan keeps the money.  On that same reasoning, in fact, JPMorgan is simultaneously asserting that "[e]quity . . . requires [California] to make JPMC whole," and that California is "fully responsible" to it for any losses that JPMorgan sustains because of *California's* cancellation of *its* payment order *to JPMorgan*.  CSUF ¶ 63(g).

---

[7] JPMorgan later asserts that "the requirement is that Chain Bridge confer a benefit on JPMC *and* that JPMC retain the benefit."  Br. 27 (first emphasis omitted).  To the extent that JPMorgan means to contradict its earlier, correct statement of the law—that *either* acceptance *or* retention is required, *see* Br. 26 (quoting *Anderson v. Fluor Intercontinental, Inc.*, No. 1:19-cv-0289, 2021 WL 837335, at *14 (E.D. Va. Jan. 4, 2021))—it was right the first time.

**CONCLUSION**

JPMorgan's motion for summary judgment should be denied as to all three counts in Chain Bridge's Third-Party Complaint.

Date: May 20, 2021                                        Respectfully submitted,

                                                         /s/ Donald Burke
                                                         Gary A. Orseck (admitted *pro hac vice*)
                                                         Matthew M. Madden (admitted *pro hac vice*)
                                                         Donald Burke (VA Bar No. 76550)
                                                         ROBBINS, RUSSELL, ENGLERT,
                                                         ORSECK
                                                             & UNTEREINER LLP
                                                         2000 K Street, N.W., 4th Floor
                                                         Washington, D.C. 20006
                                                         Tel: (202) 775-4500
                                                         Fax: (202) 775-4510
                                                         dburke@robbinsrussell.com

                                                         *Counsel for Third-Party Plaintiff Chain Bridge Bank, N.A.*

## CERTIFICATE OF SERVICE

I hereby certify that on May 20, 2021, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing to the following:

Peter H. White, Esq. (VA Bar No. 32310)
**SCHULTE ROTH & ZABEL LLP**
901 Fifteenth Street, NW, Suite 800
Washington, DC 20005
Phone: (202) 729-7476
Fax: (202) 730-4520
Email: peter.white@srz.com
*Counsel for Plaintiff*

Meredith K. Loretta, Esq. (VA Bar No. 92369)
**WILMER CUTLER PICKERING HALE & DORR LLP**
1875 Pennsylvania Avenue NW
Washington, DC 20006
Phone: (212) 663-6981
Email: meredith.loretta@wilmerhale.com
*Counsel for Third-Party Defendant*

/s/ Donald Burke
Donald Burke (VA Bar No. 76550)
ROBBINS, RUSSELL, ENGLERT,
  ORSECK & UNTEREINER LLP
2000 K Street, N.W., 4th Floor
Washington, D.C. 20006
Tel: (202) 775-4500
Fax: (202) 775-4510
dburke@robbinsrussell.com