**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

|  |  |  |
|---|---|---|
| **BLUE FLAME MEDICAL LLC** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 1:20-cv-00658** |
| | ) | |
| **CHAIN BRIDGE BANK, N.A.,** | ) | **The Honorable Leonie Brinkema** |
| **JOHN J. BROUGH, and** | ) | |
| **DAVID M. EVINGER,** | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |
| **CHAIN BRIDGE BANK, N.A.** | ) | |
| | ) | |
| *Third-Party Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **JPMORGAN CHASE BANK, N.A.** | ) | |
| | ) | |
| *Third-Party Defendant.* | ) | |

**PLAINTIFF BLUE FLAME MEDICAL LLC'S MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ................................................................................................1

MATERIAL FACTS DISPUTED BY THE PARTIES......................................................................2

      A.    Blue Flame Did Not Procure California's Order "Through Misrepresentation and Concealment."........................................................2

      B.    Blue Flame Did Not "Fraudulently Induce" Chain Bridge to Open Its Account and Chain Bridge Kept the Account Open After Blue Flame Disclosed All Relevant Details Concerning the Transaction......................5

      C.    Defendants Induced the Reversal of the Wire Transfer Without Authorization or Justification. ....................................................................8

      D.    California Refuses to Move Forward with Blue Flame due to Defendants' Actions and Blue Flame's Ability to Fill Other Orders is Impacted..........................................................................................12

ARGUMENT ......................................................................................................................13

    I.     BLUE FLAME CAN ESTABLISH DAMAGES FOR ALL CLAIMS. ...............13

    II.    CHAIN BRIDGE IS NOT ENTITLED TO SUMMARY JUDGMENT ON BLUE FLAME'S CLAIMS UNDER UCC ARTICLE 4A. .................................15

      A.    Blue Flame Was Entitled to Receive Payment from California. ..............16

    III.   DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON BLUE FLAME'S STATE LAW CLAIMS. .........................................26

      A.    Defendants' Arguments for Summary Judgment on Blue Flame's Tortious Interference Claim Fail...............................................................26

      B.    Defendants' Arguments for Summary Judgment on Blue Flame's Defamation Claim Fail...............................................................................28

CONCLUSION....................................................................................................................30

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*AG4 Holding, LLC v. Regency Title & Escrow Servs., Inc.*,
  98 Va. Cir. 89 (2018) ................................................................................................20

*Banca Commerciale Italiana, N.Y. Branch v. N. Tr. Int'l Banking Corp.*,
  160 F.3d 90 (2d Cir. 1998)........................................................................................16

*Berclain Am. Latina v. Baan Co.*,
  87 Cal. Rptr. 2d 745 (Cal. Ct. App. 1999) ...............................................................25

*Blum v. Citibank, NA*,
  81 N.Y.S.3d 51 (N.Y. App. Div. 2018) ....................................................................18

*Caperton v. A.T. Massey Coal Co.*,
  740 S.E.2d 1 (Va. 2013).............................................................................................25

*Carwile v. Richmond Newspapers, Inc.*,
  96 Va. 1 (1954) ..........................................................................................................29

*Cashion v. Smith*,
  286 Va. 327 (2013) ..............................................................................................29, 30

*CFTC v. Rust Rare Coin Inc.*,
  469 F. Supp. 3d 1211 (D. Utah 2020)..................................................................17, 18

*Chaves v. Johnson*,
  S.E.2d 97 (Va. 1985)..................................................................................................27

*Cretella v. Kuzminski*,
  640 F. Supp. 741 (E.D. Va. 2009) .............................................................................29

*Cumis Ins. Soc., Inc. v. Citibank, N.A.*,
  921 F. Supp. 1100 (S.D.N.Y. 1996)...........................................................................16

*Devine v. Buki*,
  767 S.E.2d 459 (Va. 2015)..........................................................................................17

*Duggin v. Adams*,
  234 Va. 221 (1987) ...............................................................................................27, 28

*Dunlap v. Cottman Transmission Sys., LLC*,
  754 S.E.2d 313 (Va. 2014)..........................................................................................27

*Eisenberg v. Wachovia Bank, N.A.*,
   301 F.3d 220 (4th Cir. 2002) ..................................................................28

*Emergency One v. Am. Fire Eagle Engine Co.*,
   332 F.3d 264 (4th Cir. 2003) ..................................................................22

*First Sec. Bank of N.M., N.A. v. Pan Am. Bank*,
   215 F.3d 1147 (10th Cir. 2000) ...............................................................17

*Girgis v. Salient Solutions, Inc.*,
   No. 1:11-cv-1287, 2012 WL 2792157 (E.D. Va. July 9, 2012).....................23

*Go-Best Assets Ltd. v. Citizens Bank of Mass.*,
   972 N.E.2d 426 (Mass. 2012) .................................................................20

*Gov't Micro Resources, Inc. v. Jackson*,
   21 Va. 29 (2006) ...................................................................................29

*Langman v. Alumni Association of the University*,
   247 Va. 491 (Va. 1994).........................................................................25

*Ma v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
   597 F.3d 84 (2d Cir. 2010).....................................................................20

*In re Pillowtex, Inc.*,
   349 F.3d 711 (3d Cir. 2003).....................................................................17

*Professional Recovery Servs., Inc. v. General Elec. Capital Corp.*,
   642 F. Supp. 2d 391 (D.N.J. 2009) ...........................................................30

*Receivers of Sabena SA v. Deutsche Bank A.G.*,
   142 A.D.3d 242 (N.Y. App. Div. 2016) .....................................................17

*Regions Bank v. Provident Bank, Inc.*,
   345 F.3d 1267 (11th Cir. 2003) .........................................................20, 23

*Reyazuddin v. Montgomery Cnty.*,
   789 F.3d 407 (4th Cir. 2015) ..................................................................14

*Saunders v. Gen. Servs. Corp.*,
   659 F. Supp. 1042 (E.D. Va. 1987) ...........................................................17

*Steele v. Goodman*,
   382 F. Supp. 3d 403 (E.D. Va. 2019) .......................................................29

*Synovus Bank v. Tracy*,
   603 F. App'x 121 (4th Cir. 2015) ........................................................24, 25

*Zeal Glob. Servs. Priv. Ltd. v. SunTrust Bank,*
    No. 1:20-cv-00908, 2020 WL 7480345 (N.D. Ga. Dec. 18, 2020) ........................................20

**Statutes**

UCC § 1-304, cmt. 1 ...........................................................................................................22, 23

UCC § 4A-102, cmt. .................................................................................................................19

UCC § 4A-103(c)......................................................................................................................26

UCC § 4A-203, cmt. 4 .............................................................................................................17

UCC § 4A-209(a)......................................................................................................................26

UCC § 4A-209, cmt. 3 .............................................................................................................21

UCC § 4A-211(c).....................................................................................................................19

UCC § 4A-301(a)......................................................................................................................26

UCC § 4A-404, cmt. 3 .............................................................................................................18

**Other Authorities**

12 C.F.R. § Pt. 210, Subpt. B, App. A, at Section 210.25—Authority, Purpose,
    and Scope ............................................................................................................................23

Bank Secrecy Act/Anti-Money Laundering Examination Manual, Federal
    Financial Institutions Examination Council,  (2014),
    https://bsaaml.ffiec.gov/manual.....................................................................................18, 19

Restatement (Second) of Contracts §§ 164, (1981) ....................................................................17

## PRELIMINARY STATEMENT

The Court should deny Defendants' Motion for Summary Judgment ("Motion") in its entirety. All of Defendants' arguments are either legally meritless or, at best, concern issues of disputed material fact inappropriate for summary judgment.

Defendants' arguments against liability under Article 4A (Counts I and II) are meritless and contrary to the plain text of the applicable statutes, their official commentary, and established case law. All of these confirm that the wire transfer from California (the "Wire Transfer") could not have been legally canceled and was not made by "mistake." In an effort to distract from their unlawful conduct, Defendants seek to disparage Blue Flame, arguing that it acted in bad faith and procured both its bank account at Chain Bridge and its agreement with California through false representations. Neither argument is viable, legally or factually. The undisputed evidence shows that, in advance of the Wire Transfer, Blue Flame fully disclosed the nature of its business and the California transaction to Chain Bridge. Defendants responded by assuring Blue Flame they could and would handle the Wire Transfer, and later accepted it on Blue Flame's behalf. As for California, the evidence establishes that the representations to which Defendants object were made in good faith and, in any event, played no role in any aspect of the negotiation or vetting of the transaction.

Defendants' argument that Blue Flame cannot prove damages under any circumstances belies the substantial evidence that Blue Flame could and would have performed under its agreement with California (and other purchasers) but for Defendants' reckless and bad faith actions. Accordingly, disputed issues of material fact preclude Defendants' Motion as to Blue Flame's damages. Similarly, Defendants' arguments for summary judgment on Blue Flame's tortious interference (Counts IV and V) and defamation (Count IX) claims ignore the facts

sufficient to establish each violation. Defendants' liability for defamation and the damages owed

for their violations of Article 4A and tortious interference are issues that require a trial.

