**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

|  |  |  |
|---|---|---|
| **BLUE FLAME MEDICAL LLC** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | **Civil Action No. 1:20-cv-00658** |
| | ) | |
| **CHAIN BRIDGE BANK, N.A.,** | ) | **The Honorable Leonie Brinkema** |
| **JOHN J. BROUGH, and** | ) | |
| **DAVID M. EVINGER** | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |
| **CHAIN BRIDGE BANK, N.A.** | ) | |
| | ) | |
| *Third-Party Plaintiff,* | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **JPMORGAN CHASE BANK, N.A.** | ) | |
| | ) | |
| *Third-Party Defendant.* | ) | |
| | ) | |

**PLAINTIFF BLUE FLAME MEDICAL LLC'S REPLY MEMORANDUM OF LAW**
**IN FURTHER SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT**

**Table of Contents**

**Page**

PRELIMINARY STATEMENT ............................................................................................1

ARGUMENT ....................................................................................................................2

    I.     BLUE FLAME IS ENTITLED TO SUMMARY JUDGMENT AS TO
          LIABILITY UNDER SECTION 4A-404(a). ..........................................................2

          A.     Defendants' Erroneous Interpretations of Article 4A Do Not Prevent
                 Summary Judgment on Chain Bridge's Liability Under Section 4A-
                 404(a). .............................................................................................2

          B.     Blue Flame Demanded Payment from Chain Bridge. .................................6

          C.     Defendants' Affirmative Defenses Fail as a Matter of Law. .......................7

    II.    BLUE FLAME IS ENTITLED TO SUMMARY JUDGMENT AS TO
          LIABILITY UNDER SECTION 4A-204. ..............................................................9

          A.     Defendants' Erroneous Interpretation of Section 4A-204(a) Does Not
                 Prevent Summary Judgment as to Chain Bridge's Liability......................9

          B.     Chain Bridge Credited Blue Flame's Account Before Returning the
                 Funds to JPMC...........................................................................11

    III.   THERE ARE NO DISPUTES OF MATERIAL FACT AS TO
          DEFENDANTS' LIABILITY FOR TORTIOUS INTERFERENCE. .................14

          A.     Undisputed Facts Establish Blue Flame's Contract and Business
                 Expectancy with California..........................................................14

          B.     Undisputed Facts Establish Defendant's Wrongful Intent to Interfere
                 with Blue Flame's Relationships with California. ....................................15

          C.     Undisputed Facts Establish Defendant's Use of Improper Methods. ........16

    IV.   BLUE FLAME CAN ESTABLISH DAMAGES. .................................................18

CONCLUSION.................................................................................................................20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Banca Commerciale Italiana, N.Y. Branch v. N. Trust Int'l Banking Corp.*,
   160 F.3d 90 (2d Cir. 1998)..................................................................................11

*Banque Worms v. Bank America Int'l.*,
   726 F.Supp. 940 (S.D.N.Y. 1989) ...............................................................11, 13

*Banque Worms v. BankAmerica Int'l,*
   570 N.E.2d 189 (N.Y. 1991).................................................................................5

*Bayerische Hypo-Und Vereinsbank Ag v. HSBC Bank USA, N.A.,*
   No. 602761/2009, 2015 WL 4455948 (N.Y. Sup. Ct. July 15, 2015) .....................4

*CFTC v. Rust Rare Coin Inc.*,
   469 F. Supp. 3d 1211 (D. Utah 2020).....................................................................3

*Commerce Funding Corp. v. Worldwide Sec. Servs. Corp.*,
   249 F.3d 204 (4th Cir. 2001) .........................................................................15, 16

*Dunlap v. Cottman Transmission Sys., LLC*,
   754 S.E.2d 313 (Va. 2014)..................................................................................16

*Eisenberg v. Wachovia Bank, N.A.,*
   301 F.3d 220 (4th Cir. 2002) ..............................................................................18

*Gen. Elec. Capital Corp. v. Cent. Bank*,
   49 F.3d 280 (7th Cir. 1995) ...........................................................................4, 11

*Human Rights in China v. Bank of China*,
   No. 02 Civ. 4361 (NRB), 2005 WL 1278542 (S.D.N.Y. Dec. 19, 2007)..............11

*Langman v. Alumni Ass'n of Univ. of Va.*,
   442 S.E.2d 669 (Va. 1994)....................................................................................4

*Professional Recovery Services., Inc. v. GE Capital Corp.*,
   642 F. Supp. 2d 391 (D.N.J. 2009) .....................................................................16

*Regions Bank v. Provident Bank, Inc.*,
   345 F.3d 1267 (11th Cir. 2003) ..........................................................................10

*Simbeck, Inc. v. Dodd Sisk Whitlock Corp.*,
   508 S.E.2d 601 (Va. 1999)..................................................................................16

**Statutes and Rules**

12 C.F.R. § 229.10 ........................................................................................................5

55 Fed. Reg. 40791-01 (Oct. 5, 1990) ........................................................................13

UCC Article 4A ..................................................................................................... *passim*

UCC § 1-304 .............................................................................................................8, 9

UCC § 4A-103 .........................................................................................................9, 10

UCC § 4A-104 ...............................................................................................................9

UCC § 4A-104, cmt. 1 .................................................................................................10

UCC §§ 4A-201 ...........................................................................................................10

UCC § 4A-204(a) .................................................................................................. *passim*

UCC § 4A-211 ..........................................................................................................3, 7

UCC § 4A-211, cmt. 8 ...................................................................................................4

UCC § 4A-301 .............................................................................................................10

UCC § 4A-404, cmt. 1 ...................................................................................................5

UCC § 4A-404, cmt. 3 ................................................................................................4, 7

UCC § 4A-404(a)..............................................................................................1, 2, 5, 6, 7

**Other Authorities**

James J. White & Robert S. Summers, *Uniform Commercial Code,*
    *Practitioner Treatise Series* § 22–4 (5th ed.2008) ..................................................18

## PRELIMINARY STATEMENT

It is ironic that, while insisting they never suggested to California that Blue Flame[1] was a fraud, Defendants premise their entire defense to Blue Flame's Motion for Partial Summary Judgment on the notion that Blue Flame was a fraud. That notion is as baseless today as it was on March 26, 2020. None of Defendants' arguments undercuts the undisputed material facts supporting Blue Flame's requested relief, nor the straightforward application to those facts of UCC Article 4A and its official comments (in the case of Counts I and II) or the law of tortious interference (in the case of Counts IV and V).[2]

Lacking any authority to support their interpretations of the relevant provisions of UCC Article 4A, and faced with the foreseeable impacts of their efforts to sow doubts about Blue Flame with California officials, Defendants attempt to shift the focus away from themselves and onto Blue Flame. First, they claim Blue Flame fraudulently procured its contract with California by pointing to irrelevant "facts" that Defendants did not know when they reversed the Wire Transfer and which cannot justify their violations of the law. In any case, despite numerous investigations triggered by Defendants' actions on March 26, no fraud has ever been uncovered. Instead, the undisputed evidence shows that Blue Flame acted in good faith and that none of its purported misrepresentations influenced California's vetting of or negotiations with Blue Flame. Second, Defendants assert Blue Flame cannot prove damages under any circumstances. That argument ignores undisputed evidence that Blue Flame and California were both performing under their

---

[1] Capitalized terms not defined herein have the meaning assigned to them in Plaintiff's Motion for Partial Summary Judgment (ECF No. 128).

