**IN THE UNITED STATES DISTRICT COURT FOR THE**
**EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

|  |  |  |
|---|---|---|
| BLUE FLAME MEDICAL LLC, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | |
| CHAIN BRIDGE BANK, N.A., <u>et al.</u>, | ) ) | |
| Defendants. | ) ) | 1:20-cv-658 (LMB/IDD) |
| ───────────────────── | ) ) ) | |
| CHAIN BRIDGE BANK, N.A., | ) ) | |
| Third Party Plaintiff, | ) ) | |
| V. | ) ) | |
| JPMORGAN CHASE BANK, N.A., | ) ) ) | |
| Third Party Defendant. | ) ) ) | |

## <u>MEMORANDUM OPINION</u>

Before the Court are the motion for summary judgment of defendants Chain Bridge Bank, N.A. ("Chain Bridge"), its Chief Executive Officer, John Brough ("Brough"), and its President David Evinger ("Evinger") against plaintiff Blue Flame Medical LLC ("Blue Flame" or plaintiff") [Dkt. No. 118]; plaintiff Blue Flame's cross-motion for partial summary judgment motion against defendants [Dkt. No. 127]; third-party plaintiff Chain Bridge's summary judgment motion against third-party defendant JPMorgan Chase Bank, NA ("JPMorgan") [Dkt.

No. 122]; and JPMorgan's cross-motion for summary judgment against Chain Bridge [Dkt. No. 112]. For the reasons that follow, defendants' motion for summary judgment against plaintiff Blue Flame will be granted, and plaintiff Blue Flame's motion will be denied. Additionally, third-party plaintiff Chain Bridge's motion for summary judgment against third-party defendant JPMorgan will be granted, and JPMorgan's cross-motion for summary judgment will be denied, leaving the amount of attorney fees and litigation expenses owed to Chain Bridge by third-party defendant JPMorgan as the only issue remaining to be resolved.

## I. FACTUAL BACKGROUND

Before the onset of the COVID-19 pandemic, John Thomas ("Thomas") and Michael Gula ("Gula") were political consultants. As of late 2019 and early 2020, Thomas and Gula had no "experience in the field of medical supplies," no "specialized training or certifications relating to supply chain management," and no "specialized training or certifications in the healthcare industry," Def. Ex. 1 (Gula Tr.), 25:6-18[1]; nevertheless, in February of 2020, Thomas and Gula decided to turn their attention from political consulting to "connecting … medical supply companies with buyers." Pl. Ex. 85 (Bearman Tr.), 53:12-14. Email records indicate that in March of 2020, Thomas and Gula were seeking out possible contracts, including by paying referral fees to various industry contacts. Def. Ex. 4 (March 17, 2020 email labeled "Current contracts 3.17"). On March 23, 2020, Thomas and Gula formed Blue Flame Medical LLC by filing a Certificate of Formation with the Delaware Secretary of State. Def. Ex. 5.

---

[1] Chain Bridge's exhibits ("Def. Ex.") have been filed at Docket Numbers 130, 131, and 142. Blue Flame's exhibits ("Pl. Ex.") have been filed at Docket Numbers 132 and 150.

A.  The California Negotiations

On March 20, 2020—before Blue Flame's certificate of incorporation was filed—

California's State Controller, Betty Yee, was contacted by an acquaintance of John Thomas who

had fundraised for her in the past, and who sent her a text message relating: "I received this text

from John Thomas a lobbyist involved in stimulus: [']I have 100mil 3m masks sitting here at the

Port. Of Long Beach. Can you reach out to newsoms [sic] people?[']" Def. Ex. 15; see also [Dkt.

No. 119] at 5 n.3.[2] Yee contacted Thomas to discuss whether he was in a position to supply N95

masks to the state of California, see Def. Ex. 12, and through Yee, Thomas and Gula were put in

touch with California's Department of General Services ("DGS"), the entity responsible for

contracting with vendors for supplies. Id. at 200123. At his deposition, Thomas conceded that

Blue Flame never sold any of the 100 million masks he claimed to have had available at the Port

of Long Beach, and although he insisted that there were "imminent" deals to move that many

masks, he was unable to "specifically recall" any of them. Def. Ex. 2 (Thomas Tr.), 101:1-103-1.

On March 25, 2020, only two days after Blue Flame's formation, DGS issued Blue Flame

a purchase order for a total of 100 million N95 masks in four specified models, for a total price

of $609,161,000.00, 75% of which was required to be pre-paid. Def. Exs. 6-7 (Blue Flame

Invoice; DGS Purchase Order). The purchase order incorporated the terms included in Form

GSPD - 401 Non-IT Commodities, see Def. Ex. 7, which included a provision allowing

California to "terminate performance of work under this Contract for its convenience ... if

[DGS] determines that a termination is in the State's interest." Def. Ex. 79 at ¶ 23(a). The

purchase order also included a delivery date of April 3, 2020, although DGS contract

---

[2] There is no evidence in the record that either Thomas or Blue Flame had 100 million 3m masks
in the Port of Long Beach at that, or any, time.

administrator Michael Wong ("Wong") clarified at his deposition that DGS only expected an initial delivery on April 3. Def. Ex 7; Def. Ex. 8 (Wong Tr.), 108:21-109:7 (explaining that a failure to make an initial delivery by April 3 would have been considered a breach of the contract). Wong also testified that, based on representations by Blue Flame, DGS expected at least 63 million N95 masks to be delivered no later than within 30 days, id. at 71:18-72:8 (citing Def. Ex. 10), and then-Director of DGS Daniel Kim ("Kim") testified that Blue Flame had indicated that the entire order of 100 million N95 masks would be delivered to California within "days or weeks." Def. Ex. 11 (Kim Tr.), 39:6-14.

At 11:46 PM on March 25, 2020—the same day that DGS submitted its purchase order to Blue Flame—Thomas sent Kim and Wong a message that included "a list of rough delivery timelines" for the 100 million N95 masks. Def. Ex. 9. Thomas explained that he had "[s]pent some time talking to [his] main manufacturer, Henry Huang," and that he told Huang that if they "deliver on time and [do] what we said we[']d do," they might establish a good relationship with California for later orders. Thomas represented that Huang "moved Heaven and Earth to steal from neighboring factories and promised to deliver the full order from his shop alone … You'll see on my chart the delivery dates are early." Id. The chart indicated that the first million N95 masks would be delivered on April 2, 2020 and that the entire shipment would be delivered no later than April 24, 2020. Id.

At his deposition, Kim was asked whether, at the time when the purchase order was submitted, he was aware that Blue Flame had only existed for two days, was not registered to conduct business in California, had not yet delivered any N95 masks to any customers, and had opened its bank account only the day before. Def. Ex. 11 (Kim Tr.), 82:20-85:8. Kim testified

that he was unaware of those facts, and that if he had known that information when negotiating with Thomas and Gula, it would have "raised alarm bells." Id.