## MATERIAL FACTS DISPUTED BY THE PARTIES

Defendants' "Statement of Undisputed Facts" is incomplete, misleading, and at times

completely inaccurate. Plaintiffs dispute the following numbered paragraphs in Defendants' Brief.

### A.     Blue Flame Did Not Procure California's Order "Through Misrepresentation and Concealment."

1.     In February 2020, Gula and Thomas founded Blue Flame Strategies, a consulting

company that connected medical supply companies to potential purchasers and assisted with

managing grant funds. Ex.[1] 1, 41:2-14; Ex. 85, 51:4-53:19. Beginning in March 2020, Gula and

Thomas recognized their supplier relationships provided opportunities to distribute PPE directly.

Ex. 2, 56:9-57:14. Blue Flame formally incorporated on March 23, 2020 for that purpose, though

Thomas and Gula had discussed potential PPE sales prior to that date, including with California.

Stipulation of Uncontested Facts, ECF No. 96 ("SUF") ¶ 9; Ex. 2, 99:11-21; Ex. 3, 121:2-122:2.

4.     Blue Flame did not misrepresent its capabilities or conceal material facts from

California. All of Thomas's statements to California State Controller Betty Yee were made in good

faith based on information known to him at the time, and none of the statements cited by

Defendants played any role in California's negotiations with or vetting of Blue Flame. At the time

of their initial communications, Thomas informed Yee that Blue Flame had access to 100 million

3M-brand N95 masks at the Port of Long Beach. *See* Ex. 4, 200119. That offer, as well as

Thomas's statement that more such masks would be delivered each week, was based on

information, including "proof of life" documentation, provided to Thomas by an individual with

---

[1] "Ex." refers to exhibits to the Affirmation of Peter H. White dated May 6, 2021, ECF No. 132 (for Exhibits 1-84) and to the Affirmation of Peter H. White, dated May 23, 2021 filed herewith (for Exhibits 85-118).

whom Blue Flame Strategies had a referral partner agreement. Ex. 86, 59:12-65:13, 83:15-84:8, 103:2-104:14; Ex. 87, 203903-09; Ex. 88, 206162. In any event, those masks and Thomas's representations regarding them ultimately were irrelevant to Blue Flame's deal with California. No California official ever negotiated with Blue Flame to purchase any 3M-brand N95 masks.[2] Rather, California's Department of General Services ("DGS") specifically identified other mask models, which had been expressly approved by the Department of Public Health, as the ones it wished to purchase. Ex. 91, 241:15-242:9; Ex. 10, 5563-64; Ex. 5, 200138-39; Ex. 90, 2050. Moreover, Yee and the State Controller's Office played no role whatsoever in California's negotiations with Blue Flame, its vetting of Blue Flame, or its procurement of PPE generally. Ex. 93, 113:19-114:10, 187:4-188:10, 191:14-21.[3]

     5.     DGS officials not only "approved the transaction," as Defendants acknowledge (Defs. Br. at 5), but were exclusively responsible for negotiating with and vetting potential suppliers. DGS chose to contract with Blue Flame due to its fair prices and ability to quickly deliver life-saving PPE. *See* Ex. 92, 38:1-39:5. Blue Flame did not make any material misrepresentations to DGS officials. While it is true that Thomas used both the terms "manufacturer" and "supplier" in his communications with DGS to refer to Great Health Companion ("GHC") (*see* Ex. 5, 200137-138), there is no evidence that Thomas's use of the term "manufacturer" was a key factor in DGS's

---

[2] Although relevant California officials were aware of Thomas's statement regarding the availability of the 3M-brand masks, they never expressed interest in those masks after Thomas informed them of the price. Ex. 89, 125035-36; *see* Ex. 90, 2048-55; *see also* Ex. 92, 72:16-19.

[3] Similarly, Thomas's statements to Yee regarding Blue Flame's efforts to sell PPE to "hospitals and a private buyer" in Florida (*see* ECF. No. 119 ("Defs. Br.") at 5) played no role in DGS's negotiations with Blue Flame (*see* Ex. 93, 187:4-188:10, 191:14-21) and were based on ongoing negotiations at the time between Blue Flame and other referral partners, relayed to Thomas by Gula. *See* Ex. 86, 117:11-118:19, 136:3-138:1; Ex. 97, 45:9-49:1. Moreover, there is no evidence that these statements were ever made known to DGS Director Daniel Kim or any other California official who had authority over California's decision to contract with Blue Flame. *See* Ex. 92, 134:18-135:2.

decision to purchase from Blue Flame.[4] *See* Ex. 92, 92:22-93:14.

6.      Blue Flame did not "conceal" any "key details about its operations from California." *See* Defs. Br. at 6. At the time of Thomas's discussions with California officials, Blue Flame's principals had gained experience in medical supply logistics through Blue Flame Strategies. *See, e.g.,* Ex. 1, 41:2-14; Ex. 85, 51:4-53:19. Blue Flame disclosed its Washington, D.C. address to California (*see, e.g.,* Ex. 12, BFM00011122), and Thomas was working out of a temporary office in California for Blue Flame. Ex. 86, 95:19-98:8. In any event, no California official ever asked Blue Flame any question that would have elicited the facts that Defendants cite, and Blue Flame had no obligation to volunteer them.

7.      Blue Flame did not "close[] the deal" with California by providing its rough delivery schedule to DGS officials the night of March 25. *See* Defs. Br. at 6. At that time, DGS had already informed Blue Flame that it had agreed to purchase the masks and was preparing to make payment the next morning although, unbeknownst to Blue Flame, DGS was still considering other suppliers. *See, e.g.*, Ex. 14, 111148; *see also* Ex. 92, 70:11-72:19.

8.      Furthermore, the rough delivery schedule that Blue Flame provided at DGS's request was not "fictitious" (*see* Defs. Br. at 7) and was based on information provided to Blue Flame by its suppliers. *See* Ex. 15, 212725-26; Ex. 2, 201:3-202:5; Ex. 94, 115900. The fact that GHC's products catalogue listed lower monthly capacities did not indicate that GHC could not deliver a higher volume for a prepaid order the size of Blue Flame's. Ex. 86, 154:13-156:8; Ex. 95, ¶ 18. In fact, Thomas had sent the same products catalogue to Michael Wong of DGS on March

---

[4] Indeed, California opted to purchase masks manufactured by three different companies— Shanghai Dasheng, Makrite, and Guangzhou Harley (not GHC)—from the catalogue and specification sheets provided by Blue Flame. *See* Ex. 5, 200136-39; Ex. 7, 66185-86; Ex. 8, 116042-100; Ex. 9, 116128 & 34; Ex. 10, 5563-64.

24 in an effort to be transparent. Ex. 9, 116128 & 34. Thus, California was aware of the figures in the products catalogue and proceeded with the transaction anyway.

9.      Blue Flame could and would have fulfilled California's order. While it did not have an inventory of N95 masks, a fact DGS understood, the understood purpose of prepayment was to allow Blue Flame to secure the masks from its suppliers. Ex. 92, 157:7-158:7; Ex. 91, 203:10-15; Ex. 96, 212:13-213:4. Blue Flame had supplier agreements and, as Defendants concede, purchase orders/order confirmations in place with its suppliers as of the morning of the Wire Transfer. Ex. 19, 116424-25; Ex. 20, 13610-11; Ex. 21, 72920-31; Ex. 22, 1541-51; Defs. Br. at 7-8. Blue Flame's suppliers represented they had access to the masks and could perform. Ex. 20, 13611; Ex. 72, 116661.

### B.     Blue Flame Did Not "Fraudulently Induce" Chain Bridge to Open Its Account and Chain Bridge Kept the Account Open After Blue Flame Disclosed All Relevant Details Concerning the Transaction.

11.      Gula did not "falsely report" information to Chain Bridge when opening Blue Flame's account. Defs. Br. at 8. The morning of March 25, Gula was asked to come to the bank to fill out paperwork to open the account. Ex. 97, 140:19-141:3. While there, Gula estimated Blue Flame's expected average monthly wire activity on an annualized basis. Ex. 97, 142:12-144:4. Defendants have not produced the form that Gula filled out, but have represented that he estimated a total of $125 million in monthly wire activity for the account, or $1.5 billion annually. *Id.*; Ex. 98, 1202-03. The same morning, Gula corresponded with Maria Cole regarding Blue Flame's need for wire instructions to receive funds from California. Gula asked to be immediately notified once the wire was received and informed Cole that Blue Flame would send and receive payments the same day. *See* Ex. 24, 1781-82; Ex. 25, 1514. Gula placed several calls to Chain Bridge to discuss the Wire Transfer between 2:35 PM and 3:27 PM ET. SUF ¶ 11; *see also* Ex. 1, 100:10-104:3; Ex. 2, 187:1-190:19; Ex. 99, 206224. In the midst of those discussions, Cole provided wire instructions

and a verification letter for the account. ECF No. 130-34.

12.     During his 3:27 PM ET call to the bank Gula spoke with Heather Schoeppe. Ex. 100 (audio).  Gula explained the size, source, and purpose of the Wire Transfer and requested to be notified as soon as it was received. At 4:12 PM ET, Gula also confirmed the size of the Wire Transfer with Cole via email. SUF ¶ 12; Ex. 27, 3573; Ex. 1, 172:11-174:16.