[2] Citations to "Pl. Br." refer to Blue Flame's brief in support of its motion for summary judgment (ECF No. 128), and those to "Pl. Opp." refer to its brief in opposition to Defendants' motion for summary judgment (ECF. No. 149). Citations to "Defs. Br." refer to Defendants' brief in support of their motion for summary judgment (ECF No. 119), and those to "Defs. Opp." refer to their brief in opposition to Blue Flame's motion for summary judgment (ECF No. 140).

agreement before Defendants intervened and induced JPMC to request the return of the funds.

Defendants' factual arguments are even more strained, attempting to exploit technicalities to deny what is obvious from Defendants' own internal discussions and documents: Chain Bridge credited Blue Flame's account with the funds, despite denying it did so to both California and JPMC. Then, Defendants orchestrated the return of the funds due to concerns about the Wire Transfer's impact on *Chain Bridge's* business[3] and in disregard for the business and reputation of its longtime customer. The facts and law both require that Blue Flame's motion be granted and that this action proceed to trial on Blue Flame's damages under Counts I, II, IV, and V, and on its remaining defamation claim (Count IX).

## **ARGUMENT**

## I. **BLUE FLAME IS ENTITLED TO SUMMARY JUDGMENT AS TO LIABILITY UNDER SECTION 4A-404(a).**

As demonstrated in Blue Flame's opening brief, the undisputed evidence proves that Chain Bridge is liable under UCC Section 4A-404(a) for failing to make the funds wired by California available to Blue Flame. Defendants attempt to avoid that liability by misinterpreting Article 4A, appealing to irrelevant facts, and misrepresenting relevant, undisputed facts.

### A. **Defendants' Erroneous Interpretations of Article 4A Do Not Prevent Summary Judgment on Chain Bridge's Liability under Section 4A-404(a).**

---

[3] Defendants contend that they were not concerned about the impact of the Wire Transfer on Chain Bridge's balance sheet, that those concerns did not motivate any of their actions, and that their repeated expressions of concern on that issue were focused solely on maximizing Blue Flame's FDIC insurance coverage. *See* Defs. Opp. at 8-11 ¶¶ 8-9, 11, 17; *see also* Defs. Br. at 20 n.9. But they cannot speak evidence out of existence. Defendants do not dispute, nor can they, that senior bank officers repeatedly stated on March 25 and 26 that Chain Bridge could not hold the funds wired to Blue Flame on its balance sheet (*see* Pl. Br. at 6-10 ¶¶ 8, 11). None of those communications mentioned Blue Flame's FDIC insurance coverage. Furthermore, Brough and Evinger have admitted that the Wire Transfer would have negatively impacted Chain Bridge's leverage ratio. *See* Pl. Opp. at 21 n.19.

2

First, Defendants again trot out the flawed argument that the reversal of a wire transfer automatically constitutes a cancellation and nullifies acceptance even where Section 211(c)(2) says that cancellation is impossible. Defs. Opp. at 16-17. That argument failed at the motion to dismiss stage (*see* ECF No. 19 at 9-10), and it fails here as well because it renders the limitations on cancellation under Section 211(c)(2) meaningless and thereby completely undermines the purpose of that section—and the purpose of Article 4A as whole—to ensure finality and certainty in wire payments (*see* ECF No. 27 at 11-14; Pl. Br. at 16-18).

Second, Defendants argue that a wire transfer induced by fraud constitutes a "mistake" permitting cancellation under Section 4A-211(c)(2). That argument is refuted by Article 4A's text, comments, structure, and relevant case law. *See* Pl. Opp. at 16-18; *CFTC v. Rust Rare Coin Inc.*, 469 F. Supp. 3d 1211, 1218-19 (D. Utah 2020) (rejecting argument that wire transfer procured by beneficiary's fraud is a "mistake" within meaning of Section 4A-211(c)(2)). In any event, that argument rests on the false premise that Blue Flame procured California's order through fraud. The undisputed evidence, however, proves that Blue Flame procured California's order legitimately. *See* Pl. Opp. at 2-5 ¶¶ 1-9.[4] To date, California has never alleged that Blue Flame

---

[4] Blue Flame denies that it made any "false representations" concerning 3M masks, its capabilities, or its rough delivery schedule to California officials (*see* Defs. Opp. at 3-4 ¶ 2, 5-6 ¶ 5, 14-15 ¶¶ 1-3) for the reasons detailed in its Opposition (*see* Pl. Opp. at 2-5 ¶¶ 4-9). In any event, Defendants' obsession with Blue Flame's statements to California officials other than those in the Department of General Services ("DGS") is a red herring, since it is undisputed that DGS was the California agency responsible for contracting on behalf of the state, negotiating PPE purchases, and vetting potential suppliers. *Compare* Pl. Br. at 3 ¶ 2 *with* Defs. Opp. at 3-4 ¶ 2. Defendants also ignore uncontroverted facts that disprove their suggestion that Blue Flame was not forthcoming with California about Blue Flame's need for prepayment. *See* Defs. Opp. at 4-5 ¶¶ 3, 5. In fact, on March 23, 2020 Blue Flame offered to take a smaller prepayment, but California did not accept that offer. *See* Ex. 5, 200137-38. Specifically, Thomas told Wong via text message: "I can take a small partial deposit" of "10-15% for a large order depending on the manufacturer" and also suggested California "do a small test order too before the big one." *Id.* Wong never responded to those offers and later prepared and signed California's purchase order to Blue Flame that reflected a 75% prepayment for the entire order. Ex. 17, DGS2491-95; Ex. 18, 108:12-109:2.

attempted to defraud it, despite investigations of Blue Flame by the California Highway Patrol and FBI prompted by Chain Bridge's illegal reversal of the Wire Transfer. Ex. 119, DGS6517-18; Ex. 120, 125:21-127:5, 135:21-136:9, 155:7-156:1; Ex. 121, 274. Nor did JPMC's investigation uncover any fraud. Ex. 122, 183:10-14.[5] Thus, Defendants allege a fraud that the purported victim itself (or its bank) has never alleged. Plainly, no reasonable jury could find by clear and convincing evidence that Blue Flame procured California's order by fraud. *See Langman v. Alumni Ass'n of Univ. of Va.*, 442 S.E.2d 669, 677 (Va. 1994) ("a party alleging fraud has the burden of proving by clear and convincing evidence all the elements of the cause of action").