### B. The Chain Bridge Bank Account

On March 23, 2020, in anticipation of receiving California's purchase order, Gula went to the McLean, Virginia office of Chain Bridge to open a bank account for Blue Flame. To open the account, Gula filled out an Account Agreement form on which he represented that the nature of Blue Flame's business was "[m]edical consulting." Def. Ex. 31 (Account Agreement). He also estimated that the average amount the account would receive in domestic and foreign wire transfers per month would total $100,000,000, and the average amount wired out of the account monthly would be $25,000,000. Def. Ex. 30.[3] Based on the forms Gula completed, Chain Bridge opened an account in Blue Flame's name, and provided Gula with instructions for wiring funds to the account. Def. Exs. 34-35; see also Pl. Exs. 24-25.

At around 3:30 PM[4] on March 25, 2020, Gula called Chain Bridge's Senior Vice President and Branch Manager Heather Schoeppe ("Schoeppe") to inform her that "the state of California is sending an unbelievably large wire transfer in the amount of $450 million." Def. Ex. 37 (audio recording). Gula asked Schoeppe to call or email him "the second" that the wire transfer from California hit his account, which Schoeppe agreed to do. Id. At around 6:15 PM that same day, Schoeppe called Gula back to ask for more information about the incoming wire. Def. Ex. 38 (audio recording). Specifically, she asked what the purpose of the wire transfer was,

---

[3] Early on the same morning that Gula visited Chain Bridge to set up the account, Blue Flame's attorney Ethan Bearman cautioned him: "Odd money moves raise red flags and can hold up transactions. Be VERY CLEAR with the bank that we have gigantic orders coming in from the State of California and we will provide documentation of the order." Def. Ex. 32. Gula responded, "Got it." Id.

[4] The times of phone calls are included in Dkt. No. 130 and Pl. Ex. 62.

to which Gula responded that "we're buying 100 million masks for the State of California from China." She also asked when Blue Flame would likely wire the funds out of the account. Gula said that he did not know exactly when the funds would be wired out, and speculated that it would probably not be all at once, because he thought they would pay some unspecified entity in China as the masks were manufactured. Gula told Schoeppe he would have a better idea of how long the money would be in the account the next day. Id.

After her conversation with Gula, Schoeppe called the bank's Chief Financial Officer Joanna Williamson ("Williamson"), to ask whether it would be feasible to accept a wire for $450 million. Pl. Ex. 30 (audio recording). Williamson acknowledged that it was a large sum, but told Schoeppe "we'll do whatever we need to do" to accommodate it. Id. Williamson also told Schoeppe that a deposit of that size would affect the bank's balance sheet and "capital ratios," but without more analysis or more information about how long the funds would remain in the account, she was not sure whether the impact would be negative. Id.

Next, Schoeppe reported to Chain Bridge's Chief Executive Officer, defendant Brough, and its President, defendant Evinger, explaining to them that Gula had "been calling all day" and summarizing her conversations with him. Def. Ex. 39 (audio recording). Either Evinger or Brough—it is unclear who from the recording—promptly Googled Gula, and found a report about a deal for 1 million masks, but did not find any report of a deal involving 100 million masks. Evinger or Brough then said, if Gula was telling the truth about the size of the wire, "we can't hold that money on our balance sheet," and Gula would need to agree to an arrangement that would spread the funds out over various accounts. Id. Evinger or Brough affirmed that "on a normal day" the bank "would do" a transaction of the size that Gula had described, but then observed that this was "kind of a weird transaction." During the call, Schoeppe looked up Blue

Flame and learned that it had only been founded the day before, and after some discussion, Evinger or Brough opined that it was "unbelievable" that a two-day old business had been awarded a $450 million-contract from the State of California.

Evinger and Brough next called Gula directly. That call was not recorded and there is disagreement over exactly what was said, compare [Dkt. No. 119] at ¶ 14 with [Dkt. No. 149] at ¶ 14; however, the parties agree that Evinger and Brough asked Gula for documentation showing that the deal with California was legitimate. It is undisputed that Blue Flame never sent Chain Bridge the requested documentation. See id.; Def. Ex. 45; Pl. Ex. 84. The parties also agree that Evinger and Brough informed Gula that a deposit of $450 million would not be covered by FDIC insurance, and that the funds would need to be placed into "sweep-accounts" spread out over multiple institutions, also referred to as the "ICS Program." See Pl. Ex. 84. On her earlier call with Williamson, Schoeppe had stated that she planned to prepare the paperwork needed to keep the funds in separate accounts, and after their call with Evinger and Brough, they likewise instructed employees to go ahead and prepare the ICS Program paperwork. Pl. Ex. 59.[5]

At 6:17 PM on March 25, 2020, Brough emailed Gula: "Just one question. Did you send any money to China or others as a 'fee' for these transactions?" Pl. Ex. 37; Def. Ex. 45. Gula responded, "[N]o, we have not sent the money to [C]hina but when we do this is where we are sending it," and included instructions for wiring funds to Wingar Industrial, Inc. Id. at 13448. Wingar Industrial, Inc. is evidently the United States-based affiliate of Great Health Companion, the Chinese company from whom Blue Flame intended to source the majority of the masks for

---

[5] After the wire transfer had been received from California's bank and credited to Blue Flame's account, Chain Bridge's employees learned that "the ICS program has a maximum limit of $125 mil." Pl. Ex. 59 (email from Senior Vice President and Commercial Banking Manager Mike Richardson).

California's order, see Pl. Ex. 95 at ¶ 28; however, when Evinger searched for Wingar Industrial, Inc. online, he could find only that it was a "cutlery company," which "raised more red flags" for Chain Bridge. Def. Ex. 40 (Brough Tr.), 159:18-160:2.

    C.  The Payment Reversal

    On March 26, 2020, at 11:21 AM ET, a representative from the California State Treasurer's Office originated a wire transfer in the amount of $456,888,600, for Blue Flame's benefit, through California's bank, third-party defendant JPMorgan. [Dkt. No. 96] at ¶ 15 (Stipulation of Uncontested Facts). Rakesh Korpal, a JPMorgan Executive Director and the leader of JPMorgan's Fraud Payments Control Team, testified that the outgoing wire triggered an alert in the "roll payment guardian application[,] which is screening for suspicious transaction activity." Def. Ex. 47 (Korpal Tr.), 44:3-6. As a result of the alert, an agent for JPMorgan contacted the bank's California clients to verify approval for the transaction, which California confirmed. Id. at 44:7-14. At 11:55 AM, Chain Bridge received the incoming wire, which was credited to Blue Flame's Account. See Def. Ex. 50; Pl. Ex. 59 at 663-664 (email from Chain Bridge Operations Associate Rick Claburn reporting to management that the "wire has been received and credited to the client's account"). At 11:57 AM, Gula received an automated "Incoming Wire Confirmation" informing him that $456,888,600.00 had been received on Blue Flame's behalf. Def. Ex. 52.