13.     At 4:15 PM ET, Schoeppe called Gula back to further discuss the Wire Transfer. Gula explained that California was purchasing 100 million N95 masks from Blue Flame, that Blue Flame would be buying the masks from its suppliers in China, and that Blue Flame anticipated keeping its profit in the account. SUF ¶ 13; Ex. 26, 155:4-157:7; Ex. 28 (audio), 0:00-1:02; Ex. 29, 854-56. Schoeppe asked Gula how quickly Blue Flame planned to wire the funds out; Gula initially responded that he "would probably say within the next couple days," but then said that he was not certain and would "have a better answer for you tomorrow." Ex. 28 (audio), 0:50-1:25.

Schoeppe then discussed Gula's call with others at Chain Bridge. First, she spoke to Chain Bridge's Chief Financial Officer, who raised concerns about the impact of the Wire Transfer on the bank's capital ratios and balance sheet. *See* Ex. 30 (audio), 1:56-2:30; Ex. 31, 20:16-21:13. Then Schoeppe spoke to Brough and Evinger, who stated that (i) if Chain Bridge received the wire, it "can't hold that money on our balance sheet," (ii) Blue Flame's profit would be $100 million "or something stupid like that," and (iii) they would notify the bank's Chairman and call Gula to discuss the transaction with him further. Ex. 32 (audio), 3:07-3:20, 9:29-9:45, 12:37-12:43, 13:17-13:36.

14.     Evinger and Brough then called Gula and discussed the relevant details concerning the California transaction, Blue Flame's business, Gula's career transition, and Blue Flame's need to pay its suppliers with the funds being wired by California. *See* ECF No. 128 ("Blue Flame's

Motion") at 6-7. Gula did not call the California transaction his "payday" or indicate he would be "unreachable" to Chain Bridge; conversely, he indicated only that he intended to focus entirely on Blue Flame's business going forward. Ex. 97, 189:1-190:5. Gula told Brough and Evinger that he would provide any additional information concerning the transaction that they required, and Brough and Evinger requested information related to Blue Flame's contracts. Ex. 1, 193:5-196:1; Ex. 84, 137279-80; Ex. 37, 13446.

15.     Evinger and Brough informed Gula during the call that the Wire Transfer's size would pose operational challenges for Chain Bridge, but that the bank was able to handle it. *See* Ex. 35, 244:8-245:5; Ex. 84, 137279-80.   After the call, Evinger and Brough instructed Chain Bridge employees to prepare "ICS documents" because "[i]n the event we do receive the cash, there is no way we can hold it on our balance sheet." ECF No. 130-46, 767. Chain Bridge personnel later determined that the limit of the ICS program that they intended to use to keep the funds off the bank's balance sheet was less than one-third the size of the Wire Transfer. *See* Ex. 59, 662-63.

16.     After exchanging several emails with Gula as to whether the Wire Transfer had been received, Evinger emailed Gula again, asking "[j]ust one question. Did you send any money to China or others as a 'fee' for these transactions?" Ex. 37, 13445. Gula immediately responded, "[N]o, we have not sent the money to China but when we do this is where we are sending it. [P]lease let me know if you have any questions." *Id.* Gula attached wire instructions for GHC identifying the U.S. bank account of its California-based affiliate. *Id.*, 13448; Ex. 95, ¶ 28. Shortly thereafter, Gula forwarded to Evinger and Brough a message from a DGS official to Thomas confirming that California would be paying Blue Flame the next morning. Ex. 38, 2699-700. The morning of the 26th, Gula continued to send Evinger and Brough information concerning Blue Flame's business. Ex. 101, 2686; Ex. 102, 228:4-239:18. Defendants did not respond, did not

indicate they were unwilling or unable to handle the Wire Transfer or release the funds to Blue

Flame, and did not take any action to close or suspend Blue Flame's account despite their full

knowledge of all of the facts they now call "red flags."[5]

C.   **Defendants Induced the Reversal of the Wire Transfer Without Authorization or Justification.**

19.   The purported "indicia of 'potentially suspicious activity' associated with the wire

transfer" identified by Defendants (*see* Defs. Br. at 11) were either fully disclosed by Gula to

Defendants in advance of the transaction or are simply false. Defendants plainly knew about Blue

Flame's date of formation and the age of the account. Ex. 103, 2563 & 2571. Gula discussed his

career transition with Brough and Evinger and the fact that Blue Flame was expecting a larger wire

than the estimated wire activity figures written on the bank's form earlier that day. *See, e.g.*, Blue

Flame's Motion at 6-7. While Defendants evidently wished to receive additional documentation

from Gula, they never indicated that any further information was required despite Gula's questions.

Blue Flame could and would have provided the information if asked. *See, e.g.*, Ex. 1, 103:16-

104:3. In any event, there is no dispute that Defendants, after cutting off all communication with

Blue Flame (Ex. 61, 748), received "validat[ion of] the transaction with California" (Defs. Br. at

11) directly from multiple California officials. Ex. 51; Ex. 35, 144:14-145:11, 282:19-283:8; Ex.

33, 225:19-226:17, 249:22-251:19. Furthermore, Defendants falsely assert that Blue Flame

"planned to funnel large amounts to operators in…[a] high-risk jurisdiction (China)." Defs. Br. at

11. All of Blue Flame's intended payments were to domestic accounts, as Gula represented. *See,*

*e.g.*, Ex. 97, 190:20-191:11; Ex. 37, 13445; Ex. 57, 116678; Ex. 49, 19-20. Finally, the outgoing

---

[5] None of Defendants' actions are consistent with Brough's unsupported assertion that Chain
Bridge would not have opened Blue Flame's account had it known about Blue Flame's expected
receipt of a $456 million wire transfer or its plans to import and sell PPE. *See* ECF No. 130-33,
¶ 5. Defendants learned those facts the day the account was opened. Blue Flame's Motion, at 6-7.

wire instructions Blue Flame provided were consistent with Gula's statements regarding how Blue Flame would pay its suppliers. Ex. 57, 116678; ECF No. 130-42, 137279. If Defendants actually were concerned by any of these facts, they could have followed up with their customer in accordance with standard banking practices. *See* Ex. 104, 12-13.

20.     After Chain Bridge accepted the Wire Transfer and credited Blue Flame's account, Cole confirmed to Thomas that Blue Flame could send an outgoing wire to Suuchi but would need to provide wire instructions; Blue Flame immediately sent them. *See* Ex. 48, 2673; Ex. 53, 4437; Ex. 2, 190:7-19, 225:4-227:13; Ex. 54, 1725; Ex. 55, 971; Ex. 56, 1385; Ex. 57, 116678. At that point, Brough directed bank personnel not to contact Blue Flame, despite the bank's purported desire for more information from Blue Flame. Ex. 61, 748. Chain Bridge then placed a "hold" on the funds in Blue Flame's account. *See* Ex. 60, 4468; SUF ¶ 18.

21.     Tim Coffey of JPMC called Chain Bridge at 12:30 PM ET to seek "confirmation that Chain Bridge would hold the funds pending further investigation." Defs. Br. at 12. However, according to Coffey, Evinger responded that Chain Bridge had already placed a hold on the funds and falsely stated that Chain Bridge had not credited Blue Flame's account. Ex. 62, 4333-35; Ex. 63, 64:19-66:7; Ex. 44, 63:15-64:2, 71:22-72:8, 138:21-139:14. That statement was significant since JPMC believed (mistakenly) that the funds could be returned without Blue Flame's authorization as long as they had not been credited to Blue Flame's account. Ex. 44, 38:14-40:2.

23.     At 12:51 PM ET, Fee Chang, Chief Accounting Officer of DGS, returned a call from Evinger questioning the legitimacy of DGS's Wire Transfer. Chang confirmed in a voicemail that it was "a legitimate transfer," but said she needed to speak with Evinger to verify whether the amount was $450 million (as Evinger had evidently stated) or $456,888,600. Ex. 65 (audio).

24.     At 12:55 PM ET, Brough and Evinger called Chang back because they "wanted to

speak with her directly" and partially recorded the conversation. Ex. 33, 248:2-249:11; Ex. 51 (audio). Chang again confirmed "it is a good transfer." Ex. 51 (audio). In response, Evinger said "that would be helpful if there is documentation to support it, it's obviously a sizeable amount, and we're just making sure funds were transferred properly." *Id.* Chang responded that Natalie Gonzales in the State Treasurer's Office ("STO") transferred the funds, and asked Evinger, "do you need any information from us, or you need to reach out to our [STO]?" *Id.* Despite DGS's repeated confirmation of the legitimacy of the transfer DGS had sent Blue Flame, Evinger responded that it "would be helpful to talk directly to your treasurer's office, yes."[6] *Id.*

25.     At 1:19 PM ET, Gonzales and another STO official called Evinger and Brough at Chang's request. *See* Ex. 62, 4333-35. During that call, the STO officials confirmed the Wire Transfer was authorized, Blue Flame was the intended beneficiary, and the purpose was to purchase N95 masks. Ex. 35, 144:14-145:11, 282:19-283:8; Ex. 33, 225:19-226:17, 249:22-251:19. Rather than request supporting documentation or ask a single question, Defendants told the STO officials Blue Flame's account had been opened the day before by "lobbyists" and offered to return California's payment. Ex. 42, 127:4-130:5, 132:6-18; Ex. 67, 4466. However, the STO officials "did not want [Chain Bridge] to return the money at that stage." Ex. 102, 255:17-256:2. The STO officials asked if the funds had been credited to Blue Flame's account; Evinger again responded falsely that they had not. Ex. 42, 83:7-84:12, 91:1-92:5, 131:9-16.