Defendants continue to assume the truth of their false premise in arguing that upholding Article 4A's policy goals of finality and certainty in funds transfers "would disserve public policy by leaving a wrongdoer with the fruits of its own misconduct." Defs. Opp. at 18. Leaving its circularity aside, that reasoning fails because Article 4A, its comments, and the case law repeatedly articulate that finality and certainty are stronger policy interests than fraud prevention. *See* UCC § 4A-404, cmt. 3 (beneficiary's bank must pay beneficiary despite fraud claims); UCC § 4A-211, cmt. 8 ("Because rights of the beneficiary and the originator are directly affected by acceptance, subsection (c)(2) severely limits cancellation"); *Gen. Elec. Capital Corp. v. Cent. Bank*, 49 F.3d 280, 286 (7th Cir. 1995) ("Requiring receiving banks to inquire into the source of the funds…would raise the costs of funds transfers and slow down a mechanism that is designed to allow the movement of huge sums within minutes.").[6] After all, the integrity of the wire transfer

---

[5] "Ex." refers to exhibits to the Affirmation of Peter H. White dated May 6, 2021, ECF No. 132 (for Exhibits 1-84), the Affirmation of Peter H. White, dated May 20, 2021, ECF. No. 150 (for Exhibits 85-118), and the Affirmation of Peter H. White, dated May 27, 2010, and filed herewith (for Exhibits 119-132).

[6] *See also Banque Worms v. BankAmerica Int'l*, 570 N.E.2d 189, 195 (N.Y. 1991) (citations omitted) ("Establishing finality in electronic fund wire transactions was considered a singularly important policy goal [by Article 4A's drafters]."); *Bayerische Hypo-Und Vereinsbank Ag v.*

system ultimately rests on participants' faith that wire transfers will be final and discharge their payment obligations.[7]

Next, Defendants argue that Blue Flame's observation that Chain Bridge could have continued to "hold" the funds wired by California "demonstrates that Chain Bridge did not act unlawfully in refusing to pay Blue Flame." Defs. Opp. at 19. That argument is immediately betrayed by the fact that Defendants do not even attempt to explain how "refusing to pay Blue Flame" (*id.*) could comply with an express obligation to "to pay the amount of the [payment] order to the beneficiary of the order." UCC § 4A-404(a). Moreover, Blue Flame did not suggest that Chain Bridge could have held the funds beyond the point at which Regulation CC would have mandated they be made available to Blue Flame (*i.e.*, the next day) without incurring any liability.[8] *See* 12 C.F.R. § 229.10; UCC § 4A-404, cmt. 1. But Regulation CC afforded Defendants approximately 20 more hours to conduct their due diligence than they used here. Much can be learned in that time, especially where a bank is willing to answer even one phone call from its customer of more than ten years. Instead, Defendants ordered bank staff not to communicate with Blue Flame and hastily asked for JPMC to recall the Wire Transfer barely 90 minutes after its

---

*HSBC Bank USA, N.A.*, No. 602761/2009, 2015 WL 4455948, at *8 (N.Y. Sup. Ct. July 15, 2015) (quoting UCC § 4A-102, cmt. 1) ("The drafters of Article 4A...made the 'deliberate decision' to limit cancellation of accepted orders in order [to] promote finality and predictability....").

[7] Defendants' appeal to BSA/AML principles fails for all of the reasons detailed in Blue Flame's opening and opposition briefs. *See* Pl. Br. at 25-26; Pl. Opp. at 18-21. The BSA is a recordkeeping and reporting statute that provides no exception to or exemption from the express obligations imposed by Article 4A. Defendants' assertion that Chain Bridge "may well have faced regulatory jeopardy" for complying with those obligations (Defs. Opp. at 19) is unsubstantiated speculation.

[8] Even if Chain Bridge had "held" the funds beyond the point at which Regulation CC mandated payment, that course of action would have dramatically limited its liability under Article 4A by precluding any claim under Section 4A-204(a) for the return of the funds to the originator.

receipt, all the while misrepresenting to JPMC and California the status of the payment and their understanding of Blue Flame's business.[9] *See* Pl. Br. at 10-13; Pl. Opp. at 8-12.

### B.   Blue Flame Demanded Payment from Chain Bridge.

Defendants turn a blind eye to the undisputed evidence in arguing that Blue Flame did not demand payment of the Wire Transfer. In fact, Blue Flame demanded payment multiple times and in multiple ways, including in: (i) Thomas's phone communications with Cole, both immediately before and after Chain Bridge's receipt of the Wire Transfer, in which Thomas said that Blue Flame would be using the funds to immediately pay suppliers and requested that Cole prepare a $22.6 million wire to Suuchi;[10] (ii) Thomas's email to Cole authorizing Bearman's instructions for the Suuchi wire and requesting that Cole prepare the wire "asap";[11] and (iii) repeated calls from Gula, Thomas, and Bearman to Defendants after Chain Bridge received the Wire Transfer, which Defendants intentionally ignored. Consequently, Blue Flame has satisfied the "demand" element of its Section 4A-404(a) claim.[12] *See* Pl. Br. at 8-9 ¶¶ 12-16, 12-13 ¶ 23.

---

[9] Blue Flame did not suggest that returning the funds to JPMC constitutes an independent violation of Section 4A-404(a), either. *See* Defs. Opp. at 19. Rather, Blue Flame explicitly argued in its opening brief that returning the funds violated Section 4A-204(a). Pl. Br. at 14, 19, 23-24.

[10] There is no merit to Defendants' argument that Thomas's demands for payment do not count because he did not sign the account agreement. Defs. Opp. at 23. Thomas had signed a "wire transfer agreement authorizer designation form" for Blue Flame's account, which "show[ed] he was associated or accepted the ability to wire funds from the account." Ex. 123, 557. He also was listed as a beneficial owner of Blue Flame on the account opening documents. Ex. 124, 567-68. In any case, Gula had explained that Thomas was his business partner in Blue Flame to Defendants during their 19-minute call on March 25. Ex. 34, 4445; Ex. 35, 133:10-19, 138:16-22, 251:7-15; Ex. 36, 4442; Ex. 67, 4463. Chain Bridge's familiarity with Thomas also is demonstrated by his phone calls with Maria Cole. Ex. 40 (audio); Ex. 52 (audio).