    Because Chain Bridge officials remained concerned about the transaction, at 12:07 PM, only ten minutes after Chain Bridge received the transfer, Evinger ordered that a hold be placed on the funds. Def. Ex. 55. Meanwhile, Korpal was attempting to gather more information about the transaction from California officials, "given the value of the transaction." Def. Ex. 47 (Korpal Tr.), 61:10-22. Although an official in the California State Treasurer's Office confirmed the details of the transaction to Korpal, he asked his colleague Tim Coffey ("Coffey") "to call

Chain Bridge Bank to determine if they knew the beneficiary of the funds and what the disposition of the transactions or the funds were at that point." Id. at 62:11-18. Coffey called Chain Bridge at approximately 12:30 PM and asked to speak to someone in either the wire transfer or fraud departments, relaying that JPMorgan had "concerns of fraud" related to the Blue Flame transaction. Def. Ex. 57 (audio recording). Coffey testified that he was put in touch with Evinger, who he remembers telling him that Chain Bridge had "similar suspicions" and "had already been engaged in holding on to the funds at that time." Pl. Ex. 63 (Coffey Tr.), 64:19-65:7.[6]

At 12:44 PM, Korpal called Chain Bridge and spoke with Brough and Evinger, explaining JPMorgan's concern that the "amount seems to be quite high for the supplies that they're purportedly paying for" and asking Chain Bridge, "Is it a new account or a well-established business?" Def. Ex. 59 (audio recording). Brough explained: "The money went into an account that is brand new, it was opened by an existing client, he's been a client for about 10

---

[6] In Blue Flame's opposition brief, it argues that during this call Evinger "falsely stated that Chain Bridge had not credited Blue Flame's account," and that "[t]hat statement was significant since JPMC believed (mistakenly) that the funds could be returned without Blue Flame's authorization as long as they had not been credited to Blue Flame's account." [Dkt. No. 149] at ¶ 21. This characterization is not consistent with the portions of Coffey's deposition transcript that Blue Flame cites: Coffey testified that he learned from Evinger that a hold had already been placed on the funds, but Coffey does not testify that Evinger told him that the funds had not yet been credited to Blue Flame's account. See Pl. Ex. 63 at 64-66. On the other hand, Korpal testified that "Tim [Coffey] and I spoke with" Chain Bridge and "[t]hey confirmed that the transaction had not been credited to Blue Flame Medical's account." Pl. Ex. 44 (Korpal Tr.), 63:3-9. In the recorded calls between Korpal, Brough, and Evinger, neither Brough nor Evinger makes any statement that the funds had not yet been credited to Blue Flame's account. See Def. Exs. 59, 63 (audio recordings). As a result, there does not appear to be any non-hearsay evidence in the record that Chain Bridge told Coffey or Korpal that the funds had not yet been credited to Blue Flame's account while they were being held for investigation; however, as discussed below, there was testimony that Chain Bridge later represented to California's State Treasurer's Office that the funds had not been credited to Blue Flame's account before JPMorgan recalled the funds. See Def. Ex. 62 (Gonzalez Tr.), 50:11-15.

years. He's a lobbyist." Id. Brough recounted his and Evinger's conversations with Gula the
previous day, and told Korpal, "We asked him a number of questions—he had answers to all the
questions, of course." Id. Brough and Evinger said they had had difficulty contacting anyone in
California's state government who was able to verify the transaction, and Korpal told them that
he planned to "get in touch with the banker for the State of California" to ask for additional
details about the transaction, because JPMorgan's Global Investigations Team was "coming back
to [him] and saying, this does not look right either," and because his own research was "all
leading to not-good places." Id.

At 12:51 PM, Fee Chang—an employee of California's Department of General
Services—called Chain Bridge in response to a voicemail that Chain Bridge had left on the
department's main telephone line. Def. Ex. 60 (audio recording). In the voicemail, Chang
"confirm[ed]" that the transfer was "legitimate," but asked Chain Bridge to call her back to
confirm the exact amount of the transfer. Id. At 12:55 PM, Brough and Evinger called Chang to
ask for "documentation to support … that funds were transferred properly." Def. Ex. 61 (audio
recording). Chang replied that the funds had been transferred by the California State Treasurer's
Office, and referred Brough and Evinger to Natalie Gonzalez, whom Chang stated was "in
charge of the transfers." Id.

At 1:19 PM, Natalie Gonzalez and Mark Hariri of the California State Treasurer's Office
called Brough and Evinger to discuss the transfer of funds to Blue Flame's account. Gonzalez
testified at her deposition that she and Hariri "were told by Chain Bridge Bank, that the account
had just been opened the day previously by a lobbyist." Def. Ex. 62 (Gonzalez Tr.), 53:12-14.
Gonzalez also recalled "the president of the bank" telling her that the funds had not "been
credited to the client account at that time," and in response she and Hariri asked Chain Bridge to

"wait until [they could] find out additional information" from the Department of General Services. Id. at 49:12, 50:11-15. During her deposition, when Gonzalez was asked whether Evinger or Brough (who she did not remember being on the call) had told her anything about Blue Flame other than "that the account had just been opened the day previously by a lobbyist," she said no, they had not. Id. at 53:6-16.

At 1:34 PM, Brough and Evinger again spoke with Korpal. Def. Ex. 63 (audio recording). During that call, Evinger asked, "Is there any way for JPMorgan to issue a recall for the wire, so that while you intervene in this you have the funds and feel more comfortable?" Korpal responded, "Well, I feel comfortable that you're holding the money right now. I can issue a recall. But I don't think you and I want to get onto the front page of the Wall Street Journal, especially if this is a legitimate transaction." Id. Korpal asked for "a few more minutes" to determine a course of action, and Evinger and Brough responded that they looked forward to hearing back from him. Id.

Just minutes later, at 1:37 PM, Korpal's colleague, Coffey called Evinger and Brough to explain, "We're going to be recalling those funds, OK? We have enough concerns that we feel we need to call those funds back. Do you need a recall message from us, or what are you looking for from us?" Def. Ex. 64 (audio recording). Chain Bridge asked for an official communication from JPMorgan, over the Fedline platform, requesting a recall of the funds. Id. Korpal testified at his deposition that he made the decision to recall the funds from Chain Bridge, Pl. Ex. 44 (Korpal Tr.), 79:14-19, and that at the time he was under the impression that the funds were properly subject to recall, because Coffey had told him that the funds had not yet been credited to Blue Flame's account. Id. at 38:14-40:9, 62:8-64:2.

At 1:55 PM, Chain Bridge notified Gula that it had "received official notice from the sending bank to return the wire," and advised Gula to "resolve [the matter] directly with the state of California." Def. Ex. 67. At 2:05 PM,[7] JPMorgan sent a message to Chain Bridge via the Fedwire Funds Processor, officially asking for the return of the funds. Def. Ex. 65. According to Korpal, the actual recall of the funds corresponded with a 2:00 PM request from the California State Treasurer's Office that JPMorgan recall the funds, because the Office was "not comfortable" with the Department of General Service's due diligence. Def. Ex. 47 (Korpal Tr.), 21:11-22:17.[8]

At approximately 2:30 PM, Gula came to Chain Bridge to speak to Brough and Evinger. Brough testified that Gula apologized for the transaction and did not object to the return of funds. Def. Ex. 40 (Brough Tr.), 305:10-22. In his deposition, Gula explained that he did not "ask them … not to return the money to California or its bank" because Chain Bridge "didn't ask. They just took it," and because he was under the impression that Chain Bridge "had already stolen the money out of my account." Pl. Ex. 1 (Gula Tr.), 208:18-20, 209:6-7. At 3:21 PM, Chain Bridge returned the funds to JPMorgan, noting in the accompanying Fedwire message that the action was taken "PER YOUR REQUEST." Def. Ex. 68. The funds posted to California's JPMorgan account by 4:02 PM. [Dkt. No. 96] at ¶ 34.