26.     At 1:34 PM ET, Rakesh Korpal of JPMC called back Evinger and Brough and said that the California representatives JPMC had spoken to were "a bit unsure." Ex. 68 (audio), 0:00-

---

[6] Defendants' desire to speak with STO despite DGS's confirmation of the Wire Transfer's legitimacy is noteworthy since JPMC's payment order stated "BY ORDER OF DEPARTMENT OF GENERAL SERVICES." Ex. 46, 2649. Defendants recognized that DGS was Blue Flame's counterparty, and thus the California agency from whom to seek confirmation; all of their outgoing calls to California were to DGS officials. Ex. 62, 4334.

0:03. Evinger then asked that JPMC "issue a recall for the wire, so that while you intervene in this, you have the funds and feel more comfortable"; Korpal responded "I feel comfortable that you're holding the money right now. I can issue a recall, but I don't think you or I want to get onto the front page of the *Wall St. Journal*, especially if this is a legitimate transaction." *Id.*, 0:03-0:28.

27.    Due to Defendants' request that JPMC recall the funds and Defendants' false representations that Blue Flame's account had not been credited, Korpal directed Coffey to request a recall of the funds. *See* Ex. 44, 38:14-40:9, 62:8-64:2, 79:14-19; *see also* Ex. 63, 154:18-157:12. Coffey informed Defendants at 1:37 PM ET that JPMC would be issuing a recall. Defs. Br. at 13.

28.    According to Defendants' records, at 1:45 PM ET, not 2:05 PM ET as Defendants state (*see* Defs. Br. at 13), JPMC sent a Fedwire service message to Chain Bridge requesting the return of the funds. Ex. 70, 2651-52. At 1:54 PM ET, Brough emailed a group of senior Chain Bridge personnel with the subject, "Wire is being returned," stating: "We have received a recall notice from JPMorgan to return the wire. I will let Mike Gula know." Ex. 105, 599.

29.    As a direct result of their call with Brough and Evinger, STO officials informed JPMC at that they were not comfortable with the diligence completed on Blue Flame and that they wished to recall the funds. Ex. 106, 21:8-22:17.

30.    At 1:56 PM ET, after Defendants had refused to answer Blue Flame's calls, caused the funds to disappear from Blue Flame's online account view, and campaigned to cause both JPMC and California to request that the funds be returned, they broke their silence to inform Gula that "[w]e received official notice from the sending bank to return the wire" and to "resolve directly with the state of California." Ex. 71, 74101. Gula then went to the bank to try to speak with Brough and Evinger. Ex. 97, 205:22-206:12. Brough and Evinger met Gula outside the bank and refused to answer his questions or provide an explanation as to what changed since their conversation the

previous day in which they said they were comfortable with the Wire Transfer; instead, they responded that Chain Bridge "wouldn't be receiving the transaction" and wanted to close Blue Flame's account. *Id.*, 206:15-207:15. Contrary to Defendants' statement that Gula "apologized for the transaction and did not object to the return of the funds to JPMorgan" (*see* Defs. Br. at 14), Gula had no way of knowing that Chain Bridge had not yet completed its planned return of the funds, as Defendants did not mention that fact. Ex. 1, 207:21-209:12. After all, the wired funds were no longer visible in Blue Flame's account and Defendants already had informed Gula that they were closing Blue Flame's account. *Id.*, 206:9-209:12.

31.     According to Defendants' records, at approximately 2:59 PM ET, Chain Bridge processed a new payment order on Blue Flame's behalf, without its consent, to return the funds in its account to JPMC. Ex. 75, 2653-54. That action was taken at the direction of Brough, who instructed the Operations personnel who signed the payment order (and who asked whether JPMC would provide an indemnity letter "because we credited the customer's account") that he and Evinger had "been working on this with both the State of California and JPMorgan, and this is what we have to do." Ex. 69 (audio), 1:17-1:25, 2:15-2:49. That unauthorized return of funds was completed at 3:21 PM ET. Ex. 74, 2781.

### D.     California Refuses to Move Forward with Blue Flame due to Defendants' Actions and Blue Flame's Ability to Fill Other Orders is Impacted.

32.     After the funds were returned, DGS's Deputy Director for Administration, Andrew Sturmfels, announced that DGS would not move forward with Blue Flame. Ex. 76, 0221; Ex. 77, 0131-32.

33.     Blue Flame nevertheless sought to find a path forward for a transaction with California, without success. Rather than engage in good faith discussions, Wong, the DGS official with whom Thomas had negotiated, falsely claimed that he had only ever sought to purchase 3M-

brand masks from Blue Flame—despite Wong himself identifying the four non-3M brand mask models California agreed to purchase—and immediately forwarded his communications with Blue Flame to the FBI.  Ex. 10, DGS5563; Ex. 107, 109726-29; Ex. 108, 6820-21; Ex. 109, 7257; Ex. 110, 7293. DGS Director Daniel Kim had no contact with Blue Flame after March 27 (Ex. 92, 133:17-21, 135:10-20) and was not aware of Wong's communications with Blue Flame in April 2020 (Ex. 92, 143:18-144:6). *See also* Ex. 92, 129:15-133:21.

34.    Due to the extreme damage to Blue Flame's supplier relationships and the deprivation of working capital caused by Defendants' actions, Blue Flame encountered difficulty filling numerous other orders for other customers, including for N95 masks. Ex. 86, 119:22-120:9, 125:15-127:8, 203:12-204:2, 206:19-22, 259:18-260:19.  Nevertheless, it did deliver numerous PPE orders, including 1.55 million N95 masks for the State of Maryland and 100,000 N95 masks for the City of Chicago. Ex. 111, 207341; Ex. 112, Schedule A at 5.

## ARGUMENT

## I.   BLUE FLAME CAN ESTABLISH DAMAGES FOR ALL CLAIMS.

Defendants claim that they are entitled to summary judgment because Blue Flame cannot establish damages. Defs. Br. at 22-27, 30. Defendants are wrong, and the amount of Blue Flame's damages plainly raises disputed issues of fact inappropriate for summary judgment.

First, Defendants argue that because California decided not to re-send its prepayment, and because California theoretically could have terminated the contract, they somehow are relieved from liability for damages. Defs. Br. at 22-24. But that argument omits Defendants' essential role in causing California not to proceed with the transaction. The very fact that California sent prepayment in the first place—before Defendants interfered—demonstrates conclusively that California had agreed to proceed with the transaction. Furthermore, the undisputed evidence shows that, had Chain Bridge complied with its obligations under Article 4A, Blue Flame would have

used California's prepayment to pay suppliers of the masks for California's order. Ex. 26, 155:4-157:7; Ex. 40 (audio), 2:37-2:49, 3:52-4:47; Ex. 57, 116678. Given the difficulty of sourcing N95 masks at that time, California would not have sought to terminate the transaction while Blue Flame was in the midst of performance. Moreover, no California witness testified that the State would have terminated the transaction if it had known in advance the facts Defendants improperly reported to the STO. The absence of such testimony alone forecloses summary judgment against Blue Flame on the basis of Defendants' unsubstantiated theory that California would have terminated the contract regardless of their actions.

Second, Defendants assert that "there is no record evidence that Blue Flame would have successfully fulfilled California's order." Defs. Br. at 24. To the contrary, there is ample evidence of Blue Flame's capacity to fulfill California's order and of Blue Flame's ability to prove its damages.[7] Blue Flame had signed and executed agreements in place with two suppliers, confirming its ability to supply the N95 masks. Ex. 19, 116424-25; Ex. 20, 13610-11; Ex. 21, 72920-31; Ex. 22, 1541-51. Moreover, Blue Flame had received confirmation from Henry Huang, the CEO of its primary supplier, that GHC would be able to deliver 100 million masks to California within 30 days, provided prepayment was made. Ex. 15, 212725-26; Ex. 2, 201:3-202:5. As Huang has confirmed, GHC had the capacity to supply the 100 million masks California purchased. Ex. 95, ¶¶ 22-23; 29-30; 32-37.[8]

---

[7] Defendants' reliance on the Faulker expert report to introduce otherwise inadmissible hearsay is procedurally improper. Even if it were not, the Faulker expert report merely creates a "battle of the experts" (*see generally,* Ex. 117), which cannot be resolved on summary judgment (*see Reyazuddin v. Montgomery Cnty.*, 789 F.3d 407, 417 (4th Cir. 2015)).

[8] Huang also has confirmed his understanding that Chinese regulatory restrictions and inspection requirements imposed on certain PPE at times in April 2020 would not have prevented Blue Flame or GHC from delivering the masks. Ex. 95, ¶¶ 37-40.