[11] Defendants are wrong that those instructions contradicted the wire information that Chain Bridge had received from Gula. Defs. Opp. at 11 ¶ 16. It is undisputed that Gula told Brough and Evinger that Blue Flame would be sending "outgoing wire transfers to domestic bank *accounts* for its *suppliers*." *Compare* Pl. Br. at 6-7 ¶ 9 (emphasis added) *with* Defs. Opp. at 8 ¶ 9. Thus, the wire instructions to Suuchi should not have raised any concern, and, indeed, there is no documentary evidence suggesting that Defendants harbored any such concern.

[12] Defendants assert that "Gula apologized for the transaction and did not object to the return of the funds to [JPMC]" when he came to the bank on March 26 after being told by Brough that Chain

### C.     Defendants' Affirmative Defenses Fail as a Matter of Law.

Defendants try (and fail) to establish two affirmative defenses to their liability under Section 4A-404(a). The first is the "reasonable doubt" defense built into Section 4A-404(a)'s cause of action. As with their erroneous interpretation of "mistake" under Section 4A-211(c), Defendants premise that defense on the unsubstantiated claim that Blue Flame defrauded California. *See* Defs. Opp. at 20-21. Even if that factual premise had any support in the record, the official UCC commentary expressly rejects it as a matter of law. *See* UCC § 4A-404, cmt. 3. Defendants' attempts to distinguish that commentary fall woefully short of the mark.

For their first attempt, Defendants point out that JPMC, rather than California, requested the cancellation of the payment order, and then assert, without explanation, that "[t]he cancellation thus supplied grounds for reasonable doubt as to Blue Flame's right to the funds…." Defs. Opp. at 20-21. Defendants argue, in other words, that a cancellation request itself supplies the "reasonable doubt" necessary to prove the affirmative defense. By that logic, a bank that agrees to a cancellation—even one prohibited by Article 4A—can never be liable under Section 4A-404(a). The commentary says otherwise. *See* UCC § 4A-404, cmt. 3 (emphasis added) ("Unless the payment order has been cancelled *pursuant to Section 4A-211(c)*, there is no excuse for refusing to pay the beneficiary").[13] Moreover, *Defendants asked* JPMC to issue the recall request (Ex. 68

---

Bridge had received notice to "return the wire" and that he should "resolve directly with the State of California." Defs. Opp. at 15; *see also* Ex. 71, 74101. That misleading portrayal of the encounter omits that Brough and Evinger did not inform Gula that Chain Bridge had not yet completed its return of the funds, depriving Gula of any opportunity to object. Ex. 1, 206:9-209:12. Defendants also told Gula that Blue Flame's account would be closed. *See* Pl. Opp. at 11-12 ¶ 30.

[13] To the extent the "reasonable doubt" defense to liability under Section 4A-404(a) is established by the beneficiary bank's receipt of the sender's cancellation request, that is only because Section 4A-204(a) provides an adequate remedy for the reversal of a wire transfer effected in contravention of Section 4A-211(c)(2). However, Blue Flame maintains that Sections 4A-404(a) and 4A-204(a) provide separate remedies for separate harms (*see* Pl. Br. at 14, 18-19, 23-24), and thus disagrees with Defendants' characterization of Blue Flame's claim under Section 4A-204(a) as an "alternative claim" (*see* Defs. Opp. at 23).

(audio)) that supposedly "supplied" their "reasonable doubts" (*see* Defs. Opp. at 21). Defendants cannot legitimize their motives by laundering them through JPMC's recall request.

Defendants also attempt to distinguish the comment to Section 4A-404 on the basis that it is phrased in terms of an originator's fraud claims, rather than in terms of a beneficiary bank's fraud claims. Defs. Opp. at 21. Of course it is. The originator, as the beneficiary's counterparty and the potential victim in such circumstances, is the party most likely to have knowledge of any potential fraud and the party with the strongest motive to prevent it. The comment thus addresses the most compelling fraud claims and provides that even those do not nullify the obligation to pay the beneficiary. Here, by contrast, the originator, California, repeatedly confirmed the legitimacy of the transfer—and thus, Blue Flame's right to payment. *See* Pl. Br. at 10-11 ¶¶ 17-20; Pl. Opp. at 8-12 ¶¶ 19-31.

Aware of the weakness of their first affirmative defense, Defendants invent another one out of whole cloth, arguing that UCC Section 1-304 prevents Blue Flame from enforcing its rights under Article 4A. That defense fails for a host of reasons detailed in Blue Flame's opposition brief, first and foremost because Section 1-304 provides a defense to a contract claim, not to a claim created by federal law. *See* Pl. Opp. at 21-25. Even if Blue Flame's Article 4A claims were treated as contract claims, Chain Bridge cannot establish a breach of good faith claim against Blue Flame because it cannot point to a single specific contractual duty in the account agreement that Blue Flame failed to perform in good faith. *See id.* at 23-24.[14] Defendants' baseless argument that Blue

---

[14] Blue Flame disputes Defendants' claim that Gula "ignored warnings from Blue Flame's counsel to disclose California's incoming wire" and other information about Blue Flame's business when he filled out the account opening forms on the morning of March 25. Defs. Opp. at 15 ¶ 4. That argumentative, purported "fact" ignores undisputed evidence showing that Gula did not know the precise amount of the expected wire from California at that time (*see* Pl. Opp. at 24), as the "warning" to which Defendants refer did not provide any estimate of the dollar value of the wire transfers California would be sending Blue Flame (*see* ECF No. 130-32). In any event, Blue Flame

Flame lacked good faith in its dealings with California is irrelevant because Defendants do not

have standing to enforce California's rights. *See id.* at 24-25. Finally, even if Defendants' Section

1-304 defense were legally viable, the undisputed material facts show that Blue Flame acted in

good faith in its dealings with both Chain Bridge and California. *See id.* at 2-7 ¶¶ 1-16.

## II.   BLUE FLAME IS ENTITLED TO SUMMARY JUDGMENT AS TO LIABILITY UNDER SECTION 4A-204.

Blue Flame has established that undisputed facts render Chain Bridge liable under Section

4A-204(a) for returning the funds wired by California and credited to Blue Flame's account. Chain

Bridge's only proffered defense is that it "never received a payment order purporting to come from

Blue Flame" and therefore it never accepted "a payment order *issued in the name of [Chain*

*Bridge's] customer as sender.*" Defs. Opp. at 24-25 (emphasis in original). Far from relieving

Chain Bridge of liability, that argument only highlights how egregiously Chain Bridge violated

Article 4A when it intentionally sent a wire transfer from Blue Flame's account without its consent.

Defendants also contest indisputable evidence proving that the Wire Transfer was credited to Blue

Flame's account before Chain Bridge engineered its reversal. *See infra* Section II.B.

### A. Defendants' Erroneous Interpretation of Section 4A-204(a) Does Not Prevent Summary Judgment as to Chain Bridge's Liability.