---

[7] Plaintiff quibbles that Chain Bridge's records show the recall occurring at 1:45 PM, see [Dkt. No. 149] at ¶ 28 (citing Pl. Ex. 70); however, it is not clear what service or application generated the record to which plaintiff cites, and the Fedwire message itself states "Create Time: 2020-03-26 14:05:47.902." Def. Ex. 65.

[8] Later that evening, Gonzales asked JPMorgan "to reach out to Chain Bridge Bank and see where the wire-recall is in the process" Def. Ex. 66.

D.  The Feasibility of Fulfilling the California Contract

On March 26, 2020—the same day that the wire transfer was reversed—the deputy

director of the Department of General Services announced in an internal email that the "wire

transfer was processed on STO's [California State Treasurer Office's] end but not completed.

Funds are with STO. After further discussion we won't be moving forward with the vendor." Pl.

Ex. 76. On March 27, 2020, Thomas reached back to Betty Yee, California's State Controller

who was Thomas's first contact in the state government. Thomas messaged Yee, "I'm sure you

heard about my bank bouncing payment hours after it went through. Unbelievable. However,

I've come up with a work around for the product I have in route." Def. Ex. 12 at 200132.[9] Yee

responded that Thomas needed to communicate directly with General Services Director Daniel

Kim, that he should "cease to keep [Yee] in the loop," and that he had a "credibility issue" that

he needed to solve. Id. at 200133.

Blue Flame tried to continue negotiating with the Department of General Service's

Contract Administrator Wong, but Wong declined to enter into a new agreement with Blue

Flame and began forwarding all Blue Flame correspondence directly to the FBI. Pl. Exs. 108,

109.

On April 8, Congressional Representative Katie Porter of the 45th District of California

wrote to the Principal Deputy Inspector General of the Department of Health and Human

Services about concerns of "potential price gouging regarding personal protective equipment

during the COVID pandemic," identifying Blue Flame as a "potentially costly and burdensome

middleman." [Dkt. No. 1] at ¶ 81. In a letter dated June 22, 2020, responding to congressional

investigators, Blue Flame provided a "list of all contracts, orders, or agreements that Blue Flame

_____

[9] There is no evidence in the record that any product was actually en route at that time.

13

has entered into with federal, state, or local governments or governmental entities for medical supplies or equipment." Def. Ex. 73 at 163508. Of the 24 entities listed, Blue Flame only filled two orders: one for 96,000 N95 masks purchased for Chicago by an anonymous buyer on April 16, 2020, for which 100,000 masks were delivered on May 26, 2020, Id. at 163513; Pl. Ex. 112, Schedule A at 5; and an order for 1.55 million N95 masks purchased by Maryland. Pl. Ex. 111. The Maryland order, placed on April 1, 2020, was initially cancelled after Blue Flame encountered issues with its supplier, Great Health Companion Group, which informed Blue Flame that "it could not deliver the masks because of the actions of the Chinese Government." Def. Ex. 73 at 163508. Blue Flame ultimately reached a settlement agreement with Maryland on October 9, 2020, under which it delivered the 1.55 million masks. Pl. Ex. 111. Blue Flame has not identified any other order or contract for N95 masks that it was able to fulfill.

## II. PROCEDURAL HISTORY

On June 12, 2020, Blue Flame filed a Complaint alleging ten counts against the defendants under federal and state law, five of which were dismissed on September 8, 2020. [Dkt. Nos. 1, 31]. In the remaining counts, Blue Flame alleges that Chain Bridge violated the Uniform Commercial Code ("UCC"), as incorporated in Federal Reserve Regulation J, § 4A-404(a) (Count I) and § 4A-204(a) (Count II); and that all defendants committed tortious interference with a contract (Count IV), tortious interference with a business expectancy (Count V), and defamation (Count IX). On September 29, 2020, defendants filed their answer asserting a counterclaim against Blue Flame to recover their attorneys' fees, based on the Terms and Conditions governing Blue Flame's bank account; however, the Court granted a motion to dismiss that counterclaim on November 11, 2020. [Dkt. Nos. 38, 67]. On October 13, 2020, Chain Bridge filed a third-party complaint against JPMorgan, seeking indemnification under

Regulation J or under a theory of unjust enrichment, which JPMorgan answered on November 16, 2020. [Dkt. No. 43, 64].  After engaging in discovery, each party has filed one or more motions for summary judgment; the motions have been fully briefed and oral argument has been held. For the reasons discussed in open court and in this Memorandum Opinion, defendants' motions for summary judgment will be granted as to plaintiff Blue Flame and third-party defendant JPMorgan. Plaintiff Blue Flame's cross-motion for partial summary judgment and JPMorgan's cross-motion for summary judgment will be denied.

### III. DISCUSSION

#### A. Standard of Review

A court must grant summary judgment where "there is no genuine issue as to any material fact and … the movant is entitled to judgment as a matter of law." Norfolk S. Ry. Co. v. City of Alexandria, 608 F.3d 150, 156 (4th Cir. 2010) (quoting Fed. R. Civ. P. 56). Where there are cross-motions for summary judgment, a court must "consider and rule upon each party's motion separately to determine whether summary judgment is appropriate as to each." Monumental Paving & Excavating, Inc. v. Penn. Mfrs. Ass'n Ins. Co., 176 F.3d 794, 797 (4th Cir. 1999).

#### B. Blue Flame's Claims against Chain Bridge, Brough, and Evinger

##### A. Count I (UCC § 4A-404(a))

Plaintiff alleges that Chain Bridge violated UCC § 4A-404(a) by returning the wired funds to JPMorgan after crediting the funds to plaintiff's account. Section § 4A-404(a) provides that: "if a beneficiary's bank accepts a payment order, the bank is obliged to pay the amount of the order to the beneficiary of the order."[10] To make out a claim under UCC § 4A-404(a), Blue

---

[10] Subject to Sections 4A-211(e), 4A-405(d), and 4A-405(e)

Flame must show that Chain Bridge accepted a payment order, and then failed to pay the amount

of the order to Blue Flame, the beneficiary. Unlike at the dismissal stage, defendants no longer

argue that Chain Bridge did not "accept" a payment order on Blue Flame's behalf, and evidence

in the record establishes that the funds were "accepted" because they were credited to Blue

Flame's account. See Def. Ex. 50; Pl. Ex. 59 at 663-664 (email from Chain Bridge Operations

Associate Rick Claburn reporting to management that the "wire has been received and credited

to the client's account"); Def. Ex. 52. Instead, defendants argue that although the payment was

initially accepted, they should not face liability for its return because JPMorgan cancelled the

payment. This argument relies on § 4A-211(e), which provides: "A canceled payment order

cannot be accepted. If an accepted payment order is canceled, the acceptance is nullified and no

person has any right or obligation based on the acceptance." Whether a cancellation order can

trump an acceptance depends on whether the cancellation is "effective":

> (c) After a payment order has been accepted, cancellation or amendment of the
> order is not effective unless the receiving bank agrees or a funds-transfer system
> rule allows cancellation or amendment without agreement of the bank.
>
> ...
>
> (2) With respect to a payment order accepted by the beneficiary's bank, cancellation
> or amendment is not effective unless the order was issued in execution of an
> unauthorized payment order, or because of a mistake by a sender in the funds
> transfer which resulted in the issuance of a payment order (i) that is a duplicate of
> a payment order previously issued by the sender, (ii) that orders payment to a
> beneficiary not entitled to receive payment from the originator, or (iii) that orders
> payment in an amount greater than the amount the beneficiary was entitled to
> receive from the originator.