Third and finally, Defendants posit that Blue Flame cannot recover consequential damages for the other transactions Defendants prevented because Chain Bridge was unaware of the contracts from which these damages flow and because there is no evidence these transactions would have occurred but for the return of the Wire Transfer. Defs. Br. at 26-27. Defendants' argument fails because Blue Flame advised them that the California transaction was critical and that its successful completion would allow Blue Flame to fill other PPE orders. Ex. 40 (audio), 2:37-2:49, 3:52-4:47; *see also* Ex. 67, 4463; Ex. 1, 193:5-17. Furthermore, they were aware that Gula had changed careers and was focused entirely on Blue Flame's business, which Gula had estimated would be sending and receiving $1.5 billion in wire transfers annually. Ex. 97, 142:12-144:4; Ex. 1, 193:5-194:1; Ex. 113, 202815; Ex. 98, 1202-03. Defendants also argue that "there is no evidence that any of these unrelated transactions would have been completed but for the return of California's wire transfer." Defs. Br. at 27. To the contrary, the evidence shows that Blue Flame's inability to fill these orders was a proximate result of Defendants' conduct, which robbed Blue Flame of the capital it would have used to finance these orders. Ex. 40 (audio), 2:37-2:49, 3:52-4:47; *see also* Ex. 67, 4463; Ex. 1, 193:5-17; ECF No. 130-41, 4454.

At most, Defendants' protestations indicate that there exist material issues of disputed fact as to Blue Flame's damages, any of which would preclude summary judgment.

## II.   CHAIN BRIDGE IS NOT ENTITLED TO SUMMARY JUDGMENT ON BLUE FLAME'S CLAIMS UNDER UCC ARTICLE 4A.

Defendants argue that Chain Bridge is not liable under Section 4A-404(a) of the Uniform Commercial Code, as incorporated by Federal Reserve Board Regulation J, because the payment order accepted from JPMC was canceled. That argument is foreclosed by the facts and the law. As explained in Blue Flame's Motion, a payment order accepted by a beneficiary's bank cannot be canceled except in four narrow circumstances not present here. Defendants' argument that one of

those circumstances was present is directly contradicted by the official UCC commentary, case law, and logic. Defendants' inapposite defenses premised on the Bank Secrecy Act and UCC Section 1-304 fail as a matter of law and, in any event, would be insufficient to support summary judgment because they rely on assertions contradicted by the facts. Defendants' motion also fails as to Blue Flame's Section 4A-204 claim because Chain Bridge accepted a payment order in the name of Blue Flame as sender when it returned the money California had wired to Blue Flame. Chain Bridge's argument to the contrary is directly contradicted by the plain text of Article 4A.

A.   **Blue Flame Was Entitled to Receive Payment from California.**

Defendants ignore the most relevant authorities in arguing that California's payment order was a "mistake" permitting cancellation after acceptance "because [Blue Flame] had procured the California order through a combination of misrepresentations and concealment of material facts." Defs. Br. at 18.[9] Even if the California order had been procured through fraud—and it was not— Chain Bridge's argument would fail because fraud is not a "mistake" under the UCC commentary, case law, and standard principles of statutory interpretation. Because none of the mistakes listed in Section 211(c)(2) was present when Chain Bridge reversed the Wire Transfer, Defendants' motion as to Blue Flame's Section 4A-404(a) claim should be denied.

A mistake within the meaning of UCC Section 211(c)(2) does not occur where payment is made to a beneficiary that the originator intended to pay. The commentary to Section 4A-211

---

[9] Defendants suggest two cases show that any return of wired funds necessarily constitutes a valid cancellation. *See* Defendants' Motion, 17 n.6. The cited cases expressly contradict any such notion. *See Cumis Ins. Soc., Inc. v. Citibank, N.A.*, 921 F. Supp. 1100, 1105 (S.D.N.Y. 1996) (quoting UCC § 4A-211, cmt. 5) ("if the receiving bank has incurred liability as a result of its acceptance of the sender's order, there are substantial risks in agreeing to cancellation or amendment"); *Banca Commerciale Italiana, N.Y. Branch v. N. Tr. Int'l Banking Corp.*, 160 F.3d 90, 92 (2d Cir. 1998) (beneficiary's bank reversed wire transfer upon originator's bank's request without beneficiary's consent; due to lack of beneficiary's consent, beneficiary's bank refunded beneficiary for entire amount of wire transfer and then brought action against originator's bank).

explains that the second category of mistake permitting cancellation—where payment is ordered

"to a beneficiary not entitled to receive payment from the originator"—refers to a payment order

that mistakenly identifies a beneficiary different from the one the originator intended to pay. UCC

§ 4A-203, cmt. 4, "*Case #3*."[10] In *CFTC v. Rust Rare Coin Inc.*, 469 F. Supp. 3d 1211 (D. Utah

2020), the court found that "[t]he official comments to the UCC clearly explain that 'not entitled,'

in this context, refers to a mistaken identity." *Id.* at 1218.[11] Because the originator "never suggested

that he intended to send the funds to someone other than" the beneficiary, the "not entitled to

receive payment" provision did not apply, and therefore any attempted cancellation would not

have been effective. *Id.* at 1218-19. In so holding, the court explicitly rejected the argument

Defendants assert (without support): that a wire transfer procured by the beneficiary's fraud is a

"mistake."[12] *Id.* It explained:

---

[10] Defendants' argument that this comment "merely treats a case of mistaken identity as an example of the sort of mistake encompassed by Section 4A-211(c)(2)(ii)" (Defs. Br. at 17 n. 7), is directly at odds with their interpretation of Section 4A-211(f) in their brief seeking summary judgment against JPMC. There, Defendants argue that indemnification under Section 4A-211(f) is not susceptible to "the sort of elaborate inquiry into the parties' subjective motivations that JPMorgan proposes here" (ECF No. 123 (Defendants' Indemnification Brief") at 20), and they are correct. *Cf. First Sec. Bank of N.M., N.A. v. Pan Am. Bank*, 215 F.3d 1147, 1152 (10th Cir. 2000) (citations omitted) ("Article 4A was crafted with the express purpose of creating—in an age of increasing automation—inflexible rules of liability for wire transfer disputes…. Such bright-line rules are necessary so that parties to the millions of annual wire transfers may predict risk with certainty,…insure against risk,…adjust operational and security procedures, and…price funds transfer services appropriately."). But here, Defendants contend that a bank's *perceptions* of *its customer's subjective motivations* constitute a valid basis for cancellation. Such divergent interpretations of two provisions of Section 4A-211 cannot be reconciled.

[11] Because all 50 states and the District of Columbia have adopted UCC Article 4A (*Receivers of Sabena SA v. Deutsche Bank A.G.*, 142 A.D.3d 242, 251 (N.Y. App. Div. 2016)), "decisions from other jurisdictions interpreting th[e] same uniform statute are instructive" (*In re Pillowtex, Inc.*, 349 F.3d 711, 718 n. 8 (3d Cir. 2003)).

[12] Defendants cite two cases for the proposition that "[f]raud in the inducement renders any contract voidable at the instance of the defrauded party." Defs. Br. at 18. The cases cited for that irrelevant rule of law do not concern wire transfers or mention Article 4A, and thus offer no support to Defendants' erroneous interpretation of "mistake" in Section 4A-211(c)(2). *See Saunders v. Gen. Servs. Corp.*, 659 F. Supp. 1042, 1057 (E.D. Va. 1987); *Devine v. Buki*, 767 S.E.2d 459, 466

> [The originator] cites no authority interpreting "mistake," as that term is used in § [4A-211(c)(2)], to mean a decision made because of another's fraud. Simply put, [the originator] did not make a mistake here. He intentionally and knowingly chose to transfer $1.6 million into the account of [the beneficiary]. The amount was correct and the recipient was correct. Accordingly, [the beneficiary's bank] had no discretion to cancel the transfer and return the funds to [the originator].

*Id.* at 1219. The district court's analysis of that argument is equally applicable in this case.[13]

Moreover, the commentary to Section 4A-404(a) states that a "reasonable doubt concerning *the right of the beneficiary to payment*" does *not* exist where an originator alleges "that the beneficiary is not entitled to payment because of fraud against the originator or a breach of contract relating to the obligation." UCC § 4A-404, cmt. 3 (emphasis added). Defendants' interpretation of Section 4A-211(c)(2) would render that comment meaningless because a bank that wanted to deny payment to the beneficiary on the basis of purported fraud suspicions could do so simply by canceling the payment order.[14]

### B.   Declining to Act on JPMC's Cancellation Message Would Not Have Put Chain Bridge in "Regulatory Jeopardy."

Defendants assert that the Wire Transfer involved many of the "potentially suspicious activities" identified in the Federal Financial Institutions Examination Council's Bank Secrecy

---

(Va. 2015). The rule of law recited by Defendants is irrelevant because a voidable contract remains in force until the defrauded party disaffirms it. *See* Restatement (Second) of Contracts §§ 164, 380-83 (1981). California did not disaffirm its contract with Blue Flame prior to Chain Bridge's unauthorized return of the funds to California (or after).

[13] Courts also have rejected an alternative version of Defendants' argument: that the alleged fraudulent inducement of a wire transfer means that the transfer is unauthorized. *See, e.g.*, *Blum v. Citibank, NA*, 81 N.Y.S.3d 51, 52 (N.Y. App. Div. 2018).