Blue Flame agrees that Chain Bridge never "received" a payment order purporting to come

from Blue Flame. *See id.* at 24. Instead, Chain Bridge itself created a payment order listing Blue

Flame as "originator"[15]—without Blue Flame's knowledge or consent—that it then sent to JPMC

---

did not fraudulently induce Chain Bridge to open its account, which remained open even after Gula
disclosed the information Defendants argue was concealed. *See* Pl. Opp. at 5-8 ¶¶ 11-16.

[15] That Blue Flame is identified by name and account number as the originator confirms that the
funds had been credited to its account. If Chain Bridge were correct that the funds wired by
California were held exclusively in its Federal Reserve account (*see* Defs. Opp. at 10 n.6), Chain
Bridge would have been identified as the originator in the payment order it sent to JPMC. *See*
UCC § 4A-104(c) (defining "originator" as "the sender of the first payment order in a funds
transfer"); *see also infra* Section II.B.

in order to return the funds to California.[16] *See* Pl. Br. at 13 ¶ 25; Pl. Opp. at 12 ¶ 31; Ex. 78, 2534;

Ex. 79, 791-92. Put more simply, Chain Bridge stole Blue Flame's money by sending an

unauthorized wire transfer from Blue Flame's account. Given the preemption of Blue Flame's

conversion claim (*see* ECF Nos. 30 & 31), Section 4A-204(a) provides the only remedy for that

misconduct. If it did not, then Article 4A would provide no remedy to a customer whose bank

intentionally sends an unauthorized wire transfer from his account.[17] Because Article 4A is not "a

shield for fraudulent activity," Chain Bridge is liable under Section 4A-204(a). *See Regions Bank*

*v. Provident Bank, Inc.*, 345 F.3d 1267, 1276 (11th Cir. 2003).

Chain Bridge's appeal to case law only highlights how blatantly it violated the law. Blue

Flame does not dispute that Section 4A-204(a) claims typically arise as the result of some unknown

fraudster "purporting to be the bank's customer or the customer's agent." Defs. Opp. at 24 n.9. In

the typical case, the bank is liable for sending the unauthorized payment order if it did not adhere

to an agreed-upon and commercially reasonable security procedure to verify the authenticity of the

customer's payment order. *See* UCC §§ 4A-201-4A-204. That is, the bank is liable under Section

4A-204(a) even if its sending of the unauthorized payment order was merely negligent or reckless.

It is true that Blue Flame's Section 4A-204(a) claim looks different than the typical cases

cited by Defendants. *See* Defs. Opp. at 24 n.9. Instead of an unknown fraudster, here it is *the bank*

---

[16] Brough's instruction to Thais Ribeiro and Claudia Mojica-Guadron to return the funds to JPMC (Ex. 69 (audio), 0:09-1:05, 1:24-1:42, 2:36-2:49) constitutes the "payment order issued in the name of [Chain Bridge's] customer as sender" (UCC §§ 4A-204(a), 4A-103(a)(1)). Chain Bridge accepted that payment order when it sent the payment order listing Blue Flame as originator (Ex. 74, 2781) to JPMC (UCC §§ 4A-209(a), 4A-301(a), 4A-103(c)). That Chain Bridge was the "sender" of the payment order identifying Blue Flame as originator is irrelevant (*see* Def. Opp. at 24), as the originator's bank is always the "sender" of the payment order sent to the beneficiary's bank (or an intermediary bank). *See, e.g.*, UCC § 4A-104, cmt. 1.

[17] Section 4A-204(a) contains Article 4A's only cause of action against a bank that sends an unauthorized payment order.

*itself* that caused the unauthorized payment order to be sent. Rather than mere negligence or recklessness, here the bank's liability derives from its own knowing and intentional sending of an unauthorized payment order. Those differences from the typical Section 4A-204(a) case counsel in favor of Chain Bridge's liability, not against it.

Cases involving the unauthorized return of wired funds by the beneficiary's bank demonstrate Chain Bridge's liability under Section 4A-204(a). In *Banca Commerciale Italiana, N.Y. Branch v. Northern Trust Int'l Banking Corp.*, the beneficiary's bank returned funds it had already credited to the beneficiary's account at the request of the originator's bank. 160 F.3d 90, 91-92 (2d Cir. 1998). After the beneficiary refused to consent to the debiting of its account to reflect the return of the funds, the beneficiary's bank demanded that the originator's bank return the funds to it and re-credited the beneficiary's account. *Id.*; *see also Banque Worms v. Bank America Int'l.*, 726 F.Supp. 940, 942 (S.D.N.Y. 1989) (same); *Human Rights in China v. Bank of China*, No. 02 Civ. 4361, 2005 WL 1278542 at *4 (S.D.N.Y. Dec. 19, 2007) ("The parties agree that once funds are credited to a beneficiary's account, a receiving bank must receive permission from the beneficiary in order to return any funds."). Because the beneficiary's bank in each of those cases understood that it could not debit its customer's account for the return of the funds without its customer's consent, there was no need to litigate the issue—the obligation to obtain the beneficiary's consent was obvious. *See Gen. Elec. Capital Corp.*, 49 F.3d at 282 & 286 (holding beneficiary's bank liable for conversion where, after accepting payment order and crediting beneficiary's account, beneficiary's bank reversed credit upon receiving revised payment order, which "no rule of law obliged" it to do).

**B.     Chain Bridge Credited Blue Flame's Account Before Returning the Funds to JPMC.**

Defendants concede that Blue Flame's account was "memo credited" with the funds Chain Bridge accepted from California on behalf of Blue Flame, but insist that there is "no evidence that funds were ever credited to or deposited into Blue Flame's account" because the account would not actually be credited "until the memo posting was processed overnight during Chain Bridge's nightly batch data processing." Defs. Opp. at 10 ¶14. In support, Defendants identify only deposition testimony of their own witnesses (and testimony from their banking expert based solely on the testimony of their witnesses), and argue they have produced no records reflecting any crediting of the account. *Id.*; Ex. 125, 137:9-138:11.