Id. at § 4A-211(c)(2). In other words, to effectively cancel after accepting the order, (1) Chain

Bridge must agree to the cancellation, and (2) the cancellation must be made to correct for one of

the specified mistakes: a duplicate order, a misstated beneficiary, or an erroneous amount.

Although Chain Bridge did agree to return the funds, none of the specified mistakes applies.

Therefore, defendant Chain Bridge's obligation to its customer, Blue Flame, cannot be nullified through the cancellation process.

Defendants try to argue that 211(c) is irrelevant, because § 4A-211(e) broadly provides that "any" cancellation of a payment order—not just an "effective" cancellation—"nullifies the consequences of acceptance." [Dkt. No. 119] at 17. This argument lacks textual support, and defendants do not cite any cases that follow their strained reading of the regulation.

Defendants try to avoid this conclusion by arguing that the cancellation was effective under § 4A-211(c) because the wire transfer was a "mistake" given that "California originated the funds transfer only as a result of having been misled about Blue Flame's bona fides as a PPE supplier." [Dkt. No. 119] at 17. Although this may be true regarding the underlying transaction between California and Blue Flame, the banking regulations at issue govern only the transfer of funds. Therefore, in the context of banking regulations, a mistake must be one made by the sending bank in the course of effecting a transfer. The only case cited by defendants actually makes this clear. In <u>CFTC v. Rust Rare Coin Inc.</u>, 469 F. Supp. 3d 1211 (D. Utah 2020), the court found that a mistake in the underlying transaction should not be conflated with the mistakes governed by the regulation:

> Mr. Jacobson does not argue that the transfer was unauthorized. Instead, he contends that because RRC was defrauding its investors (including Mr. Jacobson), it was a "mistake" to transfer funds to RRC.
>
> There is no authority supporting this interpretation of mistake. This situation is simply not covered by the three types of mistakes identified in Subsections (i) through (iii) of the statute. Subsections (i) and (iii) involve mistakes regarding the amount of the transfer (e.g. the correct amount was accidentally sent twice or more money was sent than the transferor intended). Subsection (ii) involves a mistake regarding the identity of the transferee. Mr. Jacobson did not make a mistake regarding either the amount of the transfer or the identity of the transferee.
>
> Mr. Jacobson urges the court to embrace a broader interpretation of Subsection (ii), arguing that the words "not entitled to receive payment" imply more than just

17

> mistaken identity. The court disagrees. The official comments to the U.C.C. clearly
> explain that "not entitled," in this context, refers to a mistaken identity.

Id. at 1218 (citing UCC § 4A-211 cmt. 4). Although not binding on this Court, CFTC highlights

the strict scope of the banking regulations. These regulations create default rules that allocate the

risk of loss between banking entities and their customers for problems that happen during fund

transfers. The regulations do not govern the underlying transactions that result in those fund

transfers, which may have problems of their own. Accordingly, Chain Bridge cannot rely on

problems with the underlying transaction to escape its obligation to its customer under the

banking regulations.

Although defendant Chain Bridge violated § 4A-404(a) by returning the wire to

JPMorgan after the wire had been credited to Blue Flame's account, summary judgment is still

appropriate in defendant's favor because plaintiff cannot establish that it sustained any damage

from that return. Section 4A-404(a) of the UCC provides relief only if a violation results in

foreseeable damages to the plaintiff: "If the bank refuses to pay after demand by the beneficiary

and receipt of notice of particular circumstances that will give rise to consequential damages as a

result of nonpayment, the beneficiary may recover damages resulting from the refusal to pay to

the extent the bank had notice of the damages...." The UCC does not provide for, and Blue

Flame has not claimed, statutory damages for a violation of § 4A-404(a). Instead, in Count I

plaintiff seeks "its lost profits for the transaction with California, lost future business

opportunities with California and other customers, and reputational damage as a result of the

subsequent media coverage of the incident." See Complaint, [Dkt. No. 1] at ¶ 97.

Defendants offer two equally compelling arguments establishing that Blue Flame cannot

prove the damages it claims. First, defendants argue that even if Chain Bridge had released the

disputed funds to Blue Flame on March 26, 2020, California would have ended its relationship

with Blue Flame, resulting in the return of the funds, because the evidence in this record

unequivocally shows that plaintiff could not fulfill the contract. [Dkt. No. 119] at 22. In

opposition, Blue Flame urges that this "argument omits Defendants' essential role in causing

California not to proceed with the transaction," and that "[t]he very fact that California sent

prepayment in the first place—before Defendants interfered—demonstrates conclusively that

California had agreed to proceed with the transaction." [Dkt. No. 149] at 13.

There is unrebutted evidence in this record that, independent of any action by any

defendant, JPMorgan began a fraud investigation concerning the wire transfer within minutes of

Chain Bridge's receipt of the wire, and once California officials became aware of Blue Flame's

recent creation and the fact that its owners were lobbyists, it immediately asked for the wire

transfer to be cancelled and the funds returned, and was no longer interested in dealing with Blue

Flame. Def. Ex. 62 (Gonzalez Tr.), 53:12-14; Pl. Ex. 76. Examples of California's decision not

to deal further with plaintiff include Thomas's March 27, 2020 efforts to revive the deal by

reaching out to Controller Yee, which were met with no interest, and Yee telling Thomas that his

company had a "credibility issue" they would need to resolve. Def. Ex. 12 at 200132-133.

Similarly, Blue Flame's April 2020 negotiations with the Department of General Services to

reach another agreement were rejected, and the California administrator with whom Thomas was

negotiating ultimately began forwarding his correspondence with Blue Flame to the FBI. Pl. Exs.

108, 109. The "credibility issues" Blue Flame faced would not have been avoided if Chain

Bridge had credited the funds to Blue Flame's account when they were first received, because

California officials would still have had reason to investigate Blue Flame's credibility even if the

funds were held in Blue Flame's account instead of being returned promptly to California's

bank. In fact, under its purchase order, California could "terminate performance of work under

19

this Contract for its convenience if … [the Department of General Services] determines that a termination is in the State's interest." Def. Ex. 79 at ¶ 23(a).

Chain Bridge's second persuasive argument concerning damages is that "there is no record evidence that Blue Flame would have successfully fulfilled California's order even if Blue Flame had received California's funds." [Dkt. No. 119] at 24. According to Blue Flame's own representations to Congress, it was able to fill only two orders for N95 masks, both much smaller than the order placed by California and neither within the time frame that Blue Flame provided to California. Pl. Ex. 112, Schedule A at 5; Pl. Ex. 111; Def. Ex. 73 at 163513.