[14] Both the beneficiary bank's obligation to pay the beneficiary under Section 4A-404(a) and the limitations on cancellation imposed by Section 4A-211(c)(2) are triggered by acceptance of the payment order. As such, in all cases the beneficiary's bank will make the decision whether to cancel the payment order after the bank has become obligated to pay the beneficiary—regardless of any fraud suspicions, as the above comment to Section 4A-404(a) makes clear.

Act/Anti-Money Laundering Manual ("BSA Manual"),[15] and then leap to the conclusion that complying with Article 4A in this instance would have exposed Chain Bridge to potential civil and criminal liability. *See* Defs. Br. at 19-20. That argument is meritless because, as explained in Blue Flame's Motion, the Bank Secrecy Act ("BSA") and its implementing regulations in no way address when a wire transfer may be canceled, let alone provide an exception to or exemption from Article 4A. *See* Blue Flame's Motion at 25. If Defendants had any support for the proposition that Article 4A's bright-line rules regarding cancellation are overruled by the BSA's silence on the subject, they would have discussed it in their motion.

The official UCC commentary to Article 4A anticipates and explicitly rejects the type of argument Defendants here assert:

> The rules that emerged [from the Article 4A drafting process] represent a careful and delicate balancing of [the interests of banks, commercial and financial organizations, and the public] and are intended to be the *exclusive means* of determining the rights, duties and liabilities of the affected parties in any situation covered by particular provisions of the Article. Consequently, *resort to principles of law or equity outside of Article 4A is not appropriate to create rights, duties and liabilities inconsistent with those stated in this Article.*

UCC § 4A-102, cmt. (emphasis added). Section 4A-211 says that a payment order accepted by the beneficiary's bank can be canceled only in four narrow circumstances. UCC § 4A-211(c). Defendants argue, without authority, that the BSA allows the beneficiary's bank to cancel an accepted payment order outside of those four narrow circumstances, and also that it effectively requires cancellation under these circumstances. Because Defendants' BSA/AML defense would

---

[15] That same manual references Article 4A's rules concerning the finality of Fedwire funds transfers: "Payment over Fedwire is final and irrevocable when the Federal Reserve Bank either credits the amount of the payment order to the receiving bank's Federal Reserve Bank master account or sends notice to the receiving bank, whichever is earlier." Bank Secrecy Act/Anti-Money Laundering Examination Manual, Federal Financial Institutions Examination Council, at 208 (2014), https://bsaaml.ffiec.gov/manual.

create rights, duties, and liabilities that run directly counter to those in Article 4A, it fails as a matter of law. *See Ma v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 597 F.3d 84, 89 (2d Cir. 2010) (quoting N.Y. UCC § 4-A-102 cmt.).

Accordingly, courts consistently hold that banks are obliged to pay beneficiaries under Section 4A-404(a) despite allegations or concerns that the beneficiary is engaged in fraud. In *Regions Bank v. Provident Bank, Inc.*, 345 F.3d 1267 (11th Cir. 2003), cited by Defendants (Defs. Br. at 21), the Eleventh Circuit found that certain "red flags" suggesting fraud by the beneficiary—including a phone call notifying the beneficiary's bank that the wires were potentially fraudulent and the bank's knowledge that *the FBI was investigating the beneficiary for fraud*—were "insufficient as a matter of law" to impose liability under Ohio state law on the beneficiary's bank for making payment to the beneficiary. *Id.* at 1277-78. The alleged "red flags" here are far less clear-cut, and Defendants have identified no law that would hold them liable for satisfying their obligation to make payment to Blue Flame.[16]

Even if Defendants' BSA/AML defense did not fail as a matter of law, it is insufficient to grant summary judgment because it rests on pure speculation. Defendants cannot predict how regulators would have reacted had Chain Bridge complied with its Article 4A obligations, and they certainly cannot make such predictions as a matter of undisputed fact. *See* Ex. 104, 8-9. Moreover, Defendants' recitation of generic "red flags" (Defs. Br. at 19) fails to mention the uncontested facts known to Defendants that addressed such concerns—in particular, the fact that Gula himself

---

[16] *See Zeal Glob. Servs. Priv. Ltd. v. SunTrust Bank*, No. 1:20-cv-00908, 2020 WL 7480345, at *6 (N.D. Ga. Dec. 18, 2020) (finding beneficiary bank's receipt of notification that wire transfers at issue were fraudulently induced was insufficient to hold bank liable for paying beneficiary); *see also Go-Best Assets Ltd. v. Citizens Bank of Mass.*, 972 N.E.2d 426, 433 n. 6 (Mass. 2012) ("The [beneficiary] bank's duty to pay the wired funds to [the beneficiary's] account supersedes any common-law duty the bank may owe to those whose funds are at risk of misappropriation."); *AG4 Holding, LLC v. Regency Title & Escrow Servs., Inc.*, 98 Va. Cir. 89 (2018).

disclosed most of the facts Defendants now call "red flags." Defendants' BSA/AML defense treats Blue Flame's express notice to its bank as evidence that Blue Flame was engaged in fraud, which is nonsense—criminals do not alert their bank that they are about to commit a crime.

Moreover, even if Defendants for some reason chose not to believe Gula or the California and JPMC representatives who confirmed the transaction's legitimacy, they had options that would have allowed them to prevent Blue Flame from wiring out the funds without violating Article 4A. For one, they could have closed Blue Flame's account at any point before Chain Bridge received the Wire Transfer. Ex. 81, 2769 ("We may also close this account at any time…."). [17] Even after Chain Bridge accepted the Wire Transfer, it could have continued to "hold" the funds (*see* Blue Flame's Motion at 26) or refused to execute Blue Flame's requested outgoing wires while conducting additional due diligence. [18] Tellingly, those options would not have resolved the concerns of Chain Bridge's senior officers and Chairman regarding the impact of the wire on the bank's balance sheet. [19] As a result, the BSA provides no defense for Defendants' illegal actions.

### C.    Blue Flame Acted in Good Faith with Both Chain Bridge and California.

---

[17] The undisputed facts reveal that Defendants did not take that course of action because they did not believe the transaction would happen at all. Ex. 39, 761; Ex. 114, 2725. Defendants' unjustifiable refusal to take Gula at his word does not insulate them from liability for Blue Flame's damages.

[18] "A receiving bank," which Chain Bridge was with respect to Blue Flame's payment orders for outgoing wires, "has no duty to accept a payment order unless the bank makes an agreement…to accept it…." UCC § 4A-209, cmt. 3.

[19] Incredibly, despite the overwhelming evidence of concern by Chain Bridge senior officers regarding the wire's impact on the bank's balance sheet, Defendants argue that "[d]iscovery has conclusively refuted" that Defendants were motivated in any way by those concerns. *See* Defs. Br. at 20, n.9. Not so. There is significant evidence to the contrary indicating that balance sheet concerns were the driving force behind Chain Bridge's highly unusual actions. *See, e.g.*, Ex. 115, 780 ("Anything of that size would need to be known on the front end because that's half our asset size and could be problems [*sic*] on our capital ratios."); Ex. 102, 160:2-12 (admitting that the Wire Transfer "would have had a slight decline to our leverage ratio"); Ex. 116, 50:6-14; 90:14-91:5; 107:2-10 (Brough admitting that the Wire Transfer would negatively impact Chain Bridge's leverage ratio); Ex. 31, 20:10-21:13 (Chain Bridge's capital ratio was set to be recalculated at the end of March 2020).

Finally, Defendants baselessly assert that Blue Flame failed to act in good faith under its contracts with Chain Bridge and California, and that Blue Flame thus cannot enforce rights created by the UCC, including those under Article 4A. *See* Defs. Br. at 21. That defense fails as a matter of law for a number of reasons. Any purported breach of contract by Blue Flame is irrelevant to Chain Bridge's liability under Article 4A because Blue Flame's claims arise from federal law, not its account agreement with Chain Bridge (the "Account Agreement"). Even if an affirmative breach of contract defense could absolve Chain Bridge of such liability, Defendants have not identified a single specific duty or obligation that Blue Flame has failed to perform in good faith under the Account Agreement, nor is there evidence that Blue Flame lacked good faith in its performance of the Account Agreement. In any event, Defendants' unsupported allegation that Blue Flame lacked good faith in its contractual dealings with California is irrelevant because Chain Bridge was not a party to Blue Flame's contract with California, and thus has no right to enforce that contract. Even if Defendants could assert California's contractual rights, the undisputed evidence proves that Blue Flame procured California's order in good faith.

Defendants' argument under UCC Section 1-304 appears to be an affirmative defense in the form of a breach of contract claim against Blue Flame. *See* UCC § 1-304, cmt. 1 ("this section means that a failure to perform or enforce, in good faith, a…contract, constitutes a breach of that contract"); *Emergency One v. Am. Fire Eagle Engine Co.*, 332 F.3d 264, 271 (4th Cir. 2003) (citation omitted) ("An affirmative defense is the defendant's assertion raising new facts and arguments that, if true, will defeat the plaintiff's…claim, even if all allegations in the complaint are true."). However, Defendants cite no authority for the proposition that a plaintiff's breach of

contract is a valid defense against claims created by federal law rather than contract.[20] Thus, Defendants' Section 1-304 defense is ill-founded.