Defendants' litigation position is contradicted by multiple contemporaneous admissions by Chain Bridge staff and officers that the bank had credited Blue Flame's account for the Wire Transfer. Defendants concede, as they must, that Rick Claburn, the operations employee who manually approved the wire for Chain Bridge, immediately notified bank personnel that "[t]he wire has been received and credited to the client's account." Defs. Opp. at 10 ¶ 14; Ex. 59, 664; Pl. Br. at 9-10 ¶¶ 15-16. Similarly, it is undisputed that the operations employee who processed the return of the funds at Brough and Evinger's direction specifically stated that "in this case, we credited the customer's account" when asking if Chain Bridge would be getting an indemnity letter from JPMC, to which Brough responded, "don't worry about it…it is what it is" and "this is what we have to do." *See* Pl. Br. at 12; Ex. 69 (audio) at 1:17-1:25, 2:15-2:49. At no point did any Chain Bridge employee observe that those statements regarding the crediting of the account were inaccurate or that the account had not actually been credited at that time. In fact, Evinger himself told a Blue Flame employee on March 27, 2020 that "[Blue Flame's] account was opened and money was accepted and then returned. We can't 'void' it." Ex. 126, 785. Defendants also concede that the "memo credit" affected the account's "Current Balance" as shown in their records (Ex. 48,

12

2673 (showing "Amount" of $456,888,600.00 in Blue Flame's account); Pl. Br. at 10 ¶ 17) and

that when they placed the "hold" on the funds at 12:25 PM ET on March 26, they did so in Blue

Flame's account (Ex. 60, 4468; Pl. Br. at 10 ¶ 17). Furthermore, Chain Bridge's wire transfer

policy provides that "[w]hen wires are received into the bank, the funds are deposited into the

designated beneficiary's account and a notice will be sent to the customer by secure email." ECF

No. 113-10, 4298. It is undisputed that Gula received the secure email notice of the receipt of the

wire. Pl. Br. at 9 ¶ 15; Ex. 50, 1938-39; SUF ¶ 17. In addition, both Gula and Thomas testified that

Gula saw the funds appear in Blue Flame's account on Chain Bridge's online account portal after

receiving that email. Pl. Br. at 9 ¶ 15; Ex. 1, 221:2-17; Ex. 2, 226:6-17.[18]

The distinction Defendants seek to draw between a "memo credit" and a "hard post" after

"nightly batch data processing" is meaningless in any event. As Blue Flame's banking expert

explained, a "memo credit" (or "memo debit") is simply shorthand for a transaction. Ex. 127,

322:4-326:11. The bank's "nightly batch data processing," meanwhile, is nothing more than a

bookkeeping mechanism that allows the bank to account for all transactions on a daily basis.[19] It

is irrelevant under the law. *Banque Worms*, 726 F.Supp. at 942 (citation omitted) (rejecting

---

[18] The cited testimony plainly supports that Gula saw the funds appear in Blue Flame's account, though Defendants bizarrely dispute that fact. *See* Defs. Opp. at 10 ¶ 15. Were Gula clairvoyant, he would have taken a picture to provide the "documentary evidence" Defendants argue is lacking. *See id.*

[19] Defendants argue in a footnote that there is no evidence in Chain Bridge's general ledger showing the crediting of the account. *See* Defs. Opp. at 10 n.6. That is irrelevant because, as Defendants have explained, all accounting entries for the bank's business demand checking accounts are aggregated together (*see* Ex. 128, 321:11-324:15); as a result, intra-day, offsetting movements of funds would not have left a record in the bank's general ledger (*see* Ex. 129, 190:14 -194:16). In response to repeated discovery requests, Defendants' counsel confirmed that the detailed daily transaction logs that would have reflected all activity related to Blue Flame's account, including intra-day, offsetting movements of funds, were too "ephemeral" to have been retained and do "not persist for more than a few days and are not included as part of any periodic back-ups of the Bank's system." Ex. 130.

argument that wire transfer sent via Clearing House Interbank Payments System (CHIPS) is complete and final only after it settles at close of business day because the "final settling of the accounts" at end of day is "mere bookkeeping"); *see also* Funds Transfers Through Fedwire, 55 Fed. Reg. 40791-01, 40800 (Oct. 5, 1990) ("Fedwire…payment orders are final and irrevocable to the receiver when made"). Logic also dictates that there is no legally cognizable distinction between a "memo credit" and a "hard post." As Chain Bridge's funds availability policy states, funds received via wire transfer typically are made available to the beneficiary the day the bank receives the wire, and thus before the "nightly batch data processing" converts the "memo credit" to a "hard post." Ex. 131, 4310 ("Cash and electronic direct deposits will be available on the day we receive the deposit…."). Because funds received by wire transfer can be (and typically are) released to a customer prior to "nightly batch data processing," it would make no sense for the law to distinguish between a "memo credit" and a "hard post."

## III.    THERE ARE NO DISPUTES OF MATERIAL FACT AS TO DEFENDANTS' LIABILITY FOR TORTIOUS INTERFERENCE.

### A.    Undisputed Facts Establish Blue Flame's Contract and Business Expectancy with California.

As demonstrated in Blue Flame's opening brief (Pl. Br. at 27), the evidence establishes that Blue Flame had a valid contract and business expectancy with California. Defendants concede that: Blue Flame had a contract to sell 100 million N95 masks to California (Pl. Br. at 4 ¶ 5; Defs. Opp. at 5 ¶ 5); California had made its prepayment of 75% of the purchase price as agreed under that contract (*see* Defs. Opp. at 5 ¶ 5); Defendants were aware of the existence of that contractual relationship and business expectancy as of March 25 (*see* Pl. Br. at 5-7; Defs. Opp. at 8 ¶ 9) and were told that the Wire Transfer was "legitimate" and a "good transfer" by California officials

(Defs. Opp. at 12 ¶ 19);[20] Blue Flame had entered contracts and orders with suppliers to provide the N95 masks to California as of the time of California's wire to Blue Flame (Pl. Br. at 7); and Defendants were aware Blue Flame stood to profit by over $100 million upon successful delivery of California's order (*see id.* at 6 ¶ 8).

With no real rejoinder to those undisputed facts, Defendants incorrectly argue that Blue Flame procured California's order by fraud and, therefore, Blue Flame had no valid contract with California. *See* Defs. Opp. at 14-15. Not so. As Blue Flame has explained, those purported "misrepresentations" were based on information represented and available to Blue Flame at the time they were made. Pl. Opp. at 2-8; *supra* Section I.A. Moreover, it is undisputed that the statements Defendants rely on were made to individuals with no role in negotiating with or vetting Blue Flame, and thus could not have been material in any event. Pl. Opp. at 2-8.

## B.   Undisputed Facts Establish Defendant's Wrongful Intent to Interfere with Blue Flame's Relationships with California.

Evidence shows that Defendants acted with the requisite intent to be liable for interference with Blue Flame's contract and business expectancy with California. Pl. Br. at 28-29. Rather than provide contrary evidence to establish a disputed issue of material fact, Defendants merely repeat their mistaken assertion that Blue Flame was somehow engaged in fraudulent activity. *See* Defs. Br. at 30 ¶ 4. Because Defendants knew or were substantially certain that their insinuations that Blue Flame was a fraud would cause California to terminate its order (Pl. Br. at 28-29),[21] the

---

[20] In addition to California's order, Defendants also were on notice at the time of their actions that Blue Flame had contracts with other purchasers (*see, e.g.,* Ex. 67, 4463; Ex. 1, 193:5-17), and do not dispute that Blue Flame had told them that its successful completion of the California transaction would enable Blue Flame to fill other orders (Defs. Opp. at 9-10 ¶ 12).