The so-called "ample evidence" which Blue Flame claims establishes that it could have met California's order proves no such thing. [Dkt. No. 149] at 14. First, Blue Flame argues that it "had signed and executed agreements in place with two suppliers, confirming its ability to supply the N95 masks," id.; however, the evidence cited for this claim is only the purchase orders and reseller agreements that Blue Flame submitted to its purported suppliers, Suuchi Inc. and Great Health Companion. Pl. Exs. 19, 20, 21, 22. The documents evidence only that Blue Flame placed orders for the masks to fulfill California's purchase order, not that the orders would have been, or could have been, filled by the suppliers. Moreover, neither the purchase orders nor the reseller agreements included delivery schedules suggesting that the products would arrive in time to satisfy the representations that Blue Flame made to California. Compare Pl. Ex. 19 (Suuchi Inc. agreement stating delivery date was "based on time from funds clearing" and that other shipping instructions were "TBD"); Pl. Ex. 20 (Great Health Companion agreement stating that "Seller will fulfill within 40 days from the time payment is received and cleared" but that the masks would "be shipped in tranches as often and as soon as available"); with Def. Ex. 8 (Wong Tr.), 108:21-109:7 (DGS expecting first delivery of masks no later than April 3, 2020); Def. Ex. 9.

20

(Thomas representing that all masks would be delivered "early" and no later than April 24, 2020).

Blue Flame's opposition also mischaracterizes the assurances it had received from its largest supplier, Great Health Companion. Blue Flame claims that it had "received confirmation from Henry Huang, the CEO of its primary supplier [Great Health Companion], ... that [it] would be able to deliver 100 million masks to California within 30 days, provided prepayment was made." [Dkt. No. 149] at 14 (citing Pl. Exs. 15, 2). Plaintiff's Exhibit 15 is a series of text messages between Thomas and Huang, in which Thomas wrote: "Henry, Mike said you can get us 100m n95 over a 30-day period of time." Far from confirming that to be the case, Huang only responded: "John, we will give it all our efforts here to fight for the most scare [sic] resources during crazy times." Pl. Ex. 15 at 212725-26; see also Pl. Ex. 2 at 201:7-202:21 (Thomas deposition transcript in which Thomas inaccurately characterizes the text conversation with Huang). Twelve days after defendants filed their Motion for Summary Judgment,[11] Blue Flame filed a sworn declaration by Huang—which Blue Flame characterizes as "confirm[ing]" that

---

[11] On August 3, 2021, five days after oral argument on the motions for summary judgment, plaintiff Blue Flame filed a Motion for Leave to File Supplemental Authorities [Dkt. No. 170] in which it provided case law to support its argument that Huang's late-filed declaration should be considered. Specifically, Blue Flame explained that the attached caselaw showed that Huang's inability to "comply with either Defendants' or Plaintiff's efforts to take his deposition" was due to both the COVID-19 pandemic and Chinese law and should not disqualify his declaration from the Court's consideration. [Dkt. No. 171] at 3-4. In reply, defendants pointed out that none of the cited decisions is actually "recent," and argued that plaintiff's effort was "in substance a post-argument sur-reply" about accepting Huang's late-filed declaration, over which the parties had already argued. [Dkt. No. 173] at 1. Defendants persuasively distinguished the cited opinions from the facts of this case, arguing that "[b]asic fairness" precludes consideration of the declaration because Huang's "evident partisanship" for his friends at Blue Flame would make his testimony "fertile grounds for cross-examination[.]" Id. at 1-2. Ultimately, the Court agrees that this issue has already been fully argued with sufficient authority, and none of the supplemental authority offered is new or relevant enough to justify reopening the issue for further argument. Accordingly, the Court will deny the motion, by an Order to accompany this Memorandum Opinion.

Great Health Companion "had the capacity to supply the 100 million masks California purchased." [Dkt. No. 149] at 14; Pl. Ex. 95. Chain Bridge strongly objected to the Court considering that declaration, as it was filed after the close of discovery, during which defendants had been unable to depose Huang. The Court agrees that the declaration should not be considered, because it was not produced during discovery and defendants were not able to depose Huang. Even if it were considered, the declaration is not particularly helpful to plaintiff. Although Huang attests in that declaration that his company had the capacity to fill the order at some point, the paragraphs in that declaration not cited by Blue Flame acknowledge that Huang's company would not have been able to satisfy the full order in the time frame that Thomas gave to California officials. Moreover, Huang only "believed," but did not know for sure, that prepayment would have made it easier for him to supply the masks. Pl. Ex. 95 at ¶ 26.

Finally, the declaration is inconsistent with other evidence on the record. For example, the statement claiming that Huang's company had the ability to fill Blue Flame's California order is flatly contradicted by the email Huang sent Blue Flame on April 7, 2020, in which he warned that "[t]here are only a set number of n95 masks throughout the country being produced every day[,] most of which are existing long term contracts dating back to February," and that there "is infinite demand but limited supply." Def. Ex. 83. Huang concluded: "See orders for 10-50M n95 here is there, however that would be impossible to fulfill given the number of people that all want it. I do not wish for blue flame to commit to something it will have a hard time delivering on." Id. (emphasis added). Huang's April 7 warning to Blue Flame that it would not be able to fill orders of even 10-50 million masks thoroughly undercuts any suggestion in Huang's late-filed declaration that his company would have been able to fill an order for 100 million masks in the time period that Blue Flame gave to California officials. Additionally, the

uncontested record showed how few of its orders plaintiff was able to fulfill and that its biggest sale involved only 1.55 million, not 100 million, masks delivered in October 2020, not April 2020. These uncontested facts establish that Chain Bridge's return of the wire transfer did not damage plaintiff in any respect. What damaged plaintiff was its unrealistic promise that it could deliver the large quantities of N95 masks in a short amount of time.

The evidence in the record makes clear that there is no basis beyond rank speculation on which a reasonable factfinder could find that Blue Flame was capable of fulfilling its order to California, nor is there any evidence that California, which was equipped with the power to terminate work on its contract with Blue Flame at any time, would have continued to do business with the plaintiff had Chain Bridge not reversed the payment. Accordingly, summary judgment will be granted in defendant's favor on Count I.[12]

B. Count II (UCC § 4A-204(a))

UCC § 4A-204(a) provides that:

> If a receiving bank accepts a payment order issued in the name of its customer as sender which is (i) not authorized and not effective as the order of the customer under Section 4A-202, or (ii) not enforceable, in whole or in part, against the customer under Section 4A-203, the bank shall refund any payment of the payment order received from the customer to the extent the bank is not entitled to enforce payment[.]

Blue Flame alleges that Chain Bridge violated this provision because "in complying with California's request to return the funds, the Bank issued a new payment order on behalf of Blue Flame which was neither authorized by Blue Flame nor effective as Blue Flame's order."