Even if Section 1-304 did provide a valid defense, it would fail as a matter of law because Chain Bridge cannot state a claim for breach of the contractual duty of good faith against Blue Flame. Section 1-304 "does not create a separate duty of fairness and reasonableness which can be independently breached." UCC § 1-304, cmt. 1. To sustain an affirmative defense under Section 1-304, Defendants therefore must prove that Blue Flame failed to "perform or enforce, in good faith, a specific duty or obligation under the contract." *Id.*; *Girgis v. Salient Solutions, Inc.*, No. 1:11-cv-1287, 2012 WL 2792157, at *17 (E.D. Va. July 9, 2012) (citation omitted) ("[T]o state a claim for a breach of implied covenant of good faith and fair dealings, a plaintiff must allege a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff."). They cannot do so for two independent reasons. First, Defendants do not and cannot point to any specific duty or obligation under the Account Agreement that Blue Flame violated. *See* Defs. Br. at 21-22. Second, Defendants do not allege that Blue Flame lacked good faith in the "performance or enforcement" (*see* UCC § 1-304, cmt. 1), of the Account Agreement (*see* Defs. Br. at 21-22). Rather, they allege that "Blue Flame induced Chain Bridge to do business with it through its bad-faith misrepresentations" *before* the account

---

[20] *Regions Bank v. Provident Bank, Inc.*, cited by Defendants (Defs. Br. at 21), provides no support for that proposition. The statement Defendants quote from that case was made in the context of an analysis of whether a claim under Ohio state law was inconsistent with, and therefore preempted by, Article 4A. 345 F.3d at 1276. That issue is irrelevant to this case, as Blue Flame asserts claims directly under Article 4A. *Regions Bank* does not suggest that a breach of good faith as to some unrelated contract prevents enforcement of federal law claims created by Regulation J. *See* 12 C.F.R. § Pt. 210, Subpt. B, App. A, at Section 210.25—Authority, Purpose, and Scope (emphasis added) ("the purpose of subpart B of [Regulation J] is to provide rules to govern funds transfers through Fedwire and recites the Board's rulemaking authority for this subpart. *Subpart B of this part is federal law* and is not a funds-transfer system rule").

23

agreement was executed. *See* Defs. Br. at 8, 22. Allegations of fraudulent inducement do not state a claim for breach of the contractual duty of good faith because they do not concern the performance or enforcement of the contract. *Synovus Bank v. Tracy*, 603 F. App'x 121, 126 (4th Cir. 2015) (emphasis added) (where defendant asserted that, under UCC Section 1-304, plaintiff-bank could not enforce promissory notes because bank fraudulently induced defendant to execute notes, court affirmed summary judgment against defendant because defendant did not identify "how the Bank acted in bad faith in its *performance and enforcement* of the notes").

In any event, Blue Flame did not fraudulently induce Chain Bridge to open the account. First, any inaccuracy in Gula's estimate of Blue Flame's expected wire activity resulted from his effort to calculate Blue Flame's expected business on an annualized basis and the fact that he did not yet know the exact amount of California's expected wire. Ex. 97, 142:12-144:4; Ex. 113, 202815. Regardless, Gula notified Defendants of the size of the Wire Transfer as soon as possible after he learned of it, mere hours after he had filled out the account opening forms. Material Facts Disputed by the Parties ("MFD"), *supra* § B; Ex. 100 (audio), 0:15-25; Ex. 27, 3573; Ex. 32 (audio), 0:06-45. Shortly after that, Gula fully explained the transaction with California and the impending Wire Transfer on a 19-minute call with Brough and Evinger.[21] *See* Ex. 1, 193:5-196:1.

Defendants' attempt to ground their affirmative defense under Section 1-304 on purported "misrepresentations" Blue Flame made to California fails because any such misrepresentations would give rise to a claim under Blue Flame's contract *with California* that only *California* could

---

[21] If, after this call, Defendants believed that Blue Flame had obtained its account through fraud, they had more than 18 hours during which they could have closed Blue Flame's account and thereby avoided all liability under Article 4A or the Account Agreement. That they chose not to do so confirms that Defendants' argument is spurious (or, at best, a disputed issue of fact).

enforce.[22] *See, e.g., Berclain Am. Latina v. Baan Co.*, 87 Cal. Rptr. 2d 745, 746 (Cal. Ct. App. 1999) (one who is not a party to a contract or an intended third party beneficiary of a contract lacks standing to enforce the contract's terms). Thus, Defendants' unfounded accusation that Blue Flame procured the California contract by fraud is irrelevant to their defense under UCC Section 1-304.[23]

Even if Chain Bridge's legal argument were not fatally flawed, Blue Flame did not fraudulently procure the California order (and Defendants certainly cannot prove otherwise with undisputed clear and convincing evidence). *See Langman v. Alumni Assoc'n of the Univ. of Va.*, 442 S.E.2d 669, 677 (Va. 1994) ("a party alleging fraud has the burden of proving by clear and convincing evidence all the elements of the cause of action"). The purported "misrepresentations and concealment" on which Defendants rely (*see* Defs. Br. at 3-8, 21) fall far short of meeting that high standard, as they were not made to California officials with the authority to contract on behalf of the State, did not induce reliance by California officials, or were not material to California's decision to contract with Blue Flame. MFD § A; *see Caperton v. A.T. Massey Coal Co.*, 740 S.E.2d 1, 9 (Va. 2013) (false representation underlying fraud claim must be material and induce reliance). Ultimately, no California witness has testified that *any* of the so-called "misrepresentations and concealment[s]" would have caused the State to terminate its negotiations or contract with Blue Flame.

### D.    Defendants Are Not Entitled to Summary Judgment on Blue Flame's Section 4A-204(a) Claim.

---

[22] Because the representations at issue were not made to Chain Bridge, they cannot support a claim that Blue Flame breached the Account Agreement. *See* Defs. Br. at 3-8, 21.

[23] Even if Chain Bridge could assert California's contractual rights, Defendants' attempt to rely on representations Blue Flame made to California would fail because the representations were made prior to the execution of the contract with California for the alleged purpose of inducing California to enter into a contract. *See* Defs. Br. at 3-8, 21. As explained above, allegations of fraudulent inducement do not state a claim for breach of the UCC's duty of good faith because they do not concern the performance or enforcement of the contract. *Synovus Bank*, 603 F. App'x at 126.

Defendants argue that Chain Bridge is not liable under UCC Section 4A-204(a) because the bank did not "receive[] a payment order purporting to come from Blue Flame, let alone accept[] such a payment order." Defs. Br. at 27. That argument fails as a matter of law because it misunderstands the term "accept" as Article 4A defines it in the context of an outgoing wire transfer.[24] There is no dispute that Chain Bridge reversed the Wire Transfer by sending—and thereby accepting—a payment order identifying Blue Flame as the "originator" to JPMC.[25] *See* Ex. 75, 2653; ECF No. 123 at 15 (emphasis added) ("Chain Bridge agreed to cancellation of JPMorgan's payment order by returning the funds to JPMorgan, *through a payment order* transmitted via the Fedwire system at 3:21 PM."); ECF No. 123 at 9-10.[26]

## III.   DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON BLUE FLAME'S STATE LAW CLAIMS.

Defendants also move for summary judgment on Blue Flame's causes of action for Defamation (Count IX) and Tortious Interference (Counts IV and V). Defs. Br. at 28-30. However, Defendants fail to establish their entitlement to such relief as a matter of law. At most, Defendants have raised a material dispute of fact requiring resolution at trial.

### A.   Defendants' Arguments for Summary Judgment on Blue Flame's Tortious Interference Claim Fail.

---

[24] The originator's bank accepts a payment order by sending it to another bank. UCC §§ 4A-209(a) ("A receiving bank other than the beneficiary's bank accepts a payment order when it executes the order."), 4A-301(a) ("executes" means "issues"); 4A-103(c) ("issues" means "sends").

[25] Defendants attempt to confuse the issue by stating that JPMC's cancellation request was a Fedwire "nonvalue message (not a payment order)." Defs. Br. at 27. That is irrelevant because JPMC's cancellation request did not return the funds to California.

[26] Defendants also misinterpret a footnote in Blue Flame's Opposition to Defendants' Motion to Dismiss to argue that JPMC's recall request means that they are entitled to summary judgment on the Section 4A-204(a) claim. Defs. Br. at 27-28. However, that footnote states that Chain Bridge would not be liable under Section 204(a) if the bank's mere acceptance of the cancellation request itself effected the return of the funds. ECF No. 27 at 15 n.8. But that is not what happened. Discovery has revealed (and Defendants admit) that the return in fact was effected through a new, unauthorized payment order prepared and accepted by Chain Bridge, and therefore Chain Bridge is liable to refund Blue Flame in the amount of that payment order under Section 4A-204(a).

Defendants are not entitled to summary judgment on Blue Flame's tortious interference claims because a reasonable jury could find that Blue Flame can establish all of their elements, including improper methods. *See Dunlap v. Cottman Transmission Sys., LLC*, 754 S.E.2d 313, 318 (Va. 2014). Defendants argue only that Blue Flame cannot establish the improper methods and intentional interference prongs. Defs. Br. at 29-30.