[21] Indeed, during motion to dismiss briefing, Defendants referred to the statements made to California as conveying "fraud concerns." ECF No. 27 at 17. Yet, incredibly, they now suggest it is impossible that California officials could have understood Defendants' fraud concerns to suggest that Blue Flame was potentially engaged in fraud.

intentional interference prong of Blue Flame's claim is satisfied. *See Commerce Funding Corp. v. Worldwide Sec. Servs. Corp.*, 249 F.3d 204, 213 (4th Cir. 2001) (finding intentional interference where defendant twice contacted plaintiff's contractual counterparty knowing that it was substantially likely to harm performance of plaintiff's contract).[22]

### C.   Undisputed Facts Establish Defendant's Use of Improper Methods.

Uncontroverted evidence also establishes that Defendants used improper methods[23] in interfering with Blue Flame's relationship with California in multiple independent ways, including by deviating from standard industry practices[24] and by violating Regulation J.[25] Defendants first try to escape liability by insisting that its deviation from standard banking practices was justified because "both Chain Bridge and California had a shared interest in investigating the wire transfer to verify its validity." Defs. Opp. at 28.[26] But Defendants ignore the undisputed facts that

---

[22] Notably, Defendants do not argue that *Commerce Funding Corp.* is inapplicable or otherwise distinct in any way, preferring to counter only with feigned indignity. *See* Defs. Opp. at 26-27.

[23] Defendants claim that Blue Flame's argument regarding "improper methods" concedes that its contract with California was terminable at will. Defs. Opp. at 22. Defendants misread Blue Flame's truthful recitation of the law that "improper methods" must be established *either* where there was interference with business expectancy *or* a contract may be terminated at will. *Dunlap v. Cottman Transmission Sys., LLC*, 754 S.E.2d 313, 318 (Va. 2014). Because Blue Flame has claimed interference with its business expectancy, it must demonstrate improper methods for that claim.

[24] Defendants assert that while the Virginia Supreme Court has "posited" that the improper methods element may be satisfied by violating the established standards of a trade/profession, "we are unaware of any decision of that court upholding liability…based on that theory." Defs. Opp. at 29 n.14. It has done so. *See Simbeck, Inc. v. Dodd Sisk Whitlock Corp.*, 508 S.E.2d 601, 604 (Va. 1999) (affirming liability for tortious interference where the "defendant intentionally interfered with the expectancy by using improper means" because it "violated unwritten trade customs or ethical practices in the trucking insurance business[.]").

[25] Defendants argue that "Blue Flame premised its tortious interference claims on allegations that Defendants 'unilaterally contacted California officials and accused Blue Flame of fraud['']" only to "now retreat[] from that theory[.]" Defs. Opp. at 27. Defendants are wrong. Blue Flame has not "retreated" from its defamation claim, but acknowledges it involves disputed issues of fact that cannot be resolved on summary judgment. There are no disputed issues of fact concerning Defendants' violations of federal regulations and deviation from standard industry practice, either of which can supply "improper means" for tortious interference under Virginia law.

[26] Defendants' citation to *Prof. Recovery Servs., Inc. v. Gen. Elec. Capital Corp.* is inapposite. That case concerned multiple *financial institutions* exchanging information, not a financial

California viewed the Wire Transfer as "legitimate" and was in the midst of performing at the time of their unsolicited contact. *See id.* at 12 ¶19. That also is why there is a distinction between Defendants' communications with California and those with JPMC. *See id.* at 28. JPMC was not the party originating the Wire Transfer and thus plausibly could have had a joint interest in investigating it with Defendants. Moreover, it would have been reasonable to expect that California would have a different—and more severe—reaction to its vendor's *own bank* raising fraud concerns related to the transaction than to JPMC flagging such concerns.

There is no genuine dispute that Defendants' actions violated standard banking practices. In an attempt to obfuscate those practices, Defendants refer to their banking expert's assertions that it is common to directly contact the originator of a wire transfer when investigating a wire.[27] Defs. Opp. at 29. However, Grice's assertion was that it is routine and appropriate to contact a counterparty where the bank requires *further* information to verify a transaction.[28] Here, Defendants had already been provided with information to verify the transaction by Blue Flame, including the originator, the amount, and the purpose. Pl. Opp. at 9-10 ¶¶ 23-25. It was therefore

_____

institution sharing information with the contractual counterparty of a customer. *See* 642 F. Supp. 2d 391, 401 (D.N.J. 2009) (emphasis added) ("Defendant[]'s fraud division had a practical, legal, and 'moral duty' to prevent identity theft and report the risk to those *with the same duty in the same industry*").

[27] Notably, in its Memorandum in Opposition to Chain Bridge Bank, N.A.'s Motion for Summary Judgment, JPMC—the largest bank in the United States by total assets—referred to Defendants decision to reach out to California as "extraordinary." ECF No. 145 at 5.

[28] Grice said that when investigating a transaction: "My one early source of information is my client, right, the beneficiary." Ex. 125, 291:23-25. He continued "So the other information banks routinely gather is, you know, web search, Internet information, Google hits, news about the originator, you know, trying to build a profile for what does this originator do." *Id.* at 292:7-11. Finally, Grice stated that "And then *if doubts persist*, again, in particular, against the backdrop of an extremely large transaction, I am free to call the originator." *Id.* at 292:14-17 (emphasis added).

inconsistent with standard banking practices to reach out to California to "verify" the Wire Transfer, much less to continue questioning it after California officials *did* verify the transfer.[29]

Finally, Defendants claim that their Article 4A violations cannot serve as the "improper methods" for a tortious interference claim because (1) they did not violate Article 4A and (2) even if they did, Article 4A (as incorporated by Regulation J) preempts state law causes of action like tortious interference. Defs. Opp. at 30. As discussed above, Blue Flame is entitled to summary judgment on its Article 4A claims. *See supra*, Sections I & II. Moreover, Defendants' own cited authority demonstrates that Article 4A does not preempt causes of action that cover different conduct and offer different remedies. In *Eisenberg v. Wachovia Bank, N.A.*, the Fourth Circuit held that a tort claim was not preempted by Article 4A where the claim challenged not the wire transfer processing itself, but surrounding conduct. 301 F.3d 220, 224 (4th Cir. 2002). Blue Flame's tortious interference claims are no different. They are predicated not on Chain Bridge's handling of the Wire Transfer, but on Defendants' interference with Blue Flame's relationship with California, and thus are not "duplicative" of Article 4A. *See id.*[30]

## IV.   **BLUE FLAME CAN ESTABLISH DAMAGES.**

Defendants argue that Blue Flame's motion for summary judgment on liability under Counts I, IV, and V must fail because they assert it is impossible for Blue Flame to establish it has suffered *any* damages as a result of Defendants' actions.[31] Defs. Opp. at 22-23, 30. Yet there is

---

[29] Schoeppe's self-serving testimony that she frequently contacts originators of wire transfers (*see* Defs. Opp. at 29) fails to raise an issue of material fact; what Chain Bridge purportedly does as its standard practice does not establish standard practice throughout the banking industry. Indeed, Chain Bridge's failure to follow industry practices is the reason for this lawsuit.