---

[12] Blue Flame offered some argument and evidence supporting the general proposition that large orders create an incentive among suppliers to work harder to prioritize satisfying such orders. That argument and the proffered evidence fails to recognize the unique supply problems that existed in the early months of the pandemic and do not change the clear evidence that Huang was not able to supply the masks in the quantity and time frame Blue Flame proposed.

Complaint [Dkt. No. 1] at ¶ 110. Although Blue Flame characterizes this provision as providing a cause of action based on payment orders issued by a bank, id. at ¶ 109; [Dkt. No. 149] at 26, § 4A-204(a) actually covers payment orders that a bank accepts from a third party pretending to be the bank's customer. See Motion to Dismiss [Dkt. No. 19] at 11-12 (citing Gold v. Merrill Lynch & Co., No. 09-318-PHX-JAT, 2009 WL 2132698, at *1 (D. Ariz. July 14, 2009) (payment orders from plaintiff's retirement account that his wife "had completed . . . by forging [plaintiff's] signature"); Regatos v. North Fork Bank, 838 N.E.2d 629, 630-31 (N.Y. 2005) (payment order "from someone [the bank] believed to be [its customer]," when the bank did not follow agreed-upon security procedures); Ma v. Merrill Lynch, Inc., 597 F.3d 84, 86-87 (2d Cir. 2010)).

In its opposition brief at the motion to dismiss stage, Blue Flame conceded: "If discovery establishes that Defendants accomplished their unauthorized return of the funds by accepting a cancellation request made by California's bank, Blue Flame agrees that this Count would not survive upon a motion for summary judgment." [Dkt. No. 27] at 15 n.8. That is precisely what the evidence in the record shows: that JPMorgan sent a "request for reversal" asking Chain Bridge to "PLS RETURN FUNDS[.]" Def. Ex. 65. Blue Flame's opposition to summary judgment tries to walk back its previous concession, now arguing that because the reversal of funds was accomplished through a payment order generated by Chain Bridge without Blue Flame's authorization, § 4A-204(a) applies, [Dkt. No. 149] at 26; however, that payment order was "issued" by Chain Bridge, not "accepted" by Chain Bridge, which is the conduct that the regulation covers. Accordingly, § 4A-204 does not apply to the reversal of funds at all, and summary judgment will be granted in defendant's favor on Count II.

C.  State Law Claims

Respectively, Counts IV and V allege that all defendants tortiously interfered with Blue Flame's contract and business expectancy. Virginia has adopted the Restatement (Second) of Torts definition of tortious interference. DurretteBradshaw, P.C. v. MRC Consulting, L.C., 670 S.E.2d 704, 706 (Va. 2009). The prima facie elements of these torts are: "(1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted." Chaves v. Johnson, 335 S.E.2d 97, 102 (Va. 1985). If the contract is at will or only a business expectancy is alleged, the plaintiff must also prove that the "defendant employed improper methods." Dunlap v. Cottman Transmission Sys., LLC, 754 S.E.2d 313, 318 (Va. 2014). Blue Flame argues that Chain Bridge's violation of the banking regulations qualifies as "improper methods," thereby satisfying this element.

Satisfying one element is not sufficient to prevail on these claims. First, there are issues with the validity of the contractual relationship and business expectancy between Blue Flame and California given Blue Flame's apparent initial misrepresentations to California authorities. Specifically, Gula sent Yee a text stating, "I have 100 3m masks sitting here in the Port of Long Beach." Def. Ex. 15; see also [Dkt. No. 119] at 5 n.3. Moreover, given the warnings from Blue Flame's Chinese supplier about the difficulty of obtaining large quantities of N95 masks, the Blue Flame contract with California contained statements that were at best naïve, and at worst, knowingly false, which undercuts the validity of Blue Flame's business relationship with California.

Second, there is insufficient evidence upon which a reasonable factfinder could conclude that the alleged interferor, Chain Bridge, had an "intent to disturb" the business relationship.

There is no evidence that defendants shared information about Blue Flame with California officials for any reason other than to avoid potential liability themselves. See UCC § 4A-201 (requiring banks transferring funds to use commercially reasonable methods to prevent fraud).

Finally, because damages are an essential element of both tortious interference claims, these counts fail for the same reason that Count I failed: there is insufficient evidence in this record from which a reasonable factfinder could conclude that Blue Flame could have fulfilled California's order and that California would not have cancelled the contract and insisted on a return of the funds in that event. Accordingly, summary judgment will be granted to defendants on Counts IV and V.

In the remaining claim, Count IX, plaintiff seeks damages on a theory of defamation. In Virginia, defamation requires "1) publication, 2) of an actionable statement, 3) with the requisite intent." Schaecher v. Bouffault, 772 S.E.2d 589, 594 (Va. 2015) (internal citation omitted). An actionable statement must be both defamatory and objectively false; "statements of opinion are generally not actionable because such statements cannot be objectively characterized as true or false." Jordan v. Kollman, 612 S.E.2d 203, 206 (Va. 2005). Summary judgment is appropriate as to this claim because there is no evidence in the record that defendants made any false statements regarding Blue Flame or its principals. Natalie Gonzalez, the California official to whom Brough and Evinger spoke directly, testified conclusively that the only statement defendants made to her about Blue Flame was "that [its] account had just been opened the day previously by a lobbyist." Def. Ex. 62 (Gonzalez Tr.), 53:6-16. That the account had been opened the previous day is not contested, Def. Exs. 34-35; see also Pl. Exs. 24-25, and Blue Flame has alleged, and therefore does not contest, that its principals "recently began their careers in the medical supply industry, but they each have had distinguished, award-winning careers in the political consulting

industry." [Dkt. No. 1] at ¶ 22. The semantic distinction between "political consultant" and "lobbyist" is not so vast as to be legally actionable.

Blue Flame does not argue that any one statement by defendants was false; instead, it argues that "Defendants' narrow focus on the truth of their individual statements ignores that their comments, taken as a whole, plainly were made to raise concerns that Blue Flame's agreement with California was somehow fraudulent." [Dkt. No. 149] at 29. Although defamation may at times be established by insinuation, the simple (and true) statement that Gula was a lobbyist who opened his bank account the day before does not present such a case. Accordingly, because Blue Flame concedes that defendants' statements were true, summary judgment will be granted in defendants' favor on Count IX.

## C. Chain Bridge's Claim for Indemnification by JPMorgan

In its third-party complaint, Chain Bridge seeks indemnification from JPMorgan under UCC § 4A-211(f) for any damages awarded against it, as well as for the attorneys' fees and costs it incurred in defending this litigation. Although granting Chain Bridge's Motion for Summary Judgment moots its claim for reimbursement of any damages, there remains the issue of whether JPMorgan must reimburse Chain Bridge for its attorney's fees and expenses incurred in this litigation. [Dkt. No. 123] at 2.

UCC § 4A-211(f) provides:

(f) Unless otherwise provided in an agreement of the parties or in a funds-transfer system rule, if the receiving bank, after accepting a payment order, agrees to cancellation or amendment of the order by the sender or is bound by a funds-transfer system rule allowing cancellation or amendment without the bank's agreement, the sender, whether or not cancellation or amendment is effective, is liable to the bank for any loss and expenses, including reasonable attorney's fees, incurred by the bank as a result of the cancellation or amendment or attempted cancellation or amendment.