First, Defendants erroneously claim that they did not induce California to terminate its contract with Blue Flame and that, even if they did, California's right to cancel the contract relieves them of liability.[27] Undisputed evidence proves that Defendants, after receiving repeated confirmations of the transaction's legitimacy from the relevant California agency and JPMC, induced the termination of the contract by reporting their concerns to officials with no involvement in vetting or negotiating with Blue Flame. Defendants' suggestion that California had the right to terminate the agreement is irrelevant and ignores the devastating impact their actions had on California's perception of Blue Flame, as well as the fact that tortious interference may be established by causing a "termination" and not solely a "breach." *See Chaves v. Johnson*, 335 S.E.2d 97, 102 (Va. 1985).[28]

Second, uncontested evidence shows that Defendants did employ improper methods for three independent reasons: (1) their statements were defamatory; (2) they violated standard industry practices; and (3) they violated applicable banking regulations. As discussed below, Defendants' statements were defamatory and not privileged (*see, infra*, Section IV.B), and as such, they constitute "improper methods." *See Duggin v. Adams*, 360 S.E.2d 832, 836 (Va. 1987).

---

[27] Defendants argue only that there is no evidence of intentional interference with Blue Flame's contractual rights. Defendants do not address Blue Flame's claim of tortious interference with Blue Flame's business expectancy. *See* ECF No. 1, ¶¶ 134-42.

[28] For this same reason, Defendants' statement that "Blue Flame thus cannot establish any breach of contract by California" ignores the proper legal standard. Defs. Br. at 30.

Similarly, Defendants deviated from accepted banking practices in their handling of the Wire Transfer, their contacts with California, and their unprompted offers to illegally return funds they had credited to their customer's account.[29] Such violations of the "established standard[s] of a trade or profession" constitute "improper methods." *Id.* at 837.

Finally, Chain Bridge's Article 4A violations, *see supra* Section II, also are "improper methods." *See id.* at 836 (violations of statutes or regulations are improper methods). Defendants' argument to the contrary is mistaken. *See* Defs. Br. at 30. In Defendants' own authority, *Eisenberg v. Wachovia Bank, N.A.*, the Fourth Circuit held that a tort claim was *not* preempted by Article 4A where the claim challenged not the wire transfer processing itself, but surrounding conduct. 301 F.3d 220, 224 (4th Cir. 2002). So too here. Blue Flame's tortious interference claim is not preempted by Article 4A, even where an Article 4A violation satisfies the improper methods element, because it is predicated not on Chain Bridge's handling of the Wire Transfer, but Defendants' interference with Blue Flame's relationship with California and the resulting harms to Blue Flame.

## B. Defendants' Arguments for Summary Judgment on Blue Flame's Defamation Claim Fail.

Defendants assert they are entitled to summary judgment as to Blue Flame's defamation claim because their statements to representatives of California were either true, and thus not a basis for a defamation claim, or privileged, and thus excused. Defs. Br. at 28-29. Neither assertion is correct and, at a minimum, there are material issues of fact that remain for the jury.

---

[29] Chain Bridge's violations of banking industry standards were legion. *See, e.g.,* Ex. 42, 97:22-98:22 (Gonzales testifying that "no, it's not typical" and was "unusual" for STO to be contacted by a counterparty's bank; and she could not recall any other such instance); Ex. 82, 26:7-28:4 (JPMC's expert could not recall any circumstances where in connection with a BSA investigation (Defendants' proffered excuse) executives from a bank directly contacted the counterparty to the transaction, as opposed to the counterparty's bank).

First, Defendants' narrow focus on the truth of their individual statements ignores that their comments, taken as a whole, plainly were made to raise concerns that Blue Flame's agreement with California was somehow fraudulent. Virginia law is clear that defamation is a holistic analysis where statements are taken together and in their proper context. *See Gov't Micro Res., Inc. v. Jackson*, 624 S.E.2d 63, 69 (Va. 2006) ("alleged defamatory statement must be considered as a whole"); *see also Cretella v. Kuzminski*, 640 F. Supp. 2d 741, 758-59 (E.D. Va. 2009) (finding that multiple statements, considered together, constitute defamation). Moreover, "[i]nsinuations may constitute defamatory statements." *Cashion v. Smith*, 749 S.E.2d 526, 532 (Va. 2013); *see also id.* at 531 (emphasis added) (internal quotations omitted) ("statements may be actionable if they have a provably false factual *connotation*"). Thus, regardless of the technical truth of each individual statement Defendants made regarding Blue Flame following their highly unusual efforts to contact Blue Flame's contractual counterparty, a reasonable jury could easily conclude that Defendants' statements were falsely insinuating that Blue Flame was engaged in fraud and that, as such, those statements were defamatory. *See Carwile v. Richmond Newspapers, Inc.*, 82 S.E.2d 588, 592 (Va. 1954) ("Every false…imputation, spoken, written or printed which *imputes* to a business…conduct which tends to injure him in his business or profession is libelous").[30]

Second, Defendants are wrong that their statements to California were privileged against defamation and made without the malice required to defeat such privilege. Defs. Br. at 29. Chain Bridge and California did not, as Defendants claim, have a common interest in "investigating the wire transfer to verify its validity." *Id.* Defendants argument is factually flawed: California had

---

[30] Defendants also claim, in a footnote, that their statements cannot constitute defamation because they lacked a "defamatory 'sting.'" Defs. Br. at 29, n.18. That is nonsense. A reasonable jury could readily conclude that the insinuation that Blue Flame was engaged in a fraudulent transaction "stings." *See Steele v. Goodman*, 382 F. Supp. 3d 403, 421-22 (E.D. Va. 2019) (statements implying a not-for-profit was engaged in fraud satisfy Virginia defamation test).

already intentionally sent the wire, confirmed its intention to its own bank, and DGS and STO officials repeatedly confirmed its validity to Defendants prior to their statements. Simply put, California had no interest in confirming the validity of a wire transfer it knew was valid.[31]

In any event, Defendants acted with malice by insinuating that Blue Flame was a fraud with reckless disregard for the truth and in bad faith, either of which alone would take them beyond the protection of such privilege. *See Cashion*, 749 S.E.2d at 533 (stating that malice necessary to overcome privilege can be found when "statements were made with…reckless disregard for their truth" or "statements were not made in good faith"). Blue Flame had told Chain Bridge the amount of the Wire Transfer, its purpose, and its originator, all of which matched the information on the payment order it received from JPMC. Ex. 1 at 193:5-196:1; Ex. 45. Then, after California confirmed the validity of the Wire Transfer, Defendants nevertheless proceeded to cast doubt on Blue Flame with representatives of the STO before offering to return the funds. Ex. 42, 127:4-130:5, 132:6-18; Ex. 67, 4466. For those reasons, as well as Defendants' repeated discussions regarding the need to avoid holding the funds on the bank's balance sheet—an issue that could only be remedied by returning the funds—a jury could reasonably conclude that Chain Bridge's motivation in insinuating to California that the transaction was fraudulent was to protect its own financial interests and, accordingly, that it acted in bad faith in its interactions with California.

<u>**CONCLUSION**</u>

For these reasons, Defendants' motion for summary judgment should be denied in its entirety.

---

[31] Defendants' citation to *Prof'l Recovery Servs., Inc. v. GE Cap. Corp.*, is inapposite. That case concerned multiple *financial institutions* exchanging information, not a financial institution sharing information with the contractual counterparty of a customer. *See* 642 F. Supp. 2d 391, 401 (D.N.J. 2009) (emphasis added) ("Defendant[]'s fraud division had a practical, legal, and 'moral duty' to prevent identity theft and report the risk to those *with the same duty in the same industry*").

Dated:  May 20, 2021

Respectfully submitted,

/s/ Peter H. White
Peter H. White (VA Bar No. 32310)
Jason T. Mitchell (*pro hac vice*)
Gregory Ketcham-Colwill (*pro hac vice*)
SCHULTE ROTH & ZABEL LLP
901 Fifteenth Street, NW, Suite 800
Washington, DC  20005
Tel.:  (202) 729-7476
Fax:  (202) 730-4520
pete.white@srz.com
jason.mitchell@srz.com
gregory.ketcham-colwill@srz.com

William H. Gussman, Jr. (*pro hac vice*)
Steven R. Fisher (*pro hac vice*)
SCHULTE ROTH & ZABEL LLP
919 Third Avenue
New York, New York  10022
Tel.:  (212) 756-2044
Fax:  (212) 593-5955
bill.gussman@srz.com
steven.fisher@srz.com

*Counsel for Plaintiff Blue Flame Medical LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 20th day of May, 2021, I caused the foregoing document to be filed and served electronically using the Court's CM/ECF system, which automatically sent a notice of electronic filing to all counsel of record.

Dated: May 20, 2021

 /s/ *Peter H. White*
Peter H. White, Esq. (VSB# 32310)
SCHULTE ROTH & ZABEL LLP
901 Fifteenth Street, NW, Suite 800
Washington, DC 20005
Tel: 202-729-7476
Fax: 202-730-4520
peter.white@srz.com

*Counsel for Blue Flame Medical LLC*

32