[30] *See also* James J. White & Robert S. Summers, Uniform Commercial Code, Practitioner Treatise Series § 22-4 at 29 (5th ed. 2008) ("When there is some sort of additional act that occurred outside of the funds transfer itself ... there is no reason to preclude a state law fraud claim.").

[31] Blue Flame is not seeking summary judgment as to the amount of its damages, which turns on questions of fact that require a trial.

ample evidence from which a reasonable jury would conclude that Blue Flame suffered damages as a result of Defendants' refusal to pay Blue Flame (under Count I) and/or Defendants' tortious interference (under Counts IV and V). After all, it is undisputed that California paid Blue Flame under a contract to sell 100 million N95 masks, and that Blue Flame was attempting to pay its suppliers and stood to profit over $100 million. *See supra* Section III.A.

Defendants' arguments that Blue Flame cannot prove damages ignore relevant evidence and are circular in that they ignore the impact of Defendants' own actions in frustrating Blue Flame's business objectives. First, Defendants argue that "Blue Flame could not have forced California to proceed with the transaction over California's objection." Defs. Opp. at 22. That argument ignores that there *was no objection* from California prior to Defendants' actions. Indeed, the undisputed evidence shows that, before Defendants took the extraordinary steps of repeatedly contacting California officials and sowing doubts about Blue Flame, California and Blue Flame were in the process of performing on that contract. *See* Pl. Opp. at 13-14.

Second, Defendants argue that "there is no evidence that Blue Flame had any source of supply to fulfill California's order" (Defs. Opp. at 22) and dispute that "Blue Flame could deliver any of the products or inventory" that California agreed to purchase (*id.* at 4 ¶ 3). Yet, Defendants concede that Blue Flame's suppliers told Blue Flame that they could deliver N95 masks to California (*id.* at 4 ¶ 4), and that Blue Flame placed orders with those suppliers prior to California's payment (*see id.* at 7). Furthermore, the CEO of Blue Flame's primary supplier for California's order, from whom Blue Flame ordered 100 million N95 masks meeting California's specifications, has confirmed that his company would have been able to deliver the masks to California had Defendants not interfered and prevented Blue Flame from making the prepayment to which

California, Blue Flame, and its supplier had agreed. Ex. 95 ¶¶ 22-23, 29-30, 32-40.[32] Plainly, there is evidence that Blue Flame had suppliers that agreed to deliver the masks California purchased. Ultimately, Defendants' argument takes their own destruction of the deal as proof that it never could have happened. To the extent Defendants dispute how many masks Blue Flame would have been able to deliver within 30 days (*see, e.g.,* Defs. Opp. at 6-7), that dispute goes to the amount of Blue Flame's damages, not whether there are any damages at all.[33]

Finally, Defendants argue that Blue Flame would not have performed on California's contract because Blue Flame was unable to fulfill certain other PPE orders. *See* Defs. Opp. at 22. But it was Defendants' unauthorized reversal of the Wire Transfer that disrupted Blue Flame's supplier relationships and robbed it of the capital it needed to prepay for those orders. *See* Ex. 86, 119:22-120:9, 125:15-127:8, 203:12-204:2, 206:19-22, 259:18-260:19; Ex. 95 ¶ 38. In any event, Defendants ignore undisputed evidence that Blue Flame delivered other PPE orders, including over 1.6 million N95 masks accepted by the State of Maryland and City of Chicago. Ex. 111, 207341; Ex. 112, Schedule A at 5.

## CONCLUSION

For these reasons, Blue Flame's Motion for Partial Summary Judgment should be granted.

---

[32] Huang also confirmed the following facts that Defendants attempt to dispute: (1) that the "allocable inventory" and "monthly capacity" figures in GHC's products catalog did not represent maximum capacities for a prepaid order the size of California's (Ex. 95. ¶ 18; *see* Defs. Opp. at 5-6); and (2) that the entity for which Gula provided wire instructions in response to Evinger's question is a GHC affiliate (Ex. 95 ¶ 28; *see* Defs. Opp. at 8-9 ¶ 10; Pl. Br. at 7 ¶ 10).

[33] For example, Defendants' purported PPE expert witness concludes primarily on the basis of otherwise inadmissible hearsay that it would have been *impossible* for Blue Flame to supply 100 million N95 masks of the designated models within sixty days. *See* ECF No. 130-22 at ¶¶ 47-52. Blue Flame's PPE expert disagrees with that analysis, creating an issue that cannot be resolved on summary judgment (*see* Pl. Opp. at 14 n.7; Ex. 117 ¶¶ 16-24), but in any event Blue Flame's successful delivery of *any quantity* of the specified masks to California would result in damages.

Dated:  May 27, 2021

Respectfully submitted,

/s/ Peter H. White
Peter H. White (VA Bar No. 32310)
Jason T. Mitchell (*pro hac vice*)
Gregory Ketcham-Colwill (*pro hac vice*)
SCHULTE ROTH & ZABEL LLP
901 Fifteenth Street, NW, Suite 800
Washington, DC  20005
Tel.:  (202) 729-7476
Fax:  (202) 730-4520
pete.white@srz.com
jason.mitchell@srz.com
gregory.ketcham-colwill@srz.com

William H. Gussman, Jr. (*pro hac vice*)
Steven R. Fisher (*pro hac vice*)
SCHULTE ROTH & ZABEL LLP
919 Third Avenue
New York, New York  10022
Tel.:  (212) 756-2044
Fax:  (212) 593-5955
bill.gussman@srz.com
steven.fisher@srz.com

*Counsel for Plaintiff Blue Flame Medical LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 27th day of May, 2021, I caused the foregoing document

to be filed and served electronically using the Court's CM/ECF system, which automatically sent

a notice of electronic filing to all counsel of record.

Dated: May 27, 2021

 /s/ *Peter H. White*
Peter H. White, Esq. (VSB# 32310)
SCHULTE ROTH & ZABEL LLP
901 Fifteenth Street, NW, Suite 800
Washington, DC 20005
Tel: 202-729-7476
Fax: 202-730-4520
peter.white@srz.com

*Counsel for Blue Flame Medical LLC*