The official comments to this provision explain that:

> If a receiving bank agrees to cancellation or amendment under subsection (c)(1) or (2), it is automatically entitled to indemnification from the sender under subsection (f). The indemnification provision recognizes that a sender has no right to cancel a payment order after it is accepted by the receiving bank. If the receiving bank agrees to cancellation, it is doing so as an accommodation to the sender and it should not incur a risk of loss in doing so.

Id. at cmt. 5. Both parties agree that this section covers the reversal of funds, but they interpret it differently. Chain Bridge argues that because there was no "agreement of the parties" to the contrary, and because as the "receiving bank" it agreed to cancellation following an acceptance of the funds, JPMorgan is automatically required to indemnify it for "any loss and expenses, including reasonable attorney's fees." JPMorgan advances several arguments to support its claim that it does not have to indemnify Chain Bridge: 1) Chain Bridge "sought and obtained the wire's cancellation," and Chain Bridge should not be allowed to "insur[e] itself for its own conduct," [Dkt. No. 113] at 2; 2) "the parties' discussions and course of conduct" evidenced an agreement between the parties that JPMorgan would not be liable for indemnification, id.; and 3) Chain Bridge cannot prove that its "loss and expenses" were incurred "as a result" of JPMorgan's cancellation. Id.

The first of these arguments—that JPMorgan is not liable for indemnification because Chain Bridge "directed" the transfer—is unpersuasive, as the text of the UCC does not impose any requirement that the receiving bank accommodate the sender's cancellation request solely to benefit the sender.[13] In fact, the regulation does not impose any requirements regarding the

---

[13] JPMorgan's claims in this litigation that Chain Bridge directed the cancellation appear to be in tension with its claims in state agency proceedings in California that the state is liable to indemnify JPMorgan for any losses because "the Agencies and Employees [of the state of California] originated the Wire Transfer, notwithstanding a deviation from normal vetting procedures; they sought the reversal of the Wire Transfer; and they benefited from the reversal of the Wire Transfer—obtaining the return of funds in full and choosing not to go through with the Blue Flame transaction, without suffering any loss[.]" Def. Ex. 96 at 7.

28

receiving bank's motivations at all. JPMorgan attempts to sidestep the text of the regulation by placing heavy emphasis on the comment, which explains that a receiving bank is not required to cancel a transfer after the funds have been accepted, and that as a result, any cancellation can be considered "an accommodation to the sender." UCC § 4A-211 cmt. 5. It does not follow from this description that the cancellation must have benefited the sending bank equally or more than the receiving bank: because cancellation is not required, a receiving bank will still be "accommodating" a sending bank, even if cancellation serves the receiving bank's own interests. The only case law that JPMorgan cites to bolster its interpretation of the regulation are common law precedents discussing the general policy behind indemnification; however, as JPMorgan concedes, reference to the common law is only appropriate "[u]nless displaced by the particular provisions of" the UCC. [Dkt. No. 113] at 15 (citing UCC § 1-103(b)). Section 4A-211(f) clearly displaces a traditional common law analysis by creating a default rule for risk allocation which parties can only alter through agreement.

JPMorgan next argues that the parties displaced the default rule, because they "reached an agreement, through their discussions and course of conduct, about how to handle the wire" which "did not include any indemnity obligation." [Dkt. No. 113] at 22. JPMorgan incorrectly reverses the requirements of the regulation when it suggests that the parties needed to have agreed upon indemnification; the UCC provides for indemnification as a default. To avoid indemnification, there would have to be an agreement to override the default rule. Such an agreement could include a "bargain of the parties in fact, as found in their language or inferred from other circumstances, including course of performance, course of dealing, or usage of trade[.]" UCC § 1-201(b)(3).

JPMorgan cites an internal Chain Bridge phone call as evidence of Chain Bridge having

agreed not to seek indemnification. During this call, as Evinger and Brough prepared employees

for a cancellation order from JPMorgan, an employee (Claudia Mojica-Guadron) asked, "Are we

getting an indemnity letter from [JPMorgan]?"[14] Evinger or Brough responded: "They're sending

a recall notice through Fed[Line] … just return it to the same place it came from." JPM Ex. 23

(audio recording). Another employee then asked, "Claudia, you mentioned the indemnity letter,

is that part of the procedures usually?" Mojica-Guardon replied: "Normally you want to get that

from the other bank, just because, and in this case because we credited the customer's account."

Evinger or Brough then cut in and said: "It's okay, don't worry about it. … It is what it is." Id.

Evinger testified in his deposition that he and Brough "didn't view there was a need for an

indemnification based on the recall because the recall had the indemnification built in, and we

viewed JPMorgan, you know, as our counterparty," Def. Ex. 28 (Evinger Tr.), 261:12-17.

An agreement between Chain Bridge and JPMorgan to change the default rule would

require a meeting of the minds between Chain Bridge and JPMorgan about indemnity at the time

of the alleged agreement, not simply an internal discussion at Chain Bridge bank about potential

liabilities. There is no evidence in the record of a communication between Chain Bridge and

JPMorgan indicating an agreement to displace the default rule of automatic indemnity.

JPMorgan is a sophisticated banking entity well-aware of the banking regulations and perfectly

capable of executing agreements to reallocate risk. JPMorgan did not do so in this case.

This conclusion is not meant to punish or criticize JPMorgan. In fact, JPMorgan's quick

and thorough investigation of potential fraud is commendable. The bank went above and beyond

---

[14] In fact, the employee asked if they would be getting an "indemnity letter from Chase," but she was clearly referring to JPMorgan.

for its customer, California, by bringing to the customer's attention several problems with the underlying contract. JPMorgan can work out with California, in the separate proceeding in California, how to allocate its losses.

Finally, JPMorgan argues that Chain Bridge's litigation expenses are not "a result of the cancellation." [Dkt. No. 113] at 24-25. This argument is weak as this civil action undoubtedly resulted from the reversal of the wire transfer, and, as Chain Bridge correctly argues, "there is zero evidentiary basis for JPMorgan's speculation that Chain Bridge would have returned the funds without a cancellation by JPMorgan." [Dkt. No. 123] at 21.

## IV. CONCLUSION

For the reasons stated in open court and in this memorandum, defendants' Motion for Summary Judgment against plaintiff Blue Flame [Dkt. No. 118] and Chain Bridge's Motion for Summary Judgment against Third Party Defendant JPMorgan [Dkt. No. 122] will be GRANTED; Blue Flame's Motion for Partial Summary Judgment [Dkt No. 127] and Motion for Leave to File Supplemental Authorities [Dkt. No. 170] and JPMorgan's Motion for Summary Judgment [Dkt. No. 112] will be DENIED; and Chain Bridge and JPMorgan will be directed to submit a briefing schedule regarding the amount of attorneys' fees and expenses to be awarded to Chain Bridge if they are unable to resolve the issue within 14 days.

An Order reflecting these decisions will be issued with this Memorandum Opinion.

Entered this 23 day of September, 2021.

Alexandria, Virginia

_____
/s/
Leonie M. Brinkema
United States District Judge